**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone:  212-857-8500

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 25-277-cr                                          Caption [use short title]

**Motion for:** bail

USA V. ROGLIERI

Set forth below precise, complete statement of relief sought:

to vacate the district court's order of

detention and grant release pending trial.

**MOVING PARTY:** Kris Roglieri                    **OPPOSING PARTY:** United States of America

☐ Plaintiff          ☐ Defendant
☑ Appellant/Petitioner   ☐ Appellee/Respondent

**MOVING ATTORNEY:** Melissa A. Tuohey        **OPPOSING ATTORNEY:** Joshua Rosenthal
[name of attorney, with firm, address, phone number and e-mail]

Office of the Federal Public Defender        United States Attorney's Office

4 Clinton Square, 3rd Floor, Syracuse, NY 13202     445 Broadway, Rm 218, Albany, NY 12207

315-701-0080                                518-431-0247

Court-Judge/Agency appealed from: United States District Court for the Northern District of New York (D'Agostino, J.)

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):_____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**
Has request for relief been made below?          ☐ Yes ☐ No
Has this relief been previously sought in this Court?  ☐ Yes ☐ No
Requested return date and explanation of emergency:_____

_____

_____

_____

Is oral argument on motion requested?  ☐ Yes ☑ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☐ No  If yes, enter date:_____

**Signature of Moving Attorney:**
/s/ Melissa A. Tuohey     **Date:** 2/28/25        Service by: ☑ CM/ECF  ☑ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 25-277

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

-v-

KRIS ROGLIERI,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of New York

Memorandum in Support of Kris Roglieri's Appeal
from an Order of Detention Pending Trial

Melissa A. Tuohey
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

# Table of Contents

Table of Authorities ........................................................................ii

Preliminary Statement ....................................................................1

Statement of the Case ....................................................................1

A.    The Indictment ......................................................................1

B.    Proceedings Below ...............................................................3

    1.  Government's June 2, 2024 Letter in Support of Detention
Pursuant to 18 U.S.C. § 3142(e), (f)(2)(B) ...............................3

    2.  June 3, 2024 Detention Hearing ..........................................5

    3.  Defendant's October 25, 2024 Request to Reopen Detention
Hearing to Present Evidence of Risk Assessment and
Release Plan ........................................................................11

    4.  November 25, 2024 Detention Hearing ...............................13

    5.  Appeal ...............................................................................17

Standard of Review ......................................................................18

Argument ....................................................................................18

A.    To detain a defendant on the basis that he poses a risk of danger
to the community, the government must establish a strong
probability that he will commit crimes if released ...................18

B.    The government failed to prove by clear and convincing evidence
that there was a strong probability that Mr. Roglieri will pose a
risk of committing future crimes if released pending trial.. .........20

Conclusion....................................................................................32

Certificate of Service ....................................................................34

i

# Table of Authorities

## Cases

*Jimenz v. Stanford,* 96 F.4th 164 (2d Cir. 2024) ...............................24

*United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985).........19-20, 27

*United States v. Dai,* 2023 WL 11016392 (NDNY 2023) ................26-27

*United States v. Friedman,* 837 F.2d 48 (2d Cir. 1988) .....................19-20

*United States v. Maddoff,* 586 F.Supp.2d 240 (SDNY 2009) .........21, 25

*United States v. Mercado,* 737 F.Supp.3d 153 (WDNY 2024) .............22

*United States v. Provenzano,* 605 F.2d 85 (3d Cir. 1979) ...................25

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................18

*United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987) ...........................18

*United States v. Storme,* 83 F.4th 1078 (7th Cir. 2023) .....................27

## Statutes

18 U.S.C. § 1343.........................................................................................1

18 U.S.C. § 3142........................................................................*passim*

18 U.S.C. § 3145.........................................................................................1

## Other Authorities

Rule 9(a) of the Federal Rules of Appellate Procedure.............................1

## Preliminary Statement

Pursuant to 18 U.S.C. § 3145(c) and Rule 9(a) of the Federal Rules of Appellate Procedure, Defendant-Appellant Kris Roglieri respectfully submits this memorandum of law in support of his appeal of an order of the Honorable Mae A. D'Agostino, United States District Judge for the Northern District of New York, entered on January 30, 2025, detaining him pending trial. As discussed below, the district court erred in determining that the government proved by clear and convincing evidence that no condition or combination of conditions would reasonably assure that Mr. Roglieri would not commit any *future* crime(s) if released pending trial. Accordingly, the district court's order should be reversed, and Mr. Roglieri should be released pending trial.

## Statement of the Case

### A. The Indictment

Mr. Roglieri was indicted on September 19, 2024, and charged with five counts of wire fraud, in violation of 18 U.S.C. § 1343. A12. The indictment alleges that Mr. Roglieri was the Chief Executive Officer and sole member of Prime Capital Ventures, LLC ("Prime Capital") and its affiliate, Prime Commercial Lending, LLC ("Prime Commercial"),

companies based in Albany, New York. A12. The companies held themselves out to be involved in commercial lending. A12. Mr. Roglieri was the sole signatory on the bank accounts for both companies. A12. 1800 Park Avenue LLC ("1800 Park") was a Minnesota company that sought Prime Capital's assistance in obtaining a loan to build a commercial egg production facility. A12. Mr. Roglieri is accused of obtaining a $5 million Interest Credit Account Payment ("ICA") from 1800 Park under the false promise and representation that the funds would be kept in a "separate and distinct account" and would be refundable if Prime Commercial and 1800 Park failed to enter an agreement for approximately $100 million line of credit. A13. The agreement was not entered and, the indictment alleged, Mr. Roglieri used the ICA funds for Prime Capital's business expenses and Mr. Roglieri's personal expenses. A13. On five separate dates, Mr. Roglieri was accused of transmitting funds by means of wire communications in interstate commerce from the Prime Commercial bank account to four separate companies and a law firm via the internet. A14-15.[1]

---

[1] Prior to the filing of criminal charges, Prime Capital was the subject of an involuntary Chapter 7 bankruptcy proceeding in the United States District Court for the Northern District of New York initiated on December 19, 2023, *see In re Prime Capital Ventures, LLC,* No. 1:23-bk-11302 (Bankr. NDNY). A18-19. This matter was

### B. Proceedings Below

#### 1. Government's June 2, 2024 Letter in Support of Detention Pursuant to 18 U.S.C. § 3142(e), (f)(2)(B).

The instant charges originated through a criminal complaint filed on May 28, 2024. A3 (Dkt. No.1). The government moved for detention at Mr. Roglieri's May 31, 2024 initial appearance, where Mr. Roglieri sought immediate release on conditions. *Id.* On June 2, 2024, the government submitted a letter to the Hon. Christian F. Hummel, United States Magistrate Judge, in support of the government's motion for detention under 18 U.S.C. § 3142(e), (f)(2)(B). A17.[2] According to the government, Mr. Roglieri presented "an unmistakably serious risk of obstruction of justice and danger to the community based on his threats of violence, including his recent threat to murder an FBI agent" who was investigating the alleged offenses. A18. No arguments were put forward

---

dismissed at the request of petitioning creditors and Prime Capital on January 9, 2024. A19. Mr. Roglieri filed a personal bankruptcy action in the Northern District on February 15, 2024 under Chapter 11 of the Bankruptcy Code, *see In re Kris Daniel Roglieri,* No. 1:24-bk-10157 (Bankr. NDNY). A19. On May 15, 2024, the matter was converted into a Chapter 7 bankruptcy proceeding. A19. Christian H. Dribusch, Esq., was appointed trustee of Mr. Roglieri's estate to liquidate his assets to repay creditors. A19.

[2] Pursuant to Local Criminal Rule 49.2(b), the court granted the government's request for limited sealing of the government's letter-motion. A4, 17. The corresponding unredacted letter-motion has been submitted to this Court under seal.

to establish a serious risk that Mr. Roglieri would flee if he was released. A18-24.

The government's arguments under 18 U.S.C. § 3142(f)(2)(B) were based on statements Mr. Roglieri allegedly made to Person-1. Person-1 was interviewed by investigators on February 16, 2024, and informed of her communications with Mr. Roglieri in mid-January 2024, where he stated he would "take out" the receiver and judge who were involved in his bankruptcy proceeding. A20-21.

The government provided the magistrate with text messages between Person-1 and Mr. Roglieri, which included the following communications:

- January 21, 2024: "I'm fucking gonna wack anybody that comes after me," "Fair game," and "You wanna come after me with guns you gonna get the same." Ex. 2.

- January 25, 2024: "I feel myself getting angry and vengeance to those that are doing this," "Including the attories [sic], judge, receiver etc," "I don't really play by the rules," "Never have and never will," and "And that's dangerous as I feel myself getting to that point with all involved against me." Ex. 3.

A. 21, 31-32, 34-35.

The government informed that Mr. Roglieri was compliant with law enforcement during a search of his home on February 2, 2024, and when vehicles were seized from his home on March 5, 2024. A21.

On May 24, 2024, Person-1 told law enforcement that Mr. Roglieri had a telephone conversation with her that evening[3] where he stated he was in a "dark place"; knew three FBI Agents who were investigating him; knew the home address of one of the agents; knew the correct first name of one of the agents; and stated he would "put a bullet in [that agent's] head." A21. Mr. Roglieri also allegedly told Person-1 that "when someone takes everything away from you . . . if I go down, everyone goes down" and "I ain't going out like that." A21.

## 2. June 3, 2024 Detention Hearing

Mr. Roglieri's detention hearing was held on June 3, 2024. A43. The Pretrial Services Report[4] recommended detention based on a risk of nonappearance citing: "1. Offense Charged (involving a significant

---

[3] To date, Person-1 never swore under oath by way of affidavit or court testimony as to the contents of the May 24, 2024 telephone call. A96. However, Person-1 submitted a sworn declaration on October 29, 2024, on behalf of the government in opposition to Mr. Roglieri's motion to reopen the detention hearing. A91-92. Person-1's sworn declaration does not speak to the May 24, 2024 telephone call. *Id.* Person-1 and Mr. Roglieri have a tenuous relationship. A55.

[4] The Pretrial Services Report has been submitted under seal.

amount of money); 2. Employment (current employment may be related to present offense and not suitable for supervision); 3. Pending Charges (Queensbury Town Court)[5]; 4. Ties to a Foreign Country (Unknown International Travel/Ties)." Pretrial Services Report, p. 4. The Report also recommended detention based on defendant posing a risk of danger, stating: "1. Safety Concerns for the Community or a Specific Individual (A document filed by the USAO on June 3, 2024, outlines alleged threats to individuals involved in defendant's case)." *Id.* According to the Report, there was no condition, or combination of conditions, which the court could impose to ensure Mr. Roglieri's appearance as required or that would mitigate the risk of danger which the probation office believed Mr. Roglieri presented to the community, if released. *Id.*

The government, relying on its June 2, 2024 letter, moved for detention based on Mr. Roglieri being a danger to the community. A45-47. According to the government, there was no guarantee that Mr. Roglieri would obey a no firearms condition, speculating that it was "certainly possible the defendant stashed away guns or could easily

---

[5] Mr. Roglieri was charged with third degree criminal possession of an assault weapon and third degree criminal possession of a weapon-ammunition feeding device. Pretrial Services Report, p.3.

obtain them." A46. The government rejected imposition of conditions such as home detention, GPS monitoring, and no-contact with potential witness provisions because GPS monitors could be removed and compliance with home detention was based on a defendant's willingness to comply with that condition. A46. The government believed Mr. Roglieri was "determined to use violence against those he perceived as acting against him." A46. Lastly, the government asserted that Mr. Roglieri had disregarded "a form of court supervision" during bankruptcy proceedings. A47.

The defense countered, noting first that the government had not argued risk of flight.[6] A48. In that regard, the defense pointed out that Mr. Roglieri, age 44, had no criminal history or history of violence and had substantial ties to the Capital Region where he was a pillar of the community. A48, 40. Mr. Roglieri had a lengthy record of philanthropic giving, including many years of giving out turkeys during Thanksgiving and being a primary benefactor of the Albany Medical Center. A49.

---

[6] The government agreed that serious risk of flight was not a basis for detention. A58.

Moreover, he was a dedicated father to his two children and always maintained employment. A49.

With respect to the threat allegations, the defense pointed out that Mr. Roglieri had been aware that he was going to be charged criminally for at least six months prior to the filing of the criminal complaint. A50. Mr. Roglieri did not flee or take any action to obstruct the proceedings, including related bankruptcy proceedings. A50. The alleged threats were made at a time when Mr. Roglieri was feeling overwhelmed by the bankruptcy proceedings and impending criminal charges. A51-52. However, there was no evidence that Mr. Roglieri had any intention to carry out the thoughts he expressed while in that frustrated state. A52. Proof was found in Mr. Roglieri's compliant conduct with law enforcement when the FBI twice executed search warrants at his property, which the government conceded in their June 2, 2024 letter. A58-59. Most importantly, Mr. Roglieri never directly communicated a threat to any witness, investigator, agent, attorney, or judge. A52. Person-1's allegations outside the text messages had not been recorded or corroborated by law enforcement. A53. Person-1 was biased against Mr. Roglieri because of their tenuous relationship. A54. If Mr. Roglieri

was inclined to harm someone, there would have been some evidence of those intentions during the months prior to the filing of charges. A52. Instead, Mr. Roglieri voluntarily surrendered his firearms in February of 2024, long before he was required to do so. A52-53. When he found antique firearms in his home that he had forgotten about, he informed defense counsel to have those firearms removed from his home. A53. Given these factors, the defense requested Mr. Roglieri's release on conditions. A54.

The magistrate asked defense counsel how the court could be assured that Mr. Roglieri's alleged statements were not idle threats, to which defense counsel replied that Mr. Roglieri had taken no action steps toward carrying out the threats from the time the text messages were sent, and criminal charges were lodged. A55-56. The defense wholeheartedly denied Person-1's uncorroborated and unrecorded May 24, 2024 allegations. A55-56.

The magistrate agreed with the government that there were no conditions or set of conditions that could be imposed to assure Mr. Roglieri's safety in the community upon his release. A59-60. The court pointed to the strength of the government's case and the threatening

9

communications included in text messages between Mr. Roglieri and Person-1 and Person-1's sole account of a telephone conversation she had with Mr. Roglieri on May 24, 2024. A60-61. The court believed the text messages were "clearly a threat against those people involving the use of violence" and raised "grave concern for the Court as to the safety of the FBI agents, the Court personnel, and judges." A60. The court credited Person-1's May 24, 2024 allegations, finding all alleged threats "deeply disturbing." A61. These concerns could not be mitigated through release on conditions because electronic monitoring and GPS tracking would not enable the court, or pretrial services, from preventing Mr. Roglieri from carrying through with the threats. A61. The magistrate also pointed to Mr. Rolgieri's possession of firearms, some of which resulted in state charges, even though they had been voluntarily surrendered. A61.

The defense asked the court if it would reconsider its detention decision if the defense obtained a risk or threat assessment. A62. The court agreed to consider such an assessment if it provided a sufficient basis for a further hearing. A62.

An order of detention was entered on June 3, 2024. A64.

### 3. Defendant's October 25, 2024 Request to Reopen Detention Hearing to Present Evidence of Risk Assessment and Release Plan.[7]

On October 25, 2024, the defense moved to reopen the June 3, 2024 detention hearing for the magistrate to consider evidence of a Forensic Mental Health Assessment evaluation (hereinafter "Risk Assessment") of Mr. Roglieri conducted by New Paradigm Psychological Services, PLLC and a release plan completed by Elizabeth Walker, DSW, LICSW, a mitigation specialist with the Federal Public Defender's Office.[8] A65.

As part of the risk assessment, Mr. Roglieri was interviewed by Victoria Dodge, PsyD, for two hours and underwent testing, specifically Balanced Inventory of Desirable Responding (BIDR) and Million Clinical Multiaxial Inventory-IV (MCMI-IV). Risk Assessment at p. 1. Dr. Dodge also reviewed materials filed in connection with Mr. Roglieri's request for release. *Id.* The Risk Assessment included consideration of a suicide

---

[7] Mr. Roglieri unsuccessfully moved to reopen the detention hearing on July 13, 2024. A4 (Dkt. Nos. 16, 17, 23, 26, 27, 30, 32).

[8] The Forensic Mental Health Assessment is reflected in Docket No. 47 and a redacted Release Plan was attached as Exhibit 1 to defendant's October 25, 2024, letter-motion. A7, 69. The Risk Assessment and an unredacted copy of the Release Plan have been submitted under seal to this Court.

note written by Mr. Roglieri in January of 2024[9], that was later found by a bankruptcy trustee in the pocket of one of Mr. Roglieri's coats. *Id.,* at p. 3. Mr. Roglieri stated he had no intention of killing himself and was just venting when he wrote the note. *Id.* Dr. Dodge made the following findings. "Overall, these results do not suggest an antisocial orientation or personality style. They also seem to converge with the desirability testing administered to him. This is good prognosis for his amenability to be released into the community while awaiting a final disposition in his case." *Id.,* at p. 9. "Given the personality testing data available, and the interview with Mr. Roglieri, he does not have a criminal history, and no antisocial traits were identified. He does not meet criteria for having antisocial personality disorder further, he does not have any traits generally associated criminality such as callousness, manipulation, and unwillingness to follow the rules. His testing, overall lifestyle stability, and numerous character letters, indicates a strong capacity for empathy and remorse." *Id.,* at p. 10. Dr. Dodge's overall opinion was that Mr. Roglieri's risk of violence was minimal. *Id.,* at p. 10.

---

[9] This document has been submitted under seal to this Court. *See also* Dkt. Nos. 16, 17, 30 regarding the note.

Ms. Walker's report included a detailed release and treatment plan. A69-75. In preparing the report, Ms. Walker met with Mr. Roglieri and spoke with Mr. Rolglieri's girlfriend, brother, and ex-wife. A69. She also reviewed Dr. Dodge's evaluation and received verbal reports about his behavior from the jail where he was detained. A69. Mr. Roglieri had zero disciplinary actions, indicating his respect for law enforcement. A70. The report informed that Mr. Roglieri's mental health and his family were negatively impacted by his detention. A69. A plan was prepared for his release, including a proposed residence, activities, treatment plan, and third-party support. A70-73.

Over the government's objection, A77-79, the magistrate agreed to reopen the detention hearing to receive this evidence, A8.

### 4. November 25, 2024 Detention Hearing

Mr. Roglieri's detention hearing was reopened on November 25, 2024. A105. Dr. Dodge's supervisor, Katrina Colistra, PsyD, who is an owner of New Paradigm Psychological Services, PLLC, testified at the hearing. A106-107. Dr. Colistra and Dr. Dodge completed the risk assessment together and they "both came to the opinions within a reasonable degree of professional certainty that Mr. Roglieri will present

minimal risk of violence" if released into the community. A113-114. Dr. Colistra testified in accord with the findings documented in the risk assessment. A113-159. The defense entered Dr. Colistra's curriculum vitae (Defendant's Exhibit 1) and the Risk Assessment into evidence (Defendant's Exhibit 2). The government called no witnesses but entered five exhibits consisting of a bankruptcy form summarizing Mr. Roglieri's assets and property (Government Exhibit 1); the suicide note (Government Exhibit 2); text messages between Mr. Roglieri and Person-1 from December of 2023 (Government Exhibit 3); text messages between Mr. Roglieri and Person-1 from January of 2024 (Government Exhibit 4); and text messages between Mr. Roglieri and Person-1 from January of 2024 (Government Exhibit 5).[10]

At the conclusion of the hearing, the government argued for Mr. Roglieri's detention based on danger to the community and risk of flight. As for danger to the community, the government continued to rely on the communications Mr. Roglieri had with Person-1 while discounting the Risk Assessment and Dr. Colistra's testimony. A161-163. As for risk of nonappearance, the government focused on the suicide note, arguing that

---

[10] Government Exhibits 1-5 have been submitted under seal to this Court.

the risk of ending one's life sufficiently established a risk of nonappearance. A163-167.

The defense countered that the text messages were dated, general, and not directed at specific people. A167. Mr. Roglieri continued to deny the verbal threats Person-1 claimed were made by Mr. Roglieri in May of 2024, noting that Person-1 failed to provide a declaration or testify under oath as to the alleged threats made during that telephone conversation, even after submitting a sworn declaration in response to Mr. Roglieri's motion to reopen the detention hearing. A181-182. Importantly, FBI agents came to Mr. Roglieri's home 12 days after he sent the January 2024 text messages to Person-1, where he had access to firearms but took no action against law enforcement. A167-168. Instead, he voluntarily surrendered all firearms. A168. Whatever angry text messages Mr. Roglieri sent to Person-1, he never acted on his words. A169-170. As for the suicide note, again, Mr. Roglieri wrote that to purge the anxiety and stress he was experiencing because of the bankruptcy proceedings and impending criminal charges. A170-171. The note was placed in the pocket of his winter coat and forgotten about. A171. There was no evidence beyond the note that he intended to follow through during the

five months between the time he wrote the note and his arrest. A171-172. Further, there were no reports from the jail where Mr. Roglieri was detained indicating that he was experiencing suicidal ideation. A176. The Risk Assessment and Dr. Colistra's testimony provided ample evidence that Mr. Roglieri presented a minimal risk of acting violently toward others. A172-174. Before his arrest, Mr. Roglieri had participated in all bankruptcy proceedings without incident. A176. The defense asked for consideration of Mr. Roglieri's proposed release plan and noted he was willing to submit to any number of conditions if released. A176-179. Importantly, Mr. Roglieri's release was necessary for him to adequately participate in his own defense given the magnitude of the case, including 55,000 pages of discovery. A179.

After hearing from the parties, the magistrate found that Mr. Roglieri's detention was not supported by a risk of nonappearance, but continued to find his release would present a danger to the community. As to risk of nonappearance, there were in fact conditions or a set of conditions the court could set which would ensure Mr. Roglieri's appearance in court. A183-184. The magistrate found, despite the suicide note, there was no indication that Mr. Roglieri actively considered

16

following through with committing suicide.  A184.  As for danger to the community, the magistrate found there were no conditions or set of conditions the court could set which would ensure Mr. Roglieri's safety in the community.  A. 185. The court remained greatly concerned by the text messages Mr. Roglieri sent to Person-1 and the uncorroborated and unrecorded threats allegedly made to Person-1 in May of 2024, none of which was negated by the risk assessment or Dr. Colistra's testimony.  A. 185-187.

### 5. Appeal

Mr. Roglieri appealed the magistrate judge's order of detention. A188-202.  On January 30, 2025, the district judge affirmed the magistrate judge's order. A241-281.  The district judge determined that Mr. Roglieri's release would present a danger to the community.  The district court took Mr. Roglieri at his word in the statements reflected in his communications with Person-1, while negating Mr. Roglieri's Risk Assessment and release plan evidence.  A271-278.  Additionally, the district court found that the suicide note presented a serious risk of danger supporting detention.  A280-281.

17

## Standard of Review

A district court's determination regarding whether there are conditions or a combination of conditions that will reasonably assure the appearance of the defendant at trial and the safety of the community under the Bail Reform Act is a mixed question of law and fact. *United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987). "Although the issue whether conditions will 'reasonably assure' the defendant's presence [and the safety of the community] involves application of a legal standard, proper resolution of that issue depends in large part on the district court's predicate findings as to the factors set forth in 18 U.S.C. § 3142(g)." *Id.* at 196. This Court reviews the district court's ultimate determination for clear error. *Id.*

## Argument

### A.    To detain a defendant on the basis that he poses a risk of danger to the community, the government must establish a strong probability that he will commit crimes if released.

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Consistent with that principle, the Bail Reform Act authorizes detention only as a last resort. *Salerno*, 481 U.S. at 755.

18

In particular, the Bail Reform Act provides that if any condition or combination of conditions "will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community," the defendant must be released. 18 U.S.C. §§ 3142(c)(1)(B), 3142(e)(1). To decide whether release on conditions is possible, a court must weigh the following factors set forth in § 3142(g): (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the defendant's history and characteristics, and (4) the nature and seriousness of the danger that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

Where the government requests pretrial detention of a defendant, it must first establish by a preponderance of the evidence that the defendant presents a serious risk of flight or obstruction of justice. *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988). If the government meets this initial burden, then it must prove that no condition or combination of conditions will reasonably assure the safety of the community by "clear and convincing evidence." *Id.*; 18 U.S.C. § 3142(f). Clear and convincing evidence is evidence that supports "a conclusion with a high degree of certainty." *United States v. Chimurenga,*

19

760 F.2d 400, 405 (2d Cir. 1985). As used in § 3142, "clear and convincing evidence" means evidence establishing "a strong probability that [the defendant] will commit additional crimes if released." *Chimurenga*, 760 F.2d at 403 (cleaned up).

**B.  The government failed to prove by clear and convincing evidence that there was a strong probability that Mr. Roglieri will pose a risk of committing future crimes if released pending trial.**

"The Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated [in 18 U.S.C. § 3142(f)(1)]." *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988).  The government claimed that there was "ample reason to conclude" that Mr. Roglieri would "obstruct justice and threaten prospective witnesses" if he was released on conditions.  A22.  The government's claims were based on the content of text messages Mr. Roglieri sent to Person-1 four months preceding his arrest and an unrecorded and uncorroborated telephone conversation he allegedly had with her a week prior.  The four-month-old text communications include vague and generalized threatening statements about unidentified people connected to the civil and criminal

actions being brought against him. A31-32, 34-35. Person-1's sole account of the telephone conversation included allegations that Mr. Roglieri identified one FBI agent by first name claiming he knew the address of one of the three FBI agents investigating him while threatening to put a bullet in his head. A21. Mr. Roglieri's denial of the telephone call accusations was supported by his actual compliant and courteous behavior during his interactions with those involved in the civil and criminal actions brought against him. A21, 50-52. As does his 44-year history that is void of criminal convictions and violent behavior. A48-50; Pretrial Services Report, p. 3; Risk Assessment, p.3. Mr. Roglieri's detention is therefore not authorized under The Bail Reform Act.

"The question is not simply whether [Roglieri's] actions can be considered obstruction, but whether there is a *serious* risk of obstruction in the future. The statute, by its nature, is always looking forward. To be sure, the Court should consider past behavior in assessing the likelihood of prohibited behavior in the future, but the Government needs to show that there is a serious risk that these potential harms exist going forward." *United States v. Maddoff,* 586 F.Supp.2d 240, 250, 254 (SDNY

2009) (emphasis in original) (defendant's potential dissemination of restitution assets did not rise to the level of danger to the community under the Bail Reform Act and there were conditions of pretrial release available to reasonably assure safety of community); *see also United States v. Mercado,* 737 F.Supp.3d 153 (WDNY 2024)). Here, the government pointed to past behavior – empty indirect threats that did nothing to obstruct the instant proceedings. As defense counsel stressed, Mr. Roglieri knew criminal charges were imminent for at least six months before he was charged, and he did nothing to act on the communications Person-1 shared with the government. A50-52, 56, 58-59, 167-168. The government conceded that Mr. Roglieri showed no signs of acting on these threats when he twice had the opportunity shortly after he sent the text messages to Person-1. A21 ("Of note, on February 2, 2024, the defendant was compliant when FBI agents searched his home; he was also compliant when FBI agents seized vehicles from his home on March 5, 2024, pursuant to warrants issued by this Court."). Further proof was found in Mr. Roglieri's voluntary surrender of his firearms[11] in

---

[11] During bankruptcy proceedings and before criminal charges were filed, Mr. Roglieri informed the bankruptcy trustee that his firearms were stored at a Queensbury gun range and store. A215. The government informed the magistrate that "[t]he FBI obtained a list of the firearms stored at this facility that matches the list of firearms

February 2024, and again when he discovered additional antique firearms he had missed during the February surrender and notified counsel for assistance with their removal. A52-53. All the government could possibly show going forward was that there was a *serious* risk that Mr. Roglieri would continue saying threatening things about "anybody" coming after him to Person-1. A31.

What his behavior has shown going forward is that he has not said threatening things about anyone to a third party. Instead, he has behaved so well (zero disciplinary actions) during his pretrial detention at the Rensselaer County Jail that he was made a trustee, illustrating his respect for law enforcement. A70, 176.

More so, Mr. Roglieri put forward a Risk Assessment that declared him a minimal risk for violence. *See* Risk Assessment, p. 10. The government brought vague communications made to a third party about other people to the magistrate and the defense brought an expert, Dr. Colistra, who spoke to the future. The magistrate erroneously relied on past evidence to conclude that FBI agents and court personnel would not

---

disclosed to the Bankruptcy Court. The government understands that these weapons were recently sold at auction by the bankruptcy trustee. *See* No. 1:24-bk-10157, Dkt. #322." A215, fn. 2.

be safe in the future if Mr. Roglieri was released, A60-61, 185-186, even though Mr. Roglieri never directly threatened an FBI agent or any member of the court, whom he directly interacted with on multiple occasions, and two psychological experts described him as presenting a minimal risk of violence to the community, A113-115; Risk Assessment, p. 10. The district court, like the magistrate, read the communications and decided to take Mr. Roglieri "at his word." A271. Essentially, both the magistrate and the district court speculated that Mr. Roglieri would act in the future in a way that he never acted in the past and detained him on that impermissible basis. A274 (According to the district court, "The evidence presented by the Government convinces this Court that it is highly probable Defendant might act out against himself or others despite his lack of criminal history. He was charged not only in federal court with the financial crimes involving alleged self-inflated statements and promises, but he was also charged in state court for his firearm possession."). These speculations do not amount to "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Jimenz v. Stanford,* 96 F.4th 164, 190 (2d Cir. 2024) (quotations and quotation menus omitted).

The same is true for the alleged danger of economic harm[12] to the community that the government claimed would be caused by Mr. Roglieri's release. A25 (citing *United States v. Provenzano,* 605 F.2d 85, 95 (3d Cir. 1979)). The government based this claim on Mr. Roglieri's commission of the instant offense while Prime Capital was being overseen by a court-appointed interim trustee during bankruptcy proceedings. A25. Again, this is past alleged behavior with no evidence of future harm. The government failed to prove that there was a *serious* risk that Mr. Roglieri would commit economic harm to the community in the future if he was released. *See Maddoff,* 586 F.Supp.2d at 254 ("Here, the Government fails to provide sufficient evidence that any potential future dissemination of Madoff's assets would rise to the level of economic harm cognizable under § 3142 of the Bail Reform Act."). In any event, Mr. Roglieri's businesses are now defunct, as is his ability to engage in commercial lending. What he is accused of doing in the past, he has no ability to do in the future.

---

[12] The magistrate did not rely on economic harm to detain Mr. Roglieri, A60-62, but the district court did, A274-275 ("Such alleged conduct combined with that which is alleged in the indictment is extremely serious and tips this factor [nature and circumstances of the offense] in the Government's favor.").

On Mr. Roglieri's appeal, the district court added risk of suicide to the dangerousness analysis that was specifically rejected by the magistrate in the context of a serious risk of flight argument advanced by the government at Mr. Roglieri's second detention hearing. A163-167. The magistrate specifically found that "there was no indication" in the record that Mr. Roglieri actively considered committing suicide in the past or during his five months of pretrial detention and any purported risk could be addressed through conditions of release, including home detention and electronic monitoring. A184.

The district court wrongly determined that, despite the lack of evidence indicating Mr. Roglieri intended to act on thoughts found in a forgotten and dated note, combined with the alleged threatening communications to Person-1 about other people, supported a finding of dangerousness. A280-281. The district court erroneously relied on *United States v. Dai,* 2023 WL 11016392, *7 (NDNY 2023), to reach this determination, claiming Chief Judge Brenda K. Sannes "concluded that a risk of suicide presents a serious risk of danger to a defendant which can support detention." A280. Not quite. Chief Judge Sannes determined that suicide risk was only "relevant in assessing the risk of

26

nonappearance." *Dai,* at *7. Here, the district court changed lanes and considered the note in terms of dangerous behavior. In the Seventh Circuit, the mere risk of self harm is not enough. *United States v. Storme,* 83 F.4th 1078, 1083 (7th Cir. 2023). This is because 18 U.S.C. § 3142(g) "suggests that suicide risk is relevant only to the extent it presents a risk of harm to others – for example, with a defendant who threatens to shoot himself and anyone else who seeks to monitor his whereabouts or well being." *Id.* The note found in Mr. Roglieri's coat pocket months after it was drafted, that he shared with no one, makes no mention of harming others. A147, 164, 171, 254; Government Exhibit 2. Contrary to the district court's determination, the magistrate correctly found that the dated suicide note did not present a serious risk of Mr. Roglieri's nonappearance and could be addressed through conditions of release.

Even if the government established that Mr. Roglieri presented a risk of obstructing justice upon his release, which Mr. Roglieri in no way concedes, the government failed to prove, by clear and convincing evidence that no condition or combination of conditions would reasonably assure that Mr. Roglieri would not commit any new crime if released. *Chimurenga,* 760 F.2d at 403. Mr. Roglieri could be subject to any

27

number of conditions, including home confinement; GPS and electronic monitoring; no-contact restrictions; mental health treatment; and any other conditions the magistrate saw fit to impose. Yet, the magistrate ordered Mr. Roglieri's detention, pointing to the strength of the government's case, and stating:

> All of those comments, text messages, and those allegations set forth in the people's letter are deeply disturbing to the Court. There's nothing I can do with respect to setting conditions that would address those. If I put him on electronic monitoring and GPS and he's determined to follow those on those alleged threats, I have no ability to stop him from doing so, and neither would pretrial services.
>
> I would further note that Mr. Roglieri has a history involving ownership of substantial number of firearms. I would not that pursuant to a warrant issued by this Court, they searched his property, and among other things, observed numerous firearms including an AR-15 style rifle and a high-capacity magazine. Possession of some of these weapons resulted in state charges, which are currently pending against Mr. Roglieri.

A61-62. Accepting these reasons requires adoption of the belief that commonly used tools of pretrial detention are ineffective. It would also require adoption of the belief that trained pretrial services probation officers are ineffective at implementing them. If the magistrate imposed home detention and/or GPS and electronic monitoring conditions, certainly a trained pretrial services officer can observe Mr. Roglieri's

movements in the community and assess any potential risks. Risks that have already been diminished by the fact that Mr. Roglieri's actions never mirrored the threat allegations attributed to him. More so, physical distance would be in play. Mr. Roglieri's release plan included living with his girlfriend at her home in Poughkeepsie, New York. A70.

It's the continuation of making threats that is at issue here since there was no evidence in the record that he took steps to harm anyone. On appeal, the district court found that, "[e]ven if the Court were to diminish the threats of *physical* violence because of Dr. Dodge's conclusion about minimal risk of violence (as Defendant would like the Court to do), the threats are *mentally* and *emotionally* harmful." A279. Given these findings, the district court struggled "to imagine a set of conditions that would prevent Defendant from making further threats about his ex-wife or the attorneys and court personnel involved in his cases." *Id.* It simply cannot be true that no condition or a set of conditions could minimize an unserious risk that Mr. Roglieri will say harmful words about others to others if released into the community. Indeed, a condition could be imposed limiting Mr. Roglieri's communications with Person-1. And, although he made no direct threats

to any FBI agent, he would not be directly communicating with them given the fact that he is under federal indictment and represented by counsel.

As for the prior possession of firearms, they were *voluntarily* surrendered, therefore, no future risk of dangerousness is associated with these facts.

At the close of the second detention hearing, the magistrate continued to be "greatly concerned" about the text messages and May 24, 2024 telephone call allegations, finding that *nothing* in the Risk Assessment or Dr. Colistra's testimony negated those concerns, stating, "I find that Dr. Colistra's opinion to be not worthy of serious consideration and frankly in no way addresses the Court's serious concerns in this matter." A186-187. Yet, the Risk Assessment and Dr. Colistra's testimony did address the magistrate's concerns by stating that Mr. Roglieri presented a minimum risk of committing violence if released into the community. A113-115; Risk Assessment, p. 10. Dr. Colistra is a licensed psychologist who is part owner of New Paradigm Psychological Services, PLLC since 2012. A107-108. Dr. Colistra earned a bachelor's degree in psychology in 1998; a master's degree in criminal justice in

2000; and a doctoral degree in clinical psychology, specializing in forensic psychology, in 2007. A109; Defendant's Exhibit 1. She is trained in forensic assessments of all types, particularly with adults in a correctional setting. A109. She has completed close to 700 evaluations throughout her career. A110. New Paradigm prepares assessments for criminal defense attorneys and prosecutors with the majority being for prosecutors. A133. To the best of her recollection, Dr. Colistra believed that out of 1,000 recidivism assessments, New Paradigm possibly got it wrong five times. A137. Before opening New Paradigm, she was employed as a psychologist with the New York State Office of Mental Health for five years. A108; Defendant's Exhibit 1. She was employed in the Division of Forensic Services, Bureau of Sex Offender Evaluation, Assessment, and Treatment. Defendant's Exhibit 1. As part of her employment, she evaluated people for dangerousness. A108; Defendant's Exhibit 1.

Certainly, the Risk Assessment combined with Dr. Colistra's testimony and Mr. Roglieri's stellar conduct during his months of pretrial detention negate the government's claims the Mr. Roglieri's pretrial release on conditions presents a *serious* risk that he will obstruct or

attempt to obstruct justice when he in fact never obstructed or attempted to obstruct justice before he was arrested.

In sum, none of the government's evidence relates to Mr. Roglieri's risk of current dangerousness if released prior to trial because it is all either remote and outdated or speculative. Although the courts below had evidence before it reflecting Mr. Roglieri's respectable and law-abiding life for the past 44 years, the magistrate judge instead relied on angry words Mr. Roglieri communicated prior to his arrest that he never showed any signs of acting upon. Nevertheless, Mr. Roglieri has been detained since his arrest on May 31, 2024 on the basis that his release would endanger the community. This was clearly erroneous by any measure.

## Conclusion

Because the district court ignored evidence showing that Mr. Roglieri is not a danger to the community if released and instead relied on vague speculative evidence to find there are no conditions or combination of conditions of release that will reasonably assure the safety of the community, the court's decision to detain Mr. Roglieri prior

to trial was clearly erroneous. Accordingly, this Court should reverse the

district court and grant Mr. Roglieri's motion for release.

February 28, 2025               Respectfully submitted,

                                   */s/*
                                   Melissa A. Tuohey
                                   Assistant Federal Public Defender
                                   4 Clinton Square, 3rd Floor
                                   Syracuse, New York 13202
                                   (315) 701-0080

## Certificate of Service

I, Renata Hohl, certify that today, February 28, 2025, one copy of the Appellant's Motion for Bail with Addendum, was served upon Joshua Rosenthal, Assistant United States Attorney, 100 South Clinton Street, Syracuse, New York 13261, by ACMS.

*/s/*
Renata Hohl

# Addendum

# Table of Contents[1]

Docket Report ...................................................................A1

Indictment .......................................................................A12

Government's June 3, 2024 Limited Sealing Request Letter ...........A17

Government's June 2, 2024 Letter in Support of Detention pursuant to 18 U.S.C. §§ 3142(e), (f)(2)(B) with Exhibits (redacted) ...................A18

Transcript of June 3, 2024 Detention Hearing .............................A43

Order of Detention ..............................................................A64

Defendant's October 24, 2024 Letter-Motion Seeking Reopening of June 3, 2024 Detention Hearing with Exhibits (redacted) ......................A65

Government's November 1, 2024 Letter in Opposition to Defendant's Motion to Reopen the Detention Hearing with Exhibits (redacted) ...A77

Defendant's November 6, 2024 Letter in Reply to Government's Opposition ......................................................................A93

Transcript of November 25, 2024 Detention Hearing ....................A105

Defendant's Memorandum of Law in Support of Defendant's Appeal of the Detention Order with Exhibit ...............................................A188

Government's Memorandum of Law in Opposition to Defendant's Appeal of the Detention Order ...................................................A207

Defendant's Reply to the Government's Response ........................A233

Memorandum-Decision and Order ...........................................A241

---

[1] Unredacted versions of the parties' filings have been submitted under seal to this Court.

Case: 25-277, 02/28/2025, DktEntry: 19.1, Page 41 of 321

APPEAL

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.8 (Revision 1.8.2)] (Albany)
## CRIMINAL DOCKET FOR CASE #: 1:24-cr-00392-MAD-1

Case title: USA v. Roglieri                          Date Filed: 09/19/2024

Magistrate judge case number:  1:24-mj-00261-CFH

---

Assigned to: U.S. District Judge Mae A.
D'Agostino

**Defendant (1)**

**Kris Roglieri**                    represented by   **Matthew E. Trainor**
Office of the Federal Public Defender -
Albany Office
Northern District of New York
54 State Street - Suite 310
Albany, NY 12207
518-436-1850
Fax: 518-436-1780
Email: matthew_trainor@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**James P. Egan**
Office of the Federal Public Defender -
Syracuse Office
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
315-701-0080
Fax: 315-701-0081
Email: James_Egan@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Jeremy B. Sporn**
Office of the Federal Public Defender -
Albany Office
54 State Street - Suite 310
Albany, NY 12207
518-436-1850

A1

Email: jeremy_sporn@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1343 Wire Fraud with Forfeiture Allegation (1-5) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1343 Wire Fraud | |

---

**Plaintiff**

| USA | represented by | **Joshua R. Rosenthal** |
| --- | --- | --- |

Office of United States Attorney - Albany
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, NY 12207-2924
518-431-0389
Email: joshua.rosenthal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Michael S. Barnett**
Office of United States Attorney - Albany
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, NY 12207-2924
518-431-0247
Fax: 518-431-0429
Email: michael.barnett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

A2

**Elizabeth A. Conger**
U.S. Attorney's Office, Northern District
of New York
100 South Clinton St.
Syracuse, NY 13261-7198
315-448-0672
Fax: 315-448-0689
Email: Elizabeth.Conger@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Melissa O'Brien Rothbart**
Office of the United States Attorney -
Syracuse
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198
315-448-0671
Email: Melissa.Rothbart@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/28/2024 | 1 | CRIMINAL COMPLAINT as to Kris Roglieri (2). (tab) [1:24-mj-00261-CFH] (Entered: 05/31/2024) |
| 05/28/2024 | 4 | MOTION to Seal Case by USA as to Kris Roglieri. (tab) [1:24-mj-00261-CFH] (Entered: 05/31/2024) |
| 05/28/2024 | 5 | ORDER granting 4 Motion to Seal Case as to Kris Roglieri (2). Signed by Magistrate Judge Christian F. Hummel on 5/28/2024. (Attachments: # 1 Public Order)(tab) [1:24-mj-00261-CFH] (Entered: 05/31/2024) |
| 05/31/2024 | | Case unsealed as to Kris Roglieri (tab) [1:24-mj-00261-CFH] (Entered: 05/31/2024) |
| 05/31/2024 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Initial Appearance as to Kris Roglieri held on 5/31/2024. Appearances by AFPD Michael McGeown-Walker for the defendant; AUSA Joshua Rosenthal and AUSA Michael Barnett for the government; USPO Amy Brancatelli, present. The Court issues the oral Rule 5(f) Reminder of Prosecutorial Obligation Order. The government moves for the complaint to be unsealed and that motion is granted. The Defendant is advised of his rights and the maximum penalties are stated. The government moves for detention as a danger to the community and as a risk of flight and requests a continuance. Defense requests a hearing be scheduled and will arrange for a pretrial services interview to be completed. A Detention Hearing is set for 6/3/2024 @ 3:00 PM in Albany before Magistrate Judge Christian F. Hummel. Defndant is remanded to the custody of the U.S. Marshal pending the detention hearing. (Court Reporter FTR Recorded) [12:05pm-12:11pm] (tab) [1:24-mj-00261-CFH] (Entered: 05/31/2024) |

A3

| 06/03/2024 | 6 | Letter from USA as to Kris Roglieri requesting limited sealing of government's letter-motion for pretrial detention (Attachments: # 1 Redacted Version of Government's Letter-Motion for Pretrial Detention)(Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 06/03/2024) |
|---|---|---|
| 06/03/2024 | 7 | PRETRIAL SERVICES INVESTIGATION REPORT - [LODGED] as to Kris Roglieri. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.]** (anp, ) [1:24-mj-00261-CFH] (Entered: 06/03/2024) |
| 06/03/2024 | 8 | TEXT ORDER granting 6 Letter from USA requesting limited sealing of government's letter-motion for pretrial detention as to Kris Roglieri (2): the redacted letter, filed as attachment to Dkt. no. 6 is accepted as filed. Authorized by Magistrate Judge Christian F. Hummel on 6/3/2024.(tab) [1:24-mj-00261-CFH] (Entered: 06/03/2024) |
| 06/03/2024 | 9 | TEXT ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Kris Roglieri. Because the defendant has testified under oath or has otherwise satisfied this court that he (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require it is hereby ORDERED that: The Office of the Federal Public Defender for the Northern District of New York is assigned representation of the defendant and shall file a notice of appearance with the Clerk of Court. So Ordered by Magistrate Judge Christian F. Hummel on 6/3/2024. (tab) [1:24-mj-00261-CFH] (Entered: 06/03/2024) |
| 06/03/2024 | 10 | RULE 5(f) ORDER as to Kris Roglieri: This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, to confirm the Government's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations. Signed by Magistrate Judge Christian F. Hummel on 6/3/2024. (tab) [1:24-mj-00261-CFH] (Entered: 06/03/2024) |
| 06/03/2024 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Detention Hearing as to Kris Roglieri held on 6/3/2024. Appearances by AFPD Jeremy Sporn for the defendant; AUSA Joshua Rosenthal and AUSA Michael Barnett for the government; USPO Amy Brancatelli, present. The government moves for detention as a danger to the community and agrees with the recommendation of pretrial services for detention. Defense argues for release. After arguments are heard, the Court detains defendant as a danger o the community and Deft is remanded to the custody of the U.S. Marshal. Defense also waives the preliminary hearing at this time, reserving the right to request a hearing at a later date if it becomes necessary. (Court Reporter Jacqueline Stroffolino)[3:13pm-4:05pm] (tab) [1:24-mj-00261-CFH] (Entered: 06/03/2024) |
| 06/03/2024 | 11 | ORDER OF DETENTION as to Kris Roglieri. Signed by Magistrate Judge Christian F. Hummel on 6/3/2024. (tab) [1:24-mj-00261-CFH] (Entered: 06/04/2024) |
| 06/05/2024 | 12 | Arrest Warrant Returned Executed on 5/31/2024, in case as to Kris Roglieri (mmg). [1:24-mj-00261-CFH] (Entered: 06/05/2024) |
| 06/11/2024 | 13 | STIPULATION by USA to exclude Speedy Trial Act time (Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 06/11/2024) |
| 06/11/2024 | 14 | NOTICE OF ATTORNEY APPEARANCE: Matthew E. Trainor appearing for Kris Roglieri (Trainor, Matthew) [1:24-mj-00261-CFH] (Entered: 06/11/2024) |

A4

| 06/12/2024 | 15 | ORDER APPROVING THE STIPULATION TO CONTINUE - Ends of Justice as to Kris Roglieri. Time excluded from 6/12/2024 until 8/11/2024. Signed by Magistrate Judge Christian F. Hummel on 6/12/2024. (egr) [1:24-mj-00261-CFH] (Entered: 06/12/2024) |
|---|---|---|
| 07/12/2024 | 16 | SEALED DOCUMENT - maintained in Clerk's Office and not available for electronic viewing (tab) (tab, ). [1:24-mj-00261-CFH] (Entered: 07/12/2024) |
| 07/13/2024 | 17 | Letter from Matthew E. Trainor as to Kris Roglieri requesting a new detention hearing (Trainor, Matthew) [1:24-mj-00261-CFH] (Entered: 07/13/2024) |
| 07/15/2024 | 18 | TRANSCRIPT REQUEST by USA as to Kris Roglieri for proceedings held on 5/31/24 and 6/3/24 before Judge Christian F. Hummel. (Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 07/15/2024) |
| 07/15/2024 | 19 | Letter from USA as to Kris Roglieri requesting deadline for government's opposition to Dkt. # 17 (Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 07/15/2024) |
| 07/15/2024 | 20 | NOTICE OF ATTORNEY APPEARANCE: Jeremy B. Sporn appearing for Kris Roglieri as co-counsel with/for Attorney: with Matthew Trainor (Sporn, Jeremy) [1:24-mj-00261-CFH] (Entered: 07/15/2024) |
| 07/18/2024 | 21 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Kris Roglieri: Detention Hearing held on 6/3/2024 before Judge Christian F. Hummel, Court Reporter: Jacqueline Stroffolino, Telephone number: 518-257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/8/2024. Redacted Transcript Deadline set for 8/19/2024. Release of Transcript Restriction set for 10/16/2024. Notice of Intent to Redact due by 7/23/2024 (jxs, ) [1:24-mj-00261-CFH] (Entered: 07/18/2024) |
| 07/19/2024 | 22 | Letter from defense counsel as to Kris Roglieri opposing Government request for additional briefing time (Sporn, Jeremy) [1:24-mj-00261-CFH] (Entered: 07/19/2024) |
| 07/19/2024 | 23 | Letter from USA as to Kris Roglieri regarding defense's letter at Dkt. # 22 (Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 07/19/2024) |
| 07/22/2024 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Kris Roglieri: FTR-recorded Initial Appearance held on 5/31/2024 before Judge Christian F. Hummel, Court Reporter/Transcriber: Jacqueline Stroffolino, Telephone number: 518-257-1894. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made |

A5

| | | available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/12/2024. Redacted Transcript Deadline set for 8/22/2024. Release of Transcript Restriction set for 10/21/2024. Notice of Intent to Redact due by 7/29/2024 (jxs, ) [1:24-mj-00261-CFH] (Entered: 07/22/2024) |
|---|---|---|
| 07/22/2024 | 25 | Letter from William J. Dreyer as to Kris Roglieri request to allow limited appearance (Dreyer, William) [1:24-mj-00261-CFH] (Entered: 07/22/2024) |
| 07/23/2024 | 26 | Letter from USA as to Kris Roglieri requesting limited sealing of government's letter in opposition to Dkt. # 17 (Attachments: # 1 Redacted Version of Government's Letter in Opposition to Dkt. # 17)(Rosenthal, Joshua) (Additional attachment(s) added on 7/30/2024: # 2 Un-redacted version of opposition letter) (tab, ). [1:24-mj-00261-CFH] (Entered: 07/23/2024) |
| 07/26/2024 | 27 | Letter from USA as to Kris Roglieri correction to page six of Dkt. # 26-1 (Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 07/26/2024) |
| 07/26/2024 | 28 | TEXT ORDER as to Kris Roglieri: Defendant's Reply to Response to Motion [Dkt. no. 17] is due by 5:00pm on 7/29/2024. Authorized by Magistrate Judge Christian F. Hummel on 7/26/2024. (tab) [1:24-mj-00261-CFH] (Entered: 07/26/2024) |
| 07/29/2024 | 30 | Letter from Defense counsel, as to Kris Roglieri, requesting to seal Reply to Opposition (Attachments: # 1 Redacted Reply)(tab) (Additional attachment(s) added on 7/30/2024: # 2 Un-redacted version of reply to opposition) (tab, ). [1:24-mj-00261-CFH] (Entered: 07/30/2024) |
| 07/30/2024 | 29 | TEXT ORDER granting 26 Letter from USA as to Kris Roglieri, requesting limited sealing of government's letter in opposition to Dkt. # 17 : The Court directs to file the un-redacted version, under seal, as an attachment to Dkt. no. 26 . Authorized by Magistrate Judge Christian F. Hummel on 7/30/2024.(tab) [1:24-mj-00261-CFH] (Entered: 07/30/2024) |
| 07/30/2024 | 31 | TEXT ORDER granting 30 Letter from Defendant as to Kris Roglieri requesting to seal Reply to Opposition : Clerk is directed to file the Unredacted version, under seal, as an attachment in Dkt. no. 30 . Authorized by Magistrate Judge Christian F. Hummel on 7/30/2024.(tab) [1:24-mj-00261-CFH] (Entered: 07/30/2024) |
| 08/05/2024 | 32 | DECISION AND ORDER denying the # 17 Letter requesting a new detention hearing. Signed by Magistrate Judge Christian F. Hummel on 8/5/2024. (mmg). [1:24-mj-00261-CFH] (Entered: 08/05/2024) |
| 08/05/2024 | 33 | STIPULATION by USA to exclude Speedy Trial Act time (Rosenthal, Joshua) [1:24-mj-00261-CFH] (Entered: 08/05/2024) |
| 08/06/2024 | 34 | ORDER APPROVING THE STIPULATION TO CONTINUE - Ends of Justice as to Kris Roglieri. Time excluded from 8/6/2024 until 9/6/2024. Signed by Magistrate Judge Christian F. Hummel on 8/6/2024. (tab) [1:24-mj-00261-CFH] (Entered: 08/06/2024) |
| 09/19/2024 | 35 | INDICTMENT as to Kris Roglieri (2) count(s) 1-5. (egr) (Entered: 09/19/2024) |
| 09/19/2024 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart:GRAND JURY makes a partial report and returns Indictment. Tally Sheet is ordered sealed. (Court Reporter: Sheila Sharp) (egr) (Entered: 09/19/2024) |

# A6

| 09/19/2024 | 38 | TEXT NOTICE TO COUNSEL FOR DEFENDANT:An Indictment dated September 19, 2024 regarding your client has been filed with the Court. In the event Defendant wishes to waive appearance at formal arraignment, the attached waiver must be signed by defendant and defendant's counsel, and electronically filed with the Court by 9/26/2024. If the Court does not receive the signed Waiver by that date, the Court will immediately schedule the arraignment of your client with little advance notice due to Speedy Trial issues. (egr) (Entered: 09/19/2024) |
| --- | --- | --- |
| 09/20/2024 | 39 | NOTICE OF ATTORNEY APPEARANCE: Elizabeth A. Conger appearing for USA as co-counsel with Attorney Joshua Rosenthal and Michael Barnett *for the forfeiture aspect of the case.* (Conger, Elizabeth) (Entered: 09/20/2024) |
| 09/27/2024 | 40 | NOTICE OF HEARING as to Kris Roglieri: Arraignment set for 9/30/2024 at 2:00 PM in Albany before Magistrate Judge Daniel J. Stewart. (egr) (Entered: 09/27/2024) |
| 09/27/2024 | 41 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Kris Roglieri (Trainor, Matthew) (Entered: 09/27/2024) |
| 09/30/2024 | 42 | ORDER as to Kris Roglieri approving 41 Waiver of Presence at Arraignment filed by Kris Roglieri. Signed by Magistrate Judge Christian F. Hummel on 9/30/2024. (tab) (Entered: 09/30/2024) |
| 09/30/2024 | 43 | CRIMINAL PRETRIAL SCHEDULING ORDER as to Kris Roglieri. Motions to be filed by 10/28/2024. Jury Trial set for 12/2/2024 @ 9:30 AM in Albany before U.S. District Judge Mae A. D'Agostino. Signed by Magistrate Judge Christian F. Hummel on 9/30/2024. (tab) (Entered: 09/30/2024) |
| 10/02/2024 | 44 | STIPULATION by USA to exclude Speedy Trial Act time (Attachments: # 1 Proposed Order/Judgment)(Rosenthal, Joshua) (Entered: 10/02/2024) |
| 10/03/2024 | 45 | Stipulation and ORDER TO CONTINUE - Ends of Justice as to Kris Roglieri Time excluded from 10/3/24 until 12/31/24: The Jury Trial is set for 2/24/2025 at 09:30 AM in Albany before U.S. District Judge Mae A. D'Agostino; The Final Pretrial Conference is set for 2/18/2025 at 10:00 AM in Albany before U.S. District Judge Mae A. D'Agostino; Pretrial Submissions due by 2/10/2025; A change of plea shall be entered on or before 2/7/25; Motions to be filed by 1/17/2025, and shall be made returnable ON SUBMIT; Discovery by USA due 1/3/25; Reciprocal Discovery by the defendant due 1/10/25.Signed by U.S. District Judge Mae A. D'Agostino on 10/3/24. (ban) (Entered: 10/07/2024) |
| 10/25/2024 | 46 | NOTICE OF ATTORNEY APPEARANCE: Melissa O'Brien Rothbart appearing for USA as co-counsel with Attorney Joshua Rosenthal and Michael Barnett *for the monetary penalty aspect of the case* (Rothbart, Melissa) (Entered: 10/25/2024) |
| 10/25/2024 | 47 | Medical Records filed as to Kris Roglieri (Trainor, Matthew) (Entered: 10/25/2024) |
| 10/25/2024 | 48 | Letter from Matthew E. Trainor as to Kris Roglieri requesting reopening of detention hearing (Attachments: # 1 Exhibit(s) Redacted Release & Treatment Plan)(Trainor, Matthew) (Additional attachment(s) added on 11/7/2024: # 2 Exhibit 1-Unredacted) (tab, ). (Entered: 10/25/2024) |
| 10/25/2024 | 49 | Letter from USA as to Kris Roglieri requesting deadline to oppose Dkt. # 48 (Rosenthal, Joshua) (Entered: 10/25/2024) |

A7

| 10/25/2024 | 50 | TEXT ORDER granting 49 Letter Request from the government re: response deadline to 48 Letter from Matthew E. Trainor as to Kris Roglieri requesting reopening of detention hearing : The government's Response to Motion is due by 11/1/2024. Authorized by Magistrate Judge Christian F. Hummel on 10/25/2024.(tab) (Entered: 10/25/2024) |
|---|---|---|
| 11/01/2024 | 51 | Letter from USA as to Kris Roglieri requesting limited sealing of government's letter in opposition to Dkt. # 48 (Attachments: # 1 Redacted Version of Government's Letter in Opposition to Dkt. # 48)(Rosenthal, Joshua) (Additional attachment(s) added on 11/5/2024: # 2 Un-redacted version of opposition letter) (tab, ). (Entered: 11/01/2024) |
| 11/04/2024 | 52 | Letter from Matthew E. Trainor as to Kris Roglieri requesting opportunity to reply to govt response (Trainor, Matthew) (Entered: 11/04/2024) |
| 11/05/2024 | 53 | TEXT ORDER granting 52 Letter Requesting permission to file a reply. RE 48 Letter from Matthew E. Trainor as to Kris Roglieri requesting reopening of detention hearing : Reply to Response to Motion due by 11/6/2024. Authorized by Magistrate Judge Christian F. Hummel on 11/5/2024.(tab) (Entered: 11/05/2024) |
| 11/05/2024 | 54 | TEXT ORDER granting 51 Letter requesting limited sealing of government's letter in opposition to Dkt. # 48, as to Kris Roglieri (1). Authorized by Magistrate Judge Christian F. Hummel on 11/5/2024.(tab) (Entered: 11/05/2024) |
| 11/06/2024 | 55 | Letter from Matthew E. Trainor as to Kris Roglieri in reply to government's letter in opposition Dkt #51 (Attachments: # 1 Exhibit(s))(Trainor, Matthew) (Additional attachment(s) added on 11/7/2024: # 2 Un-redacted version of reply to opposition) (tab, ). (Main Document 55 replaced on 11/7/2024) (tab, ). (Entered: 11/06/2024) |
| 11/15/2024 | 56 | TEXT ORDER granting (in part) 48 Letter Requesting to re-open a detention hearing, as to Kris Roglieri (1): A Hearing is now set for Friday, 11/22/2024 @ 1:30 PM in Albany. The Court will first hear arguments to determine whether or not Defendant can demonstrate changed circumstances that warrant a new detention hearing. If the Court grants the request for a new detention hearing, the hearing will be immediately held. Where applicable, the government is directed to make their best efforts to see that any known crime victims are notified of, and accorded, the rights described in 18 U.S.C. section 3771(a) including, but not limited to the scheduling of public court proceedings. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 11/15/2024.(tab) (Entered: 11/15/2024) |
| 11/22/2024 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Detention Hearing as to Kris Roglieri held on 11/22/2024. Appearances by AFPD Matt Trainor and AFPD Jeremy Sporn, for the defendant; AUSA Joshua Rosenthal and AUSA Michael Barnett for the government. USPO Amy Brancatelli, present. Arguments are heard on the issue of whether or not Defense has met it's burden to warrant the re-opening of a detention hearing. The Court rules in favor of Defendant and grants the motion to re-open the detention hearing, Due to congestion in the Court's calendar, that hearing cannot proceed immediately and is reset for 11/25/2024 @ 2:00pm. Defendant is remanded. (Court Reporter Lisa Tennyson)[1:38pm-2:17pm] (tab) (Entered: 11/25/2024) |
| 11/25/2024 | 57 | COURT NOTICE OF HEARING as to Kris Roglieri: A Detention Hearing is now set for 11/25/2024 @ 2:00 PM in Albany before Magistrate Judge Christian F. Hummel. The hearing will be held in Courtroom #6, 1st floor.(tab) (Entered: 11/25/2024) |

A8

Case: 25-277, 02/28/2025, DktEntry: 19.1, Page 49 of 321

| 11/25/2024 | | Text Minute Entry for proceedings held before Magistrate Judge Christian F. Hummel: Detention Hearing as to Kris Roglieri held on 11/25/2024. Appearances by AFPD Matt Trainor and AFPD Jeremy Sporn, for the defendant; AUSA Joshua Rosenthal and AUSA Michael Barnett for the government. USPO Amy Brancatelli, present. Defense calls Dr. Colistra (appearing virtually) who is sworn and is questioned on direct, cross and redirect. Arguments continue by proffer by both sides. The Court finds defendant to not be a risk of flight, but does find him to continue to be a danger to the community. Defendant remains detained and in the custody of the U.S. Marshal. (Court Reporter Lisa Mazzei)[2:00pm-4:45pm] (tab) (Entered: 11/26/2024) |
| 11/26/2024 | 58 | TEXT ORDER as to Kris Roglieri: After arguments were heard during the renewed detention hearing on 11/25/2024, the Court finds that the Defendant remains a danger to the community for the reasons stated at the conclusion of the hearing. The Defendant shall remain detained in the custody of the U.S. Marshal pending trial. So Ordered. Authorized by Magistrate Judge Christian F. Hummel on 11/26/2024. (tab) (Entered: 11/26/2024) |
| 12/04/2024 | 59 | TRANSCRIPT REQUEST *detention hearing* by Kris Roglieri for proceedings held on 11/25/2024 before Judge Hummel. (Trainor, Matthew) (Entered: 12/04/2024) |
| 12/06/2024 | 60 | APPEAL OF MAGISTRATE JUDGE - PRETRIAL ORDER to District Court by Kris Roglieri re 58 Order, (Trainor, Matthew) (Entered: 12/06/2024) |
| 12/11/2024 | | TEXT NOTICE SETTING DEADLINES re 60 APPEAL OF MAGISTRATE JUDGE - PRETRIAL ORDER to District Court by Kris Roglieri re 58 Order: The Appeal of Magistrate Judge - Pretrial Order to District Court was filed in this case on 12/6/24 [Dkt. no. 60]; The Defendant's Brief in Support of that Appeal is to be filed on or before 12/20/24. The Government's responsive brief will be due on or before 1/3/2025. The motion will be decided on the submission of the papers only. NO personal appearances are necessary. (ban) (Entered: 12/11/2024) |
| 12/19/2024 | 61 | STIPULATION by USA to exclude Speedy Trial Act time (Attachments: # 1 Proposed Order/Judgment)(Rosenthal, Joshua) (Entered: 12/19/2024) |
| 12/19/2024 | 62 | Stipulation and ORDER TO CONTINUE - Ends of Justice as to Kris Roglieri Time excluded from 12/19/24 until 3/18/25: The Jury Trial is reset for 5/19/2025 at 09:30 AM in Albany before U.S. District Judge Mae A. D'Agostino; The Final Pretrial Conference is set for 5/13/2025 at 10:00 AM in Albany before U.S. District Judge Mae A. D'Agostino; Pretrial Submissions due by 5/5/2025; A change of plea shall be entered on or before 5/2/25; Motions to be filed by 4/4/2025, and shall be made returnable ON SUBMIT; Discovery by USA due 3/21/25; Reciprocal Discovery by the defendant due 3/28/25. Signed by U.S. District Judge Mae A. D'Agostino on 12/19/24. (ban) (Entered: 12/19/2024) |
| 12/20/2024 | 63 | Letter from Matthew E. Trainor as to Kris Roglieri requesting additional time to file briefs (Trainor, Matthew) (Entered: 12/20/2024) |
| 12/20/2024 | 64 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Kris Roglieri: Detention Hearing held on 11/25/2024 before Judge Christian F. Hummel, Court Reporter/Transcriber: Lisa M. Mazzei,Telephone number: (315) 266-1176. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court |

A9

| | | |
|---|---|---|
| | | website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/10/2025. Redacted Transcript Deadline set for 1/21/2025. Release of Transcript Restriction set for 3/20/2025. Notice of Intent to Redact due by 12/26/2024 (Mazzei, Lisa) (Additional attachment(s) added on 12/20/2024: # 1 Sealed (Un-redacted) Transcript) (tab, ). (Entered: 12/20/2024) |
| 12/23/2024 | 65 | TEXT ORDER granting 63 Letter Request re 60 APPEAL OF MAGISTRATE JUDGE - PRETRIAL ORDER to District Court by Kris Roglieri re 58 Order: It is hereby ORDERED that the defendant's request for an extension of time to submit briefs re 60 Appeal of Magistrate Judge Pretrial Order, is GRANTED; Defense Brief due by 12/27/2024, Government Response due by 1/10/2025. Signed by U.S. District Judge Mae A. D'Agostino on 12/23/24.(ban) Modified on 12/23/2024 (ban). (Entered: 12/23/2024) |
| 12/27/2024 | 66 | MEMORANDUM OF LAW *in Support of Appeal of Pretrial Detention Order* (Attachments: # 1 Exhibit(s) Attorney Affirmation)(Trainor, Matthew) (Entered: 12/27/2024) |
| 01/10/2025 | 67 | RESPONSE in Opposition by USA as to Kris Roglieri re 60 APPEAL OF MAGISTRATE JUDGE - PRETRIAL ORDER to District Court by Kris Roglieri re 58 Order, *and Dkt. # 66* (Rosenthal, Joshua) (Entered: 01/10/2025) |
| 01/14/2025 | 68 | Letter from Matthew E. Trainor as to Kris Roglieri requesting to file a brief reply to government's response. (Trainor, Matthew) (Entered: 01/14/2025) |
| 01/15/2025 | 69 | TEXT ORDER granting 68 Letter Request for leave to file a reply re 60 APPEAL OF MAGISTRATE JUDGE - PRETRIAL ORDER to District Court by Kris Roglieri re 58 Order: It is hereby ORDERED that the defendant's request to file a reply brief is GRANTED; Reply brief due by 1/17/2025. Signed by U.S. District Judge Mae A. D'Agostino on 1/15/25.(ban) (Entered: 01/15/2025) |
| 01/17/2025 | 70 | REPLY TO RESPONSE to Motion by Kris Roglieri re 60 APPEAL OF MAGISTRATE JUDGE - PRETRIAL ORDER to District Court by Kris Roglieri re 58 Order, (Trainor, Matthew) (Entered: 01/17/2025) |
| 01/30/2025 | 71 | MEMORANDUM-DECISION AND ORDER denying 60 Appeal of Magistrate Judge Decision to District Court as to Kris Roglieri (1). Signed by U.S. District Judge Mae A. D'Agostino on 01/30/25.(ban) (Entered: 01/30/2025) |
| 01/31/2025 | 72 | Letter from USA as to Kris Roglieri requesting protective order (Rosenthal, Joshua) (Entered: 01/31/2025) |
| 01/31/2025 | 73 | PROTECTIVE ORDER granting 72 Letter Request for a Protective Order, as to Kris Roglieri (1). Signed by U.S. District Judge Mae A. D'Agostino on 01/31/2025.(ban) (Entered: 01/31/2025) |
| 02/05/2025 | 74 | NOTICE OF ATTORNEY APPEARANCE: James P. Egan appearing for Kris Roglieri as Co-Counsel with/for Attorney: Matthew Trainor, Esq. and Jeremy Sporn, Esq. (Egan, James) (Entered: 02/05/2025) |

A10

| 02/05/2025 | 75 | NOTICE OF APPEAL (Interlocutory) by Kris Roglieri re 71 Order on Appeal of Magistrate Judge Decision to District Court. No fee paid. (Egan, James) (Entered: 02/05/2025) |
| 02/07/2025 | 76 | ELECTRONIC NOTICE AND CERTIFICATION as to Kris Roglieri sent to US Court of Appeals re 75 Notice of Appeal - Interlocutory. (ham) (Entered: 02/07/2025) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/10/2025 10:07:42 | | |
| **PACER Login:** | melissatuohey | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cr-00392-MAD |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

A11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.     1:24-CR- 392 (MAD) |
| | ) | |
| **v.** | ) | **Indictment** |
| | ) | |
| **KRIS ROGLIERI,** | ) | Violations:     18 U.S.C. § 1343 |
| | ) | [Wire Fraud] |
| **Defendant.** | ) | |
| | ) | Five Counts & Forfeiture Allegation |
| | ) | |
| | ) | County of Offenses:     Warren |

U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**

**SEP 1 9 2024**

AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

### THE GRAND JURY CHARGES:

**Background**

At all times relevant to this indictment:

1.    The defendant, **KRIS ROGLIERI**, resided in Warren County, New York.

2.    Prime Capital Ventures, LLC ("Prime Capital") and its affiliate, Prime Commercial Lending, LLC ("Prime Commercial"), were companies based in Albany, New York, holding themselves out to be involved in commercial lending.

3.    **ROGLIERI** was the Chief Executive Officer and sole member of both Prime Capital and Prime Commercial.

4.    Prime Capital maintained a bank account ending in 2233 (the "Prime Capital Bank Account") and Prime Commercial maintained a bank account ending in 4465 (the "Prime Commercial Bank Account") at KeyBank, N.A.

5.    **ROGLIERI** was the only signatory on the Prime Capital Bank Account and Prime Commercial Bank Account.

6.    1800 Park Avenue LLC ("1800 Park") was a Minnesota company that sought Prime Capital's assistance in obtaining a loan to build a commercial egg production facility.

A12

**The Scheme to Defraud**

7.    In or around December 2023, **ROGLIERI** fraudulently sought and obtained a $5,000,000 "Interest Credit Account Payment," or "ICA" payment, from 1800 Park. **ROGLIERI** did so under the false promise and representation that the funds would be kept in a "separate and distinct account" and would be "refundable" if Prime Commercial and 1800 Park did not enter into an agreement for an approximately $100 million line of credit.   No such agreement was entered.

8.    **ROGLIERI** had no intention of maintaining 1800 Park's funds as promised. Instead, he used the funds for, among other things, Prime Capital's business expenses unrelated to 1800 Park and to fund his extravagant lifestyle.

9.    On or about December 22, 2023, 1800 Park transferred the $5,000,000 payment to the Prime Capital Bank Account.   That same day, **ROGLIERI** transferred the $5,000,000 from the Prime Capital Bank Account to the Prime Commercial Bank Account.   **ROGLIERI** then stole and fraudulently used the funds as follows:

a.    On or about December 22, 2023, $950,000 was transferred to Company-1, a Prime Capital client based on Saratoga County, New York, as partial loan funding for Company-1's real estate project.

b.    On or about December 22, 2023, $2,000,000 was transferred to a credit union account held by Company-2, a Virginia company.

c.    On or about December 26, 2023, $101,000 was paid to Company-3, which provided private jet services, for round-trip private air travel between Albany International Airport and Anguilla.   The flight was for a family vacation taken by **ROGLIERI** from on or about December 29, 2023 to on or about January 5, 2024.



d. On or about December 26, 2023, $84,000 was paid to Company-4, a company that sells high-end watches, to purchase a Rolex day-date yellow gold diamond bezel watch.

e. On or about December 29, 2023, $400,000 was paid to Law Firm-1, which represented Prime Capital in several court proceedings.

## COUNTS 1-5
## [Wire Fraud]

10. Paragraphs 1 through 9 are hereby realleged and incorporated as if fully set forth herein.

11. From at least December 2023 until in or around January 2024, in Warren County in the Northern District of New York, and elsewhere, the defendant, **KRIS ROGLIERI**, devised and intended to device a scheme and artifice to defraud 1800 Park, and to obtain money and property from 1800 Park by means of materially false and fraudulent pretenses, representations, and promises.

12. For the purpose of executing such scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, **ROGLIERI**, on or about the dates listed below, transmitted and caused to be transmitted by means of wire communication in interstate commerce the following writings, signs, and signals, that is, wire transfer requests transmitted over the internet by **ROGLIERI** from his home in the Northern District of New York to KeyBank, N.A. computers in Ohio initiating wire transfers from the Prime Commercial Bank Account to the following recipients:

| Count | Approximate Date | Amount | Recipient of Wire Transfer |
|-------|------------------|--------|----------------------------|
| 1 | December 22, 2023 | $950,000 | Company-1 |
| 2 | December 22, 2023 | $2,000,000 | Company-2 |
| 3 | December 26, 2023 | $101,000 | Company-3 |
| 4 | December 26, 2023 | $84,000 | Company-4 |

A14

| Count | Approximate Date | Amount | Recipient of Wire Transfer |
|-------|------------------|--------|----------------------------|
| 5 | December 29, 2023 | $400,000 | Law Firm-1 |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATION

13.     The allegations contained in Counts 1 through 5 of this indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

14.     Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Counts 1 through 5 of this indictment, the defendant, **KRIS ROGLIERI**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

     a.  a money judgment of $5,000,000;

     b.  a Rolex day-date yellow gold diamond bezel watch bearing Serial No. 16JV1686;

     c.  $223,365 in U.S. currency seized from the Thread Bank account with account number ending in 7554; and

     d.  $467,810 in U.S. currency seized from the Thread Bank account with account number ending in 1832.

15.     If any of the property described above, as a result of any act or omission of the defendant:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

4



    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c).

Dated:    September 19, 2024

A TRUE BILL.

Grand Jury Foreperson

***Redacted

CARLA B. FREEDMAN
United States Attorney

By: _____

Joshua R. Rosenthal
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & 519140

5

A16

June 3, 2024

**By ECF**

Hon. Christian F. Hummel
U.S. Magistrate Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207

     **RE:**    **United States v. Kris Roglieri**, No. 1:24-CR-261 (CFH)

Dear Judge Hummel:

     Pursuant to Local Criminal Rule 49.2(b), we respectfully submit this letter in support of the government's motion for limited sealing of its letter-motion seeking pretrial detention, which was submitted to Your Honor's chambers, defense counsel, and the U.S. Probation Office yesterday morning by email. The portions of the letter that are subject to the government's limited sealing request reveal the identity of a witness who provided sensitive information to law enforcement and should be therefore be sealed. *See, e.g.*, *United States v. Amodeo*, 71 F.3d 1044, 1050-52 (2d Cir. 1995); *In re Newsday, Inc.*, 895 F.2d 74, 79-80 (2d Cir. 1990). A proposed redacted version of the letter and its exhibits is enclosed with this letter.

     Respectfully submitted,

     CARLA B. FREEDMAN
     United States Attorney

By:   _____
     Joshua R. Rosenthal
     Michael Barnett
     Assistant United States Attorneys
     Bar Roll Nos. 700730 & & 519140

Encl.

cc:    AFPD Matthew E. Trainor / AFPD Jeremy B. Sporn (by ECF)

A17



**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

445 Broadway, Room 218          Tel.: (518) 431-0247
James T. Foley U.S. Courthouse   Fax: (518) 431-0249
Albany, New York 12207-2924

June 2, 2024

**BY EMAIL // TO BE FILED WITH REDACTIONS**

Hon. Christian F. Hummel
U.S. Magistrate Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207

    RE:    **United States v. Kris Roglieri, No. 1:24-CR-261 (CFH)**

Dear Judge Hummel:

    We respectfully submit this letter in support of the government's motion for detention pursuant to 18 U.S.C. § 3142(e), (f)(2)(B). As set forth in more detail below, the defendant presents an unmistakably serious risk of obstruction of justice and danger to the community based on his threats of violence, including his recent threat to murder an FBI agent who is investigating him. The defendant should be detained pending trial.

<div align="center"><u>BACKGROUND</u></div>

    The case arises from an ongoing investigation into a fraud and money laundering scheme perpetrated by Roglieri and others via Prime Capital Ventures, LLC ("Prime Capital"), a purported commercial lending business, that began to unravel in late fall 2023. Since that time, Roglieri, his companies, and others have been the subject of several litigations in this District and elsewhere, as detailed in relevant part below for context.

    As set forth in the complaint in this proceeding (Dkt. # 1), Prime Capital held itself out as a commercial lending business. As part of contractual arrangements with its borrower clients located across the country, Prime Capital obtained upfront interest payments from prospective borrowers while it sought to secure loans for those borrowers. Prime Capital characterized these upfront interest payments as the "Interest Credit Account Payment," or "ICA" payment. ICA payments did not represent fees to Prime Capital. Instead, each borrower's upfront ICA payment would be debited over time as the loan was funded and accrued more interest. An ICA payment would also be refundable if Prime Capital failed to secure a loan for the borrower client.

    ***The Involuntary Bankruptcy Proceeding.*** Prime Capital was the subject of an involuntary Chapter 7 bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of New York that was filed on December 19, 2023 and captioned *In re Prime Capital Ventures,*

<div align="right" style="font-size:3em">A18</div>

Page 2

*LLC*, No. 1:23-bk-11302 (Bankr. N.D.N.Y.) (the "Involuntary Bankruptcy Proceeding"). In that proceeding, three Prime Capital creditors filed a petition to put Prime Capital into bankruptcy based on allegations that Prime Capital had fraudulently taken and refused to return $43 million from numerous entities, including more than $20 million from the petitioning creditors. No. 1:23-bk-11302, Dkt. ## 1, 4. The petitioning creditors alleged that Prime Capital defrauded its borrower clients by using the ICA funds so that those clients paid to Prime Capital – as pre-payment of interest on yet-to-be issued loans – for Prime Capital's own purposes and then failed to return the ICA funds when the loans did not materialize. *See, e.g.*, No. 1:23-bk-11302, Dkt. # 4. On December 21, 2023, the Bankruptcy Court appointed an interim trustee to oversee Prime Capital. No. 1:23-bk-11302, Dkt. # 13. The Bankruptcy Court dismissed the Involuntary Bankruptcy Proceeding on January 9, 2024, at the request of both the petitioning creditors and Prime Capital. No. 1:23-bk-11302, Dkt. # 87.

  ***The Receivership Proceeding.*** Following the dismissal of the Involuntary Bankruptcy Proceeding, on January 12, 2024, one of the above-referenced creditors sued Prime Capital, the defendant, and other parties in the United States District Court for the Northern District of New York. *See Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC et al.*, No. 1:24-cv-55 (MAD/CFH) (N.D.N.Y.) (the "Receivership Proceeding"). In that case, the presiding U.S. District Judge signed an Order to Show Cause for January 22, 2024, and appointed a temporary receiver in the interim. No. 1:24-cv-55, Jan. 22, 2014 Text Min. Entry. The District Court permanently appointed the receiver on January 24, 2024. No. 1:24-cv-55, Dkt. # 56.[1] On January 30, 2024, the District Court entered an order temporarily restraining the defendant and others from transferring, selling, disposing, or encumbering the funds in Prime Capital's financial accounts, as well as a number of vehicles. No. 1:24-cv-55, Dkt. # 78. The defendant was dismissed without prejudice from the Receivership Proceeding on March 19, 2024 based on his personal bankruptcy filing, discussed *infra*. No. 1:24-cv-55, Dkt. # 160.

  ***The Personal Bankruptcy Proceeding.*** On February 15, 2024, the defendant filed a personal bankruptcy action in this District under Chapter 11 of the Bankruptcy Code, a provision that debtors generally use to maintain control of their estate's property while they seek to restructure their finances with court approval. *See In re Kris Daniel Roglieri*, No. 1:24-bk-10157 (Bankr. N.D.N.Y.) (the "Personal Bankruptcy Proceeding"). In late April 2024, the U.S. Trustee moved to convert the Personal Bankruptcy Proceeding into a proceeding under Chapter 7 of the Bankruptcy Code based on claims that the defendant was, among other things, depleting assets of the estate (including by spending $1.5 million from his personal bank account in the span of several weeks prior to his personal bankruptcy filing) and had testified at creditors' meetings that he had no job, no income, and no prospects for same. No. 1:24-bk-10157, Dkt. # 119 at 1-3. On May 15, 2024, the Bankruptcy Court granted this motion. No. 1:24-bk-10157, Dkt. # 159. In Chapter 7 proceedings, a trustee liquidates the debtor's assets in order to repay creditors, leaving the debtor with little control over the process as compared to a Chapter 11 proceeding. The same day that the Bankruptcy Court granted the motion to convert the proceeding, the U.S. Trustee appointed Christian H. Dribusch, Esq. as interim trustee of the defendant's estate. No. 1:24-bk-10157, Dkt. # 160.[2]

---

[1] This order is subject of a pending interlocutory appeal. The Second Circuit denied a stay of the order pending appeal.

[2] Mr. Dribusch will become a permanent trustee unless the defendant's creditors elect a different permanent trustee.

Page 3

On May 20, 2024, the Bankruptcy Court held a hearing on the interim trustee's motion for turnover of the defendant's estate's property to the interim trustee. No. 1:24-bk-10157, Dkt. ## 166, 186. According to a recording of the hearing, the defendant appeared *pro se* because his bankruptcy counsel sought to withdraw from the proceeding following the conversion. In objecting to the motion for turnover, the defendant told the court that "the last several months have ripped apart my life in more ways than anyone can imagine." He further said that he found the positions taken by an Assistant U.S. Trustee to be "very disturbing." At the end of the hearing, the Bankruptcy Court granted the motion for turnover. No. 1:24-bk-10151, May 20, 2024 Text Entry.

On May 24, 2024, the interim trustee emailed the defendant inquiring about the location of the defendant's sizable collection of firearms, which were among the assets that the defendant had been ordered to turn over.[3] The defendant responded that "I will" provide the location of the firearms. Ex. 1. The defendant and the interim trustee then exchanged emails about the interim trustee's having frozen one of the defendant's bank accounts. The defendant responded, by email on May 24, "Christian I literally have no credit cards and no money for basic living expenses. Fucking cocksucker." *Id.* On May 28, 2024, the defendant wrote to the Bankruptcy Court seeking an "emergency hearing" based on the interim trustee's freezing of the defendant's "last remaining funds" and stating "I have no way to provide basic needs for myself and my children . . . ." No. 1:24-bk-10157, Dkt. # 189. Later in the week, the defendant finally informed the interim trustee that the firearms disclosed to the Bankruptcy Court were being stored at a Queensbury gun range and store.[4]

***The Searches.*** On February 2, 2024, the FBI conducted court-authorized searches of, among other places, the defendant's Queensbury property in connection with the investigation. During the search, agents observed numerous firearms, including an AR-15 style rifle and a high-capacity magazine. State authorities subsequently charged the defendant with two counts of Criminal Possession of a Weapon in the Third Degree, in violation of N.Y. Penal Law § 265.02(7), (8), for possession of these items. These charges are currently pending.

***The Defendant's Increasingly Threatening Behavior.*** The defendant has made increasingly concerning threats in discussions with ████████████ Person-1.[5] During a February 16, 2024 interview, Person-1 stated that around mid-January 2024, in a telephone conversation, the defendant said that he would "take out" the receiver and judge who were involved

---

[3] In the Personal Bankruptcy Proceeding, the defendant's counsel disclosed to the Bankruptcy Court that he owned 20 firearms, including three pistols and several shotguns. No. 1:24-bk-10157, Dkt. # 80 at 34.

[4] After Friday's initial appearance, the FBI obtained a list of the firearms stored at this facility that matches the list of firearms disclosed to the Bankruptcy Court.

[5] ████████████████████████████████████████████████████████████

in his bankruptcy proceeding.  Text messages between Person-1 and the defendant, found on Person-1's cell phone, include the following:

- January 21, 2024: "I'm fucking gonna wack anybody that comes after me," "Fair game," and "You wanna come after me with guns you gonna get the same."  Ex. 2.

- January 25, 2024: "I feel myself getting angry and vengeance to those that are doing this," "Including the attories [sic] judge, receiver etc," "I don't really play by the rules," "Never have and never will," and "And that's dangerous as I feel myself getting to that point with all involved against me."  Ex. 3.

Of note, on February 2, 2024, the defendant was compliant when FBI agents searched his home; he was also compliant when FBI agents seized vehicles from his home on March 5, 2024, pursuant to warrants issued by this Court.

On the evening of Friday, May 24, 2024, this Office was contacted by Person-1's representative to urgently report threats that the defendant had relayed to her.  An FBI supervisory agent interviewed Person-1 by phone later that night.  She disclosed that earlier in the night, the defendant told her that he was in a "dark place," because he was going through bankruptcy proceedings, had no money, and felt he would be indicted soon. The defendant told her that he knows the three FBI Agents who are investigating him.  The defendant further stated that he knew the home address of one of the agents (whom he correctly identified by first name), and that the defendant would "put a bullet in [that agent's] head."  In a subsequent interview, Person-1 described the threats as the defendant telling her that "'he knows where [one of the agents] fucking lives' and that he would not put it past himself 'to put a bullet in [that agent's] head.'"  The defendant also told Person-1 that "when someone takes everything away from you . . . if I go down, everyone goes down."  At another point he said, "I ain't going out like that."

**_The Criminal Complaint._**  On May 28, 2024, the government obtained the criminal complaint in this proceeding charging the defendant with one count of wire fraud.  In sum, the complaint alleges that the defendant defrauded a prospective borrower of a $5 million ICA payment while the Involuntary Bankruptcy Proceeding was pending.  The defendant promised to keep the ICA payment in a separate and distinct account, but immediately broke that promise by using the money on, among other things, a financial obligation owed to another Prime Capital client and the defendant's personal expenses, including a $84,000 watch and $101,000 for private jet flights.  _See_ Dkt. # 1.

## LEGAL STANDARD

The Bail Reform Act of 1984 authorizes and sets forth the procedures for pretrial detention of a criminal defendant.  _See generally_ 18 U.S.C. §§ 3141 _et seq._  Detention determinations are a two-step inquiry.  _See, e.g._, _United States v. Dai_, 2023 WL 11016392, at *1 (N.D.N.Y. Dec. 19, 2023) (Sannes, C.J.).  First, the court must determine whether a detention hearing is authorized. _Id._  A detention hearing is authorized only if the government establishes by a preponderance of the evidence that the case involves one of the offenses enumerated in 18 U.S.C. § 3142(f)(1) or that the defendant presents certain risk factors identified in 18 U.S.C. § 3142(f)(2).  _See, e.g._,

Case: 25-277, 02/28/2025, DktEntry: 19.1, Page 62 of 321
Case 1:24-cr-00392-MAD    Document 6-1    Filed 06/03/24    Page 5 of 25

Page 5

*United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019). Second, "if the court determines that a detention hearing is authorized, the court must consider whether any condition or combination of conditions will reasonably assure the defendant's appearance at trial and the safety of the community by applying four factors listed in § 3142(g)." *Dai*, WL 11016392, at *2 (citing *United States v. Berrios–Berrios*, 791 F.2d 246, 249 (2d Cir. 1986)).

"[T]he Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release." *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015) (citing *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (reversing release, ordering detention, and rejecting "requirement that the violent conduct . . . be connected to the activity charged in the indictment")).

Because the rules concerning admissibility of evidence in criminal trials do not apply to bail hearings, the parties may proceed by way of proffer. *See, e.g.*, *Abuhamra*, 389 F.3d 309, 325 (2d Cir. 2004) (noting that "[t]he proceeding here at issue, a . . . bail hearing, permits receipt of hearsay evidence and does not determine guilt or innocence"); *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (affirming bail decision where "the government proceeded almost entirely by proffer"). Thus, "courts often base detention decisions on hearsay evidence." *United States v. Boustani*, 356 F. Supp. 3d 246, 251 (E.D.N.Y. 2019).

## ARGUMENT

### I.    A Detention Hearing Is Warranted

Under 18 U.S.C. § 3142(f)(2), the government can seek detention by establishing that there is "(A) a serious risk [the defendant] will flee; or (B) a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

As the Court correctly found at Friday's initial appearance, a detention hearing is warranted here. There is ample reason to conclude that the defendant will obstruct justice and threaten prospective witnesses if he is released. Indeed, the defendant has actively voiced his intent to kill an agent involved in the investigation of his conduct. *See supra* at 4. Prior to that, the defendant suggested that he wanted to harm the attorneys and federal judges involved in the various litigations concerning his conduct. *See supra* at 3-4. Taken together, these troubling statements meet the government's burden for obtaining a detention hearing.

### II.    The Defendant Should Be Detained

"[I]f a detention hearing is mandated under Section 3142(f), the Bail Reform Act permits pretrial detention if, after the hearing, the prosecution establishes that no assortment of bail conditions reasonably will assure the defendant's presence and the safety of others." Gordon Mehler *et al.*, *Federal Criminal Practice: A Second Circuit Handbook* § 4-3 (22d ed. 2022). To make such a determination, a court considers the following statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any

person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).
The weight to be accorded to each factor is "the special province" of this Court as the factfinder.
*United States v. Shakur*, 817 F.2d 189, 196 (2d Cir. 1987).  "If, based on an application of these
factors, the court determines that 'no condition or combination of conditions will reasonably assure
the appearance of the [defendant] as required and the safety of any other person and the
community,' the defendant must be detained."  *Dai*, 2023 WL 11016392, at * 6 (quoting 18 U.S.C.
§ 3142(e)(1)).  A detention finding on this prong must "be supported by clear and convincing
evidence."  18 U.S.C. § 3142(f).  On balance, analysis of the statutory factors shows that there is
no set of conditions that would assure the safety of the community if the defendant were released.

    ***The Nature and Circumstances of the Offense Charged.***    While non-violent, the
defendant's offense is very serious.  As alleged in the complaint, while in bankruptcy proceedings
where his company's creditors alleged frauds exceeding $40 million, the defendant nevertheless
brazenly defrauded yet another victim of $5 million.  And this happened even as Prime Capital
was under the supervision of an interim bankruptcy trustee.  To do this, the defendant caused the
victim to turn over its money subject to an express agreement by the defendant to maintain the
victim's money in a "trust fund" and that the money would be refundable.  The defendant took that
money and transferred it into the account of one of his other companies.  From there, the defendant
made numerous transfers of the funds, including by sending $950,000 to meet a financial
obligation to *another* Prime Capital client; paying $84,000 for his purchase of a Rolex watch; and
paying $101,000 to a private jet services company, for round-trip, private air travel between
Albany and Anguilla, for a family vacation.  Thus, "the gravity of [the] charges weigh in the
government's favor."  *Cf. United States v. Dupree*, 833 F. Supp. 2d 241, 253 (E.D.N.Y. 2011)
(denying motion for release and finding "the[] alleged offenses, and the millions of dollars
involved in the various frauds, constitute serious crimes").

    ***The Weight of the Evidence.***    The weight of the evidence also supports detention.  As
detailed above, the complaint alleges a clearcut fraud involving a significant amount of money.
The defendant induced his victim to transfer to millions of dollars with promises of a loan and the
safety of its money, but then spent the money to fund another Prime Capital client and on lavash
personal expenditures.  What is more, the defendant knew this was illegal, as his contemporaneous
text messages from early January 2024 illustrate:

| Sender | Recipient | Message |
| --- | --- | --- |
| Person-1 | Roglieri | Why can't it just be a bankruptcy? |
| Roglieri | Person-1 | Becuase I unused others money to fund deals |
| Roglieri | Person-1 | I already told you this |
| Person-1 | Roglieri | And that's illegal? |
| Roglieri | Person-1 | Yes |
| | | |
| Person-1 | Roglieri | It's a civil case it's not a criminal case |
| Roglieri | Person-1 | It will turn criminal as soon as they get into bank statements |
| Roglieri | Person-1 | They will bring in the Feds |

Ex. 4.  At bottom, the weight of the evidence is strong, and it shows that the defendant is willing

Case: 25-277, 02/28/2025, DktEntry: 19.1, Page 64 of 321
Case 1:24-cr-00392-MAD    Document 6-1    Filed 06/03/24    Page 7 of 25

Page 7

to engage in a largescale fraud while under the supervision of a court-appointed professional.

**The Nature and Seriousness of the Danger.**  The nature and seriousness of the danger posed by the defendant strongly support detention.  First, the defendant's threats of violence and obstruction warrant detention.  "[O]bstruction poses a danger to the community," and where there is a risk that such activities will continue, pretrial detention may be appropriate.  *United States v. Stein*, 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005); *see also United States v. Kwok*, 2023 WL 3027440, at *4 (S.D.N.Y. Apr. 20, 2023) (ordering detention based on, *inter alia*, defendant's likelihood of obstruction if released).  In fact, the Second Circuit has noted that "obstruction of justice has been a traditional ground for pretrial detention by the courts."  *LaFontaine*, 210 F.3d at 134.  As detailed above, the defendant has threatened to harm judicial officers, agents, and others involved in bringing his misconduct to light.  *See supra* at 3-4.  While the defendant did not communicate those threats directly to the people affected, they are nonetheless extremely troubling given their specificity and tenor.  Simply put, this Court should take the defendant at his word – he has suggested that he would "put a bullet" in the head of a prospective witness.  The Court should not release the defendant so that he can make that plan come to fruition.  Indeed, even though the defendant's known collection of firearms is currently secured with a third party, no set of conditions could truly prevent him from obtaining a firearm and attempting to harm someone.

Second, while a lesser concern than physical violence, "economic harm qualifies as a danger within the contemplation of the Bail Reform Act."  *United States v. Persaud*, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007).  In fact, courts have recognized that a defendant's economic danger to the community may be taken into consideration based on the defendant's propensity to commit further crimes, even if the resulting harm is solely economic.  *See, e.g.*, *United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979); *Kwok*, 2023 WL 3027440, at *6. Here, while the complaint details one instance where the defendant defrauded a prospective borrower, the government's ongoing investigation reveals many other victims and losses likely exceeding $75 million.  That the defendant committed fraud against 1800 Park while Prime Capital was being overseen by a court-appointed interim trustee is even more concerning, because it shows that the defendant has no regard for judicial supervision.

**The History and Characteristics of the Defendant.**  The defendant has no criminal convictions, and he has been compliant during all of his encounters with the FBI, so his history does not support detention.  That said, his commission of a major fraud while under Bankruptcy Court supervision, his recent threat to murder an FBI agent, and his recent statement that "if I go down, everyone goes down," indicate that he cannot control himself and will seek to harm others, as his life continues to spiral downward.

<div align="center">*    *    *</div>

For these reasons, the defendant should be detained.

Page 8

Respectfully submitted,

CARLA B. FREEDMAN
United States Attorney

By: _____

Joshua R. Rosenthal
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & & 519140

cc:   AFPD Matthew E. Trainor / AFPD Jeremy B. Sporn (by Email)
       Senior U.S.P.O. Amy Brancatelli (by Email)

A25

# Exhibit 1

**Rosenthal, Joshua (USANYN)**



**From:** Christian Dribusch <cdribusch@chd-law.com>
**Sent:** Tuesday, May 28, 2024 11:16:35 AM
**To:** Vick, Jonathon Joseph (AL) (FBI) ▓▓▓▓▓▓▓▓▓>
**Subject:** [EXTERNAL EMAIL] -  Fw: Gun Collection

Per request, please see email chain below on Roglieri matter.

**Christian H. Dribusch**
**The Dribusch Law Firm**
p: 518.227.0026
e: cdribusch@chd-law.com
w: www.chd-law.com
a: 187 Wolf Road • Suite 300-020 • Albany • N.Y. 12205

**From:** john bush <finance12207@yahoo.com>
**Sent:** Friday, May 24, 2024 4:43 PM
**To:** Christian Dribusch <cdribusch@chd-law.com>
**Subject:** Re: Gun Collection

Christian.

I know I have rights to live off of. I liberally can't purchase food for my family this weekend.

I know I have rights to living expenses.

This is ludicrous

Sent from my iPhone

> On May 24, 2024, at 2:29 PM, Christian Dribusch <cdribusch@chd-law.com> wrote:

I understand your situation, but you are directing your anger at the wrong person.  I am not
intentionally trying to harm you.  I have a statutory and fiduciary duty to secure the DIP

A27

account.  It happens in every converted Chapter 11 case.  I thought we discussed this yesterday, so I apologize for the confusion.  Chris Dribusch

**Christian H. Dribusch**
**The Dribusch Law Firm**
p: 518.227.0026
e: cdribusch@chd-law.com
w: www.chd-law.com
a: 187 Wolf Road • Suite 300-020 • Albany • N.Y. 12205

---

**From:** john bush <finance12207@yahoo.com>
**Sent:** Friday, May 24, 2024 1:50 PM
**To:** Christian Dribusch <cdribusch@chd-law.com>
**Subject:** Re: Gun Collection

Christian I literally have no credit cards and no money for basic living expenses. Fucking cocksucker.
Sent from my iPhone

On May 24, 2024, at 1:48 PM, Christian Dribusch <cdribusch@chd-law.com> wrote:

I did.  You may be entitled to some of the funds, but only for post-petition earnings or assets acquired post-petition.   My understanding is that the account was primarily funded from bankruptcy estate assets (e.g., assets or proceeds which existed on the date of filing).   If you provide me with the information on what was funded into the DIP account with post-petition earnings or assets, then I can determine which funds belong to you and can promptly have them either released or turned over to you.  Sorry for the inconvenience.  Chris Dribusch

**Christian H. Dribusch**
**The Dribusch Law Firm**
p: 518.227.0026
e: cdribusch@chd-law.com
w: www.chd-law.com
a: 187 Wolf Road • Suite 300-020 • Albany • N.Y. 12205

---

**From:** john bush <finance12207@yahoo.com>
**Sent:** Friday, May 24, 2024 1:34 PM
**To:** Christian Dribusch <cdribusch@chd-law.com>
**Subject:** Re: Gun Collection

I will

Question did you put a freeze or hold on my dip account ?

Kris
Sent from my iPhone

A28

On May 24, 2024, at 11:39 AM, Christian Dribusch <cdribusch@chd-law.com> wrote:


Could you let me know precisely which gun club is securing your guns.  Thanks.  Chris Dribusch

**Christian H. Dribusch**
**The Dribusch Law Firm**
p:  518.227.0026
e:  cdribusch@chd-law.com
w:  www.chd-law.com
a:  187 Wolf Road • Suite 300-020 • Albany • N.Y. 12205

A29

# Exhibit 2





**Extraction Report** - Apple iOS Full File system

---

## Participants



Kris

Me (owner)

---

### Conversation - Instant Messages (3)



From:                Kris
To:                   me (owner)

I'm fucking gonna wack anybody that comes after me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Me | | | |

1/21/2024 4:37:24 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Intent/local/7273
98605535127 : 0xFEBDC (Size: 1048576 bytes)



From:                Kris
To:                   e (owner)

Fair game

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Me | | | |

1/21/2024 4:37:55 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Int
ent/local/727547875517699 : 0xDEB (Size: 1048576 bytes)

A31

From: ▮▮▮▮▮▮ Kris
To: ▮▮▮▮▮▮▮ Me (owner)

You wanna come after me with guns you gonna get the same

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮▮ Me | | | |

1/21/2024 4:38:10 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Intent/local/72754787
5517699 : 0x1FA9 (Size: 1048576 bytes)

A32

# Exhibit 3



**Extraction Report** - Apple iOS Full File system


www.cellebrite.com

## Participants



Kris

Me (owner)

## Conversation - Instant Messages (6)



From: ▇▇▇▇ Kris
To: ▇▇▇▇ me (owner)

I'm wearing down girl

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▇▇ Me | | | |

1/25/2024 11:02:28 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Int
ent/local/727836424517501 : 0xE1803 (Size: 1048576 bytes)



From: ▇▇▇▇ Kris
To: ▇▇▇▇ e (owner)

I feel myself getting angry and vengeance to those that are doing this

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▇▇ Me | | | |

1/25/2024 11:03:00 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Intent/local/727836424517501 :
0xE29DD (Size: 1048576 bytes)

A34



From: ▮▮▮▮▮ Kris
To: ▮▮▮▮▮ Me (owner)

Including the attories, judge, receiver etc

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ Me | | | |

1/25/2024 11:03:20 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Intent/lo
cal/727836424517501 : 0xE3B7F (Size: 1048576 bytes)



From: ▮▮▮▮▮ Kris
To: ▮▮▮▮▮ Me (owner)

I don't really play by the rules

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ Me | | | |

1/25/2024 11:03:50 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Int
ent/local/727836424517501 : 0xE4D11 (Size: 1048576 bytes)



From: ▮▮▮▮▮ Kris
To: ▮▮▮▮▮ Me (owner)

Never have and never will

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ Me | | | |

1/25/2024 11:03:58 PM(UTC+0)

Source Info:
00008110-
00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Int
ent/local/727836424517501 : 0xE5E8C (Size: 1048576 bytes)



From: ▮▮▮▮▮ Kris
To: ▮▮▮▮▮ Me (owner)

And that's dangerous as I feel myself getting to that point with all involved against me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ Me | | | |

1/25/2024 11:04:23 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/Biome/streams/restricted/App.Intent/local/727836424517501 :
0xE708B (Size: 1048576 bytes)

A35

2

# Exhibit 4



## Extraction Report - Apple iOS Full File system



### Participants



Me* (owner)

Kris*

### Conversation - Instant Messages (16)



From: ▮▮▮▮▮ Me (owner)
To: ▮▮▮ Kris

**Can't you just keep working on those companies?**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ Kris | 1/4/2024 11:20:42 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:20:42 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x528F310
(Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA
(Table: message; Size: 1128912 bytes)



From: ▮▮▮▮ Me (owner)
To: ▮▮▮▮ Kris

**I know it might be hard at first, but look what you built this up to beat from nothing**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮ Kris | 1/4/2024 11:20:56 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:20:56 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5290F8D (Table: message, handle; Size:
121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912
bytes)

A37

1















From: [redacted] Kris
To: [redacted] Me (owner)

Yea I can but not when I'm in fucking prison

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Me | | 1/4/2024 11:20:56 PM(UTC +0) | |

**Status:** Read

1/4/2024 11:20:56 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5290CBC (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Me (owner)
To: [redacted] Kris

Why do you think that's gonna happen?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Kris | 1/4/2024 11:21:09 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:21:09 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5290A7F (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Me (owner)
To: [redacted] Kris

Why can't it just be a bankruptcy?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Kris | 1/4/2024 11:21:19 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:21:19 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5290817 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Kris
To: [redacted] Me (owner)

Becuase I unused others money to fund deals

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Me | | 1/4/2024 11:21:47 PM(UTC +0) | |

**Status:** Read

1/4/2024 11:21:47 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x52905AB (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Kris
To: [redacted] Me (owner)

I already told you this

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Me | | 1/4/2024 11:21:53 PM(UTC +0) | |

**Status:** Read

1/4/2024 11:21:53 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x529036A (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Me (owner)
To: [redacted] ris

And that's illegal?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Kris | 1/4/2024 11:22:02 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:22:02 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5291F8D (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

**From:** [REDACTED] Kris
**To:** [REDACTED] Me (owner)

Yes

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [REDACTED] Me | | 1/4/2024 11:22:15 PM(UTC +0) | |

**Status:** Read

1/4/2024 11:22:15 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library//SMS/sms.db :
0x5291D3F (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library//SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



**From:** [REDACTED] Me (owner)
**To:** [REDACTED] Kris

How bad . I mean, what's the worst you do a couple years who cares

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [REDACTED] Kris | 1/4/2024 11:22:36 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:22:34 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5291B58 (Table: message,
handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message;
Size: 1128912 bytes)



**From:** [REDACTED] Me (owner)
**To:** [REDACTED] ris

You have your family

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [REDACTED] Kris | 1/4/2024 11:22:45 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:22:45 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x5291B83 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)

A40

4



From: ▬▬▬ Me (owner)
To: ▬▬▬ Kris

**This whole family will support you through this**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▬▬ Kris | 1/4/2024 11:24:30 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:24:30 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5291671
(Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA
(Table: message; Size: 1128912 bytes)



From: ▬▬▬ Me (owner)
To: ▬▬▬ Kris

**It's a civil case it's not a criminal case**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▬▬ Kris | 1/4/2024 11:25:52 PM(UTC+0) | | |

**Status:** Sent

1/4/2024 11:25:52 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x52913F9 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



From: ▬▬▬ Kris
To: ▬▬▬ e (owner)

**It will turn criminal as soon as they get into bank statements**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▬▬ Me | | 1/4/2024 11:27:42 PM(UTC+0 ) | |

**Status:** Read

1/4/2024 11:27:09 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x5292F83 (Table: message,
handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message;
Size: 1128912 bytes)

A41





A42

1

1                 UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF NEW YORK

3

4   UNITED STATES OF AMERICA,         )
                               )

5                           )
                           ) CASE NO. 24-MJ-261

6                           )
     vs.                   )

7                           )
   KRIS ROGLIERI,                )

8                           )
          Defendant.       )

9  _____)

10              **TRANSCRIPT OF PROCEEDINGS**

11      **BEFORE THE HON. CHRISTIAN F. HUMMEL**
             **MONDAY, JUNE 3, 2024**

12               **ALBANY, NEW YORK**

13  **FOR THE GOVERNMENT:**
     UNITED STATES ATTORNEY'S OFFICE

14     By:  JOSHUA R. ROSENTHAL, AUSA and MICHAEL S. BARNETT, AUSA
     445 Broadway, Room 218

15     Albany, New York 12207

16  **FOR THE DEFENDANT:**
     OFFICE OF THE FEDERAL PUBLIC DEFENDER

17     By:  JEREMY B. SPORN, ESQ.
     54 State Street, Suite 310

18     Albany, New York 12207

19

20

21

22

23

24

25

A43

2

**USA v. Roglieri - 24-MJ-261**

1              (Open court, 3:12 p.m.)

2              THE CLERK:  The case is United States of America

3    versus Kris Roglieri, docket No. 24-MJ-261.  Appearances for the

4    record, please.

5              MR. ROSENTHAL:  Good afternoon, Your Honor.  Joshua

6    Rosenthal and Michael Barnett for the United States.

7              THE COURT:  Good afternoon, counselors.

8              MR. SPORN:  Jeremy Sporn, Federal Public Defender's

9    Office on behalf of Mr. Roglieri.  Your Honor, good afternoon.

10             THE COURT:  Good afternoon, Mr. Sporn.

11             Good afternoon, Mr. Roglieri.

12             Folks standing in the doorway, if you'd like to sit in

13   the jury box, you're welcome to stand in the doorway, but to the

14   extent you'd rather sit down, you're welcome to do so.

15             This was a matter which was previously before the

16   Court.  We have set down this afternoon for a detention hearing.

17             Mr. Sporn, let me ask you a very basic question.  How

18   do you say your client's last name?  We seem to say it different

19   every time I see him.

20             THE DEFENDANT:  It's actually pronounced Roglieri.

21   The G is silent.

22             THE COURT:  Roglieri.

23             THE DEFENDANT:  Roglieri.

24             THE COURT:  I'll do my best.

25             So this Court adjourned this matter so we could have a

A44

3

USA v. Roglieri - 24-MJ-261

1    Pretrial Services Report done, and a Pretrial Services Report

2    has been done.  I would note two things.  With respect to the

3    fact that during the course of this afternoon's proceeding,

4    reference is made to person-1, the Court is aware who in fact

5    person-1 is; and number two, the Pretrial Services Report

6    prepared by Ms. Brancatelli -- and the Court thanks

7    Ms. Brancatelli -- contained certain information which has been

8    confirmed by the defendant's brother Joseph, reflecting that the

9    information set forth in the report is accurate.

10           Mr. Rosenthal, sir, what is the government's position

11   regarding Mr. Roglieri and the issue of detention or release

12   pending further proceedings?

13           MR. ROSENTHAL:  Yes, Your Honor.  We still seek the

14   defendant's detention for the reasons set forth in our letter

15   based on danger to the community.

16           THE COURT:  And thank you.

17           Mr. Sporn, sir, two things.  Number one, just for the

18   record, have you received a copy of the Pretrial Services

19   Report?

20           MR. SPORN:  I have, Your Honor, yes.

21           THE COURT:  Have you received a copy of the letter

22   which the United States Attorney's Office filed with the Court

23   on June 2 of 2024?

24           MR. SPORN:  Yes, Judge.

25           THE COURT:  Go ahead, Mr. Rosenthal, sir.

A45

4

**USA v. Roglieri - 24-MJ-261**

1          MR. ROSENTHAL:  Thank you, Your Honor.  As laid out in

2     the letter that we submitted yesterday morning and as the

3     Pretrial Services Report agrees, there is no set of conditions

4     that Your Honor could impose to reasonably assure the safety of

5     the community if the defendant were released.

6          The defendant has engaged in some extremely concerning

7     conduct, including most recently, making a specific and detailed

8     threat about one of the FBI agents involved in the investigation

9     of his conduct.  Even stringent conditions will not sufficiently

10    mitigate the serious risk that the defendant presents.  No

11    firearms condition is largely contingent on a defendant who will

12    obey that condition.  And here, it is certainly possible the

13    defendant stashed away guns or could easily obtain them.  The

14    government has obtained text messages where the defendant

15    discussed wanting to hide assets from his creditors.  So it

16    isn't a stretch to think that he might have hidden personal

17    property as well.

18         Home detention, location monitoring, and a no-contact

19    with potential witness provision do not present viable options

20    here either.  GPS monitors, as the Court knows, can be removed,

21    and again, the defendant's compliance with home detention is

22    based on his willingness to abide by the condition.

23         The sources detailed in the letter paint a picture of

24    someone who appears determined to use violence against those he

25    perceives as acting against him.  We have those quotes.  We

A46

**USA v. Roglieri - 24-MJ-261**

1    don't need to rehearse them all here, but obviously, they are

2    quite troubling.  They include things like, "You want to come

3    after me with guns?  You're gonna get the same," and, "if I go

4    down, everyone goes down."  At another point, the defendant also

5    says, "I'm not going out like that," and he described wanting to

6    whack people involved in proceedings against him.

7              The conduct outlined in the complaint took place when

8    an interim trustee was assigned to Prime Capital.  So defendant

9    has already disregarded a form of Court supervision.  He also

10   misled the Bankruptcy Court in December into believing that

11   certain client ICA funds were at RBC, when that was not true.

12   And most recently, defendant's former counsel in the personal

13   bankruptcy proceeding suggested that the source of his firm's

14   $100,000 retainer was misrepresented by the defendant.

15             For these reasons and those set forth in our letter,

16   we believe that the defendant should be detained pending further

17   proceedings.  Your Honor, if you have any questions about our

18   submissions, I'd be happy to answer them.

19             THE COURT:  I may, counselor, after I hear from

20   Mr. Sporn.

21             MR. ROSENTHAL:  Thank you.

22             THE COURT:  Mr. Sporn, sir.

23             MR. SPORN:  Thank you, Your Honor.  I respectfully

24   disagree with Mr. Rosenthal, the primary conclusion that there

25   are no conditions the Court can set to assure the safety of the

6

**USA v. Roglieri - 24-MJ-261**

1    community.  Certainly, we disagree with that.

2         The government has not argued risk of flight or risk

3    of nonappearance, and I don't intend to dwell on that or to go

4    too far deep into that prong or that issue, but just to give the

5    Court the flavor or a sketch of who Mr. Roglieri is, where he's

6    coming from, I think it's important to lay that out,

7    particularly as it does have a bearing on risk of dangerousness,

8    lack of risk of dangerousness really.

9         Mr. Roglieri is 44 years old.  He comes to the Court

10    with no criminal convictions.  He was born in Kingston, New

11    York.  He has lived virtually his entire life in the Capital

12    Region, if we can consider Kingston part of the southern Capital

13    Region, I guess.  He's grown up in the area.  He's lived here.

14    He's been a pillar of the community here for all of his 44

15    years.  He pursued his education here in college.  I don't

16    believe he ended up graduating from -- with a BA, but certainly,

17    he pursued his studies here.  This is where he's made his life,

18    and it's a place where he has substantial ties.  As I mentioned,

19    he's been a pillar of the community here.

20         The reason I bring that up is it's one thing to refer

21    to alleged threats or some of the materials provided to the

22    Court in text messages in the abstract or in isolation, but I

23    think the Court's job is, rather, to weigh that evidence against

24    the full backdrop of Mr. Roglieri's life and who he is, and more

25    importantly, maybe who he's not.

A48

7

**USA v. Roglieri - 24-MJ-261**

1   So he's someone who has a very lengthy record of

2   philanthropic giving, charitable efforts and endeavors.  He's

3   handed out turkeys, for example, at Thanksgiving in the Albany

4   area for years and years.  He's been a primary benefactor of

5   Albany Medical Center here in the area for years and years.  I

6   think that cuts against, in some respects, just the level of

7   alleged greed that the complaint seems to lay out or venality in

8   terms of Mr. Roglieri's business dealings and how he's operated

9   his businesses.

10   He's someone who's lived at the same address in

11   Queensbury for a decade or so.  He has two young children, 14

12   and 12, with whom he's very close, with whom he splits custody

13   with them.  As the Court is aware of his familial situation, I

14   won't go too deeply into that issue, but certainly from our

15   perspective, that -- withdrawn, Your Honor.  I'll move on to

16   another point.

17   Mr. Roglieri is a hard worker.  He's someone who's

18   always been employed.  He's been self-employed now operating

19   businesses for close to two decades.  And if he's released,

20   he'll be able to go back to work or find different work.  He's

21   discussed the availability of a job in marketing, and I don't

22   know what restrictions may be either from the Court or from the

23   bankruptcy trustee or receiver in terms of his ability to wind

24   down the affairs or conduct the affairs of the business.  Either

25   way, he's going to follow whatever conditions are laid down by

8

**USA v. Roglieri - 24-MJ-261**

 1   either this Court or whoever does it.

 2           As I mentioned, Mr. Roglieri, no criminal history, no

 3   history criminal or otherwise with respect to violence or

 4   violent acts.  And this is doubly significant, I think, given

 5   what the government's outlined not just generally for the

 6   history and characteristics of the defendant, although it goes

 7   to that too, but more importantly, again more information for

 8   which the Court can contextualize some of the things that have

 9   been said allegedly on Mr. Roglieri's part in terms of comments

10   he made, which I'll get to in just a moment.

11           The key point or one of the key points here is that

12   Mr. Roglieri has been aware of the -- either the potential at a

13   minimum or the likelihood of criminal charges as a result of

14   this case and this investigation for the better part of at least

15   six months or so.  He hasn't fled.  He hasn't done anything to

16   obstruct the proceedings.  He's shown up in Bankruptcy Court.

17   He's participated fully in the hearings, in the back and forth

18   with the lawyers, with bankruptcy judges, trustees, et cetera.

19           The government did include an email exchange that was

20   Exhibit 1 to its filing.  I think there's one part in particular

21   that it did that for, sort of an inflammatory aside that

22   Mr. Roglieri appeared to respond to the trustee with.  I don't

23   think the Court should give that too much credence.  Here's why.

24           This is someone who, over a relatively lengthy period

25   of time, Mr. Roglieri is trying to convince to authorize him to

A50

**USA v. Roglieri - 24-MJ-261**

1    do certain things or to release certain amounts of money.  He's

2    someone who he wants to keep on his good side.  The last thing

3    in the world he wants to do is aggravate or alienate this person

4    to the point where he's not going to be permitted to draw down

5    on certain funds or do whatever it is he's trying to do.  So --

6             THE COURT:  Mr. Sporn, sir, if it will help you, the

7    emails that are contained in Exhibit 1 are not particularly

8    concerning to the Court.  At some point, you need to move on to

9    what's attached to Exhibit 2, which are much more concerning

10   matters to the Court.

11            MR. SPORN:  I will, Your Honor.  I appreciate the

12   guidance the Court has given in that regard.

13            I think referring to these comments in the text

14   messages that are government Exhibits 2, 3, and 4 as threats or

15   a desire or an intention to do harm, significantly overstates

16   not just what was said, but more importantly, what the actual

17   desire or intention is.

18            The government is right about one thing:  that over

19   the past six months or so, Mr. Roglieri's life has been upended.

20   There's a lot of different ways we can describe what's occurred

21   to him financially, professionally, emotionally, personally, and

22   now criminally.  Things, I don't want to say they're spiraling

23   out of control, but certainly, they're spiraling downward.

24            He's had a lot to deal with, a lot on his plate, and

25   occasionally, he's vented, as people need an outlet to express

A51

USA v. Roglieri - 24-MJ-261

1   their frustrations.  So he said some things that by themselves

2   in isolation, obviously appear somewhat troubling, at least to

3   the government and most likely to anyone that would view them.

4   We get that.  I understand the government's focus on bringing

5   them to the Court's attention.

6          But I think the Court needs to contrast that with

7   what's actually happened, and what has actually happened with

8   respect to those people, those witnesses, has been nothing.

9   There's been no threat communicated to a witness, to an

10  investigator, to an agent, to an attorney, certainly not to a

11  judge, nobody, Your Honor.

12         So it's one of several contradictions that underlie

13  these text messages.  Someone with no history of committing

14  crimes or assaults or violent conduct is suddenly spouting off

15  about vague, abstract notions of doing harm, more like he's just

16  quoting bad movies or TV shows -- not necessarily bad movies or

17  TV shows, but things that you hear in popular culture that don't

18  reflect who he is, that don't reflect what he's trying to do.

19         Bluntly, Judge, he's been aware of this for six

20  months.  If he were the type of person to have an inclination to

21  harm someone, we would see more in the record than just text

22  messages and idle talk and idle chatter.  That's really what it

23  is.

24         I want to focus on one issue that in my mind, is not

25  related, but for the Court's analysis, may be.  Mr. Roglieri

11

**USA v. Roglieri - 24-MJ-261**

1    voluntarily turned over firearms for storage back in February, I

2    believe.  He worked closely with Mr. Dryer to get that done, I

3    think well before he was required to.  In the course of going

4    through his home, he came across three additional firearms that

5    he had forgotten were there.  He's brought that to our attention

6    now.  His girlfriend, I believe, can remove those from the home

7    so that he doesn't have access to them.

8         It's not a question of trying to hide anything or

9    evade scrutiny, and if it were, again, the record would be

10   different.  It would not be three antique long guns or shotguns

11   from a century ago.  That's what it appears to be.  He did have

12   a concealed carry permit.  That's been suspended, and the rest

13   of the firearms have been turned over for storage, and we're

14   happy to turn over these three as well.  Again, much more in the

15   issue of an oversight than any intentional part, intentional

16   withholding on Mr. Roglieri's part, and he's the person who's

17   brought it to our attention to potentially resolve.

18        I think there's a distinction in some of the things

19   the government has brought to the Court's attention between the

20   documentary evidence that it appears to have in the way of text

21   messages, and to a lesser extent, the email exchange and what

22   someone we're referring to as person No. 1 has brought to the

23   attention of law enforcement, of law enforcement.  None of her

24   comments have been corroborated the same way that we have

25   documentary evidence of the text messages.

A53

**USA v. Roglieri - 24-MJ-261**

1    As the Court is aware, this is a person who has an ax

2    to grind with Mr. Roglieri, who is adverse to him currently, who

3    has every reason in the world to bring him down.  She's not the

4    only one, but certainly among them.  I think the Court should

5    take those comments with an immense grain of salt given who she

6    is, some other information that's been brought to my attention

7    on her reliability these days, lack of stability, someone with

8    an ax to grind against Mr. Roglieri.

9    And with respect to a specific and detailed threat, I

10   disagree with that.  I think whatever she's saying is seemingly

11   much more generalized than anything specific.  There's an

12   allegation about knowing an address of where someone lived.  He

13   doesn't know where these people live.  He doesn't care where

14   they live, and the only reason he would care where they live is

15   so that he could know to stay away from that vicinity if he's

16   released.

17   I think the Court can set conditions that would assure

18   the safety of the community and everyone in it including law

19   enforcement, including anyone involved in bankruptcy or other

20   civil cases.  And it may be that those conditions include some

21   degree of electronic monitoring or ankle monitor so that if for

22   whatever reason, Mr. Roglieri went someplace he wouldn't go, the

23   Court would be aware immediately.

24   That said, there's nothing really in the record to

25   suggest that this is anything other than just a man whose life

13

**USA v. Roglieri - 24-MJ-261**

1   is seemingly falling apart, and he's saying these things to blow

2   off some steam, and if that's the worst of if and it goes no

3   further, then I think that's what it is.

4              THE COURT:  My question, Mr. Sporn, is:  How do I know

5   that?  I mean I read these texts, in which he allegedly sent a

6   text saying, among other things, "I find myself getting angry

7   and vengeance to those doing this including the attorneys, the

8   judge, and the receiver."  How do I know those are just idle

9   threats as opposed to some intention as to what he is going to

10  do?

11             MR. SPORN:  Well, Your Honor, because that occurred in

12  January, so six months ago, and again, nothing has happened.

13             THE COURT:  So then what about this report of a

14  conversation that took place on Friday, May 24, in which

15  person-1 told the FBI that your client had told him where he

16  knew where the three FBI agents investigating him lived and he

17  would put a bullet in the agent's head?

18             MR. SPORN:  We deny that Mr. Roglieri said that, Your

19  Honor.  Didn't happen.

20             THE COURT:  I understand, but it's clearly concerning

21  to the Court.

22             MR. SPORN:  As I understand it probably would be, but

23  our position is that that didn't happen.  He didn't say those

24  things, and without the same degree of corroboration that we see

25  in the text messages, I think the Court should look much more

**USA v. Roglieri - 24-MJ-261**

1   askance at that type of summary evidence from person-1 without

2   frankly her coming in here and my being able to cross-examine

3   her and probe a little bit further.  Our position is simply he

4   did not say those things.

5           THE COURT:  All right.

6           MR. SPORN:  There were other things going on in

7   Mr. Roglieri's life at the time of some of these communications.

8   I don't want to go into them in further detail, but again, just

9   to underscore, he's someone who's gone through an extraordinary

10  crucible these last six months in terms of the pressure that

11  he's felt himself under, that he's legitimately been under.

12  It's not just his perception, of course.  It's the reality, but

13  the reality is whatever the tenor of his comments, and yes,

14  they're disturbing, there's been absolutely nothing that he's

15  done to give the Court any idea that this was anything more than

16  idle talk, idle chatter, venting, blowing off steam, whatever

17  you want to call it.  And for those reasons, I don't think

18  there's enough in the record for the Court to conclude that its

19  only option at this point, given the utter lack of criminal

20  history and violence, is to keep him detained.

21          The thing I want to just close with is the government

22  has said the Court should not release the defendant so that he

23  can make that plan come to fruition.  I agree with that, but

24  there's no plan.  There never was a plan.  He doesn't have

25  access to firearms.  He doesn't have the desire or intention to

15

**USA v. Roglieri - 24-MJ-261**

1    harm anyone, and I think he needs to be given an opportunity to

2    demonstrate that to the Court, that he's not the type of person

3    that it might otherwise appear he is.

4              If I could just consult very briefly.

5              THE COURT:  Take as much time as you need, Mr. Sporn.

6              MR. SPORN:  Thank you.

7              I said lastly earlier.  This time, I really mean it.

8              THE COURT:  I'm not going to hold you to that,

9    Mr. Sporn.  Go ahead.

10              MR. SPORN:  Thank you.  With respect to the weight of

11   evidence, the government included some information that the

12   Court could sort of make of it as it will in terms of the weight

13   that it gives -- the weight that it gives that factor under the

14   3142 analysis.  I disagree with that.  I think there's authority

15   in the circuits and elsewhere that the weight of the evidence is

16   typically afforded the least consideration in terms of the 3142

17   factors.  There may be other things that are more important

18   including the defendant's history and characteristics, and

19   that's something the government I think has really glossed over

20   here, but in our minds, it's what justifies and warrants release

21   under the circumstances.

22              THE COURT:  Thank you, Mr. Sporn, sir.

23              MR. SPORN:  Thank you.

24              THE COURT:  The government wish to be heard further?

25              MR. ROSENTHAL:  Yes, very briefly, Your Honor.  First,

**USA v. Roglieri - 24-MJ-261**

1    it seems that a lot of the presentation, at least the start from

2    the defense, dealt with risk of flight, and that's not an issue

3    we're pressing here.

4             In terms of weight of the evidence, I think that I

5    just want to make one point on that.  While it's definitely a

6    secondary point to the other considerations we've put into our

7    letter, I think the greater point is this, that the defense

8    admits that there's a downward spiral going on here.  The

9    evidence is exceedingly strong and provides more of a motivation

10   to commit a violent act.

11            And again, person-1's prior report was corroborated

12   with text messages.  Maybe the defendant didn't put this one in

13   writing, but just the specificity is extremely troubling.  And

14   for those reasons and as we've outlined in our prior submissions

15   and today, we continue to seek detention.  I'm happy to answer

16   any questions if the Court has them.

17            THE COURT:  I have none, counselor.  Thank you.

18            Mr. Sporn, sir, would you like the last word?

19            MR. SPORN:  I would, Your Honor.  It will be a brief

20   one.  Just in terms of in terms the last points that

21   Mr. Rosenthal made, it wasn't in writing because it never

22   happened.

23            And the last thing I want to leave the Court with is

24   again one of these contradictions or contrast between the words

25   and the actions.  We have several occasions or at least one

A58

**USA v. Roglieri - 24-MJ-261**

1  occasion where the FBI went to Mr. Roglieri's residence and

2  executed search warrants, and as noted even in the government's

3  letter -- and to give them their credit, they included that --

4  he didn't do anything.  He didn't mouth off.  He was courteous.

5  He wasn't disrespectful.  He wasn't violent.  I think that was

6  his opportunity to put his money where his mouth was, in terms

7  of these threats.  He didn't do anything.  So he's talking like

8  a lion, but he's acting more like a lamb, and I think that goes

9  to what he was going through and saying in those messages.

10          THE COURT:  Anything else for the government?  I just

11  asked to be polite.

12          MR. ROSENTHAL:  No, Your Honor, thank you.

13          THE COURT:  The record should reflect that the Court

14  has had an opportunity to listen to the arguments of counsel.

15  The Court has reviewed the criminal complaint in this matter.

16  The Court has reviewed the Pretrial Services Report.  The Court

17  has reviewed the lengthy letter which was submitted by the

18  government on June 2 of 2024 including all of the text messages.

19  The Court has considered all the appropriate statutory factors

20  and considerations under the Bail Reform Act.

21          The government argues that there are no conditions or

22  set of conditions I could set which would insure Mr. Roglieri's

23  safety in the community, and therefore, he should be detained.

24  The Court agrees with the government, and I find there are no

25  condition or set of conditions I could set which would insure

18

**USA v. Roglieri - 24-MJ-261**

1    Mr. Roglieri's safety in the community.

2              In reaching that conclusion, I would note a number of

3    things.  Number one, it appears that the government's evidence

4    in this case is strong.  There appears to be substantial

5    evidence which supports the allegations set forth in the

6    complaint.  The Court would further note that the nature of the

7    charge alleges he'd engaged in fraud in an amount which appears

8    to be in excess of $40 million.

9              While Mr. Sporn has tried and done an admirable job in

10   trying to explain away these text messages, they are deeply

11   disturbing to the Court, one of which reads, "I am wearing

12   down."  The next one reads, "I feel myself getting angry and

13   vengeance to those that are doing this including the attorneys,

14   the judge, and the receiver."  That appears to the Court to be

15   clearly a threat against those people involving the use of

16   violence.

17             At a further point writes, "I don't really play by the

18   rules.  I never have and never will.  And that's dangerous as I

19   feel myself getting to the point with all involved against me."

20   All of those statements raise grave concern for the Court as to

21   the safety of the FBI agents, the Court personnel, and judges.

22             The Court further finds deeply disturbing these

23   allegations set forth in the government's letter as conveyed by

24   person-1, indicating on May 24 of 2024, person-1 advised the FBI

25   that the plaintiff -- excuse me, the defendant told her he was

A60

**USA v. Roglieri - 24-MJ-261**

1    in a dark place and felt he would be indicted soon.  He

2    allegedly further told person-1 that he knew the address of

3    three FBI agents who were investigating him.  He knew the home

4    address of one of the agents, who he correctly identified by the

5    first name, and said he would put a bullet in the agent's head.

6    In addition, in a later interview, he said he knew where one of

7    the agents lived.  He would not put it past himself to put a

8    bullet in the agent's head.

9         All of those comments, text messages, and those

10   allegations set forth in the people's letter are deeply

11   disturbing to the Court.  There's nothing I can do with respect

12   to setting conditions that would address those.  If I put him on

13   electronic monitoring and GPS and he's determined to follow

14   those on those alleged threats, I have no ability to stop him

15   from doing so, and neither would pretrial services.

16        I would further note that Mr. Roglieri has a history

17   involving ownership of substantial numbers of firearms.  I would

18   note that pursuant to a warrant which was issued by this Court,

19   they searched his property, and among other things, observed

20   numerous firearms including an AR-15 style rifle and a

21   high-capacity magazine.  Possession of some of these weapons

22   resulted in state charges, which are currently pending against

23   Mr. Roglieri.

24        Given all of those factors and considerations, I find

25   there are no conditions or set of conditions I could set which

20

**USA v. Roglieri - 24-MJ-261**

1  would insure Mr. Roglieri's safety in the community.  I'm

2  therefore remanding him to detention pending further proceedings

3  in this matter.

4  Mr. Sporn, sir, would your client like the Court to

5  schedule a preliminary hearing in this matter?

6  MR. SPORN:  At this time, Your Honor, we'd reserve on

7  that and get back to the Court if necessary going forward.

8  THE COURT:  Anything else the Court can do for the

9  government?

10  MR. ROSENTHAL:  No, Your Honor, thank you.

11  THE COURT:  Mr. Sporn, sir, anything else I can do for

12  you or your client?

13  MR. SPORN:  Your Honor, I'm wondering if the Court

14  might consider if the defense were to obtain a risk or threat

15  assessment from someone who can sit down with Mr. Roglieri and

16  get a better sense of who he is and where he's coming from, and

17  bring that to the Court's attention and come up with maybe a

18  counseling plan for him to speak to someone as an outlet if he

19  were to be released.

20  THE COURT:  If you can come up with such a plan, you

21  can submit it to the Court.  I'll give the government a chance

22  to respond to it.  I'll determine whether or not that is a

23  sufficient basis for a further hearing.  So I'm not saying I

24  will or will not do it until I see the plan and see what it

25  involves.

21

**USA v. Roglieri - 24-MJ-261**

1          MR. SPORN:  Understood, Your Honor.  Thank you.

2          THE COURT:  Mr. Barnett and Mr. Rosenthal, sir, if he

3   does, then I'll give you an opportunity to respond.

4          MR. ROSENTHAL:  We appreciate that.  Thank you.

5          THE COURT:  You folks are all set.  Everyone have a

6   good afternoon.  Thank you.

7          THE CLERK:  Court is adjourned.

8                    (The matter adjourned at 3:42 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A63

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

       v.

KRIS ROGLIERI,                  No. 1:24-MJ-261
                              (CFH)

                      Defendant.

---

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### ORDER OF DETENTION

The defendant appeared before the undersigned for a detention hearing on June 3, 2024. The United States moved for the detention of the defendant, contending that the defendant was a danger to the community. The defendant opposed the government's motion.

Wherefore, the undersigned finds, for the reasons stated herein and those incorporated by reference, which were stated on-the-record at the conclusion of the detention hearing on June 3, 2024, that there are no conditions or combination thereof which would assure the safety of the community. Accordingly, it is hereby

**ORDERED** that pursuant to 18 U.S.C. § 3142(f), the defendant shall be detained without bail pending trial in this case.

**IT IS SO ORDERED**.

Dated:  June 3, 2024
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

A64

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
## FOR THE NORTHERN DISTRICT OF NEW YORK

Syracuse Office

4 Clinton Square
3ᴿᴰ FLOOR
SYRACUSE, NY 13202
(315) 701-0080
(315) 701-0081 FAX

Lisa Peebles
Federal Public Defender



Albany Office

54 State Street
STE 310
ALBANY, NY 12207
(518) 436-1850
FAX (518) 436-1780

Paul Evangelista
First Assistant

October 25, 2024

Hon. Christian F. Hummel, U.S. Magistrate Judge
James T. Foley U.S. Courthouse
445 Broadway, Room 441
Albany, NY 12207

      re:    United States v. Kris Roglieri
               Case No. 24-mj-261 (CFH)

Dear Judge Hummel:

    At the close of the initial detention hearing held on June 3, 2024 the Court indicated that if

the defense can come up with a risk or threat assessment and a counseling plan the Court would

consider it after allowing the government to respond and would make a determination if it provided

a sufficient basis for a further detention hearing. *See* Transcript of Detention Hearing held on

6/3/2024, Dkt#21, at pg. 20.

    A risk assessment evaluation was conducted by New Paradigm Psychological Services, PLLC

and a report was completed on October 15, 2024.  That has been filed on the docket this afternoon

as a medical record.  The ultimate conclusion by Dr. Dodge was, "Given the totality known

information at this time, it is the overall opinion of this evaluator that Mr. Roglieri's risk of violence

A65

is minimal." Put another way, it is not possible for any able-bodied man to have a lower risk of violence than Mr. Roglieri.[1]

Based in part on that report Elizabeth Walker, DSW, LICSW, of the Federal Public Defender's Office, NDNY, has prepared a detailed release and treatment plan.[2] Ms. Walker was not available to provide any assistance generating such a plan prior to the initial detention hearing in June because she was not employed by our office until July, and our office did not previously have any employees who were licensed social workers with a doctorate in social work and for that reason her plan provides "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 1342(f)(2).

Finally, in the Court's Decision and Order on August 5, 2024 to deny Mr. Roglieri's request to reopen the detention hearing the Court noted that the defense "fails to address defendant's history of owning numerous firearms." Decision and Order, Dkt #32, at pg. 3. It is unclear to the defense why a citizen's legal exercise of his rights pursuant to the Second Amendment to the Constitution would need to be addressed. Owning numerous firearms provides no greater inference of a danger of violence towards others than numerous exercises of one's first amendment rights would necessarily infer any propensity to commit wire fraud.

That being said, Mr. Roglieri is an avid hunter and sports shooter (skeet and trap shooting). The majority of the firearms in his house on February 2, 2024 were inherited from his father when he passed away in 2022. As the Court is already aware, all firearms previously in his possession are

---

[1] To be fair, comatose or quadriplegic individuals could ostensibly be determined to have a lower risk of violence than Mr. Roglieri.
[2] Attached hereto as Exhibit 1.

A66

now in the custody of third parties and out of Mr. Roglieri's control. The pending indictment alone is sufficient to prevent his legal acquisition of any new firearms.

Having provided information not available at the time of his detention hearing on June 3, 2024, Mr. Roglieri requests that the detention hearing be reopened so the Court can consider release on conditions that will mitigate any danger to the community, which is minimal based on the conclusions of Dr. Victoria Dodge.

Sincerely,

Matthew E. Trainor
Assistant Federal Public Defender, Albany Office
Bar Roll # 105643
matthew_trainor@fd.org

cc:    AUSA Joshua Rosenthal – via ECF
       AUSA Michael Barnett – via ECF
       USPO Amy Brancatelli – via email

A67

# Exhibit 1

Release & Treatment Plan

(redacted)

A68

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# FOR THE NORTHERN DISTRICT OF NEW YORK



**Syracuse Office**                                                                     **Albany Office**

**4 Clinton Square**                                                                    **54 State Street**
**3RD FLOOR**                                                                           **STE 310**
**SYRACUSE, NY 13202**                                                                  **ALBANY, NY 12207**
**(315) 701-0080**                                                                      **(518) 436-1850**
**(315) 701-0081 FAX**                                                                  **FAX (518) 436-1780**

**Lisa Peebles**                                                                        **Paul Evangelista**
**Federal Public Defender**                                                             **First Assistant**

October 18, 2024

Attorney Matthew Trainor
Assistant Federal Public Defeder
54 State Street
Albany, NY 12207

> **Re:**   <u>United States v. Kris Roglieri</u>
> Case No. 24-cr-00161-CFH

Dear Attorney Trainor:

Please accept this memo to aid in your advocacy for an alternative to pretrial detention for Mr. Kris Roglieri. I am the mitigation specialist assigned to this case. I'm an independently licensed clinical social worker and I have a doctorate in social work. To prepare this memo, I met with Mr. Roglieri and spoke at length with his partner, Ms. Linda Oliver; his brother, Dr. Joe Roglieri; and his ex-wife, Tina Roglieri. I also reviewed Dr. Dodge's evaluation, received a verbal report about his behavior in detention from the jail, and read through several news reports and documents related to the instant case and to Mr. Roglieri's work in the community.

Mr. Roglieri has been detained since May of this year, totaling 140 days at the time of this memo. In the time that he has been detained, Mr. Roglieri's grandmother passed away at the age of 106. His mother, suffering from cerebral amyloid angiopathy, is quickly succumbing to dementia. According to his ex-wife, his two children, G█████ (age 14) and S█████ (age 12) have exhibited elevated anxiety and sadness due to their separation from their father. The collateral consequences of Mr. Roglieri's lengthy period of detention are significant; he will not get back time with his mother while she is still lucid enough to know him and his children are in an important developmental period in their lives.

A69

Mr. Roglieri's impeccable record in detention (zero disciplinary actions) has demonstrated to the Court that he is capable of both respecting law enforcement and supervision and avoiding dangerous individuals and situations. To Mr. Roglieri, the period of detention has "humbled" him. Dr. Joe Roglieri, in an interview for this memo, described how he has watched his brother move from totally distressed about losing his home, possessions, and lifestyle to "accepting that those things are just material, and they don't matter."

Given Dr. Dodge's assessment of minimal risk of violence and that he has a strong support network and that, if released, he will play an important role in caring for his ailing mother and his two children, Mr. Roglieri's release from detention can be both safely and adequately managed and will give him the opportunity to be a needed support to his family. The following plan outlines where he will be living, who will support him, the activities he will engage in, and the care he will receive to support his adjustment to his new environment and the pressures of pending federal charges. Although Mr. Roglieri's risk of dangerousness or failure to appear are already minimal, the below plan further mitigates concerns. I have attached to (and embedded in) this memo pictures that the family has shared with me, both of his proposed living environment and of his family.

**Proposed Residence**

Ms. Linda Oliver, consulted for this memo, confirmed that if released Mr. Roglieri will live with her in her rented home ███████████████ in Poughkeepsie, New York.  Ms. Oliver works in Manhattan several days a week and, reportedly, settled in Poughkeepsie to be equidistant from Mr. Roglieri's children and her work. The home is a single-family home in a quiet neighborhood of the small city. Ms. Oliver proudly reported that she has worked to make the home comfortable (i.e. laying down hardwood floors) and welcoming for Mr. Roglieri's two children.  She set up an office for Mr. Roglieri and created an outdoor living area to give him space should there be restrictions on his movement.  Ms. Oliver owns a car and confirmed that Mr. Roglieri can have access to it as needed to comply with any conditions of release.

Specific to the concerns of the Court, Ms. Oliver confirmed that there are no firearms in her home, and she welcomes Probation's inspection and visits. She is proud of the home she has established for the couple.

**Proposed Activities**

Although Mr. Roglieri reported that he expects to spend much of his time studying and reviewing documents related to his defense, he also has community and familial obligations he will attend to if he is released.  Mr. Roglieri is the youngest child of his family.

His mother named him "Kris" as a nod to Kris Kringle and his Christmas birthday. Dr. Joe Roglieri reported that mother and son have always been close. Ms. Brigita Roglieri moved into the TenBroeck nursing home in Lake Katrine, NY, in January of this year.  Diagnosed with a rare brain condition, cerebral amyloid angiopathy (CAA), the family matriarch lost her ability to live independently as the disease progressed. The end stags of CAA involve recurrent brain hemorrhages, severe cognitive decline, and other neurological impairments. The nursing home is 26 miles from Ms. Oliver's home in Poughkeepsie. If released, Mr. Roglieri will regularly spend time with his mother as she endures the final stages of her disease. Dr. Roglieri expressed, "my biggest fear is that she will suffer a catastrophic stroke and never see my brother again."

In addition to caring for his mother and aiding in his defense, Mr. Roglieri will attend church with Ms. Oliver at Christ Episcopal Church in Poughkeepsie, NY.  Ms. Oliver reported that she spoke to her pastor about Mr. Roglieri and his situation and that the pastor invited him to do volunteer work at the church and with the congregation. Ms. Oliver hopes that her partner will use his advanced piano skills to enrich services.  Mr. Roglieri has a strong track record of giving back to the community. For several years he distributed Thanksgiving dinners to families in need; in 2023, for example, he donated and distributed 1,500 frozen turkeys and sides to families in the Arbor Hill neighborhood of Albany (see attached CBS news coverage



screenshot). Mr. Roglieri also hosted an annual fundraiser at his home for the Melodies Center for Childhood Cancer and Blood Disorders; raising over $39,000 in 2020 (see inset picture).  Volunteering in the community is a core to Mr. Roglieri's values and he looks forward to engaging in community betterment work if he is released.

Finally, as noted above, Mr. Roglieri has two children, ages 12 and 14. His ex-wife, interviewed for this memo, reported that "Kris has always been a good father." Although the parents separated over five years ago, Mr. Roglieri split custody of the children with his ex-wife and was very active in their school and sport activities. Until the destruction of his business, he financially supported his ex-wife and his children completely. Ms. Tina Roglieri only started working recently.  Ms. Roglieri reported that the children have suffered in their father's absence.  His 14-year-old daughter is anxious about his safety and when she will see him again. His 12-year-old son has grown sullen.  The father and children

exchange letters regularly, but the confusion over Mr. Roglieri's arrest, their drastic lifestyle change, and their lengthy separation remains an unspoken tension. Mr. Roglieri does not want to expose his children to the jail environment and therefore has not visited with them in person in the months he's been detained. If released, Mr. Roglieri is committed to working to repair the damage done to their relationship and re-engaging in regular parenting and caretaking of his children.

**Proposed Treatment**

At the time of his detention on the instant case Mr. Roglieri's world was crumbling. His once successful business was in ruins, his hard-earned image as a community philanthropist was besmirched by serious allegations of wrongdoing, and he was unable to continue to support his children in the way he had always prided himself in doing. Acute depressive thoughts flooded his brain. In the months since his detention, the pressure dissipated, and Mr. Roglieri reports to feel calmer and more accepting of his situation.

Mental health treatment, specifically psychotherapy to address stressors of significant life transitions, management of destructive thoughts, and relationship support, is appropriate for Mr. Roglieri. While detained, Mr. Roglieri applied for Medicaid. In preparation for Mr. Roglieri's possible release, I reached out to psychotherapists local to the Poughkeepsie area and have identified two who are accepting new patients, accept Medicaid, and specialize in areas relevant to Mr. Roglieri's needs. If released, Mr. Roglieri will engage in weekly psychotherapy.  Dr. Joe Roglieri agreed to cover any costs associated with his brother's mental health treatment until his insurance coverage commences.

**Proposed Supports & Third-Party Custodian**

Everybody interviewed for this report, including Mr. Roglieri's ex-wife, Tina Roglieri, expressed support for his release from detention.   Dr. Roglieri is a practicing nephrologist in the Troy area and agreed to support his brother both emotionally and materially as he works to get back on his feet. Mr. Roglieri's partner, Ms. Linda Oliver has remained committed to Mr. Roglieri through the investigation, arrest, and detention. She has been active in preparing this report and is quick to respond to messages and inquiries. Ms. Oliver is a working fit model for the fashion industry. She commutes to Manhattan several days per week and independently supports herself- and now, Mr. Roglieri as well.

If needed, Ms. Oliver is willing to assume the responsibilities of a third-party custodian for Mr. Roglieri.  She agreed to work with probation and the court to ensure that Mr. Roglieri is compliant with any conditions of release. She affirmed her understanding that the role of third part custodian will require her to assume responsibility for monitoring Mr. Roglieri in the community and reporting any infractions. In response to my inquiry

about her willingness to perform these duties she responded affirmatively and added, "everything will be super organized, that's the way I am."

**Summary**

Dr. Dodge's assessment that Mr. Roglieri poses "minimal" risk of violence is supported by non-existent history of any anti-social behaviors or violence. His brother reported, "I don't think Kris ever even got in a fight in high school." Two ex-girlfriends submitted character letters in support of Mr. Roglieri and his ex-wife, Tina Roglieri, agreed to be interviewed for this memo.  None report aggression or violence.

Prior to building up his financial company, Mr. Roglieri worked in a non-profit supporting people with developmental disabilities. He has lived experience in poverty as a child and has demonstrated resilience and determination throughout his life. All describe him as family-oriented and caring towards his loved ones. Given Mr. Roglieri's mother's serious and progressive illness, the community supports available to him, his two children's need for their father, his history of good character, the objective assessment of minimal risk to the community and minimal flight risk, it is appropriate to release Mr. Roglieri to the home of his partner, Ms. Linda Oliver with community supervision.

Please contact me with further requests for service coordination or monitoring as appropriate.


Respectfully,

*E. Walker*
_____
Elizabeth Walker, DSW, LICSW
Mitigation Specialist

A73

Family photos shared for this memo



Mr. Roglieri's mother, Brigita Roglieri



Mr. Roglieri and his children



Christ Episcopal Church, Poughkeepsie



Ms. Linda Oliver with Mr. Roglieri and children



Ms. Oliver's home at ███ Poughkeepsie

The Big Giveback 2022

A74

https://cbs6albany.com/news/local/for-fourth-year-big-give-back-provides-thanksgiving-meals-to-area-families



## For fourth year, Big Give Back provides Thanksgiving meals to area families

by WRGB Staff | Sun, November 19th 2023 at 5:31 PM
Updated Sun, November 19th 2023 at 7:06 PM

*For fourth year, Big Give Back provides Thanksgiving meals to area families (WRGB)*



**TOPICS:**  THANKSGIVING   TURKEYS   BIG GIVE BACK   FAMILIES   ALBANY   LOCAL   MEALS   DISTRIBUTED

ALBANY, NY (WRGB) — For the fourth consecutive year, two Albany business owners are teaming up to provide Thanksgiving meals to local families. The Big Give Back gave out 1,500 turkeys, running out within an hour.

A75

November 1, 2024

**By ECF**

Hon. Christian F. Hummel
U.S. Magistrate Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207

    **RE:**   **United States v. Kris Roglieri**, No. 1:24-CR-392 (MAD)

Dear Judge Hummel:

    Pursuant to Local Criminal Rule 49.2(b), we respectfully submit this letter in support of the government's motion for limited sealing of its letter in opposition to the defendant's second motion to reopen his detention hearing (Dkt. # 48). The portions of the letter that are subject to the government's limited sealing request address the same subject matter that the Court previously sealed in response to the defendant's June 12, 2024 sealing request, *see* Dkt. # 16, as well as the psychologist's report submitted under seal with the defendant's new motion and a discussion of minors. A proposed redacted version of the government's letter in opposition is enclosed with this letter.

    We thank the Court for its attention to this matter.

                          Respectfully submitted,

                          CARLA B. FREEDMAN
                          United States Attorney

By:    _____

                          Joshua R. Rosenthal
                          Michael Barnett
                          Assistant United States Attorneys
                          Bar Roll Nos. 700730 & 519140

Encl.

cc:    AFPD Matthew E. Trainor / AFPD Jeremy B. Sporn (by ECF)

A76



**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

*445 Broadway, Room 218*        *Tel.: (518) 431-0247*
*James T. Foley U.S. Courthouse*        *Fax: (518) 431-0249*
*Albany, New York 12207-2924*

November 1, 2024

B ECF // F  R    
**BY ECF // FILED WITH REDACTIONS**

Hon. Christian F. Hummel
U.S. Magistrate Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207

     **RE:   United States v. Kris Roglieri, No. 1:24-CR-392 (MAD)**

Dear Judge Hummel:

     We respectfully submit this letter in opposition to the defendant's second motion to reopen his detention hearing under 18 U.S.C. § 3142(f) (Dkt. # 48), which requires the movant to proffer new information that was (1) unavailable at the time of the initial detention hearing; and (2) would have been material to the court's original detention decision. The defendant's new motion suffers from the same fatal flaws as his prior attempt to re-litigate his pretrial detention. In August, this Court denied the defendant's first motion to reopen the detention hearing because "none of defendant's new submissions constitute new evidence which was unavailable at the time of the [June] detention hearing." Dkt. # 32 at 3. The Court then ruled that the defendant's newly proffered evidence also "fail[ed] to address in any way the allegation that defendant threatened to harm the attorneys, receiver, and judge in his bankruptcy proceeding and the allegation that he knew where three FBI agents lived and threatened to shoot at least one of them in the head." *Id.* Now, taking a third bite at the apple, the defense submits (1) a release and treatment plan recently prepared by Elizabeth Walker, a new mitigation specialist at the Federal Public Defender's Office; and (2) a forensic mental health assessment prepared in early October by Psychologist Victoria Dodge. The reports do not meet either prong of Section 3142(f)'s test, so reopening the detention hearing is, once again, not merited. As Your Honor already observed, defense counsel's "failure to request an adjournment of the original detention hearing to gather" materials such as "a mental health evaluation of defendant" is "not a sufficient basis upon which to justify a new detention hearing." Dkt. # 32 at 3. And even if that were not the case, the defense's newly proffered reports do not change the Court's prior finding that no set of conditions can mitigate the danger that the defendant poses. The instant motion should therefore be denied without a hearing.

     ***The Defendant Still Fails to Present Previously Unavailable Information.*** The defense's latest attempt to transform bail determinations into an iterative process should be rejected. The rationale for Section 3142(f)'s new evidence requirement is to encourage parties to be diligent in bringing forth all material evidence the first time a hearing is held and to discourage piecemeal

<div align="right">

# A77

</div>

Page 2

presentations. *See, e.g., United States v. Chappell*, 2017 WL 11517833, at *4 (N.D. Tex. Oct. 10, 2017). Here, the defense asks the Court to reopen the hearing because the Federal Public Defender's Office hired Ms. Walker in July. *See* Dkt. # 48 at 2. In the defense's telling, it was not possible to procure a release and treatment plan until Ms. Walker's onboarding. *See id.* This argument does not hold water. Indeed, at the conclusion of the June 3, 2024 detention hearing, defense counsel indicated that the defense might obtain a "risk or threat assessment" and "counseling plan," *see* June 3, 2024 Tr. at 20, showing that the defense was fully cognizant of the desirability of having such documents prepared for the Court at the time of the initial hearing. But rather than "request[ing] an adjournment of the original detention hearing to gather such information," the defense pressed on at the earliest possible juncture, which, as this Court already held, "is not a sufficient basis upon which to justify a new detention hearing." Dkt. # 32 at 3; *see United States v. Civitello*, No. 1:21-cr-386 (MAD) (N.D.N.Y. Feb. 23, 2022) (Stewart, J.) (denying motion to reopen detention hearing and explaining "[t]he failure to request a delay . . . is also not a sufficient justification for reopening the detention hearing"); *cf. United States v. Martin*, 2015 WL 1738362, at *2 (N.D. Cal. Apr. 13, 2015) (rejecting defense argument that defendant's completion of anger management classes while in pretrial detention constituted new information because under such a theory, "any defendant can seek to reopen detention hearings simply by taking courses offered to them while they are in custody," which "would lead to judicially inefficient practices"). This pattern then repeated itself: the defense filed its first motion to reopen the detention hearing on July 12, 2024 but did not submit any risk assessment materials or a release plan with that motion even though Ms. Walker joined the Federal Public Defender's Office around the same time. In other words, the defense has elected to proceed in a piecemeal fashion, which is improper. The motion can and should be denied on this basis alone. *See* Dkt. # 32 at 3; *see also, e.g., United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989); *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991).

**The Materials Proffered by the Defense Should Not Change the Court's Prior Decision.** Even if the Court considers the defense's newly proffered materials on the merits, they do not present a basis to disturb the Court's sound conclusion that there are no release conditions that it could set to reasonably assure the safety of others. While the defense seizes upon Dr. Dodge's statement that the defendant's "risk of violence is minimal," a closer look at her report and Ms. Walker's submission reveals several troubling details.

For starters, Dr. Dodge's conclusions are compromised by the defendant's manifest lack of veracity with her. The report, for instance, states that █████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████ as the defendant told his estranged wife in December 2023 that he feared he would "rip off [her] fucking throat and piss down [her] fucking neck." Ex. 1 at 7; *see also id.* at 8 (defendant responding "I don't give a fuck abou the cops [*sic*]" when the recipient suggested that she would report threat to law enforcement). What is more, Dr. Dodge based her conclusions, in

Page 3

part, on an observation that  In doing so, she ostensibly overlooked the grand jury's finding of probable cause that the defendant engaged in a brazen multimillion-dollar fraud scheme, the defendant's own admissions to committing financial crimes in the text messages that the government previously submitted to the Court, detailed allegations of fraud that have been lodged against the defendant by counterparties in numerous courts, and pending state firearms charges against the defendant. Against this backdrop, Dr. Dodge's conclusions about the risks presented by the defendant are unconvincing.

Still, Dr. Dodge's report is remarkable for some of its *other* conclusions. In examining the  All of this paints a picture of someone who cannot be trusted to control himself. It should only intensify this Court's concerns that the defendant's statements leading up to his arrest are "deeply disturbing" and cannot be addressed adequately through even stringent release conditions. June 3, 2024 Tr. at 19.

Next, Ms. Walker's release and treatment plan likewise would not have changed the Court's prior determination that detention is required. Ms. Walker represents that "[e]verybody interviewed for this report, including Mr. Roglieri's ex-wife, Tina Roglieri, expressed support for his release from detention." Dkt. # 48-1. That representation lacks context. As Ms. Roglieri explains, she has serious concerns about the defendant's mental health and stability. *See* Ex. 2. Ms. Walker's plan, which suggests that the defendant will live in a different federal district (the Southern District of New York), also lacks specificity. It does not list the provider for the "weekly psychotherapy" sessions in which the defendant will engage. *See* Dkt. # 48-1 at 5. Nor does it explain how the defendant's brother, who lives in Troy, or his girlfriend, who works in Manhattan "several days per week," will serve as "third-party custodian[s]" for the defendant or what such a task would entail. *Id.* Beyond describing volunteer work, the report does not explain whether or how the defendant will seek employment, which is a nearly universal condition of pretrial release. Simply put, the release plan omits important details and does not address the Court's "grave concern" that the defendant could defeat even the most restrictive conditions to follow through on his threats. *See* June 3, 2024 Tr. at 18-19.

In sum, the defense's reliance on the reports for its claim that that "it is not possible for any able-bodied man to have a lower risk of violence than Mr. Roglieri," Dkt. # 48 at 2 & n.1, is misplaced. The reports do not warrant reopening the detention hearing because they will not have a material bearing on this Court's carefully reasoned detention decision.

*        *        *

For these reasons, the defendant's second motion to reopen his detention hearing should be denied in its entirety and without a hearing.

A79

Page 4

Respectfully submitted,

CARLA B. FREEDMAN
United States Attorney

By:    _____
Joshua R. Rosenthal
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & 519140


cc:    AFPD Matthew E. Trainor / AFPD Jeremy B. Sporn (by ECF)
       Senior U.S.P.O. Amy Brancatelli (by Email)

A80

# Exhibit 1





**Extraction Report** - Apple iOS Full File system

## Participants



_$!<Other>!$_* (owner)

Me* (owner)

Kris*

## Conversation - Instant Messages (23)



From: [ ] Kris
To: [ ] e (owner)

I can't fucken wait until you bring a blue coller jack ass around.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Me | | 12/3/2023 1:43:12 PM(UTC+0) | |

Status: Read

12/3/2023 1:42:53 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E8F5DB (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)



From: [ ] Kris
To: [ ] Me (owner)

I'm gonna make fucking life so fucking miserable and emasculating. It's gonna be fucking hilarious.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| Me | | 12/3/2023 1:43:12 PM(UTC+0) | |

Status: Read

12/3/2023 1:43:05 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E8F367 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

A82

1



Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90F83 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90D6C (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90B67 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)

A83

2



From: ████ Me (owner)
To: ████ Kris

lol

| Participant | | Delivered | Read | Played |
|---|---|---|---|---|
| ████ | Kris | 12/3/2023 1:43:29 PM(UTC+0) | | |

**Status:** Sent

12/3/2023 1:43:29 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90964 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



From: ████ Me (owner)
To: ████ Kris

I don't care

| Participant | | Delivered | Read | Played |
|---|---|---|---|---|
| ████ | Kris | 12/3/2023 1:43:40 PM(UTC+0) | | |

**Status:** Sent

12/3/2023 1:43:40 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90744 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



From: ████ Kris
To: ████ e (owner)

You will

| Participant | | Delivered | Read | Played |
|---|---|---|---|---|
| ████ | Me | | 12/3/202 3 1:43:47 PM(UTC +0) | |

**Status:** Read

12/3/2023 1:43:46 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90504 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)

A84



From: ▮▮▮▮ Kris
To: ▮▮▮▮ Me (owner)

When that time comes

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮ Me | | 12/3/202 3 1:43:52 PM(UTC +0) | |

Status: Read

12/3/2023 1:43:52 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E90309 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)

From: ▮▮▮▮ Kris
To: ▮▮▮▮ Me (owner)

You fuck with the hand that feeds you and you're gonna get fucked up the ass
royally

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮ Me | | 12/3/2023 1:44:18 PM(UTC+0) | |

Status: Read

12/3/2023 1:44:17 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E91F83 (Table: message, handle; Size:
121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size:
1128912 bytes)



From: ▮▮▮▮ Me (owner)
To: ▮▮▮▮ ris

Please stop texting me .

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮ Kris | 12/3/2023 1:44:38 PM(UTC+0) | | |

Status: Sent

12/3/2023 1:44:37 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E91CF7 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)

A85



From: ▊▊▊▊ Me (owner)
To: ▊▊▊▊ Kris

I don't care

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▊▊▊▊ Kris | 12/3/2023 1:44:40 PM(UTC+0) | | |

Status: Sent

12/3/2023 1:44:39 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E91AAB (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



From: ▊▊▊▊ Me (owner)
To: ▊▊▊▊ Kris

I'm a good mom. A good person and I don't deserve any of this and I didn't deserve what you did to me years ago. So please let me life my life peacefully

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▊▊▊▊ Kris | 12/3/2023 1:45:46 PM(UTC+0) | | |

Status: Sent

12/3/2023 1:45:46 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E91875 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)



From: ▊▊▊▊ Kris
To: ▊▊▊▊ Me (owner)

Go to the chicken farm where you fucking belong.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▊▊▊▊ Me | | 12/3/2023 1:45:54 PM(UTC +0) | |

Status: Read

12/3/2023 1:45:54 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E9150C
(Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA
(Table: message; Size: 1128912 bytes)

A86



From: [redacted] Kris
To: [redacted] Me (owner)

Let me live peacefully instead of fuck out of my business

| Participant | Delivered | Read | Played |
|-------------|-----------|------|--------|
| [redacted] Me | | 12/3/2023 1:46:19 PM(UTC+0) | |

Status: Read

12/3/2023 1:46:19 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E92B55 (Table:
message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table:
message; Size: 1128912 bytes)



From: [redacted] Kris
To: [redacted] Me (owner)

Stay the fuck out of my business

| Participant | Delivered | Read | Played |
|-------------|-----------|------|--------|
| [redacted] Me | | 12/3/2023 1:46:35 PM(UTC+0) | |

Status: Read

12/3/2023 1:46:35 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E928F7 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



From: [redacted] Me (owner)
To: [redacted] Kris

Let's be clear . I didn't say a word to you about this

| Participant | Delivered | Read | Played |
|-------------|-----------|------|--------|
| [redacted] Kris | 12/3/2023 1:46:41 PM(UTC+0) | | |

Status: Sent

12/3/2023 1:46:41 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E926D6 (Table:
message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table:
message; Size: 1128912 bytes)

A87



From: ████████ Kris
To: ████████ Me (owner)

And whatever happens or comes to my house

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ████████ Me | | 12/3/202 3 1:46:52 PM(UTC +0) | |

**Status:** Read

12/3/2023 1:46:51 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x4E9243B (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0xE6FAA (Table: message; Size: 1128912 bytes)



From: ████████ Kris
To: ████████ Me (owner)

And listen, I'll gladly talk about this, but my fear is I'll rip off your fucking throat and piss
down your fucking neck. That's why I'm texting.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ████████ Me | | 12/3/2023 1:48:04 PM(UTC+0) | |

**Status:** Read

12/3/2023 1:47:17 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E93F83 (Table: message, handle; Size: 121409536
bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)



From: ████████ Me (owner)
To: ████████ ris

Keep talking like that to me and I'm gonna go to the cops. How about that?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ████████ Kris | 12/3/2023 1:48:16 PM(UTC+0) | | |

**Status:** Sent

12/3/2023 1:48:16 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E95F8D (Table: message, handle;
Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size:
1128912 bytes)

A88







From: [redacted] Me (owner)
To: [redacted] Kris

You are not going to fucking abuse me

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Kris | 12/3/2023 1:48:22 PM(UTC+0) | | |

**Status:** Sent

12/3/2023 1:48:22 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E95CDA (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Me (owner)
To: [redacted] Kris

Don't you ever fucking talk to me like that?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Kris | 12/3/2023 1:48:29 PM(UTC+0) | | |

**Status:** Sent

12/3/2023 1:48:28 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E95A76 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

From: [redacted] Kris
To: [redacted] e (owner)

I don't give a fuck abou the cops

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Me | | 12/3/2023 1:48:46 PM(UTC+0) | |

**Status:** Read

12/3/2023 1:48:46 PM(UTC+0)

Source Info:
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x4E957F6 (Table: message, handle; Size: 121409536 bytes)
00008110-00114C3822C0401E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal : 0xE6FAA (Table: message; Size: 1128912 bytes)

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      -against-

KRIS ROGLIERI,

                             Defendant.

**DECLARATION**
**Case No.: 1:24-cr-00392-MAD**

**STATE OF NEW YORK**   **)**
**COUNTY OF ALBANY**    **) ss.:**

Tina Roglieri, under penalty of perjury, declares as follows:

    1.      I am the estranged wife of Kris Roglieri. We were married on January 16, 2009 and share two children.

    2.      Kris and I have been separated since August of 2019 and we are in the process of obtaining a divorce.

    3.      Earlier this month, I was contacted by a social worker who told me she was working for Kris and his attorneys and that she had some questions for me about Kris and his relationship with our children.

    4.      I was caught off guard and surprised that Kris's lawyers would have someone contact me directly without going through my attorney, but I nevertheless agreed to speak with her.

    5.      Subsequently, I reviewed a letter dated 10/18/24 from this social worker addressed to the court, purportedly summarizing my answers to the social worker's questions.

    6.      The social worker left out some important things I told her, and I want to bring those things to the Court's attention.

{01554033.1}





12.    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of October, 2024.

TINA ROGLIERI

A92

# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# FOR THE NORTHERN DISTRICT OF NEW YORK



Syracuse Office                                                                    Albany Office

4 Clinton Square                                                                   54 State Street
3RD FLOOR                                                                          STE 310
SYRACUSE, NY 13202                                                                 ALBANY, NY 12207
(315) 701-0080                                                                     (518) 436-1850
(315) 701-0081 FAX                                                                 FAX (518) 436-1780

Lisa Peebles                                                                       Paul Evangelista
Federal Public Defender                                                           First Assistant

November 6, 2024

Hon. Christian F. Hummel, U.S. Magistrate Judge
James T. Foley U.S. Courthouse
445 Broadway, Room 441
Albany, NY 12207

      re:    United States v. Kris Roglieri
              Case No. 1:24-cr-392 (MAD)

Dear Judge Hummel:

I write in reply to the government's response in opposition to Mr. Roglieri's most recent request to reopen his detention hearing. *See* Letter from USA as to Kris Roglieri requesting limited sealing of government's letter in opposition, Dkt#51, hereinafter "Govt #51"

My first request was admittedly a bit ham fisted and ultimately insufficient to reopen the detention hearing under 18 U.S.C. § 3142(f)(2), however we have now provided information that was neither available nor known at the time of the original hearing. The new information consists of the risk evaluation report and the release and treatment plan submitted to the Court on October 25, 2024. *See* Medical Records filed as to Kris Roglieri, Dkt #47 hereinafter, "Risk Evaluation Report," *and* Letter from Matthew E. Trainor as to Kris Roglieri requesting reopening of detention hearing, Exhibit1, Dkt #48-1, hereinafter "Release and treatment plan."

A93

The government's allegation that the proffered reports do not change the Court's prior finding is up to the Court. The Court's primary concern at the original detention hearing was the risk of potential violence that "raise[d] grave concern for the Court as to the safety of the FBI agents, the Court personnel, and judges." *See* Transcript of Detention Hearing 6/3/24, Dkt#21 at pg. 18. The Court's ordered detention because it felt that was the only way to prevent actual physical violence by Mr. Roglieri. "If I put him on electronic monitoring and GPS and he's determined to follow [through] on those alleged threats, I have no ability to stop him from doing so, and neither would pretrial services." Transcript of Detention Hearing at pg. 19.

The government claims that because AFPD Jeremy Sporn requested the opportunity to provide such documents like the Risk Evaluation Report and the Release and treatment plan to the Court in reconsideration of its ruling to detain Mr. Roglieri, that those materials are therefore *per se* insufficient to reopen the detention hearing. This theory was directly contradicted by the Court at the close of the original detention hearing on June 3, 2024 where the Court indicated that it would "determine whether or not it was sufficient basis for a further hearing. So I'm not saying I will or will not do it until I see the plan and see what it involves." Transcript of Detention Hearing at pg. 20.

If the mere acknowledgement of the possibility of obtaining a "risk or threat assessment" and/or a "counseling plan" establishing the defense's knowledge thereof was sufficient to preclude it from being a basis to reopen a detention hearing, the Court would not have offered to even review such a submission. The government's proposed standard is therefore much narrower than what is required by §3142(f).

The government and the Court both mention the Court's ruling that the defense "fails to address in any way the allegation that defendant threatened to harm the attorneys, receiver, and

A94

judge in his bankruptcy proceeding and the allegation that he knew where three FBI agents lived and

threatened to shoot at least one of them in the head." Decision and Order of Detention, Dkt#32 at

pg. 3 *and* Govt #51 at pg. 1.  As to the text messages referenced they can be explained by simple

logic.  The alleged threats to harm the attorneys, receiver, and judge in [the] bankruptcy proceeding,

are at best only inferred from the text messages. *See* Letter from USA as to Kris Roglieri, Dkt#6,

hereinafter Govt #6.

The three text messages in Exhibit 2 of Govt #6 were sent on 1/21/24 within a single

minute.  The statements do not specify any particular target and are consistent with self-defense.

The text messages in Exhibit 3 of Govt #6 do specify identifiable persons as targets of Mr.

Roglieri's anger and vengeance, but anger and vengeance do not necessarily require physical

violence.  One could seek vengeance through civil litigation, professional discipline upon complaint,

or exposure of a less than perfect reputation or by a myriad of other ways.  The texts in Exhibit 3

were sent on 1/25/24, more than four days after the texts in Exhibit 2 and therefore cannot be

considered together as a single continuous train of thought.  There is no logical way to connect the

attorneys, judge and receiver in Exhibit 3 with the specific threat in Exhibit 2.

As to the allegations by Person-1 about verbal statements by phone in January, *see* Govt #6

at pg. 3, and those in person on or about May 24, 2024, *see id.* at pg. 4, there are at least four reasons

why this wasn't addressed in my original attempt to reopen the detention hearing.  First is because

Mr. Sporn proffered at the initial detention hearing that Mr. Roglieri categorically denied the

allegations made by Person-1.  "He Doesn't know where these people live." Transcript of Detention

Hearing, *supra* at pg. 12.  And, "We deny that Mr. Roglieri said that, Your Honor. Didn't happen."

*Id.* at pg. 13. Second is that the government's original filing only alleged that Mr. Roglieri knew

where *one* of the agents lived, so the allegation that he knew the addresses of all three agents is self-

refuting. *See* Govt #6, at pg 4.  Also, Person-1 merely "described" the threats rather than any attempt to relate them verbatim, which was at a "subsequent" interview held an unknown period of time after May 24, potentially over a week later, so there is as good possibility of some embellishment by Person-1. *Id.*

Finally, the government's response to the most recent request to reopen the detention hearing, includes as Exhibit 2 a declaration under penalty of perjury by Mr. Roglieri's estranged wife. In contrast, the government apparently has not been able to (or has not even attempted to) obtain a similar sworn statement from Person-1 reiterating the allegations about an alleged phone call in January nor in person statements on or about May 24, 2024 under penalty of perjury. *See* Govt #51, Exhibit 2.  Considering the defendant's outright denial of the alleged verbal statements at the original detention hearing, the government would have logically sought to obtain such a declaration, the lack thereof speaks volumes.[1]

Regarding Mrs. Roglieri's affidavit, she stated that she reviewed Ms. Walker's Release and treatment plan.  In that letter Ms. Walker indicated that "Everybody interviewed for this report, including Mr. Roglieri's ex-wife, Tina Roglieri, expressed support for his release from detention." Def Request #48 Exhibit 1, at pg 5 of 8.  Mrs. Roglieri did not include in her declaration any denial of expressing support for Mr. Roglieri's release.  The most she said in that regard was in ¶10 where she said, "If the social worker took my comments to mean that I had no issues with Kris's request for release, then she misconstrued my sentiments."  Mrs. Roglieri can have issue with Mr. Roglieri's request for release and still support his release. ████████████████████████████
████████████████████████████████████

---

[1] Ironically the government relies on information that was both known and/or available to them at the time of the original hearing on June 3, 2024 to argue that the court should ignore any information that they allege was known or available to the defense at the same time.

A96

████████████████████████████████████    At no point in the

declaration does she indicate any fear of physical violence from Mr. Roglieri.  The Release and

treatment plan also said "Tina Roglieri, agreed to be interviewed for this memo. [She did not] report

aggression or violence." Def Request #48, Exhibit 1 at pg. 6 of 8.  There is no attempt to refute this

fact in her sworn declaration.  Certainly, whoever assisted the preparation of her declaration would

have asked about that at the time her declaration was prepared.

Regarding the Risk Evaluation Report, the government attempts to nit pick the report

produced by two PsyD, one of which is licensed psychologist in two states.  ████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

█████████████████████████.  The government also alleges accusations of criminal behavior

as conclusive of Mr. Roglieri's ability to follow rules.  *See* Govt #51 at pg. 3.  Probable cause is

literally the lowest legal burden possible in law and mere accusation is insufficient by itself to

establish a failure to follow rules.  The government next gets well out of their lane attempting to

interpret the psychological findings of the defense experts.  *See* Govt #51 at pg. 3.  The government

claims that "the defendant is compulsive to the point of having a personality disorder." Ostensibly

attempting to interpret the Millon Clinical Multiaxial Inventory - IV (MCMI-IV) in the Risk

Evaluation Report at pg. 6-7, which explicitly states that, "A mental health clinician trained in the

use of psychological tests should interpret the report."

A97

Drs. Colistra & Dodge can be made available to provide testimony should the Court require clarification of any portions of the Risk Evaluation Report.

However, the conclusions of the report speak for themselves. "Overall, these results do not suggest an antisocial orientation or personality style. They also seem to converge with the desirability testing administered to him. This is good prognosis for his amenability to be released into the community while awaiting a final disposition in his case." *Id.* at pg. 9. "Given the personality testing data available, and the interview with Mr. Roglieri, he does not have a criminal history, and no antisocial traits were identified. He does not meet criteria for having antisocial personality disorder. Further, he does not have any traits generally associated criminality such as callousness, manipulation, and unwillingness to follow the rules. His testing, overall lifestyle stability, and numerous character letters, indicates a strong capacity for empathy and remorse." *Id.* at pg. 10.

> Given the totality known information at this time, it is the overall opinion of this evaluator that Mr. Roglieri's risk of violence is minimal. As noted above, Mr. Roglieri's alleged behavior does not appear to be related to antisociality which has been repeatedly demonstrated through the research to be the strongest predictor of reoffending. Additionally, he has no history of violent behavior toward others, which research has shown to be predictive of future violence. His past behavior has never indicated violent tendencies, nor has there been any report of violent behavior in the past by individuals close to Mi. Roglieri. Further, Mr. Roglieri currently does not have any known access to weapons, and he has previously surrendered all firearms to law enforcement. Mr. Roglieri's alleged threats of violence seem to have been made during a time of significant psychological distress, and they do not appear to be part of a larger pattern of violence against others throughout his life. Further, there is no data that suggests he has difficulty following rules and/or conditions mandated to him. Thus, the totality of the data suggests to us that Mr. Roglieri could be safely managed if returned to the community at this time.

> *Id.*





The government complains that the providers of the mental health treatment suggested by Ms. Walker were not specifically identified in the Release and treatment plan. The names of those providers can be provided upon request. Finally, the government concludes its response with the it's most baseless conclusion in their response, to wit, "In sum, the defense's reliance on the reports for its claim that that 'it is not possible for any able-bodied man to have a lower risk of violence than Mr. Roglieri,' Dkt. # 48 at 2 & n.1, is misplaced." This gratuitous assertion should be gratuitously ignored.

For all of the above reasons, Mr. Roglieri has provided new information that was not known or available at the time of the original detention hearing that has material bearing on the issue whether there are conditions of release that will reasonably assure the safety of any person and the community. In this case, based on all the available information now before the Court, there is no reliable evidence that Mr. Roglieri is in any way inclined let alone determined to follow through on any of the alleged threats and therefore there are conditions of release that could be imposed for his pretrial release.



Mr. Roglieri has asked to have attached to this reply as Exhibit a personal statement which he acknowledges was known at the time of his original hearing but wishes it to be made part of the record for the consideration of the Court.

Thank you for your consideration in this matter.

Sincerely,

Matthew E. Trainor
Assistant Federal Public Defender, Albany Office
Bar Roll # 105643
matthew_trainor@fd.org

cc:    AUSA Joshua Rosenthal – via ECF
       AUSA Michael Barnett – via ECF

A100

### Certificate of Service

I, Matthew E. Trainor, attorney of record for the above-named defendant, hereby certify that on

November 6, 2024, I electronically filed the foregoing Sentencing Memorandum, with the Clerk of

the District Court using the CM/ECF system, which sent notification of such filing to

Joshua Rosenthal & Michael Barnett, Assistant U.S. Attorneys.


by:  _____

Matthew E. Trainor, Esq.
Assistant Federal Public Defender
Bar Roll No. 105643
54 State St, STE 310
Albany, New York 12207
Tel: (518) 436-1850
Fax: (518) 436-1780
matthew_trainor@fd.org

A101

Dear Honorable Judge Hummel,

   I appreciate you taking the time to read my statement in response to my request for another detention hearing. Although my defense counsel has been doing there best efforts in representing me I felt it was important to have my voice heard for your consideration.

   I'm writing this court as a human being, as I feel the one thing we all can agree on is that no human is perfect. For example, I am embarassed and ashamed of the text messages that where produced to the court. Wich I will remind you where the result of venting due to fustrations and stress I was experiencing at that time.

   In the governments recent response they stated; I cannot be trusted to control myself. Your honor, I believe in the rule of law and our justice system. So I ask... does not the last 44 years of my life with no criminal record, no acts of violence reflect the true nature of who I am and my character A.102

I would say thats one of the most important factors in determining if it's safe in my return to the ( ) community. I would like to remind the court that the individuals mentioned in the text correspondence that the goverment produced I have met on multiple occasions and have fully cooperated with there demands and was cordial while doing so, before and after those messages where exchanged.

I'm a loving father, hardworker and person who gives back to his community as opposed to a person who presents a danger to his community as the goverment is portraying.

In conclusion I humbly ask you to these points into consideration as you make a descision on my counsels request. My hope is to be released from detention and comply with whatever restrictions you may impose so that I can get back to being a father to my children, be with my mother in the last days of her life and handle my affairs.

A103

Lastly due to the complex nature and dynamics of my case, I would like a fair chance at aiding and assisting my defense Counsel as Currently being detained makes this nearly impossible due to the restrictions of being incarcerated.

I would like to thank you your Honor for taking your time to read this. (Respectively.



Kris D. Roglieri

A104

REDACTED TRANSCRIPT

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------x
UNITED STATES OF AMERICA

vs.                        Case No. 24cr392

KRIS ROGLIERI,

                           Defendant.
-----------------------------------------x

  Transcript of a Detention Hearing held on

November 25, 2024, at the James T. Foley Courthouse,

445 Broadway, Albany, New York, the

HONORABLE CHRISTIAN F. HUMMEL, United States

Magistrate Judge, Presiding.


A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
        445 Broadway, Room 218
        Albany, New York 12207
         BY:  JOSHUA R. ROSENTHAL, ESQ.
           MICHAEL S. BARNETT, ESQ.
           Assistant U.S. Attorneys

For Defendant:     FEDERAL PUBLIC DEFENDER'S OFFICE
        NORTHERN DISTRICT OF NEW YORK
        39 North Pearl Street
        5th Floor
        Albany, New York  12207
         BY:  MATTHEW E. TRAINOR, ESQ.
           JEREMY B. SPORN, ESQ.
           Assistant Federal Public Defenders


*Lisa M. Mazzei, RPR*
*Official United States Court Reporter*
*10 Broad Street*
*Utica, New York  13501*
*(315) 266-1176*

A105

2

```
 1              (Open court, 2:10 p.m.)
 2         COURTROOM DEPUTY:  Today is Monday, November 25,
 3    2025 [sic], 2:10 p.m.  The case is United States of
 4    America vs. Kris Roglieri, Docket No. 24-CR-392.
 5         Appearances for the record, please.
 6         MR. ROSENTHAL:  Good afternoon, your Honor.
 7    Joshua Rosenthal and Michael Barnett for the United States.
 8         Also note the presence of United States Probation
 9    Officer, Aimee Messier, who is in the courtroom for her
10    colleague, Senior U.S. Probation Officer, Amy Brancatelli.
11         THE COURT:  Good afternoon.  Thank you.
12         MR. TRAINOR:  Matthew Trainor with Jeremy Sporn
13    appearing on behalf of Kris Roglieri, who is seated to my
14    left.
15         THE COURT:  Good afternoon, Mr. Roglieri.  Good
16    afternoon, counselors.
17         In anticipation of this afternoon's hearing, there
18    was a conversation among counsel, which was agreed that
19    Mr. Trainor would be permitted to call a witness by video out
20    of order and then we would proceed with the government's
21    presentation in this matter.
22         Mr. Rosenthal, sir, any objection to that?
23         MR. ROSENTHAL:  No, your Honor.  Thank you.
24         THE COURT:  Mr. Trainor, sir, is your witness ready
25    to go?
```

Colistra - Direct                                           3

1          MR. TRAINOR:  It is my understanding that she is,
2     your Honor.  Mr. Sporn will be handling the direct
3     examination.
4          THE COURT:  Go ahead, Mr. Sporn, sir.
5          COURTROOM DEPUTY:  Okay.  Let me get her on.
6          Dr. Colistra, can you hear me okay, Doctor?  She's
7     frozen.
8          THE WITNESS:  Yes, I can hear you now.
9          COURTROOM DEPUTY:  Can you please raise your right
10    hand?
11         K A T R I N A  C O L I S T R A,  P s y D,
12    called as a witness and being duly sworn, testifies
13    as follows:
14         THE COURT:  Go ahead, Mr. Sporn, sir.
15         MR. SPORN:  Thank you, your Honor.
16    <u>DIRECT EXAMINATION BY MR. SPORN:</u>
17    Q    Dr. Colistra, good afternoon.  Can you hear me okay?
18    A    Good afternoon, counselor.  Yes, I can.
19    Q    Thank you.  Can you introduce yourself, please, to the
20    Court?
21    A    Yes.  Katrina Colistra.  I am a licensed psychologist.
22    Q    That was my first question.  How are you employed?
23    A    I am employed through a private practice that I co-own
24    with my partner, and we have owned that private practice
25    since 2012.

A107

Colistra - Direct                                    4

1    Q       What do you do in your private practice?

2    A       The bulk of the private practice work consists of

3    assessments, evaluations, treatment of persons committed of

4    sexual sentences or violent offenses.  We offer treatment

5    evaluations for people on probation, parole, or civil

6    management through the state, as well as federal probation.

7    Q       Prior to owning your own practice, did you have any

8    other positions in the psychological field?

9    A       Yes, I did.

10   Q       Can you tell us what those may have been?

11   A       Yes.  Following my completion of my doctoral program, I

12   was employed as a psychologist with the Office of Mental

13   Health for evaluating persons under the section dangerous

14   persons statute.

15   Q       And how long did you do that for about?

16   A       That was 2007 to 2012.

17   Q       Thank you.  You indicated, I think, that you completed

18   a doctoral program.  Was that a PhD?

19   A       It was a doctorate in clinical psychology.  So, a PsyD.

20   Q       And is that the highest level of education that you've

21   achieved?

22   A       Yes, I have.  That's correct.

23   Q       Where was that from?

24   A       I attained my doctorate from the Massachusetts School

25   of Professional Psychology, which is now William James

Colistra - Direct                                          5

1    College.

2    Q      Thank you.  Are you a member of any professional

3    organizations?

4    A      Yes, I am.

5    Q      And can you --

6    A      I am a member of --

7    Q      I'm sorry.  I didn't mean to cut you off.  Go ahead.

8    A      I'm a member of the American Psychological Association,

9    as well as the Association for the Treatment and Prevention

10   of Sexual Abuse.  I am also on the National Health Register

11   of Health Services in Psychology.

12   Q      Would you be able to just briefly describe the training

13   you have received relative to your current position?

14   A      Yes.  I earned my bachelor's degree in psychology in

15   1998.  I earned my master's degree in criminal justice in

16   2000.  And I earned my doctoral degree in clinical psychology

17   with a specialization in forensic psychology in 2007.

18          During that time I was trained in forensic assessments

19   of all types and particularly with adults within a

20   correctional setting or would come in contact with the

21   criminal justice system.  I have worked in juvenile detention

22   centers, prisons, psychiatric centers and federal prisons in

23   assessing treatment to those in those facilities.

24   Q      Would you be able to ballpark for us the approximate

25   number of evaluations or assessments you have conducted in

Colistra - Direct                                6

1   your career?

2   A      As a licensed -- or since being licensed in 2007 and

3   then licensed in the Commonwealth of Massachusetts in 2015,

4   between those I would say that I completed upwards of close

5   to 700 evaluations.

6   Q      Are you affiliated with any state or governmental

7   agencies?

8   A      No, I'm not.  My practice, we have a -- some type of

9   government contract with state or governmental agencies, but

10  I'm not affiliated with any.

11  Q      Have you worked for such agencies in the past?

12  A      Yes, I have.

13  Q      Thank you.  I've sent to you -- I can't say I have

14  placed it in front of you, but I've sent to you what's been

15  marked as Government -- I'm sorry, Defense Exhibit 1.

16         Do you happen to have that close by or in front of you?

17  A      Yes, I do.  Just pulled it up.

18  Q      Can you tell us what you recognize Defense Exhibit 1 to

19  be, if anything?

20  A      Yes.  I recognize that to be a copy of my curriculum

21  vitae.

22  Q      Who prepared that?

23  A      I did.

24  Q      Is it accurate?

25  A      Yes, it is.

Colistra - Direct                                    7

1          MR. SPORN:  Your Honor, I would offer into evidence

2    Defense Exhibit 1, Dr. Colistra's CV.

3          THE COURT:  Any objection from the government?

4          MR. ROSENTHAL:  No, your Honor.

5          THE COURT:  Okay.  Number 1 will be marked received

6    without objection.

7          MR. SPORN:  Thank you, your Honor.  And at this

8    time I would proffer Dr. Colistra as an expert in psychology.

9    Specifically, within the subfields of forensic mental health

10   assessments and sexual and violence risk assessments.

11         THE COURT:  Mr. Rosenthal, sir, any objection to

12   that?

13         MR. ROSENTHAL:  Your Honor, the Rules of Evidence

14   don't actually apply to this hearing, so I don't have an

15   objection.  I don't -- you know, I don't concede that she

16   would be proffered correctly as a trial witness, but for the

17   purposes of this hearing, we don't object.

18         THE COURT:  Go ahead, Mr. Sporn.

19         MR. SPORN:  Thank you.

20   Q     Dr. Colistra, what were you asked to do in this case?

21   A     With regard to this case, I was asked to conduct a risk

22   assessment assessing a likelihood of violence for

23   Mr. Roglieri.

24   Q     And prior to that, did you have former engagements with

25   my office, with the Federal Public Defender's Office?

Colistra - Direct                                    8

1    A     Yes, I have.

2    Q     Did you, in fact, complete the assessment that you were

3    asked to do?

4    A     Yes, I did.

5    Q     Did you meet with Mr. Roglieri?

6    A     Yes, I did.

7    Q     Did you interview him?

8    A     Yes, I did.

9    Q     Who administered the actual testing on Mr. Roglieri?

10   A     The testing was administered by our forensic staff and

11   Dr. Dodge, who has also coauthored this report.

12   Q     And is that someone that you work with?

13   A     Yes.  She is a psychologist, postdoctoral psychologist

14   in my office.

15   Q     Thank you, Dr. Colistra.

16         Were you present when Dr. Dodge performed the testing

17   on Mr. Roglieri?

18   A     No, I was not.

19   Q     Is that unusual, in your experience?

20   A     No.  That's our standard course of practice.

21   Q     Did you review any records that were provided to you as

22   part of your engagement here?

23   A     Yes, I did.

24   Q     Would you be able to tell us a few, not necessarily all

25   of them, but just maybe one or two of the things that you

Colistra - Direct                                          9

1   reviewed?

2   A     I have reviewed numerous character letters on behalf of

3   Mr. Roglieri.  I reviewed responses to and from the

4   government to the Public Defender's Office regarding this

5   case.  I reviewed records regarding the allegations.  And I

6   reviewed text messages between Mr. Roglieri and Person 1.

7   And I reviewed the tests that we had administered.

8   Q     Thank you, Dr. Colistra.  Did you also review a draft

9   email or draft message that Mr. Roglieri had appeared to

10  write?

11  A     I reviewed a message, a draft message that was written

12  by Mr. Roglieri to ███████████.

13           MR. SPORN:  Your Honor, if we could strike the

14  last --

15           THE COURT:  I'll direct that the last reference to

16  ███████████ be stricken from the record.

17           MR. SPORN:  Thank you.

18  Q     Dr. Colistra, were you able to reach any conclusions?

19  A     As to the question of violence and likelihood of

20  violence?

21  Q     Yes.

22  A     Yes.  Yes, I was.

23  Q     And we are going to talk about it in some detail, but

24  just to touch on it for now, what is that opinion, generally?

25  A     Dr. Dodge and myself, we both came to the opinions

Colistra - Direct                          10

1    within a reasonable degree of professional certainty that

2    Mr. Roglieri will present minimal risk of violence.

3    Q    Thank you, Dr. Colistra.  Did you indicate that you

4    wrote a report in this case?

5    A    Yes.  That's correct.

6    Q    I'd ask you to take a look at what's been marked as

7    Defense Exhibit 2.  I don't know if you happen to have it in

8    front of you.

9    A    Yes, I do.

10   Q    Do you recognize Defense Exhibit 2?

11   A    Yes, I do.

12   Q    What is it?

13   A    It is a copy of the report completed for the purposes

14   of the referral questions and testimony.

15   Q    And, again, who completed the report?

16   A    Dr. Dodge and myself have completed the report.

17   Q    Thank you, Dr. Colistra.

18        MR. SPORN:  Your Honor, I offer Defense Exhibit 2

19   for purposes of the hearing.

20        THE COURT:  Any objection from the government?

21        MR. ROSENTHAL:  No.  Not with that proviso.  Thank

22   you, your Honor.

23        THE COURT:  It will be received solely for purposes

24   of this hearing.

25        Go ahead, Mr. Sporn.

Colistra - Direct                                    11

1    Q    Dr. Colistra, in terms of the overall opinion that you

2    just mentioned, what is that based on in terms of testing or

3    evaluative components?

4    A    The overall opinions that we concluded is based upon

5    the testing administered, testing interpreted, interview,

6    records reviewed, collateral information reviewed.

7    Q    And specifically in terms of testing instruments, are

8    there any in particular that you use in an assessment like

9    this?

10   A    Yes, there are.

11   Q    Is one of those social desirability?

12   A    Yes.  That's correct.

13   Q    Can you tell us what you mean by social desirability

14   and what goes into that?

15   A    Yes.  Social desirability is the tendency of a person

16   or persons to make themselves appear as favorable as

17   possible.  That could be an underreporting of issues or it

18   can be overreporting of positive issues.  Social desirability

19   itself is made up of two facets:

20        So one is a self-deceptive facet in which the level of

21   one's distorted beliefs about themselves is measured and the

22   second facet is impression management.  So the degree to

23   which the person has the tendency to present data that makes

24   them look the most favorable to others.

25   Q    And were you able to make any findings with respect to

Colistra - Direct                    12

1  self-deception or self-deceptive enhancement for

2  Mr. Roglieri?

3  A      Yes, I was.

4  Q      And what were those for, for the first self-deceptive

5  component?

6  A      For the facet of self-deceptive enhancement,

7  Mr. Roglieri was lower than 21 percent of the community

8  control.  So relative to the community control sample, his

9  levels are moderate-high tendency to engage in self-deceptive

10 enhancements.

11 Q      And how about for the other component, impression

12 management?

13 A      Yes.  On that facet, he was assessed at scoring lower

14 than 1 percent of the community sample and that was

15 suggestive of a very high tendency of impression management.

16 Q      And in sort of common language or real-word experience,

17 what might that mean or translate into?

18 A      There are a number of potential hypotheses to consider

19 when someone scores high in either.  And when we take

20 impression management, we -- when we see a high level of

21 impression management, one, we know that it's not uncommon in

22 situations like this in forensic evaluations, given the high

23 stakes that we would expect that people would attempt to

24 place themselves in the most favorable light possible.  So

25 when we have this information, that gives us a lens through

Colistra - Direct                           13

1   which to consider the remaining information provided.

2   Q     And, for example, a high impression management score,

3   is there anything necessarily nefarious or sinister about

4   such a result?

5   A     Not necessarily, no.

6   Q     Why not?

7   A     Because as all humans are wired for self-protection, we

8   know that most people -- and, again, in a forensic setting or

9   a legal circumstance in which the stakes are high for them,

10  this would not be necessarily uncommon to see -- to see this

11  presentation or tendency.

12  Q     Same question but for dangerousness.  Is there anything

13  necessarily dangerous about a high impression management

14  score?

15  A     There is no correlation between high impression

16  management and a high level of danger for physical harm.

17  Q     Would a high score on either social self-deception or

18  impression management, does that mean that a person is

19  knowingly or intentionally trying to be deceptive?

20  A     Not necessarily.  It is possible they may be

21  intentionally deceptive in minimizing information or

22  exaggerating a degree of something that would make them look

23  favorable.  However, if they also engage in self-deception,

24  or if they are -- if they are unaware of their limitations or

25  struggles, they -- they may well, in fact, then minimize that

Colistra - Direct                14

1    to others as well.

2    Q      Thank you.  Would it be unusual for someone in

3    business, a business person or a salesperson to have an

4    elevated impression management score, in your experience?

5    A      That would not be inconsistent.  It would not be

6    uncommon to see that in that type of presentation or area of

7    work.

8    Q      How about a lawyer?  Withdrawn.  Sorry.

9           Moving on to personality testing, am I correct that you

10   employed certain personality testing on Mr. Roglieri?

11   A      That's correct.

12   Q      Can you briefly describe what that involves, the MCMI?

13   A      Yes.  The MCMI is one personality test that is

14   approximately 200 true and false questions that the

15   individual completes on their own and assesses a personality

16   style based upon their responses that are entered.

17   Q      When you say "personality style," can you expand just a

18   bit on what that might mean?

19   A      Yes.  A personality style would be the tendencies of an

20   individual and how they interact within the world

21   interpersonally.  So, like, others within certain

22   environments and how their characteristics may be helpful to

23   them or may be a hindrance to them.

24   Q      Would it be fair to say that this type of testing

25   identifies certain personality traits or patterns someone may

Colistra - Direct                                    15

1    or may not have?

2    A     Yes.  That's correct.

3    Q     And let's start out with histrionic traits.  What, if

4    anything, did your testing reveal about if Mr. Roglieri has

5    any histrionic traits or tendencies?

6    A     So the testing indicated a response style.  So in the

7    way in which Mr. Roglieri responded to the questions

8    indicated a number of histrionic tendencies that would land

9    in the type category.  So not disorder and not necessarily

10   pathological or interfering.

11   Q     And when we talk about that histrionic style or type,

12   can you tell us what you mean by that?

13   A     Yes.  Someone who exhibits histrionic tendencies can be

14   impulsive, can be exaggerative.  It can be highly, highly

15   emotional.  And someone like if we were to liken it to

16   perhaps an emotional rollercoaster.  So if maybe some

17   frequent highs and lows or marked dips and lows, highs and

18   lows.

19   Q     And I don't remember if you mentioned whether

20   Mr. Roglieri's scores on that front were greater than

21   average?

22   A     They were greater than average, but not to the extent

23   that it would be a disorder.  And this is solely based upon

24   this test in the response styles.

25   Q     And I have the same question with respect to

Colistra - Direct                                          16

1   compulsions or compulsive tendencies.

2         How did Mr. Roglieri score in that regard?

3   A     So with regard to compulsive tendencies, he --

4   Mr. Roglieri's responses were considered at a level of

5   compulsivity that would be regarded in the disorder range

6   according to this test.

7   Q     When we talk about compulsivity, can you describe what

8   that means for you?

9   A     Yes.  According to how the test would define

10  compulsivity is a tendency to ruminate to have a high degree

11  of needing to or exhibiting a high degree of controlled

12  behavior, controlled repetitive behavior that they -- that a

13  person tends to engage in more often than not.

14  Q     Thank you.  Were you in fact able to diagnose a

15  personality disorder based on these results?

16  A     No, I was not.

17  Q     I'd like to direct your attention to what's in evidence

18  now as Defense Exhibit 2 to page 7 in particular.

19        Specifically with respect to the scoring for compulsive

20  patterns, does the fact that Mr. Roglieri's level extends

21  into disorder range mean that he has a compulsive personality

22  or a personality disorder?

23  A     No, not necessarily.

24  Q     And why not?

25  A     Well, first, the test administered is one piece of

Colistra - Direct                                    17

1    data.  So when conducting any psychological assessment, we

2    never rely on one piece of data alone to offer a diagnosis.

3         Second, while we -- when we interview Mr. Roglieri and

4    the documents that were provided to us, certainly he himself

5    described some degree of compulsiveness over the years where

6    that tended to be his, you know, way of interacting with the

7    world.  However, we didn't have any data that supported a

8    pervasive or chronic way in which this compulsivity had

9    impacted his life or impacted the way he interacts with

10   others.

11   Q    Thank you, Dr. Colistra.

12        Is there any correlation that you are aware of between

13   compulsive traits or compulsivity and level of dangerousness?

14   A    No, there's not.

15   Q    I'd like to shift gears a little bit and talk about an

16   antisocial orientation or personality.  If you were to talk

17   about those things, what would you mean?

18   A    If I were asked about an antisocial personality or

19   antisocial orientation, it would be the tendency of an

20   individual to present with traits in which they consistently,

21   chronically or pervasively disregard the rights of others,

22   disregard the law.  They may act impulsively with a high

23   degree of violence and callousness or lack of remorse for

24   others.  Impulsivity in the sense of failing to plan ahead or

25   not -- either not taking on responsibilities or purposely

Colistra - Direct                    18

1    shirking responsibilities.  Oftentimes irritability,

2    aggressiveness towards oneself or others.

3        All of these traits are identified in the Diagnostic

4    and Statistical Manual of Mental Disorders, which is what

5    psychologists, psychiatrists commonly use to diagnose here in

6    the United States.  In all of those traits mentioned, a

7    person would have to at least be over the age of 18.  They

8    would have to have some evidence of these behavior problems

9    or symptoms beginning in early childhood or consistent with a

10   conduct disorder.  And all of these traits couldn't

11   necessarily be better attributed to a major mental illness

12   such as schizophrenia or bipolar disorder.

13   Q    Thank you for that explanation.

14       Were you able, in fact, to reach any conclusions about

15   antisocial orientations or styles or personality disorders on

16   the part of Mr. Roglieri?

17   A    Yes, I was.

18   Q    And what was that conclusion?

19   A    It comes to the conclusion that his personality style

20   was not consistent with an antisocial personality disorder.

21   Q    Did you notice or observe or are you aware of any

22   antisocial traits?

23   A    We considered in identifying some antisocial traits

24   certainly for the recent allegations.  However, we did not

25   have any data that supported ongoing criminality, numerous

Colistra - Direct                                    19

1    arrests, convictions, allegations.  No pervasive history of

2    disobeying the law.  No pervasive history of physically

3    hurting others, or a lack of responsibility towards family,

4    children, and so on.

5    Q    Thank you.  Is there a correlation or association that

6    you are aware of between antisocial personalities and the

7    commission of violent acts?

8    A    Yes.  Antisocial personality or those who suffer from

9    antisocial personality disorder have a -- that's highly

10   correlated with violence.

11   Q    And did Mr. Roglieri meet the criteria for antisocial

12   personality disorder?

13   A    No, he did not.

14   Q    Were you able to detect or observe any delusional

15   thinking on Mr. Roglieri's part?

16   A    No, I did not.

17   Q    Did you develop any concerns that he may have

18   delusional thought patterns?

19   A    No, I did not.

20   Q    Why not?  If you can explain.

21   A    Yes.  There -- for someone to display or suffer from

22   delusional qualities, ideas, or disorder, it would have to be

23   a belief, a belief that no one else can outwardly witness or

24   that when presented with factual information, the person with

25   a delusion stays adamant that that delusion is real.  And I

Colistra - Direct                                    20

1    did not -- we did not see any data that supported any kind of

2    delusional disorder or delusional thinking.

3    Q    Does that include the various documents that you have

4    reviewed?

5    A    That's correct.

6    Q    Dr. Colistra, I'd like to direct your attention to page

7    10 of Defense Exhibit 2.  Since this is in evidence, I would

8    just ask about your conclusion on page 10 that no data

9    suggests that Mr. Roglieri has difficulty following rules or

10   conditions mandated to him.  Did you write that?

11   A    Yes.

12   Q    When you wrote that, did you consider the indictment or

13   other charges pending against Mr. Roglieri in this case?

14   A    Yes, we did.

15   Q    Typically, in evaluations, are you looking historically

16   at the past or are you crediting current charges someone may

17   be facing?

18   A    We primarily looked at the past.  We might consider --

19   we would take into context current charges in terms of

20   pretrial, probation, things like that.  But we -- we rely on

21   data that shows a pervasive or chronic history of issues such

22   as following the rules.

23   Q    And is it standard practice in forensic assessments to

24   not necessarily give too much credence to current charges?

25   A    It would depend on the context.  But certainly we do

Colistra - Direct                                    21

1   not give credence to allegations or charges that have not

2   been adjudicated.

3   Q     Understood.  Thank you.  To the extent that

4   Mr. Roglieri in the interview exaggerated anything or engaged

5   in any degree of exaggeration, does your testing and do your

6   results, do they account for that possibility?

7   A     Yes, they do.

8   Q     And what might you attribute any exaggeration to in

9   this case?

10  A     An interest in self protection and placing himself in

11  the most favorable light possible.

12  Q     And does that go back to the social desirability scores

13  and testing that we discussed earlier?

14  A     Yes.  That's part of it, correct.

15  Q     Are the results of those testing components and the

16  personality testing, are they correlated with violence either

17  historically or prospectively, going forward?

18  A     The particular results of his testing, no, they are not

19  correlated with violence.

20  Q     You talked earlier about a subject's response style.

21  Do you remember discussing that briefly?

22  A     Yes.

23  Q     And is a response style something that you can

24  correlate with violence or violent acts?

25  A     A response style in testing?  No.

Colistra - Direct                                    22

1    Q    Did you factor in Mr. Roglieri's response style to your

2    overall opinion?

3    A    Yes.

4    Q    Do you recall asking Mr. Roglieri about any outstanding

5    debts he may have?

6    A    Yes, I do.

7    Q    And were you aware that Mr. Roglieri was involved in

8    bankruptcy proceedings?

9    A    Yes, I was.

10   Q    Was your question and Mr. Roglieri's answer about

11   debts, was that understood to be apart from this case and the

12   bankruptcy proceedings?

13   A    Yes.  That's correct.

14   Q    To your understanding, are the bankruptcy proceedings

15   involved or intertwined with the criminal charges here?

16   A    Yes.  That's my understanding.

17   Q    Did you get the impression in speaking about debts or

18   liabilities that Mr. Roglieri was attempting to conceal the

19   bankruptcy cases?

20   A    No, I did not.

21   Q    Did you get the impression he was trying to conceal or

22   minimize debts or liabilities in those bankruptcy filings?

23   A    No, I did not.

24   Q    As part of your evaluation, Dr. Colistra, did you ask

25   Mr. Roglieri about any self-harm historically or currently?

Colistra - Direct                    23

1   A      Yes, I did.

2   Q      And does your report reference a draft or a saved

3   email?

4   A      Yes, it does.

5   Q      Did you ask about that specifically to Mr. Roglieri?

6   A      Yes, we did.

7   Q      Did he mention whether it was an actual expression of

8   any intent to kill himself?

9   A      He had indicated that it was not an expressed intent to

10  kill himself or end his life.

11  Q      Did he at any point in your interview ever express any

12  intention of self-harm?

13  A      No, he did not.

14  Q      Apart from that letter, to the extent it's relevant,

15  are you aware of anything in Mr. Roglieri's history that

16  might suggest thoughts of suicide or self-harm?

17  A      No, I'm not.

18  Q      I'd like to focus your attention, Dr. Colistra, on page

19  5 of your report.  If I can take you there, Defense Exhibit

20  2, you stated that Mr. Roglieri has no history of making or

21  acting on similar threats.

22         Do you remember drafting that?

23  A      Yes.  That's correct.

24         THE COURT:  Mr. Sporn, sir, where in the letter are

25  you referencing?

Colistra - Direct                              24

1      MR. SPORN:  This is in Defense Exhibit 2, the
2  evaluation page 5.
3      THE COURT:  Is there a particular paragraph you are
4  referencing, counsel?
5      MR. SPORN:  The paragraph entitled "Self Report of
6  the Alleged Statement," and it's the last sentence of that
7  paragraph.
8      THE COURT:  All right.  Thank you.
9      MR. SPORN:  Thank you.
10 Q    Dr. Colistra, do you recall at any point seeing a text
11 message string between Mr. Roglieri and Person 1 from
12 December 2023?
13 A    Yes.
14 Q    And is that what has been provided to you as Government
15 Exhibit 3, if you know?
16 A    Yes.  That's correct.
17 Q    And without identifying the other person, when we talk
18 about Person 1, do you know who that is without saying who?
19 A    Yes.
20 Q    Thank you.  Do you remember if you saw what's
21 Government Exhibit 3 before drafting your report or after
22 drafting your report for the first time, if you saw it?
23 A    After -- yes.  After drafting the report.
24 Q    Did you discuss with Mr. Roglieri in the interview the
25 types of communications in Government Exhibit 3?

LISA M. MAZZEI, RPR
Official U.S. Court Reporter

A128

Colistra - Direct                                    25

1    A      Yes, we did.

2    Q      And was Government Exhibit 3 consistent with those

3    communications Mr. Roglieri had and discussed with you?

4    A      Yes, it was.

5    Q      Was it your understanding that Government Exhibit 3 is

6    separate from this case or would you view it more as a

7    continuous course of conduct here?

8    A      I considered it as a continued course of conduct and

9    part of this overall evaluation and questioning.

10   Q      And now that you have seen it after your report, does

11   it affect your ultimate opinion on any risk of violence

12   Mr. Roglieri may have posed?

13   A      No, it does not change my opinion.

14   Q      Did you consider any history of violence here on

15   Mr. Roglieri's part?

16   A      Yes, I did.

17   Q      Was there any history that you are aware of?

18   A      None that has been documented.

19   Q      And what, if any, significance can we attach to the

20   lack of any violent history?

21   A      Most significantly is that even initially in the past

22   with this question of likelihood of violence, we typically

23   might utilize risk assessment that would give us instruments

24   or likelihoods of violence.  However, with an absence of

25   acting violently, any prior violent charges or convictions of

Colistra - Direct                                    26

1    violent behavior, we were unable to utilize those

2    instruments.  And that in and of itself suggests to me that

3    there is a -- based upon the totality of the information

4    provided, a minimal risk of violence for Mr. Roglieri.

5    Q    And the correlation between the history of violent

6    behavior on the one hand and on the other hand the risk of

7    similar future violent behavior, how strong, if at all, is

8    that correlation or association?

9    A    That tends to be the strongest predictor of future

10   violence.

11   Q    Just to sum up, and I think you just stated it, what is

12   your overall opinion going forward as to Mr. Roglieri's risk

13   of committing violent acts?

14   A    It remains my opinion that he is at a minimal risk of

15   engaging in violent acts.

16   Q    Did you review the government's response to the

17   defense's letter asking for a renewed detention hearing?

18   A    Yes, I did.

19   Q    Was that one of the things Mr. Trainor sent to you?

20   A    Yes.  That's correct.

21   Q    And did anything you read in that response change your

22   opinion as to the risk of violence on Mr. Roglieri's part?

23   A    No, it did not.

24        MR. SPORN:  Your Honor, if I could just have a

25   moment.

Colistra - Cross                                    27

1          THE COURT:  Take your time, counselor.

2          MR. SPORN:  Thank you, Dr. Colistra.  I appreciate

3   your time and I have no further questions.

4          THE COURT:  Thank you, Mr. Sporn.

5          MR. SPORN:  I believe Mr. Rosenthal may have a few,

6   however.

7          THE COURT:  Mr. Rosenthal, do you have a few?

8          MR. ROSENTHAL:  With the Court's permission.

9          THE COURT:  Go right ahead.

10          MR. ROSENTHAL:  Thank you, your Honor.  Your Honor,

11   may I approach and just hand you printouts of Government's

12   Exhibits 1 through 5, which I provided to chambers and the

13   defense on Friday?

14          THE COURT:  I believe I have those.  But you are

15   welcome to give me another copy, if you'd like.

16          MR. ROSENTHAL:  Very good.  And I've got one for

17   your deputy as well.

18          Your Honor, may I proceed?

19          THE COURT:  Go right ahead, counselor.

20   CROSS-EXAMINATION BY MR. ROSENTHAL:

21   Q    Good afternoon, doctor.

22   A    Good afternoon, counselor.

23   Q    You said earlier that you are the co-owner of

24   New Paradigm Psychological Services, correct?

25   A    That is correct.

LISA M. MAZZEI, RPR
Official U.S. Court Reporter

A131

Colistra - Cross                                    28

1    Q     And do you share in the profits of that business?

2    A     Yes.

3    Q     And your business was engaged by a defense team to

4    perform a forensic mental assessment in this case.  Is that

5    right?

6    A     That's correct.

7    Q     Were you asked to perform any additional services for

8    this case?

9    A     No, I was not.

10   Q     Would you please explain how much New Paradigm has been

11   paid in connection with this case?

12   A     Yes.  For the evaluations, there was a flat fee of

13   $2,800 that included testing, interview, administration,

14   report writing, preparation.  And, in addition, I was paid

15   12 -- $1,250 for in preparation of testimony and my time

16   today.

17   Q     And is your testimony contingent upon reaching any

18   conclusion?

19   A     No, it's not.  A particular conclusion I did on my own.

20   Q     Did you prepare for your testimony?

21   A     Yes.

22   Q     How did you do that?

23   A     Reviewing the records that were provided to me or that

24   would be exhibits and preparing with the attorneys and

25   reviewing the report.

A132

Colistra - Cross                    29

1  Q     And more broadly, New Paradigm, does it perform
2  services for attorneys to use in court proceedings?
3  A     Yes.  That's one thing that we can do, yes.
4  Q     And is part of New Paradigm's practice to prepare
5  assessments for criminal defense attorneys?
6  A     Criminal defense attorneys, prosecutors, yes.
7  Q     About how much of your practice is devoted to preparing
8  assessments for criminal defense attorneys?
9  A     I would estimate approximately 30 to 40 percent.
10 Q     Of the total business of your company?
11 A     Yes.  That's correct.
12 Q     And what does that translate to in terms of a ballpark
13 number of assessments that you performed in the last three
14 years?
15 A     For just defense attorneys?
16 Q     Yes, ma'am.
17 A     Oh, gosh.  I would estimate close to 75.
18 Q     And you mentioned prosecutors earlier.  In looking at
19 your materials, I saw that you had done some work for the
20 state of Massachusetts, but approximately how many
21 assessments have you done for prosecutors' offices in the
22 past three years?
23 A     I would estimate a bit more.  Probably 125.
24 Q     And are those with regard to defendants who are accused
25 of, say, violent crimes or sex offenses or both?

Colistra - Cross                    30

1   A     Yes.  That's correct.

2   Q     Both?

3   A     Yes.  Both.

4   Q     And how does that break down between violent crimes and

5   sex offenses?

6   A     The majority would be sex offenses.  So I would say,

7   you know, 65 to 70 percent.

8   Q     Are you familiar with the Federal Public Defender's

9   Office for the Northern District of New York?

10  A     Yes, I am.

11  Q     And prior to your work on this case, have you done work

12  on other cases for that office?

13  A     Yes, I have.

14  Q     Approximately how many cases have you worked with them

15  on in the last three years?

16  A     Approximately 30 to 40.

17  Q     And were you paid for all of those assessments?

18  A     Yes, I was.  Or my office was.

19  Q     When did defense counsel first contact you about this

20  case?

21  A     Defense counsel first contacted me in the summer of

22  2024.  So, around June.  I don't have a specific date

23  offhand.

24  Q     And you went over a number of records that you received

25  from the defense team, but did you ask defense counsel for

Colistra - Cross                                    31

1   any document or information that you were ultimately not

2   given access to?

3   A      No, I was not.

4   Q      Did defense counsel answer, to your satisfaction, any

5   question or concern that you raised?

6   A      Yes.

7   Q      You described New Paradigm's evaluation to the

8   defendant earlier.

9        In essence, what you do boils down to taking known

10  information, applying it to standards developed by

11  psychologists, like the VIVR or the MCI for -- to make a

12  prediction about how someone will behave in the future,

13  correct?

14  A      No.  When you refer to VIVR or the MCMI, those are not

15  risk assessments.  Those are assessments of one's

16  desirability or tendencies.  And then when there is data that

17  supports tendencies or those desirabilities at times, then we

18  offer those as correlation to violence or reoffending.

19  Q      And is it fair to say that this is a prediction of how

20  someone will behave in the future, correct?

21  A      It provides -- attempts to provide likelihood.  Not

22  necessarily prediction as much as likelihood.

23  Q      And so forgive me if this question sounds a little

24  crass, but there's still no technology out there that allows

25  an evaluator to know exactly what their subject is thinking,

Colistra - Cross                                    32

1   right?

2   A     That's correct.

3   Q     So in other words, humans can't read each other's

4   minds?

5   A     Not at this time.

6   Q     And if a subject is deceptive to others or

7   self-deceptive, that could affect your assessment, couldn't

8   it?

9   A     Yes.

10  Q     And you are applying techniques that apply your best

11  assessment of whether the person is being deceptive.  Is that

12  right?

13  A     Yes.

14  Q     But, obviously, there's no way to know exactly what

15  someone will do in the future, correct?

16  A     That is correct.

17  Q     And there is no way to actually get right inside their

18  mind when they are talking to you, correct?

19  A     That's correct.

20  Q     So what you are doing at the end of the day is an

21  educated -- or I think in your case, a highly educated guess?

22  A     Providing an educated opinion based upon research,

23  skills, training, experience, interviews, testing.

24  Q     Do you ever get informed when someone acts in a way

25  that's different from the prediction that you made about how

Colistra - Cross                                    33

1    they would act or not act?

2    A      At times.  Certainly not in every case, but at times,

3    yes.

4    Q      Have you been wrong?

5    A      Oh boy.  I'm sure I have at some point.  In our

6    database of close to a thousand evaluees or treatment of

7    patients, we look at outcome data, of recidivism.  And to my

8    knowledge, we've had less -- approximately, five re-offenses.

9    Q      And when you talk about the recidivism, you talk about

10   somebody who has already been convicted of a crime, correct?

11   A      Correct.

12   Q      Have you ever been cross-examined before about an

13   assessment you have made?

14   A      Yes.

15   Q      In response to a cross-examination, have you ever

16   changed an assessment?

17   A      Changed an assessment on the stand as I have testified?

18   Q      Or at some point in the future based on

19   cross-examination.

20   A      I guess I'm not sure.  Maybe could you rephrase that?

21   Q      Sure.  In response to cross-examination about an

22   assessment or an opinion, have you ever changed your

23   assessment or opinion?

24   A      In that particular case, no, I haven't.  But certainly

25   I've learned from testimony as I go, and may alter the way I

Colistra - Cross                                    34

1    state things or explain things in the future based upon cross

2    or direct.

3    Q    But you have never changed an actual opinion or

4    assessment based on cross-examination?

5    A    No.

6    Q    Is there anything that has ever caused you to revise an

7    assessment that you previously made to the point of actually

8    changing your opinion?

9    A    Yes, there has.

10   Q    Could you explain what some of those things are?

11   A    Yes.  Certainly there are times if I evaluate a person

12   who is potentially up for release from prison or secured

13   treatment or psychiatric facility, at times, I've evaluated

14   them on more than one occasion.  And while initially I may

15   have said the person is dangerous or should stay over time or

16   with -- with treatment or progression, I have reversed my

17   opinion and said they are okay to be in the community.

18        And on the flip side of that, there have been people in

19   our treatment program even who we initially accepted or would

20   attempt to treat and ultimately perhaps we had to say that

21   they won't be okay to be in the community and needed a higher

22   degree of supervision.

23   Q    So I want to shift just a bit, doctor.

24        As a general matter, do you think it's fair to say that

25   extreme stress could cause a person to act out of character?

Colistra - Cross                                    35

1   A    I think that's fair to say, yes.

2   Q    Could extreme stress cause a person with no history of

3   violence to act violently?

4   A    Well, that's a large question.  I am not sure I can

5   answer that with a direct yes or no, but anything is

6   possible.

7   Q    Could the prospect of a long prison sentence cause

8   extreme stress?

9   A    In some individuals, yes, it could.

10  Q    Could someone having their home taken from them by

11  creditors cause extreme stress?

12  A    That is possible.

13  Q    Could someone having most or all of their possessions

14  taken from them cause extreme stress?

15  A    That's also possible.

16  Q    Could someone having their businesses get abruptly shut

17  down lead to extreme stress?

18  A    That's also possible, yes.

19  Q    So we talked a bit -- or you talked a bit earlier with

20  defense counsel about Defense Exhibit 2, the report.

21       Were you and Dr. Victoria Dodge the only people who

22  wrote this report?

23  A    Yes.  That's correct.

24  Q    How did you divide up the writing?

25  A    So as part of standard course of training, Dr. Dodge

A139

Colistra - Cross                                    36

1   wrote a draft of her report, which are the results.  And then

2   after reviewing the report and edited -- provided edits of

3   feedback, some sent to me, we both agreed upon the

4   conclusions.

5   Q    When did you form the opinion that Mr. Roglieri

6   presents a minimal risk of violence?

7   A    After reviewing the testing data, the interview, the

8   records provided to us.  So when -- when compiling all of

9   those into the report.

10  Q    When you prepare an evaluation, you typically interview

11  the subject of the evaluation, right?

12  A    Yes.  That's correct.

13  Q    And is it important --

14  A    If --

15  Q    Sorry.

16  A    I'm sorry.  I just wanted to -- if they choose to meet

17  with us.  We give them the option.

18  Q    When you prepare an -- is it important that your

19  subject be truthful in the interview?

20  A    That would be -- that would be appreciated, but we

21  certainly don't expect that.  Especially, in the context of

22  our forensic evaluation.

23  Q    Can the report's ultimate findings be inaccurate if the

24  subject is not truthful --

25  A    That's a possibility.  However, we wouldn't be

Colistra - Cross                                    37

1   utilizing just the subject's report --

2   Q     But it certainly --

3   A     -- to make a --

4   Q     It certainly is possible if they are not telling the

5   truth that your ultimate finding might be impacted or

6   compromised, correct?

7   A     That's a possibility.

8   Q     So to prepare the assessment in this case, you

9   conducted an interview of Mr. Roglieri, correct?

10  A     Yes.  That's correct.

11  Q     And were you there for the entire interview?

12  A     Yes, I was.

13  Q     But you weren't there for the testing that Dr. Dodge

14  conducted, correct?

15  A     That's correct.  There is minimal interaction in

16  those -- in the testing.  In the directions of the test and

17  having the person complete the test on our computers.

18  Q     So I want to direct your attention to page 5 of Defense

19  Exhibit 2, your report.  You spoke about this earlier with

20  defense counsel under educational and employment history,

21  there is a -- the last sentence on the page it says that

22  Mr. Roglieri denied any outstanding debts.

23  A     Yes, I did.

24  Q     Okay.  And there is no mention of a bankruptcy

25  proceeding anywhere in this section; is there not?

Colistra - Cross                                    38

1   A      No, there's not.

2   Q      So you are just implying in this place that the

3   bankruptcy proceeding is somehow excluded from that denial,

4   correct?

5   A      When we spoke -- when we spoke regarding and asked

6   questions of outstanding debt, this was in the context, or

7   he, Mr. Roglieri actually shared about the bankruptcy

8   proceedings.  So I had taken that into account.

9   Q      Okay.  Were you provided with Government Exhibit 1?

10  A      If I could look.  Give me one moment.  I apologize.

11         I was provided this following my interview, our

12  interview.

13  Q      Okay.  And do you recognize this document now?

14  A      Yes, I do.

15  Q      And if you look at the top box on page 1, is there a

16  place to fill in where it says "Debtor 1"?

17  A      Page 1?

18  Q      Yes.  It says at the very top, "Fill in this

19  information to identify your case."

20  A      Correct.  Yes.  I see that.

21  Q      Who is identified as Debtor 1?

22  A      Kris Roglieri.

23         MR. ROSENTHAL:  And, your Honor, may we tender

24  Government Exhibit 1 into the record?

25         THE COURT:  Mr. Trainor, Mr. Sporn, any objection?

Colistra - Cross                                   39

1        MR. TRAINOR:  No objection, your Honor.

2        THE COURT:  Exhibit 1 will be received for the

3   limited purposes of this hearing.

4   Q    And when you flip, you will see that there are page

5   numbers right at the top of the document.  Would you flip

6   with me to page 30.  And, doctor, you will see that there is

7   a box that says "sign below."

8   A    One moment.  Okay.  Yes.

9   Q    And right above that, there is something that says,

10  "Declaration about an individual debtor's schedule."

11       Do you see that?

12  A    Yes.

13  Q    And it looks like this is signed, correct?

14  A    Yes.  It appears that way.

15  Q    And it says, "Under penalty of perjury, I declare that

16  I have read the summary and schedules filed with this

17  declaration that they are true and correct."  Is that right?

18  A    Yes.  That is what it says.

19  Q    And then the defendant's electronic signature is right

20  below that, correct?

21  A    That's correct.

22  Q    Will you take a look at page 2 with me, please?

23  A    Of this document?

24  Q    Yes, ma'am.

25  A    Okay.

Colistra - Cross                                    40

1   Q      And I'm going to direct your attention to box 7.

2   A      Okay.

3   Q      And would you read that question, please?

4   A      Yes.  Question 7 asks:  "What kind of debt do you

5   have?"

6   Q      And is there a box checked that says, "Your debts are

7   primarily consumer debts"?

8   A      Yes.  That's correct.

9   Q      And turn with me to page 15, please.  And my apologies;

10  15 is probably blacked out there, but if you go to page 14

11  and you flip, it's the next page.

12          THE COURT:  Counselor, is it the document that

13  says, "Schedule EF Creditors"?

14          MR. ROSENTHAL:  Yes, your Honor.  That's correct.

15          THE COURT:  Do you have that, doctor?

16          THE WITNESS:  Yes, I do.

17  Q      Doctor, do you see the part that says, "Schedule EF

18  Creditors who have unsecured claims"?

19  A      Yes, I do.

20  Q      And then there is a box called "Part 1," correct?

21  A      Yes.

22  Q      And it says, "Do creditors have priority unsecured

23  claims against you"?  And "yes" is checked, correct?

24  A      Yes.  That's correct.

25  Q      And going down to Item 2.1, is there an entry for the

Colistra - Cross                    41

1    New York State Department of Taxation and Finance?

2    A     Yes, there is.

3    Q     And is there a total claim of a bit over $500,000

4    attributed to New York State Department of Taxation and

5    Finance?

6    A     The total claim on the right?

7    Q     Yes.

8    A     Is that what we're --

9    Q     Yes, doctor.

10   A     Yes.  That's correct.

11   Q     And you will also see that as of the date you filed the

12   claim is and then it says, "Check all that apply:

13   Contingent, unliquidated" or "disputed," none those boxes are

14   checked.  Is that correct?

15   A     That is correct.  None are marked.

16   Q     And there is -- right below that, a type of -- there is

17   an indication for type of priority, unsecured claim?

18   A     Yes.

19   Q     And the box that's checked is taxes and certain other

20   debts you owe the government, correct?

21   A     Yes, sir.  That's correct.

22   Q     So would you agree with me that this document does

23   indicate that Mr. Roglieri does in fact have outstanding

24   debts?

25   A     Yes, I would.

Colistra - Cross                                    42

1   Q    But the report says he denied any outstanding debts?

2   A    It does, correct.

3   Q    And it's your testimony that even though the report

4   doesn't mention the bankruptcy, that that was wrapped in with

5   all the legal proceedings and therefore it just wasn't

6   mentioned in the report?

7   A    Yes.  That's correct.

8   Q    So I want to go to page 5 of Defense Exhibit 2, if you

9   don't mind, under self-report of the alleged statements.

10  A    Yes.

11  Q    So there is --

12  A    I'm sorry.  What page?

13  Q    Page 5 of your report, doctor.  And I apologize.  It's

14  actually the section above the self-report of the alleged...

15  A    Okay.

16  Q    There's a description of verbal threats that the

17  defendant allegedly made to Person 1 about killing FBI

18  personnel.  Is that right?

19  A    That's correct.

20  Q    And then the report says, "Mr. Roglieri adamantly

21  denied making those verbal threats," correct?  That is the

22  right below self-report.

23  A    Oh, yes.  Sorry.  That's correct.

24  Q    Did you accept that denial as true?

25  A    Well, I pursued it when we asked additional questions.

Colistra - Cross                                    43

1   I might -- I would also argue that he acknowledged the

2   texting piece of it and not the outward verbal, which is what

3   will be right here.

4   Q    So let's just go back.  We spent some time talking

5   about a note in which Mr. Roglieri discusses suicide.  Is

6   that correct?

7   A    Yes.  That's correct.

8   Q    And you and defense counsel will refer to it as a

9   draft.  Is that right?

10  A    Yes.  That's correct.

11  Q    Do you know how that note was found?

12  A    I do not exactly recall the specifics, but Mr. Roglieri

13  did report to us that it was discovered maybe in the pocket

14  of his coat or something.  I apologize.  I don't remember the

15  specific details of where it was discovered.

16  Q    And is it fair to say that you don't know whether or

17  not it was a draft?

18  A    That's possible.  That's fair to say.

19  Q    And he could have -- do you know any -- do you know

20  when the note was written?

21  A    No, I do not.

22  Q    So it could have been written the day before he was

23  taken into custody, correct?

24  A    Well, would he have reported to those prior to that, I

25  couldn't tell you an exact specific time.

Colistra - Cross                                    44

1    Q      You wouldn't know anything about that, right, other
2    than Mr. Roglieri told you?
3    A      That's correct.
4    Q      And the note wasn't found and torn up on the bottom of
5    a trash can, right?
6    A      Not that I'm aware of, no.
7    Q      As far as you know, it was found intact in a place
8    where someone else would be likely to find it, correct?
9    A      That -- I can't speak to that.
10   Q      Toward the top of the note, does it say, "I need you to
11   fully understand what led to my decision to take my own
12   life"?
13   A      Yes.  If I could just --
14   Q      Yes.  It's actually Government Exhibit 2.  I apologize.
15   A      No.  I am just -- I am just flipping between them here.
16   Yes.  That is correct.
17          MR. ROSENTHAL:  Your Honor, we've tendered
18   Government Exhibit 2 to the Court.  Obviously, it's been
19   submitted under seal and we have no objection to it remaining
20   so.
21          THE COURT:  Mr. Sporn, any objection?
22          MR. SPORN:  No, your Honor.  We would just ask that
23   it be maintained under seal.  Thank you.
24          THE COURT:  Court will receive it in evidence.  It
25   will continue to be maintained under seal.

Colistra - Cross                                    45

1    Q    So toward the top, it says, "I need you to fully

2    understand what led to my position to take my own life,"

3    correct?

4    A    Yes, it does.

5    Q    And then does it say, "I would have been convicted of

6    financial crimes and would have been away for a long time in

7    prison"?

8    A    Yes, it does say that.

9    Q    And then it goes on to say, "The pain is too much to

10   think of and frankly prison is not for me"?

11   A    That's correct.

12   Q    So is it fair to say that the note here is talking

13   about the writer would rather kill himself than spend a long

14   time in prison, correct?

15   A    That is what's written, yes.

16   Q    But during the interview, Mr. Roglieri denied that he

17   was planning to commit suicide when writing the letter,

18   correct?

19   A    Correct.

20   Q    In fact, the report at page 3 says, "While he stated he

21   did not explicitly say he was planning to commit suicide in

22   the letter, a copy of the letter shows that Mr. Roglieri

23   refers to events which led to his, quote, the decision to

24   take my own life," correct?

25   A    That's correct.

A149

Colistra - Cross                    46

1    Q    So he wasn't being truthful there; was he?

2    A    I would not consider it intentionally lying, no.

3    Q    Just a mistake, you think?

4    A    No.  It may have been when we talk about people being

5    under a high degree of stress in those moments, quotes,

6    feelings or hyperbole or statements, it may seem real or may

7    feel real at the time and then months after, they may be able

8    to take a step back and then look at that behavior and

9    characterize it as terrible feelings in the moment, but not

10   necessarily an accurate depiction of how they are overall.

11   Q    So is it fair to say that you characterized him as

12   being under extreme stress when he wrote this letter?

13   A    As he describes.  That's correct.

14   Q    And did you talk about whether he was under the

15   influence of drugs or alcohol when he wrote it?

16   A    I -- if I could just review my report.  I don't think

17   we asked specifically about under this letter, but he did not

18   appear to have a history of substance abuse.

19   Q    Did you ask him how he planned to take his own life?

20   A    No, I did not.

21   Q    Did you ask him whether he planned to kill others in

22   addition to himself?

23   A    Yes, we did.

24   Q    And, again, without getting to who the letter is

25   addressed to, did you ask him why he addressed the letter to

A150

Colistra - Cross                              47

1   a specific person?

2   A     Yes.

3   Q     And if you can explain that without describing the

4   recipient, could you, please?

5   A     Yes.  It was explained to us that it was in the context

6   of conflicts between the two.

7   Q     Did you ask him if there are any other suicide notes

8   that have not been found?

9   A     Yes, we did.

10  Q     What was his answer?

11  A     His answer was, no, there were not.

12  Q     So at the bottom of page 3 of the report -- just give

13  me a moment -- you write under "history of violence,

14  Mr. Roglieri denied any history of violence, fighting or

15  outbursts of anger."  Is that correct?

16  A     Yes.  That's correct.

17  Q     And on page 5 of -- under self-reporting of the alleged

18  statements, you say, "Mr. Roglieri further asserted that he

19  had no history of making or acting on similar threats in the

20  past."  Is that right?

21  A     That's correct.

22  Q     And have you -- would you please pull up Government

23  Exhibit 3.

24        Have you seen these text messages before?

25  A     Yes, I have.

Colistra - Cross                                    48

1    MR. ROSENTHAL:  Your Honor, we would offer

2  Government Exhibit 3.

3    THE COURT:  Mr. Sporn, any objection?

4    MR. SPORN:  No, your Honor.

5    THE COURT:  Exhibit 3 will be received for purposes

6  of the hearing.

7  Q    Is the sender of the blue messages on this, the

8  defendant, Mr. Roglieri?

9  A    The blue messages, yes.  That's correct.

10  Q    And would you read the first three messages in this

11  report?

12  A    Starting on page 1?

13  Q    Yes, doctor.

14  A    It says -- 1, says, "I can't fucken wait until you

15  bring a blue color jackass around."

16        Second one says, "I'm gonna make fucking life so

17  fucking miserable and emasculating, it's gonna be fucking

18  hilarious."

19        And the third one says, "I get even times worse."

20  Q    If you would go with me to page 7, please.

21  A    Seven of this document?

22  Q    Yes.  Doctor, does the blue text message in the middle

23  of the page say, "And, listen, I will gladly talk about this,

24  but my fear is I'll rip off your fucking throat and piss down

25  your fucking neck.  That's why I'm texting"?

Colistra - Cross                                    49

1   A     Yes, it does.

2   Q     And if we go to the next page, is there another blue

3   message that says, "I don't give a fuck about the cops"?

4   A     Yes, it does.

5   Q     Would you please pull up Government Exhibit 4.

6         Have you seen these text messages before?

7   A     Yes, I have.

8   Q     And is the sender in blue, the defendant?

9   A     Yes.

10         MR. ROSENTHAL:  Your Honor, I would offer

11   Government Exhibit 4.

12         THE COURT:  Mr. Sporn, is there any objection?

13         MR. SPORN:  No, your Honor.

14         THE COURT:  Exhibit 4 will be received for purposes

15   of this hearing.

16   Q     Does the first message say, "I am going to fucking

17   whack anybody that comes after me"?

18   A     Yes, it does.

19   Q     Does the second one say, "Fair game"?

20   A     Yes, it does.

21   Q     And, finally, the third one on the second page, does it

22   say, "You want to come after me with guns, you are going to

23   get the same"?

24   A     Yes, it does.

25   Q     Doctor, is Mr. Roglieri's denial of a history of

Colistra - Cross                                    50

1    threats consistent with what you just read?

2    A      Well, yes, it is.  When we spoke about threats or asked

3    about threats, this conversation was considered the current

4    course of conduct; not historically.

5    Q      How about his denial of outbursts of anger?

6    A      And what about them?

7    Q      Is his denial of outbursts of anger consistent with

8    what we just read in Government's Exhibits 3 and 4?

9    A      Historically, outbursts of anger, I would say that it's

10   inconsistent with that.

11   Q      Is it fair to say that the report's conclusions were

12   based in part on finding that Mr. Roglieri tries to follow

13   the rules?

14   A      I would not say that, no.

15   Q      Let's look at page 10 of your report, Defense Exhibit

16   2, please.

17          There is a sentence in the -- approximately the middle

18   of the page, the first full paragraph that's not in the

19   sentence that says, further, he does not have any trades

20   generally associated with criminality such as callousness,

21   manipulation and unwillingness to follow the rules.

22          Do you see that?

23   A      Correct.  Yes.

24   Q      I'm going to show you -- or would you please look at

25   Government Exhibit 5.

Colistra - Cross                51

1          Have you seen these text messages before?

2     A    Yes, I have.

3     Q    And is the blue, the defendant?

4     A    That's him.

5     Q    Would you please read these messages for the Court.

6     A    On page 1, there's a message that says, "I'm wearing

7     down, girl."

8          The next one says, "I feel myself getting angry and

9     vengeance to those that are doing this, including the

10    attorneys, Judge, receiver, et cetera."

11         And next one says, "I don't really play by the rules.

12    Never have and never will.  And that's dangerous, as I feel

13    myself getting to that point with all involved against me."

14    Q    Do these statements indicate a willingness to follow

15    the rules?

16    A    In those statements, they do not.

17    Q    So turning back to Defense Exhibit 2, page 10 of the

18    report, it also says towards the very bottom, "Further, there

19    is no data that suggests that Mr. Roglieri has difficulty

20    following rules and/or conditions mandated to him."  Is that

21    right?

22    A    That is correct.

23    Q    Were you aware that Mr. Roglieri's driver's license was

24    suspended in September of 2023 as a persistent violater?

25    A    No, I was not.

Colistra - Cross                    52

1    Q      Did you know that he received eight points on his

2    driver's license for speeding in 2021 and then again in 2023?

3    A      No, I was not aware.

4    Q      Did you know that 8 points are given when somebody is

5    caught speeding 31 to 40 miles per hour over the speed limit?

6    A      I'm not familiar with the point system.

7    Q      Okay.  And we just saw in Government Exhibit 1, a tax

8    lien from 2021 of more than a half a million dollars, right?

9    A      Correct.

10   Q      Does anything that we just discussed change your

11   finding in any way?

12   A      No, it does not.

13   Q      And the defense lawyers didn't provide any information

14   about the speeding, correct?

15   A      Correct.

16   Q      Did they provide to you the transcript of

17   Judge Hummel's original decision to detain the defendant?

18   A      I don't believe I saw in the transcript the responses

19   from the government and the federal public defender.

20   Q      Would you agree that someone engaging in a scheme to

21   fraudulently obtain $5 million from a victim and then

22   spending that money on, for instance, a private jet,

23   vacation, and a luxury watch exhibit some level of

24   callousness and manipulation?

25   A      Not necessarily.  That depends on the context.

Colistra - Redirect                                          53

1   Q     So somebody who fraudulently obtains a large sum of

2   money by fraud, a lie, and then spends it on themselves does

3   not exhibit some level of callousness or manipulation?

4   A     Not -- not in the way that we utilize it and define for

5   violence risk assessments.

6               MR. ROSENTHAL:  One moment.  Thank you very much

7   for your time, doctor.  No further questions.

8               THE COURT:  Anything further, counsel?  Mr. Sporn,

9   sir, redirect?

10  REDIRECT EXAMINATION BY MR. SPORN:

11  Q     Dr. Colistra, hello, again.  I am going to be much,

12  much, much shorter than I was before.

13  A     Okay.

14  Q     Mr. Rosenthal asked you some questions about Government

15  Exhibits 4 and 5.

16        Do you recall those questions?

17  A     Yes.

18  Q     Do you recall the dates on those text message strings?

19  A     Yes.  They were from December of '23.

20  Q     December or January?

21  A     Some were January and some were December.  I am not

22  sure which exhibit is which.

23  Q     Okay.

24  A     Exhibit 4 is January.  As is Exhibit 5.

25  Q     And do you recall when Mr. Roglieri was arrested in

Colistra - Redirect                                      54

1    this case?

2    A      Yes.  The end of May of 2024.

3    Q      Thank you, Dr. Colistra.

4           Mr. Rosenthal asked you a number of questions about

5    Mr. Roglieri's answers during the interview.

6    A      Yes.

7    Q      And do you recall his questions about the truthfulness

8    of those responses?

9    A      Yes.

10   Q      One of them was asking whether you always expect

11   truthful responses and I think your answer was, I don't

12   always expect truthful responses?

13   A      That's correct.

14   Q      Are the defendant's responses the only thing that you

15   take into account in formulating your opinion?

16   A      No, they are not.

17   Q      Do you base your opinion on the possibility that the

18   answers received may not always be a hundred percent accurate

19   or truthful?

20   A      Yes.  That's correct.

21   Q      And, again, what are some of the other things that you

22   take into account besides a person's self responses?

23   A      The additional things we would take into account, any

24   kind of testing results, collateral information and behavior.

25   Behavior itself tends to be data we rely on.

Colistra - Redirect                                    55

1   Q     You were offered the opportunity to revise your
2   opinion.  Do you recall Mr. Rosenthal giving you that
3   opportunity?
4   A     Yes.
5   Q     And I think that you declined to revise it.  Is that
6   fair?
7   A     Yes.  That's correct.
8   Q     Why is that?
9   A     Because based upon the information that we utilize, the
10  testing, the historical behavior, the interview, the records,
11  when we take all of that in totality and when I consider a
12  pervasiveness of behavior, we -- I don't have data that
13  supports violent behavior.
14  Q     You were asked a number of questions about the
15  bankruptcy filing.
16        Is it fair to say you are not an expert in bankruptcy
17  or bankruptcy laws?
18  A     Yes.  That is absolutely fair to say.
19  Q     Do you know whether Mr. Roglieri had any prior
20  experience in bankruptcy before 2023, say?
21  A     No, I do not.
22  Q     And Mr. Rosenthal showed you a number of documents,
23  Government Exhibits 2, 4, 5, 3.
24        Had you had the opportunity to see all of those, or at
25  least most of them prior to forming your opinion?

A159

56

1    A      Yes.

2            MR. SPORN:  Thank you.  Nothing further,

3    Dr. Colistra.

4            Thank you, your Honor.

5            THE COURT:  Thank you, Mr. Sporn.  Mr. Rosenthal,

6    sir?

7            MR. ROSENTHAL:  No, your Honor.  Thank you.

8            THE COURT:  You are all set, doctor.  Thank you for

9    your testimony.

10           THE WITNESS:  Thank you so much.

11           THE COURT:  We are going to take a five-minute

12   recess and then we will resume.  And I assume, Mr. Rosenthal,

13   the government will be prepared to proceed?

14           MR. ROSENTHAL:  Yes, your Honor.

15           THE COURT:  All right.  We'll see you folks in five

16   minutes.  Thank you.

17                   (Recess, 3:40 p.m.)

18                   (Open court, 3:51 p.m.)

19           THE COURT:  Government ready to proceed?

20           MR. ROSENTHAL:  Yes, your Honor.

21           THE COURT:  Go ahead, Mr. Rosenthal.

22           MR. ROSENTHAL:  Your Honor, with the Court's

23   permission, we would like to divide up our time.  I'm going

24   to focus on danger to the community.  AUSA Barnett is going

25   to focus on risk of nonappearance.

57

1          THE COURT:  Okay.  So just so I'm clear, the
2    government is arguing both the risk of flight and the danger
3    to the community?
4          MR. ROSENTHAL:  That's right, your Honor, because
5    there's a plenary re-opening.  We think that the new evidence
6    that's in the record would support risk of nonappearance.
7          THE COURT:  That's fine.  I just wanted to make
8    sure we were all on the same page.
9          Go ahead, counselor.
10          MR. ROSENTHAL:  Thank you, your Honor.  And just,
11    also for the record, Senior U.S. Probation Officer
12    Amy Brancatelli is now here at the hearing.  So she's in the
13    room.
14          THE COURT:  All right.
15          MR. ROSENTHAL:  Thank you.
16          Your Honor, while Dr. Colistra's report was
17    sufficient to reopen the hearing, it is insufficient to
18    change the Court's reasonable and well-founded decision from
19    June.  As laid out in our original detention letter, the
20    defendant has been very clear about committing violence
21    against those involved in the various legal proceedings
22    against him.  I'm not going to rehearse too much, but "I'm
23    going to fucking whack anybody that comes after me.  You want
24    to come after me with guns, you are going get the same.  I
25    feel myself getting angry and vengeance to those who are

A161

58

1    doing this, including the attorneys, receiver, Judge,
2    receiver.  I don't play by the rules.  Never have.  Never
3    will and that's dangerous, as I feel myself getting to the
4    point with all involved against me."
5            Your Honor, those aren't idle words about civil
6    litigation or professional discipline.  Those are words about
7    harm.  And those words are -- buttress what Person 1 informed
8    the government about, which was the very specific threat of
9    the defendant intending to kill an FBI agent.
10           So the defense's downplaying of that we think is
11   just not persuasive.  And look, you know, I do want to say
12   that the defendant has presented mitigating evidence,
13   including that he's, by all means, a good father and has done
14   good things in the community, but it doesn't change the fact
15   that you've got real words of violence against people just
16   trying to do their jobs and investigate this case.  Judges
17   who are just trying to preside over what was then civil
18   litigation.
19           I don't know how to take those words as anything
20   other than threats of violence consistent with what Person 1
21   said.  And I don't think that what Dr. Colistra testified to
22   earlier really moves the needle.  She said that she is basing
23   her opinion on probabilities on a history that she hasn't
24   really checked into all that much.  And, you know, she admits
25   that there are parts of what the defendant told her that were

59

1  wrong, that were deceitful.  And it just doesn't change the

2  fact that you've got the defendant's words.  So what I would

3  say is that the Court should take the defendant at its word.

4          The other thing that I would say, too, is that the

5  defendant's suicide note -- and AUSA Barnett will talk about

6  that with regard to risk of flight -- or, sorry, risk of

7  nonappearance, but the suicide note is also important because

8  it shows somebody spiraling out of control.  Somebody who is

9  willing to engage in self-harm.  And it underscores the

10  danger that he presents.  When somebody is willing to harm

11  themselves, the legal consequences of harming others are of

12  no deterrence.  I mean, unfortunately, murder suicide and

13  suicide by cops, they are a real thing.

14          Your Honor, for those reasons, the defendant has

15  presented a dangerousness to the community that cannot be

16  mitigated.

17          THE COURT:  Mr. Barnett, sir?

18          MR. BARNETT:  Thank you, your Honor.  And I think

19  AUSA Rosenthal summarized why your Honor should feel no need

20  to revisit your original detention decision on dangerousness.

21  I'm focusing on risk of nonappearance and specifically,

22  Government's Exhibit 2 and the suicide note.

23          Your Honor, in our submission to the Court dated

24  July 23rd of 2024, pages 4 through 5, we cited case law to

25  your Honor to the effect of someone's risk of ending their

60

1    own life is an appropriate thing to take into account on risk

2    of nonappearance.  As Chief Judge Sannes recently observed,

3    quote, suicide risk is certainly an appropriate factor in

4    determining whether to order detention under the 3142(e)(1),

5    risk of nonappearance prong.  That's *United States vs. Dai,*

6    D-A-I, 2023 WL 11016392.  That's a decision from December of

7    2023.

8            And your Honor, of course, unlike with

9    dangerousness, preponderance we need to prove only -- sorry,

10   risk of nonappearance, we have to prove only by a

11   preponderance of the evidence.  And, of course, this note was

12   not known to us at the time of your Honor's original

13   detention decision and we think it should be taken very

14   seriously.  This note was found intact.  It's unclear when it

15   was written.  And it ties the defendant's debt to his legal

16   troubles and his inability to accept the consequences of his

17   conduct; i.e., a very long prison term.  This note,

18   your Honor, also is corroborated by the statements of

19   Person 1 who also has reported to the authorities that

20   Mr. Roglieri was suicidal earlier this year.  So, again, she

21   said it and in this letter found in a coat pocket in his

22   house after he was arrested confirmed it.

23           And, your Honor, unfortunately, for the defendant,

24   his legal situation has become far worse than it was when he

25   actually wrote this letter.  He wrote this letter,

61

1    your Honor, before he was arrested, before he was charged by

2    the complaint, before he was indicted.  Before his bankruptcy

3    proceeding progressed to the point where his assets are being

4    sold by the trustee.  Before the United States filed a civil

5    complaint seeking the forfeiture of various vehicles and

6    watches that the defendant acquired with stolen funds.

7              So to say as the defense says, well, he's accepted

8    the consequences -- he has accepted his altered state I think

9    ignores that that's based on, you know, a self-serving say so

10   and it also ignores that its legal situation has actually

11   gotten far worse from the period of time when he wrote this

12   note.

13             And, of course, your Honor, when you are assessing

14   risk of nonappearance, you can look at the risk of

15   nonappearance as magnified by the strength of the evidence

16   and the consequences of being found guilty.  And here we have

17   provided voluminous discovery to defense counsel; we are

18   going to obviously be provided more.  But the defendant's own

19   words underscore his guilt.  His own words in this note,

20   Government's Exhibit 2.  His own words in text messages that

21   we presented to your Honor at a prior detention hearing where

22   he explains why he's guilty of fraud.  And that, your Honor,

23   is just the tip of the iceberg.

24             From the defense I see no serious engagement with

25   the issues raised by this suicide note other than to say he

62

1   needs mental health therapy, which he obviously does.  And
2   also to say, well, there hasn't been an attempt which
3   underscores that, you know, we don't know everything.  Could
4   there have been an attempt?  I don't know.  I am not here
5   saying that there was an attempt.  And it certainly is our
6   burden on our preponderance standard.  I am just saying, I
7   don't know how much weight your Honor should give to the
8   absence of an attempt when someone can attempt to take their
9   own life and no one might ever know of it.
10          And, again, it's not as though that the suicide
11  note was found ripped up at the bottom of the trash can.
12  Presumably, the defendant knew where this note was.  He put
13  it in a place where someone could easily find it and it in
14  fact was found.
15          I also want to note, your Honor, that even if he
16  found that he was not a risk of nonappearance, so if you
17  disagreed with us, I still think this suicide note raises
18  concerns about the proper and proposed release plan.  He's
19  proposing to reside out of district with a girlfriend who
20  appears to not even be home half the time.  And he is
21  residing two hours from where he previously lives.  And the
22  only other person he knows in the area is his ailing elderly
23  mother.  And to me when someone has expressed an intent to
24  end their own life due to mounting legal troubles, it just
25  heightens the risk to have them living in an unfamiliar place

63

 1   with someone who is not there half the time, two hours plus

 2   from where they normally reside.

 3           And I'm not saying to your Honor that I have an

 4   idea of how he should be released.  That's on the defense to

 5   do that.  What I am saying is that even if your Honor doesn't

 6   agree with us on how great the risk of nonappearance is, I

 7   think the risk is still high enough that there needs to be a

 8   different release plan than the one that's being proposed.

 9           So for those reasons, your Honor, we submit that he

10   is a risk of nonappearance due to risk of suicide, and we ask

11   that he be detained on that independent basis which was not

12   available to argue at the original detention hearing.  And

13   thank you for your time.

14           THE COURT:  Thank you, Mr. Barnett.  Mr. Trainor?

15           MR. TRAINOR:  Thank you, your Honor.

16           Okay.  So the government's argument for danger to

17   the community or danger to specific people, it rests

18   primarily on the text messages that my client sent in January

19   and more recently the series of text messages from early

20   December of 2023.

21           Government 4, the text messages were vague

22   statements not targeting anyone in particular.  Could have

23   been talking about just about anybody.  But assuming that

24   even if he were referring to directly to the FBI agents,

25   which the government wants the Court to infer 12 days after

64

1   sending these text messages, the FBI came to his house with

2   guns.  And he had some guns inside the house and nothing

3   happened.  He didn't try.

4           In fact, the government said that the defendant was

5   compliant when the FBI agent searched his home.  He was even

6   compliant with them a month later when the FBI seized

7   vehicles from his home.  He actually just voluntarily on his

8   own turned over the vast majority of the firearms to a gun

9   dealer nearby and left it in their custody.  There were a

10  couple of firearms which were stored in another part of his

11  house that he didn't realize were still there.  Those were

12  turned over the bankruptcy trustee.

13          Those text messages in Government 4 do not indicate

14  a strong propensity for my client to actually try and

15  perpetrate violence against anyone under any circumstances.

16  He's just shooting things off.  I mean these text messages

17  are taken out of context.

18          In Government's 5, there are some relatively

19  specific targets described by their job and not necessarily

20  the -- you know, by name.  And, again, it's -- there is no

21  specific actions following up on any of these.  The Court

22  really should not conflate Government's Exhibit 4 which were

23  text messages sent on January 21st to be part of the same

24  conversation that is in -- was issued in the text messages in

25  Government 5, which was four days later.  And so the

65

1    government is basically cherrypicking text messages and
2    placing them together as if it's all part of one
3    conversation.
4         Now, Government 3, the most recent submission,
5    these are the text messages from December where he was
6    sending messages again to his estranged wife.  This was in
7    the context of an argument between -- between his ex-wife or
8    his estranged wife and the girlfriend.  And it's clear from
9    the context and from the responses to those text messages
10   that his estranged wife did not take these as actual threats
11   of things that he was going to actually attempt to perpetrate
12   at sometime.  And it's -- I mean, it's pretty clear from the
13   whole thing, yes, it's something that she didn't want.  She
14   didn't want to get mean text messages from him, but it's
15   clear that she did not take it to mean actual threats of
16   things that he was going to do.  It was just something mean
17   he was saying to her to hurt her feelings.
18        Okay.  And then the -- his estranged wife did file
19   a declaration under penalty of perjury; wanted to make some
20   corrections to some of the things that Dr. Walker put in her
21   mitigation report.  Things that were not mentioned by
22   Dr. Walker was that his estranged wife wanted supervised
23   visitation with the children.  Dr. Walker didn't include it
24   in her mitigation report because it's essentially irrelevant,
25   albeit consistent with release, but it's not really relevant

66

1    to whether or not the Court would make a determination to
2    detain or release my client on conditions.
3          Mrs. Roglieri did say that Dr. Walker failed to
4    convey a level of concern about Kris having unsupervised
5    visitation with the children.  The concerns that she may have
6    about, you know, unsupervised visitation does not necessarily
7    mean that Mrs. Roglieri wants him to be detained.  She just
8    wants -- it's pretty clear from the context of her
9    declaration that she wants sufficient conditions such as an
10   order of protection so that he will not send her mean text
11   messages as he has in the past and be cordial when discussing
12   issues with the children because she -- in the same
13   declaration she says he's a wonderful father and does well by
14   the children.
15         Now, when it comes to the sealed document, which is
16   Government's Exhibit No. 2, that document does not explicitly
17   say that he is planning to commit suicide.  It's written in
18   the past tense about thence it never happened.  This is a
19   cathartic exercise to purge the anxiety and stress related to
20   the results of a complicated business deal that rapidly fell
21   apart resulting in civil litigation as well his own
22   bankruptcy, which was extraordinarily stressful for him
23   because he ended up losing everything.  He had no assets,
24   nothing.  And it was an extremely stressful time in his life.
25   And this was back in December of 2023 into January when all

67

1    the -- everything basically started falling apart.

2           Now, the government is arguing that because he had

3    written a suicide note in January of 2024 and he put it into

4    the pocket of a winter coat of his, that is not an indication

5    that he is putting it in a place where he intends other

6    people to find it.  If you want to put something like that in

7    a place where people would find it, you leave it on a table,

8    you put it in a drawer that someone else would be opening.

9    Tape it to the door or something like that.  You don't tuck

10   it into an inner pocket of a winter coat that only you wear.

11          And there is no other indications, not only no

12   indications of any plans to commit suicide, there is no

13   evidence he took any steps to follow through.  There was no

14   researching on how to commit suicide.  There's no evidence of

15   either a -- you know, him calling up old friends saying

16   goodbye about how he is never going to see them again.  There

17   is no evidence of him giving away, you know, sentimental

18   items that had been in his possession for a while.  There is

19   no evidence of making any kind of will.  He is not taking any

20   dangerous risks, you know, that are -- or, you know,

21   something that may cause him to -- you know, could kill

22   himself.  Either he is not using drugs or alcohol in

23   excessive amounts.  He is not eating or sleeping either more

24   or less.  There is no indication of any of these signs would

25   show that someone is in a suicidal mood.  He had five months

68

1    to make plans.  He had five months to make an attempt.

2    Nothing.  Nothing happened.  He didn't do anything.

3              And it's clear from some of the exhibits presented

4    by the government in their filings that Mr. Roglieri was

5    aware that there was going to be some kind of charges coming.

6    And the only time that there was any discussion about, you

7    know, his suicidal ideation either from Mrs. Roglieri or from

8    him was all back in January and nothing has happened since.

9    So there's no reason to believe that he's going to commit

10   suicide just to avoid prosecution under this current case.

11             Now, the risk assessment presented by Dr. Colistra

12   was very thorough.  She finds that he's a minimum risk for

13   violence to others.  The alleged behavior does not appear to

14   be related to antisociality, which has been repeatedly

15   demonstrated through the research to be the strongest

16   predictor of reoffending.  Also, one of the strongest things

17   that Dr. Colistra mentioned in her testimony, one of the

18   strongest indicators of committing violent acts is based on

19   their history.  History of either criminal activity or any

20   reports of past reports of violence or anything like that.

21   He has no history of violent behavior toward others which

22   research has shown to be a predictor of future violence.  His

23   past behavior has never indicated violent tendencies, nor has

24   there been any report of violent behavior in the past by

25   individuals close to Mr. Roglieri, including from his

69

1    estranged wife whom obviously they don't get along.

2          So the government does complain that Dr. Colistra

3    is making her determinations as a sort of predictive basis

4    without coming and saying anything in any absolutes.  It

5    would be unethical for her to make a declaration that a

6    particular individual was absolutely no risk for violence.

7    They can't say that.  It's -- they can only make

8    determinations.  And they found that Mr. Roglieri has a

9    minimal, lowest possible risk of any kind of violent action

10   whatsoever.

11         So the information provided by the government fails

12   to establish any propensity to perpetrate actual violence on

13   behalf of my client.  He has never done it before.  He had

14   many opportunities to do so in this particular case from the

15   time these messages were sent until today and -- or until his

16   incarceration at least, and he took no steps.  He was cordial

17   and compliant with everyone.  He made appearances in the

18   bankruptcy court and was never abrasive or disruptive or --

19   in any way with any of the individuals who were present

20   there.

21         The government makes a big deal about his statement

22   to Dr. Colistra during the interview that he had no debts and

23   they pull up a document that was filed in his bankruptcy

24   proceeding on March 22, 2024 that indicated several debts

25   which he had acknowledged at that time.  Of course this is

70

1    Mr. Roglieri's first bankruptcy.  He has no prior experience

2    in bankruptcy.  And he was interviewed by Dr. Colistra in

3    September, more than six months after filing this document.

4    It's his understanding, which is the general understanding of

5    people who go through bankruptcy and are found to be bankrupt

6    is that they come out with no debts.  He doesn't know what

7    the timeline is.  He doesn't know -- or understand how the

8    process goes.  He is not lying to Dr. Colistra about not

9    having any debts.  That was his understanding.

10           In fact, Dr. Colistra testified that he brought up

11   the fact that he was in bankruptcy when this discussion

12   happened.  So he's trying to be truthful to provide

13   information.  And there's just insufficient evidence to find

14   by a preponderance of the doubt that he poses a danger to

15   anyone physically.  And I believe that there are conditions

16   that can be imposed by this Court that would allow him to be

17   released and live with his current girlfriend down in

18   Poughkeepsie.  That is in another district.  It's not unheard

19   of for defendants to be released and live in an adjoining

20   district.  I've had a number of clients.  Some of them

21   charged with much more dangerous crimes than my client has

22   been charged with.  There had been drug charges and other

23   types of charges and they've been released to live in an

24   adjoining district and then be supervised from the Southern

25   District probation department and to make sure that he

A174

71

1    follows his conditions.  And I believe that there are
2    sufficient conditions in this particular case for someone who
3    has no history of violence that a -- you know, some
4    restriction on his movement the Court can impose either like
5    a curfew or home confinement.

6         Mr. Roglieri is in an awkward position with the
7    bankruptcy proceedings.  I'm not sure how that would affect
8    his ability to obtain employment or, you know, meaningfully,
9    you know, earn a wage while on supervised release, but it's
10   actually his plan to spend 16 hours a day researching
11   voluminous discovery materials.  And the government has
12   indicated that more is on the way.  We received over 55,000
13   pages of documents and other recordings mostly related to
14   some of the -- either the civil litigation or the bankruptcy
15   proceedings, but he's very much wanting to spend all his time
16   helping in the defense of this case, providing a clear
17   picture about what actually happened in this case so that
18   there isn't any substantial, you know, penalty for him when
19   it comes out because it's very hard to determine this far in
20   advance how the case is going to come out.

21        My client is very confident in his position and he
22   wants to be able to research his case with as much time as he
23   can.  He is not able to do that while he is incarcerated.
24   It's going to take much longer.  I am not sure exactly how
25   the Rensselaer County Jail works with providing digital

A175

72

1    information and I'm sure there is a limited number of

2    computers that are available.  And so there must be some sort

3    of rationing of the amount of time available for people to

4    use those computers to review their materials.  Obviously,

5    Mr. Roglieri is a little different from the average, you

6    know, inmate at that facility and therefore would be spending

7    a lot more time on those activities than others would.

8              If you just give me a second, Judge.

9              THE COURT:  Take your time, counselor.

10             MR. TRAINOR:  So, you know, he has been in court

11   several times and he's been -- you know, remanded, you know,

12   each of those times.  And in fact the government has -- we

13   have all had an opportunity to observe his demeanor in court

14   taking the proceedings seriously.  First time in jail, he's

15   been there for five months and there is no issues.  He's a

16   trustee.  He is working at -- you know, throughout the

17   facility.  There's no -- he has not engaged in any kind of

18   violence in the jail, as many inmates tend to do.  And

19   there's been no indication of any suicidal ideation there

20   either.  If someone was going to become more depressed,

21   putting them in jail is the best way to make that happen, I

22   would say.

23             So, if the Court were to release him, he would be

24   willing to consent to any of the conditions that are

25   necessary to ensure the -- his return to court.  Which, as I

73

1    mentioned before, he was involved in numerous civil

2    litigations as well as bankruptcy; never missed a court

3    appearance when his presence was necessary.  And any of the

4    regular conditions, he's already surrendered his passport.

5    He will restrict travel in the Northern District of New York

6    and the Southern District of New York.  He might even -- you

7    know, I don't see any reason why he wouldn't consent to just,

8    you know, going to no further south than Poughkeepsie

9    because, you know, he's -- that's where he's going to reside

10   and that's the only reason why we needed an out-of-district

11   supervision, remain at an authorized address, avoid all

12   contact directly or indirectly with any other persons who are

13   potential witnesses in this case.

14          He is already willing to submit to a mental health

15   evaluation.  And Dr. Walker was able to find some facilities

16   that are able to do that.  I have a little card with that

17   information on it.  I may have put it up here already.  I can

18   provide this to the Court and to the government.  There's one

19   in Poughkeepsie and one in Fishkill.  If he's not able to get

20   covered by insurance, his brother has been willing to pick up

21   on the fees for that.

22          He's also willing to refrain from the consumption

23   of any alcohol or any other kind of substances.  He doesn't

24   use drugs otherwise.  He would submit to any other testing

25   that the Court might want to impose.  And I have spoken to

74

1    him about -- and this might be sort of an unusual condition
2    and I am not sure if the Court would impose something like
3    this, but it's my understanding that the house that his
4    girlfriend has rented in Poughkeepsie has Ring cameras
5    associated with it, as my client intends spend all his day
6    researching his case.  Wouldn't have any problem -- I
7    discussed this with him, you know, putting an interior Ring
8    camera so that, you know, if probation wants to check on him
9    to see what he's doing, they can see what he's doing.
10           This kind of thing is -- it just seems very strange
11   that he spent 44 years of his life engaging primarily in
12   consensual business deals.  He's been a big philanthropist
13   throughout the area.  There is no history of any violence
14   anywhere.  And there is no indication that despite the
15   hyperbolic language that he uses in the text messages
16   particularly with his estranged wife, there's no indication
17   that he's a threat to anybody for any reason.  And I think
18   that the -- his continued detention in this case is going to
19   prolong the process of being ready for trial on a case of
20   this size.  This is a big case.  There's a lot of
21   information.  We need all hands on deck, including the
22   defendant.  And Mr. Roglieri is the person who knows the most
23   about what has happened and knows which emails and which
24   communications are going to be the most relevant to his
25   defense.  And we need him to be able to spend as much time

75

1    collecting and aggregating that information.

2           In addition to the investigators and the attorneys

3    who have been assigned from my office to handle this case, he

4    needs to be out so that he can do them.  The restrictions --

5    as accommodating as Rensselaer County Jail is, there still

6    are restrictions which will necessarily prolong the amount of

7    time he needs to prepare for the case.  And, frankly, I think

8    that at some point that's going to become a due process

9    problem in that, you know -- I suppose, technically, the

10   government is not required to narrow the scope of the

11   evidence from the discovery to -- you know, they are not

12   required to notify the defense of what evidence they intend

13   to introduce.

14          I am going to go out on a limb and say they are not

15   going to introduce all 55,000 pages of the discovery

16   materials, but I would say that, you know, by not really

17   narrowing it down for us, it's -- they are prolonging the

18   amount of time it takes us to research everything.  We have

19   got to read every word on every document if we are going to

20   be properly prepared for something for a case this size.  And

21   at some point, you know, his prolonged detention is going to

22   be a problem.  So I mean that's something that we can't

23   really predict at this stage, but, you know, I think based on

24   the facts before the Court now, particularly, Dr. Colistra's

25   report finding him minimal risk of danger, that there is no

76

1    reason for the Court to continue his detention.

2         And, again, he was out for five months after having

3    drafted that letter and there is no indication that he tried

4    to -- or did anything to try and, you know, take his own

5    life.  And, actually, it is my understanding that there was

6    someone at RCJ who may have tried that recently.  So it's

7    something that people do, do at the correctional facilities,

8    but Mr. Roglieri is not one of them.  To be honest with you,

9    Dr. Colistra's assessment that he has some narcissistic

10   tendencies, I mean, he likes himself too much to do something

11   like that.  So for those reasons, your Honor, I believe that

12   there are conditions that can be imposed and that the Court

13   should release my client under supervision by pretrial

14   services.  Thank you.

15        THE COURT:  Thank you, Mr. Trainor, sir.

16        Mr. Rosenthal and Mr. Barnett?

17        MR. ROSENTHAL:  Very briefly.  Your Honor, we want

18   to make sure that the Court doesn't lose sight of the fact

19   that the last threat that we proffered was in May, and that's

20   the threat to the FBI agent that takes place approximately a

21   week before the defendant is arrested.  So to the notion that

22   there is this late in time where nothing happens I think is

23   besides the point.

24        Your Honor, the other thing I'd say, too, is, you

25   know, the psychologist's report is what it is, but, you know,

77

1   you saw a lot of equivocating during cross-examination.  At

2   one point she even said that the conduct alleged in this case

3   doesn't necessarily evince callousness and manipulativeness

4   that, you know, those are clinical words that maybe have a

5   different meaning.

6          So with that I think that we talked on Friday and

7   in our papers about why the defense's parsing of text

8   messages is inappropriate.  The discussion about the

9   accommodations at Rensselaer County Correctional Facility and

10  the defendant's ability to prepare his defense have been

11  briefed in our July letter.  I don't think anything has

12  changed from that.

13         There's nothing further from us, your Honor.

14  Thank you.

15         THE COURT:  Mr. Trainor, Mr. Sporn, would you like

16  the last word?

17         MR. TRAINOR:  Just give me a minute.

18         THE COURT:  Take your time.

19         MR. TRAINOR:  Well, first off, I'm glad

20  Mr. Rosenthal brought up the verbal threats, which my client

21  has categorically denied.  And note that while there was a

22  declaration filed by Mrs. Roglieri under penalty of perjury,

23  the government has not sought any kind of similar document

24  from Person 1 who alleged those statements were made in their

25  presence.

78

1    And, quite frankly, after having mentioned that on
2    Friday, I kind of expected one being introduced today, but
3    there isn't one.  I think that, you know, the absence of that
4    information speaks volumes in and of itself.  You know, my
5    client denies making those -- making those threats at all and
6    therefore I think that they should be completely disregarded
7    and on top of the fact that Dr. Colistra's report found him
8    to be of minimal violent risk.

9    And my client also mentions that he's concerned --
10   his grandmother passed away while he has been incarcerated
11   and he's concerned that his mother may pass away also.
12   That's more of an emotional appeal than, you know, hard
13   evidence appeal.  But he wants to be able to get out and
14   spend some time with her and assist with her, also.  And
15   that's another reason why he is not a suicide risk because he
16   wants to spend time with his mother.  He wouldn't want to
17   kill himself.  He wouldn't be able to do that.  Thank you.

18        THE COURT:  Mr. Rosenthal and Mr. Barnett?

19        MR. ROSENTHAL:  Just very briefly.  Your Honor
20   already accepted our factual proffer of the statements by
21   Person 1.  That's perfectly proper under *LaFontaine*.  And to
22   say that we need to go above and beyond that isn't required
23   at this juncture.  Thank you, your Honor.

24        THE COURT:  Mr. Trainor?

25        MR. TRAINOR:  It's not required, but it also didn't

A182

79

1    happen, so...

2         THE COURT:  All right.  We are going to take a

3    10-minute recess and the Court will return and advise you of

4    my decision with respect to this matter.  Thank you.

5         COURTROOM DEPUTY:  Court stands in recess.

6              (Recess, 4:31 p.m.)

7              (Open court, At 4:40 p.m.)

8         THE COURT:  This is a matter before the Court in

9    which the Court has great familiarity.  I conducted one prior

10   detention hearing in this matter.  I reviewed a prior request

11   by Mr. Roglieri for another hearing which I have denied, and

12   then conducted a hearing the other day which I determined

13   based upon, in large measure, the opinion of Dr. Colistra, he

14   was entitled to another hearing in this matter.

15        I reviewed all of the submissions which have been

16   submitted to the Court with respect to this matter.  I have

17   considered all of the arguments of counsel.  I've considered

18   all the appropriate statutory factors and considerations

19   under the Bail Reform Act and the Court finds as follows:

20        The government seeks Mr. Roglieri's detention on

21   the grounds that he is a risk of nonappearance and a danger

22   to the community, and there are no conditions or set of

23   conditions I could set which would ensure his appearance in

24   court and his safety in the community.

25        I will first address the risk of nonappearance and

80

1    the government's burden of proof of the preponderance of the

2    evidence.  With respect to that request that he be detained

3    on the grounds he is a risk of nonappearance, the Court finds

4    there are in fact conditions or a set of conditions I could

5    set which would ensure his appearance in court.

6            The Court has specifically reviewed the alleged

7    suicide note which he wrote with respect to this matter.  The

8    Court finds that despite that, there is no indication that he

9    is actively or have actively considered committing suicide in

10   this matter.  The Court would note that he has been

11   incarcerated for a substantial period of time and there is no

12   indication that he has attempted to harm himself.

13           I would quote and further note despite the fact

14   that his legal situation has gotten worse and there is no

15   indication that he has attempted to harm himself at the

16   Rensselaer County Jail, I therefore find by the required

17   quantum of evidence that there are in fact conditions which I

18   could just set which would ensure his return to court.  Those

19   would, among other things, include home detention and

20   electronic monitoring, which would require him to be

21   monitored on a constant basis by pretrial services.  As such,

22   I find there are, in fact, conditions I could set which would

23   ensure his appearance in court.

24           I know I have reached a different conclusion with

25   respect to the argument of danger to the community and I find

81

1    by the required quantum of evidence there are no conditions

2    or set of conditions I could set which would ensure his

3    safety in the community.  Therefore, I am continuing

4    Mr. Roglieri in detention pending further proceedings in this

5    matter.

6         In reaching that conclusion, I would note the Court

7    continues to be greatly concerned by the text messages which

8    Mr. Roglieri sent.  I am looking at the text message which is

9    included in Government Exhibit 3.  Those text messages

10   provide, "I'm going to" -- and I apologize for Mr. Roglieri's

11   language -- "I'm going to make fucking life so fucking

12   miserable and emasculating, it's going to be fucking

13   ridiculous."

14        I would note that in Government Exhibit 4, he sent

15   a text which reads, "I'm fucking going to laugh at anybody

16   that comes after me."

17        An additional text message says, "It's fair game."

18        An additional text message indicates, "You are

19   going to come after with me guns, you are going to get the

20   same."

21        In Exhibit 5, the text message provides, "I feel

22   myself getting angry and vengeance to do is doing the same."

23        The following text message, "Including the

24   attorneys, the Judge and the receiver, et cetera."

25        The next text message, "I do not really play by the

LISA M. MAZZEI, RPR
Official U.S. Court Reporter

A185

82

1    rules.

2            The next text message, "I never have and I never

3    will."

4            The next text message, "And that's dangerous as I

5    feel myself getting to the point with all involved against

6    me."

7            In addition to that, the Court has considered the

8    proffer by the government, as set forth in a letter of May

9    24th of 2024, that Person 1 advised the FBI and the

10   defendant, said he's in a dark place and felt he would be

11   indicted soon.  He allegedly further told Person 1 that he

12   knew the address of the three FBI agents investigating him.

13   He knew the home address of one of the agents who he

14   correctly identified by first name and said he would put a

15   bullet in the agent's head.

16           In an additional later interview, he said he knew

17   where one of the agents lived.  He would not put himself to

18   put a bullet in the agent's head.

19           There is nothing set forth by the defendant today

20   or by Dr. Colistra in her report that addresses any

21   significant or serious fashion the Court's concern with

22   respect to those statements.  While Ms. Colistra or

23   Dr. Colistra has indicated she finds he represents a minimal

24   risk of damage and deal with those text messages and that

25   proffered by Individual 1, I find that Dr. Colistra's opinion

83

1    to be not worthy of serious consideration and frankly in no

2    way addresses the Court's serious concerns in this matter.

3         In view of that, the Court is going to continue

4    Mr. Roglieri in detention pending further proceedings in this

5    matter.

6         Anything else I can do for the government?

7         MR. ROSENTHAL:  No, your Honor.  Thank you.

8         THE COURT:  Mr. Trainor?

9         MR. TRAINOR:  Not at this time, your Honor.

10        THE COURT:  You folks are all set.

11        Good luck, Mr. Roglieri.  Thank you.  We are

12   adjourned.

13        COURTROOM DEPUTY:  Court stands in recess.

14             (Court adjourned, 4:46 p.m.)

15

16

17

18

19

20

21

22

23

24

25

A187

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | **MEMORANDUM OF LAW** |
| -against- | **IN SUPPORT OF** |
|  | **MR. ROGLIERI'S APPEAL** |
| **KRIS ROGLIERI,** | **OF THE DETENTION ORDER** |
| **Defendant.** | **Indictment No.  24-CR-392 (MAD)** |

### Preliminary Statement

A magistrate judge's pretrial detention order is not final until it is reviewed by the appropriate district court.  *United States v. Harrison*, 396 F.3d 1280, 1281 (2d Cir. 2005).  When a party moves for revocation of a pretrial detention order, the district court reviews the factual findings of the magistrate judge for clear error.  *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).  The ultimate legal determination is reviewed de novo by the district court.  *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).  A district court reviewing a magistrate judge's bail determination "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *Leon*, 766 F.2d at 80.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Pretrial detention is governed by 18 U.S.C. § 3142, the Bail Reform Act.  Here, the magistrate judge misapplied the Bail Reform Act by conducting a detention hearing despite the government's failure to meet its burden of establishing that it was entitled to such a hearing.  Because the government failed to meet its burden, the detention hearing that ensued was not authorized by the Bail Reform Act.

A188

"There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. it is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial." S. REP. 98-225, 6-7, 1984 U.S.C.C.A.N. 3182, 3189.

**A.      The Bail Reform Act Allows the Court to Conduct a Detention Hearing Only if Evidence is Presented at the Initial Appearance that One of the Factors Listed in 18 U.S.C. § 3142(f) Exists—Otherwise the Defendant Must Be Released.**

The Bail Reform Act allows the Court to conduct a detention hearing only if evidence is presented at the initial appearance that one of the seven factors listed in 18 U.S.C. § 3142(f) exists. This requires the government to (1) cite one of the seven (f) factors as a reason for requesting a detention hearing; and (2) present evidence establishing that the cited factor exists.

**1.      One of the seven (f) factors must be present for the Court to conduct a detention hearing—otherwise the defendant must be released at the conclusion of the initial appearance.**

According to the plain language of the Bail Reform Act, "the judicial officer shall hold a [detention] hearing" only "in a case that involves" one of the seven factors listed in 18 U.S.C. § 3142(f)(1) and (f)(2). These factors are commonly referred to as the "(f) factors."

18 U.S.C. § 3142(f)(1) contains the first five (f) factors. It states that the government may request a detention hearing if the defendant is charged with one of the following crimes:

- a crime of violence, sex trafficking of children or by force, fraud, or coercion (18 U.S.C. § 1591), or a federal crime of terrorism (18 U.S.C. § 2332b(g)(5)(B)) for which a maximum term of imprisonment of 10 years or more is prescribed;

- an offense for which the maximum sentence is life imprisonment or death;

- an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. § 951 et seq.), or chapter 705 of title 46;

- any felony if such person has been convicted of two or more offenses described in the three bullet points above, or two or more state/local offenses that would have been offenses described in the three bullet points above if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses; or

- any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device, or any other dangerous weapon, or involves a failure to register as a sex offender (18 U.S.C. § 2250).

18 U.S.C. § 3142(f)(2) contains the other two (f) factors. It states that the government may request a detention hearing (or the Court may order one on its own motion) if the case involves:

- a serious risk that such person will flee; or

- a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

The Supreme Court has affirmed that the plain language of the Bail Reform Act means what it says it means: "Detention hearings [are] available if" and only if one of the seven (f) factors is present. *Salerno*, 481 U.S. at 747. "Absent one of these circumstances, detention is not an option." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). Every federal court of appeals that has examined this issue agrees that it is illegal to hold a detention hearing unless the government properly invokes one of the (f) factors at the initial appearance. See, e.g., *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988); *United States v. Friedman*, 837 F.2d 48, 48–49 (2d Cir. 1988); *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986); *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992); *United States v. Twine*, 344 F.3d 987 (9th Cir. 2003); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). As the Second Circuit has noted, "Section 3142(f)(1) thus performs a gate-keeping function

A190

by limiting the circumstances under which pretrial detention may be sought to the most serious of crimes." *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019) (punctuation omitted).

### 2.      The government must establish the cited (f) factor by a preponderance of the evidence.

Simply citing an (f) factor is not enough to trigger a detention hearing. The government must do more. For a court to lawfully move forward from an initial appearance to a detention hearing, "the Government must establish by a preponderance of the evidence that it is entitled to a detention hearing." *Watkins*, 940 F.3d at 158. Thus, the government must establish one of the (f) factors by a preponderance of the evidence before a detention hearing can be scheduled. If it does not do so, the defendant must be released at the conclusion of the initial appearance.

### 3.      The government is not entitled to a three-day continuance to seek evidence establishing an (f) factor.

The government is not entitled to a three-day continuance to seek evidence establishing an (f) factor. That evidence must be produced at the initial appearance and no later. If and only if the government meets its burden and shows that it is entitled to a detention hearing may a continuance be requested. This is clear from the structure of subsection (f). Subsection (f) first sets forth the seven factors that must be established before a detention hearing can be scheduled. After setting forth those factors, subsection (f) states that the detention hearing "shall be held immediately" unless the defendant or the government seeks a continuance of the detention hearing. The Bail Reform Act does not include any provision authorizing the government extra time to establish an (f) factor. If the government does not present such evidence at the initial appearance, the Court must release the defendant.

A191

**B.    Mr. Roglieri Should Have Been Released at the Conclusion of his Initial Appearance Because the Government Did Not Establish any (f) Factor by a Preponderance of the Evidence.**

Here, the government did not establish an (f) factor by a preponderance of the evidence at Mr. Roglieri's initial appearance.  Accordingly, Mr. Roglieri should have been released at the conclusion of that appearance as requested by his counsel.  The Magistrate Judge's failure to do so has resulted in Mr. Roglieri being wrongfully detained since May 31, 2024.

At the initial appearance AFPD Michael McGeowan-Walker stated on the record that this case did not include the presumption cases listed in 18 U.S.C. §3142(f)(1).  *See* Official Transcript of Initial Appearance held on 5/31/2024, Dkt #24, (hereinafter "Transcript IA") at pages 5-6.  He was also very dubious that the government would be able to establish their burden to prove by a preponderance of the evidence that there was "a serious risk that [Mr. Roglieri] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B), and asked that Mr. Roglieri be immediately released on conditions.  *See* Transcript IA at pg. 6.

The government moved for a detention hearing on the basis that:

> The government believes it's entitled to a bail or a detention hearing under 3142(f)(2)(B), that the defendant poses a serious risk that he will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to threaten, injure, intimidate a prospective witness or juror. Your Honor, the government is in possession of threats that, while Mr. McGeown-Walker has accurately stated were not transmitted to the supposed victims of the threats, they are quite concerning. I know the Court is aware of at least some of them through the search warrant application that we made last night.  And for those reasons, we believe that we'd be entitled to a detention hearing and that at the detention hearing, we would be able to meet our burden that the defendant is a danger to the community.

Transcript IA at pg. 6.

The government cited the following evidence to establish the (f)(2)(B) (f) factor:

A192

- That the government was in possession of "threats" that were not transmitted to the purported targets and said further claimed that "they are quite concerning."
- That they made a search warrant application May 30, 2024.

That's it. Nothing else. No mention at all of obstruction or intimidation. The government did not provide the defense with a copy of the referenced search warrant application until July 15, 2024 when it disclosed, among other materials, 2,871 PDFs collectively containing 55,634 pages. The PDF file names only included the Bates number on the first page of each file. The government provided an index to the discovery materials on September 25, 2024. In that index the written search warrant application made on May 30, 2024 was identified as "124mj22 CFH 25 App Aff 053022024." Every other search warrant application listed in the index had "SW" as part of the index filename. *See e.g. In re Oliver* 333 U.S. 257, 266 (1948).

"After a motion for detention has been filed, the district court must undertake a two-step inquiry. … It must first determine by a preponderance of the evidence … that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice. Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." *U.S. v. Friedman*, 837 F.2d 48, 49 (1988)(internal citations omitted). "The question whether the defendant poses a danger to the safety of the community under subsection 3142(e) *cannot be considered* unless the defendant is found to be eligible for detention under subsection 3142(f). A defendant who is not eligible *must* be released, notwithstanding dangerousness." *U.S. v. Dillard*, 214 F.3d 88, 96 (2000)(emphasis added).

Because the government didn't even attempt to provide evidence let alone a preponderance, that Mr. Roglieri posed a serious risk of obstructing justice, threatening, injuring or, intimidating any

prospective witnesses at the initial appearance on May 31, 2024, his pretrial detention is illegal and void.

**C.    The government never argued at the detention hearing that Mr. Roglieri would attempt to obstruct justice.**

The Court started the detention hearing by asking the government's position was to which AUSA Rosenthal responded, "We still seek the defendant's detention for the reasons set forth in our letter based on danger to the community."

In fact, the only person who said anything about whether or not Mr. Roglieri might obstruct anything was AFPD Jeremy Sporn when he pointed out that "He hasn't done anything to obstruct the proceedings. He's shown up in Bankruptcy Court. He's participated fully in the hearings, in the back and forth with the lawyers, with bankruptcy judges, trustees, et cetera."

**D.    The Magistrate never made any written finding that there was a serious risk that Mr. Roglieri would attempt to obstruct justice.**

"In a detention order issued under subsection (e) of this section, the judicial officer shall include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i).  The Magistrate's written Order of Detention, Dkt#11, incorporates by reference his statements on the record at the close of the detention hearing on June 3, 2024, *see e.g. United States v. Barth*, 899 F.2d 199, 201 (2d Cir. 1990), where the Magistrate announced his findings to support his order of detention. *See* Official Transcript of Detention Hearing, Dkt#21 (hereinafter "Transcript Det Hrg"), at pgs 17- 20.  His findings included the following:

1. That there were no conditions that could be set that would ensure Mr. Roglieri's safety in the community.

2. That the government's evidence on the nonviolent Wire Fraud charge appeared to be strong and that the allegations involved a substantial amount of loss. *See* Transcript Det Hrg at 18.

3. The Magistrate then summarized the text messages from Government's Letter-Motion for Pretrial Detention, Exhibit 3 Dkt#6, at Pg 17 – 18. *See* Transcript Det Hrg at 18.

4. That the Magistrate was also disturbed by the allegations by Person-1 regarding oral statements first reported on May 24, 2024.

5. That based on the text messages and oral statements the Magistrate said:

> There's nothing I can do with respect to setting conditions that would address those. If I put him on electronic monitoring and GPS and he's determined to follow those on those alleged threats, I have no ability to stop him from doing so, and neither would pretrial services.
>
> Transcript Det Hrg at Pg 19.

6. The Magistrate also noted Mr. Roglieri's "history involving ownership of substantial numbers of firearms." And further mentioned that "Possession of some of these weapons resulted in state charges, which are currently pending against Mr. Roglieri." *Id.*

7. The Magsitrate concluded his findings by saying "Given all of those factors and considerations, I find there are no conditions or set of conditions I could set which would insure Mr. Roglieri's safety in the community. I'm therefore remanding him to detention pending further proceedings in this matter." *Id.* at 19-20.

The Magistrate Judge never made any finding that Mr. Roglieri presented a risk of obstruction of justice. "[T]he Bail Reform Act *does not permit* detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated [in 18 U.S.C. §3142(f)(1)]". *Friedman, supra* at 49(emphasis added).

### E.    The Magistrate's findings following both detention hearings were not supported by clear and convincing evidence

The evidence presented by the government is not sufficient to establish a serious risk of obstruction by clear and convincing evidence, particularly when measured against the Mr. Roglieri's counterevidence on the record in this case.

"The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. §3142(f)(2).

The evidence presented by the government is neither clear nor convincing that Mr. Roglieri poses a serious risk of obstruction etc. or a danger to the community at large.

### a.  Text Messages

The Court begins by quoting from Government Exhibit 3 which was a text exchange between Mr. Roglieri and his estranged wife that was instigated when his wife got into an argument via text with his new girlfriend.  Mr. Roglieri had previously suggested his wife commence a divorce proceeding because he had found "the one" and had already introduced his girlfriend to their children.  *See* Medical Records filed as to Kris Roglieri, Dkt#47, Forensic Mental Health Assessment, (hereinafter "Colistra Assessment") at pg. 3.

Next the Court reviewed Govt. Exhibit 4 consisting of only three text messages sent to Person-1, but the statements read like quotes out of Good Fellas and there are no specified targets for the purported aggression.  The Court then conflates the messages in Exhibit 4 with the text messages also sent to Person-1 in Govt Exhibit 5 that were sent more than four days later.  In this set of text messages the people he is complaining about are somewhat identifiable, by their function in the litigation but the threats are vague and there is no explicit expression of violence or intimidation.

### b.  Alleged oral statements to Person-1

The Court then discussed Person-1's uncorroborated allegations of oral statements.  Prior to May of 2024 Person-1 had been interviewed by the FBI agents involved in the case and therefore independently knew their names and descriptions.  The only evidence that Mr. Roglieri allegedly knows one of the FBI agent's home address is the completely uncorroborated claim by Person-1's

claim that Mr. Roglieri *said* he knew where the FBI agent lived. There was never any mention of any specifics of that address, not the street or even the city or town or even what county or state it might be located in. This is because Person-1 didn't know the residential addresses of any of the FBI agents. Person-1's uncorroborated allegations have no weight whatsoever. The "evidence" of verbal threats conveyed only to Person-1 with no instruction to pass those threats on to the purported targets are neither clear nor convincing that Mr. Roglieri poses any risk to "obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate" any of the FBI agents or any other witness for that matter. Every encounter he had with the investigating agents Mr. Roglieri was cordial and compliant with them.

> Of note, on February 2, 2024, the defendant was compliant when FBI agents searched his home; he was also compliant when FBI agents seized vehicles from his home on March 5, 2024, pursuant to warrants issued by this Court.

Letter from USA as to Kris Roglieri, Dkt#6, at pg. 4.

Mr. Roglieri has interacted with the bankruptcy trustees, attorneys, receiver and judge on many occasions and has never engaged in any violent threatening or intimidating behavior and has been polite and deferential. Mr. Roglieri has complained about many of those individuals to his estranged wife and others, but that alone is insufficient to establish a clear and convincing evidence of a serious risk that he would "obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate" any witnesses either directly or indirectly.

The Magistrate in his most recent ruling on November 25 put a lot of weight on the allegations by Person-1 who *claimed* that Mr. Roglieri made several oral statements, all of which have been consistently and repeatedly denied by the defense:

- We deny that Mr. Roglieri said that, Your Honor. Didn't happen.
  Transcript Det Hrg at pg. 13.

- [O]ur position is that it didn't happen.  He didn't say those things, and without the same degree of corroboration that we see in the text messages, I think the Court should look much more askance at that type of summary evidence from Person-1 without frankly [Person-1] coming in here and my being able to cross-examine … and probe a little bit further.   Our position is simply [Mr. Roglieri] did not say those things.

    Transcript Det Hrg at pg. 13-14

- The thing I want to just close with is the government has said the Court should not release the defendant so that he can make that plan come to fruition. … there's no plan. There never was a plan.

    Transcript Det Hrg at pg 14

**F.    The Magistrate's findings following the detention hearings are clearly erroneous.**

Mr. Roglieri sent text messages to Person-1 not to any prospective witnesses.  Those text messages were vague at best either in either what or who was being threatened.  Government Exhibit 4 contains some bombastic language but no identifiable targets and the government deliberately conflated those text messages with Govt. Exhibit 5 that specifies some individuals by their function in Mr. Roglieri's bankruptcy and civil litigation to bolster the impression that Mr. Roglieri was making explicit threats directed at specific witnesses.

Mr. Roglieri has no history of violence, obstruction or intimidation whatsoever.  *See e.g.* Letter from Matthew E. Trainor as to Kris Roglieri requesting a new detention hearing, Dkt#17 and exhibits pgs. 7-17.  He has never been accused of a crime of violence let alone been charged with one.  There is no evidence that Mr. Roglieri poses any risk of violence let alone clear and convincing evidence of a *serious* risk of obstructing or attempting to obstruct justice, or threatening, injuring or intimidated or attempting to threaten injury or intimidate a prospective witness or juror.  *See* 18 U.S.C. § 3142(f)(2)(B).

Dr. Colistra testified that she found that Mr.Roglieri is *minimum* risk for violence to others. The alleged behavior does not appear to be related to antisociality, which has been repeatedly demonstrated through the research to be the strongest predictor of reoffending. Another strong indicator that Dr. Colistra mentioned in her testimony, one of the strongest indicators of committing violent acts in the future is a history of either criminal activity or any reports of past reports of violence.  Mr. Roglieri has no history of violent behavior toward others which research has shown to be one of the strongest predictors of future violence. His past behavior has never indicated violent tendencies, nor has there been any report of violent behavior in the past by individuals close to Mr. Roglieri, including from his estranged wife with whom he has a strained relationship at best.

The Magistrate's dismissal of Dr. Colistra's psychological risk assessment finding in favor of uncorroborated allegations is clearly erroneous.

> Given the totality known information at this time, it is the overall opinion of this evaluator that Mr. Roglieri's risk of violence is minimal. As noted above, Mr. Roglieri's alleged behavior does not appear to be related to antisociality which has been repeatedly demonstrated through the research to be the strongest predictor of reoffending. Additionally, he has no history of violent behavior toward others, which research has shown to be predictive of future violence. His past behavior has never indicated violent tendencies, nor has there been any report of violent behavior in the past by individuals close to Mi. Roglieri. Further, Mr. Roglieri currently does not have any known access to weapons, and he has previously surrendered all firearms to law enforcement.

Colistra Assessment at pg. 10.

How can uncorroborated claims of unrecorded statements from an antagonistic witness overcome Mr. Roglieri's 44 years of consistent history of non-violent behavior, and having been professional assessed by two psychiatrists who found that he represents at most a minimal risk of

violent behavior, yet the Magistrate is able to find that Mr. Roglieri poses a serious risk of obstruction and intimidation as well as a danger to the community.

In determining whether there are conditions of release that will reasonably assure the safety of any person in the community, the Court must consider specific factors outlined in 18 U.S.C. §3142(g) which include:

1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

2. The weight of the evidence against the person;

3. The history and characteristics of the person, including

   a. The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

   b. whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

4. The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The first factor weighs in Mr. Roglieri's favor since the offense he is charged with is an economic offense.

The second factor is neutral at this stage while the government literally has a mountain of purported evidence, Mr. Roglieri has a viable defense available. *See* Attorney Affidavit of Daniel Rubin attached hereto as Exhibit 1.

The third factor also weighs in favor of Mr. Roglieri as he has deep ties to the community with a history philanthropic activity.  He has no criminal history, no history of alcohol or drug abuse, and has never failed to appear in court as required (granted his only court history prior to the instant offense being his involvement in civil litigation).  Having never been convicted of a crime before he has never been on probation or parole or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

The fourth factor also weighs in Mr. Roglieri's favor.  With absolutely no history of violence in over four decades and a professional psychiatric assessment finding him at minimal risk of violence Mr. Roglieri poses no danger to any person or the community should he be release.

## **CONCLUSION**

The detention order must be vacated because the government failed to provide any evidence at the initial appearance to warrant holding a detention hearing at all, *see Watkins, supra*.  Even if the government had met their burden at the initial appearance and provided by a preponderance of the evidence that Mr. Roglieri posed a serious risk of obstruction etc. instead of alluding to evidence presented to the Magistrate *ex parte* without even sharing it with the defense, the record clearly establishes not only that Mr. Roglieri does not pose any risk as the clear and convincing evidence submitted by the defense, including Dr. Colistra's Assessment as well as Dr. Walker's Release and

Treatment Plan attached as Exhibit 1 to Letter from Matthew E. Trainor as to Kris Roglieri,

Dkt#48, establishes that he poses no risk of dangerousness to anyone.

DATED: December 27, 2024

<div style="margin-left:40%;">

Lisa Peebles
Federal Public Defender

By  _____

Matthew E.  Trainor, Esq.
Assistant Federal Public Defender
Bar # 105643
39 North Pearl Street, 5th Floor
Albany, New York 12207
Tel: (518) 436-1850
Fax: (518) 436-1780
matthew_trainor@fd.org

</div>

A202

**<u>Certificate of Service</u>**

I, Matthew E. Trainor, attorney of record for the above-named defendant, hereby certify that on

December 27, 2024, I electronically filed the foregoing Sentencing Memorandum, with the Clerk of

the District Court using the CM/ECF system, which sent notification of such filing to

, Assistant U.S. Attorney.

by:    _Matthew E Trainor_

Matthew E. Trainor, Esq.
Assistant Federal Public Defender
Bar Roll No. 105643
54 State St, STE 310
Albany, New York 12207
Tel: (518) 436-1850
Fax: (518) 436-1780
matthew_trainor@fd.org

A203

# Exhibit 1

## Attorney Affirmation of
## Daniel Rubin

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -against-

KRIS ROGLIERI,
      Defendant.

Criminal Action No. 24-CR-392 (MAD)

**ATTORNEY AFFIRMATION**

STATE OF NEW YORK    }
                         } §§
COUNTY OF ALBANY    }

Daniel Rubin, being duly sworn, deposes and says:

1. I am an attorney duly admitted to practice in the State of New York and I am licensed in the Courts of State New York and The United States District Court for the Northern District of New York. I make this affirmation in support of relief sought as set forth in the Notice of Motion.

2. I represented Kris Roglieri and his company Prime Capital Ventures, LLC in civil litigation against Reign Financial International, Inc. *et al* and due to said capacity, I am familiar with the facts and circumstances relevant to that litigation.

3. In September 2023 I was contacted by Jason Athony, Senior Counsel at the U.S. Securities and Exchange Commission who was seeking documentation as well as an interview with Mr. Roglieri regarding Reign Financial.

4. Requested documents were provided and the interview with the SEC took place on December 8, 2023 via Video conference.

5. In December 2023 I was contacted by Daniel Onove, a Special Agent with the New York Office of the FBI who was also seeking documents and an interview with Mr. Roglieri regarding Reign Financial.

6. Requested documents were provided and the interview with the FBI took place on December 21, 2023 via telephone.

A205

7. Both the SEC and the FBI informed me that Mr. Roglieri and Prime Capital Ventures were not the target of their investigation, that Reign Financial was the target and had been "on their radar" for some time.


DATED: December 27, 2024

Daniel S. L. Rubin, Partner

_____

Girvin & Ferlazzo, PC
20 Corporate Woods Boulevard
Albany, NY 12211
Cell: 281-546-9721
Office:  518-462-0300
Facsimile: 518-462-5037
www.girvinlaw.com

A206

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:24-CR-392 (MAD) |
| | ) | |
| | ) | Speedy Trial Act Exclusion: |
| **v.** | ) | 18 U.S.C. § 3161(h)(1)(D), (H) [filing of |
| | ) | motion through 30 days after motion is fully |
| | ) | submitted] |
| **KRIS ROGLIERI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT
KRIS ROGLIERI'S MOTION FOR REVOCATION OF
<u>DETENTION ORDER PURSUANT TO 18 U.S.C. § 3145(b)</u>**

A207

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

   A.  Summary of Offense Conduct and Relevant Background ................................ 3

   B.  Procedural History .......................................................................................... 9

       i.      The First Detention Hearing ................................................. 9

       ii.     The First Motion to Reopen the Detention Hearing ............................. 10

       iii.    The Second Motion to Reopen the Detention Hearing ......................... 11

LEGAL STANDARD ....................................................................................................... 13

   A.  Detention Hearing Framework ..................................................................... 13

   B.  Review of a Magistrate's Detention Decision by a District Judge ................... 15

ARGUMENT .................................................................................................................... 16

   I.  THE DEFENDANT'S CLAIM THAT THE MAGISTRATE JUDGE ERRED IN HIS DETERMINATION THAT A DETENTION HEARING WAS MANDATED BY 18 U.S.C § 3142(f)(2)(B) IS WAIVED AND, IN ANY EVENT, MERITLESS ...... 16

   II.  THE MAGISTRATE JUDGE CORRECTLY RULED THAT THE DEFENDANT SHOULD BE DETAINED PENDING TRIAL ....................................... 18

CONCLUSION ................................................................................................................ 23

A208

The government respectfully submits this memorandum of law in opposition to defendant Kris Roglieri's challenge to his pretrial detention under 18 U.S.C. § 3145(b) (Dkt. ## 60, 66).

## INTRODUCTION

In late 2023, Kris Roglieri's multimillion-dollar advance fee and Ponzi scheme began to unravel. For several years, he had conned a host of prospective borrowers into turning over upfront interest payments with promises that this money would be maintained safely in segregated accounts and used only in the event that Roglieri's companies – Prime Capital Ventures, LLC ("Prime Capital") and Prime Commercial Lending, LLC ("Prime Commercial" and with Prime Capital, "Prime") – found them a lender. In reality, Roglieri stole the borrowers' money, using it to pay back prior victims of his fraud and on lavish purchases for himself and those around him. As the lawsuits from these victims mounted, Roglieri privately admitted that his conduct was "illegal" and that the proceedings against him would quickly "turn criminal," because once the victims started to look at his companies' bank records, they would "bring in the Feds."

But Roglieri's prescient statements were not limited to foreboding – on numerous occasions, he suggested that he would harm people involved in the cases against him. In January 2024 text messages, for instance, he said "I'm fucking gonna wack anybody that comes after me . . . You wanna come after me with guns you gonna get the same." Roglieri exclaimed that he was "angry" and wanted "vengeance" to the point where it was "dangerous." And in late May 2024, several months after the FBI's investigation became overt and many of his possessions had been seized, Roglieri declared that he would "put a bullet" in the head of one of the assigned agents.

The FBI soon arrested Roglieri on wire fraud charges and the government sought his detention. After receiving briefing from the government and holding a lengthy detention hearing

A209

on June 3, 2024, then-U.S. Magistrate Judge Christian F. Hummel found that he could not set conditions of release that would reasonably assure the safety of the community. Judge Hummel noted the "substantial evidence" supporting the allegation that Roglieri perpetrated a large fraud as well as his "grave concern" stemming from Roglieri's text messages and oral statements discussing violence toward other people. In ordering Roglieri's detention, Judge Hummel further explained that the threats were "deeply disturbing to the Court" and [t]here's nothing I can do with respect to setting conditions that would address those." Roglieri did not appeal Judge Hummel's decision to hold a detention hearing or to detain him.

Instead, six weeks later, Roglieri sought to reopen the detention hearing by providing character letters from, among others, his brother, girlfriend, and former lawyer. Judge Hummel denied that motion, ruling that Roglieri failed to present grounds to revisit his detention because, as all Circuit authority holds, character letters are not new information that was unavailable to a defendant at the time of an initial detention hearing. Roglieri did not appeal this decision either.

Next, in late October 2024, Roglieri filed another motion to reopen the detention hearing, this time submitting to Judge Hummel a psychologist's report and a release plan by a member of defense counsel's office. After oral argument, Judge Hummel reopened the detention hearing. He then received extensive testimony from a psychologist about her view that Roglieri poses a "minimal" risk of violence. The psychologist, however, withered on cross-examination as she was forced to confront the numerous ways that Roglieri misled her during an evaluation as well as her erroneous assumptions about his conduct. Judge Hummel again found that detention was merited.

Roglieri now seeks to undo Judge Hummel's well-reasoned conclusion. The defense's first salvo is that the government was not even entitled to a detention hearing in the first place because, in its telling, there was too little evidence that Roglieri presents a serious risk of obstructing justice

A210

or harming potential witnesses.  Next, the defense asserts that Judge Hummel erred by giving Roglieri's threats more weight than, *inter alia*, his lack of a criminal history and the psychologist's opinion that Roglieri is unlikely to engage in violence.

The defense is wrong on all fronts.  For starters, Roglieri's challenge to Judge Hummel's decision that a detention hearing was required is waived because it was filed months after the 14-day deadline for such motions under this District's local rules.  In any event, Judge Hummel made no mistake by holding a detention hearing based on his commonsense finding that the defendant's declarations about attacking investigating agents, attorneys, and judicial officers demonstrate a serious risk that the defendant will obstruct justice or harm a witness.  And Judge Hummel also did not err by finding that the defendant's background and his psychologist's compromised conclusions fell far short of offsetting the palpable danger evinced by the defendant's own statements.  Simply put, Judge Hummel correctly took the defendant at his word. This Court should, too.

For these reasons, and as explained in more detail below, the defendant's motion should be denied in its entirety and without a hearing.

## BACKGROUND

### A.    Summary of Offense Conduct and Relevant Background

This case arises from an ongoing investigation into a fraud scheme perpetrated by Roglieri via Prime that came crashing down in late 2023.  Since that time, Roglieri, his companies, and others have been the subject of several litigations in this District and elsewhere, as detailed here for context.

As set forth in the indictment and an earlier-filed complaint (Dkt. ## 1, 35), the Prime entities were held out as commercial lending businesses.  As part of contractual arrangements with

A211

clients located across the country, Prime obtained upfront interest payments from prospective borrowers while it sought to secure loans for those borrowers. Prime characterized these upfront interest payments as the "Interest Credit Account Payment" or "ICA" payment. ICA payments did not represent fees to Prime. Instead, each borrower's upfront ICA payment would be debited over time as the loan was funded and accrued more interest. An ICA payment would also be refundable if Prime failed to secure a loan for the borrower client.

 ***The Involuntary Bankruptcy Proceeding.*** Prime Capital was the subject of an involuntary Chapter 7 bankruptcy proceeding in this District that was filed on December 19, 2023 under the caption *In re Prime Capital Ventures, LLC*, No. 1:23-bk-11302 (Bankr. N.D.N.Y.) (the "Involuntary Bankruptcy Proceeding"). In that proceeding, three Prime Capital creditors sought to put Prime Capital into bankruptcy based on allegations that Prime Capital had fraudulently taken and refused to return $43 million from numerous entities, including more than $20 million from the petitioning creditors. No. 1:23-bk-11302, Dkt. ## 1, 4. The petitioning creditors alleged that Prime Capital defrauded its borrower clients by using the ICA funds that those clients paid to Prime Capital – as pre-payment of interest on yet-to-be issued loans – for Prime Capital's own purposes and then failed to return the ICA funds when the loans did not materialize. *See, e.g.*, No. 1:23-bk-11302, Dkt. # 4. On December 21, 2023, the Bankruptcy Court appointed an interim trustee to oversee Prime Capital. No. 1:23-bk-11302, Dkt. # 13. The Bankruptcy Court dismissed the Involuntary Bankruptcy Proceeding on January 9, 2024, at the request of both the petitioning creditors and Prime Capital. No. 1:23-bk-11302, Dkt. # 87.

 ***The Receivership Proceeding.*** Following the dismissal of the Involuntary Bankruptcy Proceeding, on January 12, 2024, one of the above-referenced creditors sued Prime Capital, Roglieri, and other parties in this Court. *See Compass-Charlotte 1031, LLC v. Prime Capital*

A212

*Ventures, LLC et al.*, No. 1:24-cv-55 (MAD/CFH) (N.D.N.Y.) (the "Receivership Proceeding").
In that case, the Court signed an Order to Show Cause for January 22, 2024, and appointed a
temporary receiver in the interim. No. 1:24-cv-55, Jan. 22, 2024 Text Min. Entry. The Court
appointed the receiver permanently two days later. No. 1:24-cv-55, Dkt. # 56. On January 30,
2024, the Court entered an order temporarily restraining the defendant and others from
transferring, selling, disposing, or encumbering the funds in Prime Capital's financial accounts, as
well as a number of vehicles. No. 1:24-cv-55, Dkt. # 78. The defendant was dismissed without
prejudice from the Receivership Proceeding in March 2024 based on his personal bankruptcy
filing, discussed *infra*. No. 1:24-cv-55, Dkt. # 160. In August 2024, the Court stayed the
Receivership Proceeding pending the resolution of this proceeding and a related bankruptcy
appeal. *See* No. 1:24-cv-55, Dkt. # 188.

***The Personal Bankruptcy Proceeding.*** On February 15, 2024, the defendant filed a
personal bankruptcy action under Chapter 11 of the Bankruptcy Code, a provision that debtors
generally use to maintain control of their estate's property while they seek to restructure their
finances with court approval. *See In re Kris Daniel Roglieri*, No. 1:24-bk-10157 (Bankr.
N.D.N.Y.) (the "Personal Bankruptcy Proceeding"). In late April 2024, the U.S. Trustee moved
to convert the Personal Bankruptcy Proceeding into a proceeding under Chapter 7 of the
Bankruptcy Code based on claims that the defendant was, among other things, depleting assets of
the estate (including by spending $1.5 million from his personal bank account in the span of several
weeks prior to his personal bankruptcy filing) and had testified at creditors' meetings that he had
no job, no income, and no prospects for a job or income. No. 1:24-bk-10157, Dkt. # 119 at 1-3.
On May 15, 2024, the Bankruptcy Court granted this motion. No. 1:24-bk-10157, Dkt. # 159. In
Chapter 7 proceedings, a trustee liquidates the debtor's assets to repay creditors, leaving the debtor

A213

with little control over the process as compared to a Chapter 11 proceeding.  The same day that the Bankruptcy Court granted the motion to convert the proceeding, Christian H. Dribusch, Esq. was appointed as the trustee of the defendant's estate.  No. 1:24-bk-10157, Dkt. # 160.

On May 20, 2024, the Bankruptcy Court held a hearing on Mr. Dribusch's motion for turnover of the defendant's estate's property.  No. 1:24-bk-10157, Dkt. ## 166, 186.  According to a recording of the hearing, the defendant appeared *pro se* because his bankruptcy counsel had moved to withdraw from the proceeding following the conversion.  In objecting to the motion for turnover, the defendant told the Bankruptcy Court that "the last several months have ripped apart my life in more ways than anyone can imagine."  He further said that he found the positions taken by an Assistant U.S. Trustee to be "very disturbing."  At the end of the hearing, the Bankruptcy Court granted the motion.  No. 1:24-bk-10151, May 20, 2024 Text Min. Entry.

On May 24, 2024, Mr. Dribusch emailed the defendant inquiring about the location of the defendant's collection of firearms, which were among the assets that the defendant had been ordered to turn over.  Dkt. 6-1 at Ex. 1.[1]  The defendant and Mr. Dribusch then exchanged emails about the freezing of one of the defendant's bank accounts.  The defendant responded, "Christian I literally have no credit cards and no money for basic living expenses. Fucking cocksucker."  *Id.* On May 28, 2024, the defendant wrote to the Bankruptcy Court seeking an "emergency hearing" based on Mr. Dribusch's freezing of the defendant's "last remaining funds" and stating "I have no way to provide basic needs for myself and my children . . . ."  No. 1:24-bk-10157, Dkt. # 189.

---

[1] In the Personal Bankruptcy Proceeding, the defendant's counsel disclosed to the Bankruptcy Court that he owned 20 firearms, including three pistols and several shotguns.  No. 1:24-bk-10157, Dkt. # 80 at 34.

A214

Later in the week, the defendant informed Mr. Dribusch that the firearms disclosed to the Bankruptcy Court were being stored at a Queensbury gun range and store.[2]

*The Searches.*  On February 2, 2024, the FBI conducted court-authorized searches of, among other places, the defendant's Queensbury mansion in connection with the investigation. During the search, agents observed numerous firearms, including an AR-15-style rifle and a high-capacity magazine.  State authorities subsequently charged the defendant with two counts of Criminal Possession of a Weapon in the Third Degree, in violation of N.Y. Penal Law § 265.02(7), (8), for possession of these items.  These charges are currently pending.

*The Defendant's Increasingly Threatening Behavior Before Arrest.*  The defendant made increasingly concerning threats in discussions with Person-1.  During a February 16, 2024 interview, Person-1 stated that around mid-January 2024, in a telephone conversation, the defendant said that he would "take out" the receiver and judge who were involved in his bankruptcy proceeding.  Text messages between Person-1 and the defendant, found on Person-1's cell phone, include the following:

- January 21, 2024: "I'm fucking gonna wack anybody that comes after me," "Fair game," and "You wanna come after me with guns you gonna get the same."  Gov't Hr'g Ex. 4.[3]

- January 25, 2024: "I feel myself getting angry and vengeance to those that are doing this," "Including the attories [sic], judge, receiver etc," "I don't really play by the rules," "Never have and never will," "And that's dangerous as I feel myself getting to that point with all involved against me."  Gov't Hr'g Ex. 5.

---

[2] The FBI obtained a list of the firearms stored at this facility that matches the list of firearms disclosed to the Bankruptcy Court. The government understands that these weapons were recently sold at auction by the bankruptcy trustee.  *See* No. 1:24-bk-10157, Dkt. # 322.

[3] The hearing exhibits cited here refer to the exhibits submitted by the parties at the November 25, 2024 hearings. The government is sending copies of these exhibits to the Court's chambers contemporaneously with the filing of this brief.

A215

Of note, the defendant was compliant when FBI agents searched his home on February 2, 2024; he was also compliant when FBI agents seized vehicles from his home on March 5, 2024, pursuant to warrants issued by Judge Hummel.

On the evening of Friday, May 24, 2024, Person-1's representative contacted this Office to urgently report threats that the defendant said to Person-1. An FBI supervisory agent interviewed Person-1 by phone later that night. She disclosed that earlier in the night, the defendant told her that he was in a "dark place," because he was going through bankruptcy proceedings, had no money, and felt he would be indicted soon. The defendant told her that he knows the three FBI Agents who are investigating him. The defendant further stated that he knew the home address of one of the agents (whom he correctly identified by first name), and that the defendant would "put a bullet in [that agent's] head." In a subsequent interview, Person-1 described the threats as the defendant telling her that "'he knows where [one of the agents] fucking lives' and that he would not put it past himself 'to put a bullet in [that agent's] head.'" The defendant also told Person-1 that "when someone takes everything away from you . . . if I go down, everyone goes down." At another point he said, "I ain't going out like that." Sometime prior to making these statements, the defendant authored a letter in which he said he planned to kill himself because "prison is not for me." Gov't Hr'g Ex. 2.

***The Criminal Complaint and Indictment.*** On May 28, 2024, the government obtained the criminal complaint in this proceeding charging the defendant with one count of wire fraud. Dkt. # 1. The government subsequently obtained a five-count wire fraud indictment based on this same conduct. Dkt. # 35. In sum, the indictment alleges that the defendant defrauded a prospective borrower of its $5 million ICA payment while the Involuntary Bankruptcy Proceeding was pending. The defendant promised to keep the ICA payment in a separate and distinct account, but

A216

immediately broke that promise by using the money on, among other things: $950,000 toward a financial obligation owed to another Prime Capital client; $400,000 for Prime's law firm; $84,000 for a Rolex; and $101,000 in private jet flights for a family vacation. The government's ongoing investigation reveals many other victims and losses likely exceeding $75 million.

### B. Procedural History

#### i. The First Detention Hearing

The defendant was arrested and made his initial appearance on the complaint before Judge Hummel on May 31, 2024. *See, e.g.*, May 31, 2024 Tr. (Dkt. # 24) at 1-2. At the initial appearance, the government sought a detention hearing under 18 U.S.C. § 3142(f)(2)(B) after the preparation of a pretrial services report, based on the serious risk that the defendant would obstruct justice and threaten or harm prospective witnesses if released. *See id.* at 5-7. The defense opposed this request, arguing for Roglieri's immediate release, but Judge Hummel agreed that a detention hearing was merited and scheduled the hearing for the next business day, June 3, 2024. *See id.*

On June 2, 2024, the government filed a letter detailing the reasons why the defendant should be detained pending trial. *See* Dkt. # 6-1. The government described the seriousness of the defendant's charged offense and other conduct, a multi-million-dollar fraud scheme that appears to involve many victims. *See id.* at 6-7. The government submitted the chilling text messages described above. *See id.* Exs. 2-3; *supra* at 7. The government also attached text messages demonstrating the defendant's guilt – messages where the defendant recognized that his conduct was "illegal" and would result in criminal charges by "the Feds." Dkt. # 6-1 at Ex. 4. The pretrial services report, issued on June 3, recommended detention. *See* Dkt. # 7.

At the detention hearing, defense counsel argued vigorously against detention. June 3, 2024 Tr. (Dkt. # 21) at 5-15. Defense counsel questioned the significance of the defendant's text

A217

messages, suggesting that they were the product of frustration and nothing "more than idle talk, idle chatter, venting, blowing off steam, whatever you want to call it." *Id.* at 14. Defense counsel denied the defendant's oral comments to Person-1 as invented by someone with "an ax to grind." *Id.* at 12. Defense counsel raised the defendant's lack of a criminal record and suggested that if the defendant truly planned to act on his threats, he would have done so well before his arrest. *See, e.g.*, *id.* at 8, 10, 13. Defense counsel also stressed the defendant's "philanthropic giving," closeness to his children, and ties to the community. *Id.* at 6-7.

Judge Hummel carefully considered the defendant's arguments and ultimately found that that the government had met its burden of demonstrating the danger posed by the defendant and that he could not set conditions that would reasonably assure the safety of the community. *See id.* at 17-20. Explaining his decision, Judge Hummel noted "substantial evidence" supporting the allegation that the defendant engaged in a large fraud as well as his "grave concern" with the defendant's text messages and oral statements about harming people. *Id.* at 18. Judge Hummel reasoned, "[a]ll of those comments, text messages, and those allegations set forth in the [government]'s letter are deeply disturbing to the Court" and "[t]here's nothing I can do with respect to setting conditions that would address those." *Id.* at 19. Judge Hummel explained, "[i]f I put him on electronic monitoring and GPS and he's determined to follow [through] on those alleged threats, I have no ability to stop him from doing so, and neither would pretrial services." *Id.*

### ii.    The First Motion to Reopen the Detention Hearing

The defense first moved to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f) by letter-motion on July 13, 2024. *See* Dkt. # 17. That motion attached letters or declarations of support from the defendant's: (1) former girlfriend; (2) brother; (3) neighbor; (4) current girlfriend;

(5) prior criminal defense lawyer; and (6) cousin.  Dkt. # 17 at 7-17.[4]  The government opposed the motion and the defense submitted a reply.  Dkt. ## 26, 30.

Judge Hummel promptly denied the motion, ruling that (1) "none of defendant's new submissions constitute new evidence which was unavailable at the time of the detention hearing," and (2) in any event, that Roglieri's "'new evidence' also fail[ed] to address in any way the allegation that defendant threatened to harm the attorneys, receiver, and judge in his bankruptcy proceeding and the allegation that he knew where three FBI agents lived and threatened to shoot at least one of them in the head."  Dkt. # 32 at 3.

### iii.    The Second Motion to Reopen the Detention Hearing

On October 25, 2024, the defense again moved to reopen the detention hearing, this time submitting (1) a release and treatment plan prepared by Elizabeth Walker, a mitigation specialist at the Federal Public Defender's Office; and (2) a forensic mental health assessment prepared by psychologists Victoria Dodge and Katrina Colistra.  Dkt. ## 47, 48.  The defense argued that the defendant's release was required based on Dr. Dodge's statement that the defendant's "risk of violence is minimal" and the mitigation specialist's plan that the defendant live with his girlfriend in Poughkeepsie, New York.  *See* Dkt. # 48.  After the government opposed the motion, Dkt. # 51, Judge Hummel heard argument on whether he should reopen the detention hearing and decided to reopen the hearing, Nov. 22, 2024 Text Min. Entry.

Judge Hummel presided over the second detention hearing on November 25, 2024.  The defense presented testimony from Dr. Colistra, who confirmed her opinion was that "within a reasonable degree of professional certainty[,] Mr. Roglieri will present minimal risk of violence."

---

[4] Immediately prior to this filing, the defense submitted under seal an undated letter in which the defendant described his "decision to take [his] own life" because he would have been "convicted of financial crimes" and sentenced to "a long time in prison."  Dkt. # 16.  This letter was received as Government Exhibit 2 at the November 25, 2024 hearing.

Nov. 25, 2024 Tr. at 9-10; *see id.* at 3-27; *see also* Def. Hr'g Ex. 2 (V. Dodge & K. Colistra

Report).[5]  On cross-examination, Dr. Colistra admitted that it is impossible to know with complete

certainty what a person will do in the future and that her assessments seek to establish a likelihood

that a person will engage in violence based on her training and observations of the subject.  *See id.*

at 31-32.  When asked whether extreme stress could cause a person with no history of violence to

act violently, Dr. Colistra replied "I am not sure I can answer that with a direct yes or no, but

anything is possible."  *Id.* at 35.  She also testified that a psychologist's assessment could be

affected or rendered inaccurate if their subject is deceptive.  *See id.* at 32, 36.  The government

then walked Dr. Colistra through a series of representations that the defendant made during his

interview.  These included:

- The defendant's denial of "any outstanding debts" despite his being in bankruptcy proceedings in which he disclosed, *inter alia*, owing more than $500,000 to state tax authorities.  Nov. 25, 2024 Tr. at 37-42; *see* Gov't Hr'g Ex. 1.

- The defendant's initial denial in his interview that he had planned to commit suicide despite his writing a letter describing his "decision to take [his] own life," because "[t]he pain is too much to think of and frankly prison is not for me."  Nov. 25, 2024 Tr. at 43-46; *see* Gov't Hr'g Ex. 2.

- The defendant's denial of a history of making threats similar to those proffered by the government at the first detention hearing even though in December 2023 text messages, the defendant told his estranged wife that he "fear[ed]" he would "rip off [her] fucking throat and piss down [her] fucking neck."  Nov. 25, 2024 Tr. at 47-49; *see* Gov't Hr'g Ex. 3; *see also* Gov't Hr'g Ex. 3 (defendant threatening "You fuck with the hand that feeds you and you're gonna get fucked up the ass royally").

After considering additional argument from the parties, Nov. 25, 2024 Tr. at 56-79, Judge

Hummel issued his decision, *id.* at 79-83.  Judge Hummel again found that he could not set

conditions that would reasonably assure the safety of the community if the defendant were

---

[5] Pursuant to this District's transcript policy, the November 25, 2024 transcript cited has not been attached as an exhibit because it has not yet been publicly posted to ECF.  An unredacted copy of the transcript, which was ordered by the defense, has been sent to the Court's Chambers.

A220

released.  *See id.* at 81.[6]  Judge Hummel explained "the Court continues to be greatly concerned by the text messages which Mr. Roglieri sent" before describing the text messages submitted by the government.  *Id.* at 81-82.  He went on to detail the government's proffer of Person-1's recounting of the defendant's threats to investigating agents.  *Id.* at 82.  Finally, Judge Hummel explained that "nothing" in Dr. Colistra's report and testimony "addresse[d] [in] any significant or serious fashion the Court's concern with respect to [the defendant's] statements."  *Id.*

## LEGAL STANDARD

### A.    Detention Hearing Framework

The Bail Reform Act of 1984 sets forth the procedures for pretrial detention of a criminal defendant.  *See generally* 18 U.S.C. §§ 3141 *et seq.*  Detention determinations are a two-step inquiry.  *See, e.g.*, *Dai*, 2023 WL 11016392, at *1.  First, the court must determine whether a detention hearing is authorized.  *Id.*  A detention hearing is authorized only if the government establishes by a preponderance of the evidence that the case involves one of the offenses enumerated in 18 U.S.C. § 3142(f)(1) or that the defendant presents certain risk factors identified in 18 U.S.C. § 3142(f)(2), which include (A) a serious risk that the defendant will flee; or (B) a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.  *See, e.g.*, *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019).

Second, "if the court determines that a detention hearing is authorized, the court must consider whether any condition or combination of conditions will reasonably assure the

---

[6] The government also sought detention based on the risk of nonappearance presented by the defendant's suicidal ideation.  Nov. 25, 2024 Tr. at 59-63; *see generally United States v. Dai*, 2023 WL 11016392, at *6 (N.D.N.Y. Dec. 19, 2023) (Sannes, C.J.) (noting "suicide risk is certainly an appropriate factor in determining whether to order detention under [the] § 3142(e)(1)" risk of nonappearance prong).  Judge Hummel found that he could set conditions to mitigate the defendant's risk of nonappearance sufficiently.  *See* Nov. 25, 2024 Tr. at 79-80.

A221

defendant's appearance at trial and the safety of the community by applying four factors listed in § 3142(g)." *Dai*, WL 11016392, at *2 (citing *United States v. Berrios-Berrios*, 791 F.2d 246, 249 (2d Cir. 1986)).  In making this determination, courts examine four factors: (1) the nature and circumstances of the crime charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the weight of the evidence against the defendant.  18 U.S.C. § 3142(g).  The weight to be accorded to each factor is "the special province" of the factfinder.  *United States v. Shakur*, 817 F.2d 189, 196 (2d Cir. 1987).  The facts underpinning a dangerousness finding must be supported by clear and convincing evidence.  *See* 18 U.S.C. § 3142(f).  "If, based on an application of these factors, the court determines that 'no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community,' the defendant must be detained."  *Dai*, 2023 WL 11016392, at * 6 (quoting 18 U.S.C. § 3142(e)(1)).

"[T]he Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release."  *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015) (citing *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991)).  Indeed, there is no "requirement that the violent conduct" subject of this inquiry "be connected to the activity charged in the indictment." *Rodriguez*, 950 F.2d at 88.

Because the rules concerning admissibility of evidence in criminal trials do not apply to bail hearings, *see* 18 U.S.C. § 3142(f), the parties may proceed by way of proffer.  *See, e.g.*, *United States v. Abuhamra*, 389 F.3d 309, 325 (2d Cir. 2004) (noting that "[t]he proceeding here at issue, a . . . bail hearing, permits receipt of hearsay evidence"); *United States v. Boustani*, 356 F. Supp. 3d 246, 251 (E.D.N.Y. 2019) ("courts often base detention decisions on hearsay evidence").  Still, the district court "must also ensure the reliability of the evidence, by selectively insisting upon the

A222

production of the underlying evidence or evidentiary sources where their accuracy is in question." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (internal quotation marks omitted) (affirming bail decision where "the government proceeded almost entirely by proffer" and holding that district court did not abuse discretion in not requiring live testimony from witness who previously lied in grand jury testimony).

### B.    Review of a Magistrate's Detention Decision by a District Judge

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). A district court reviews such a detention order *de novo*. *See, e.g.*, *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). In considering a motion under 18 U.S.C. § 3145(b), "a district court may rely on the record developed before the magistrate judge and may also accept additional evidence." *Dai*, 2023 WL 11016392, at *2 (citing *United States v. Colombo*, 777 F.2d 96, 98 n.1 (2d Cir. 1985)). "[D]istrict courts are not required to hold hearings on appeals of a magistrate judge's bail determination." *United States v. Rivera*, 2020 WL 4383505, at *1 n.1 (S.D.N.Y. July 31, 2020) (Nathan, J.).

Local Criminal Rule 59.1 is titled "Magistrate Judges." It provides, in relevant part, that "[a] party seeking review of a Magistrate Judge's release or detention order pursuant to 18 U.S.C. § 3145(c) shall file a Notice of Appeal of Magistrate Judge Pretrial Order pursuant to Fed. R. Crim. P. 58(g)(2)(A) within fourteen (14) days of the date of entry." N.D.N.Y. L.R. Crim. P. 59.1(a)(3). Courts have applied similar rules to prohibit untimely challenges to a magistrate judge's detention order under 18 U.S.C. § 3145(b). *See, e.g.*, *United States v. Savage*, 2025 WL 26507, at *1 (N.D. Ohio Jan. 2, 2025) (defendant "waived his right to 3145(b) review" under rule providing 14-day window for appeal where defendant's challenge of a magistrate's October 2024 detention order was not filed until December 2024).

## ARGUMENT

**I. THE DEFENDANT'S CLAIM THAT THE MAGISTRATE JUDGE ERRED IN HIS DETERMINATION THAT A DETENTION HEARING WAS MANDATED BY 18 U.S.C. § 3142(f)(2)(B) IS WAIVED AND, IN ANY EVENT, MERITLESS**

Roglieri's stale claim that Judge Hummel erred in his May 31, 2024 determination that a detention hearing was required by 18 U.S.C. § 3142(f)(2)(B), Mem. at 4-8, should be rejected because it is waived. While Local Criminal Rule 59.1(a)(3) references 18 U.S.C. § 3145(c), it appears to apply to any instance where a defendant challenges a magistrate judge's bail determination before a district judge, including under 18 U.S.C. § 3145(b). This is because it clearly contemplates a procedure in which a district judge reviews the magistrate's order after briefing by the parties. Because Roglieri did not challenge the finding that a detention hearing was required under 18 U.S.C. § 3142(f)(2)(B) for more than six months, his challenge – which rests entirely on grounds that would have been immediately apparent when Judge Hummel ruled – is waived. *See United States v. Savage*, 2025 WL 26507, at *1. Roglieri's instant challenge should therefore be confined to those issues that Judge Hummel decided in November 2024.

Regardless of waiver, Judge Hummel's determination that a detention hearing was required easily passes muster on the merits. There was ample reason to conclude that the defendant would obstruct justice and threaten or harm prospective witnesses if released. The defendant had actively voiced his intent to kill an agent involved in the investigation of his conduct. *See supra* at 8. Prior to that, the defendant suggested that he wanted to seek "vengeance" against the attorneys and federal judges involved in the various litigations concerning him. *See supra* at 7. Taken together, these troubling statements met the government's burden for obtaining a detention hearing.

The defendant's various complaints about Judge Hummel's sound determination to hold a detention hearing all miss the point. First, the defendant suggests that in seeking a detention

A224

hearing, the government made "[n]o mention at all of obstruction or intimidation." Mem. at 6. Not so: the portion of the transcript cited in the defendant's own brief reveals that the government sought a detention hearing because there is "a serious risk that [Roglieri] will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to threaten, injure, intimidate a prospective witness . . ." Mem. at 5 (quoting May 31, 2024 Tr. at 6).[7] Second, the defendant claims that Judge Hummel ran afoul of 18 U.S.C. § 3142(i) because he did not issue a written order regarding his decision that a detention hearing was required. Mem. at 7. That is wrong, because while the Bail Reform Act requires that a judge issuing a detention order "include written findings of fact and a written statement of the reasons for the detention," 18 U.S.C. § 3142(i)(1), the Second Circuit has held that the requirement is met where, as here, "the court's findings and reasons for issuing a detention order are clearly set out in the written transcript of the hearing[,]" *United States v. English*, 629 F.3d 311, 321 (2d Cir. 2011). Third, the defendant baldly claims that his detention between his initial appearance and the June 3, 2024 hearing was "illegal." Mem. at 7. But this fails as well because, as noted above, Judge Hummel had ample grounds to hold a detention hearing under 18 U.S.C. § 3142(f)(2) and made such a finding immediately upon Roglieri's first appearance. Even so, a trial court's "failure to comply with the first appearance requirement does not defeat the Government's authority to seek detention of the person charged." *United States v. Montalvo-Murillo*, 495 U.S. 711, 718 (1990). And, in any event, because this Court's review of Judge Hummel's detention determination is plenary, it can remedy any purported deficiency in that ruling by concluding that a detention hearing was indeed merited under 18 U.S.C.

---

[7] The defense also advances the inaccurate representation that "[t]he government never argued at the detention hearing that Mr. Roglieri would attempt to obstruct justice." Mem. at 7. In fact, the government's June 2, 2024 letter asserted "the defendant's threats of violence and obstruction warrant detention." Dkt. # 6-1 at 7.

17

A225

§ 3142(f)(2)(B) based on the unmistakably serious risk that the defendant would obstruct justice and harm witnesses as evidenced by his threatening conduct.

## II.    THE MAGISTRATE JUDGE CORRECTLY RULED THAT THE DEFENDANT SHOULD BE DETAINED PENDING TRIAL

Judge Hummel's carefully reasoned detention order should not be disturbed because the defendant, by his own words, represents a serious threat to those involved in the legal proceedings against him. As explained below, the Section 3142(g) factors firmly support the defendant's detention.

*The Nature and Circumstances of the Offense Charged.* While non-violent, the defendant's offenses are very serious. As alleged in the indictment, while in bankruptcy proceedings where his company's creditors alleged frauds exceeding $40 million, the defendant nevertheless brazenly defrauded yet another victim of $5 million. And this happened even as Prime Capital was under the supervision of an interim bankruptcy trustee, demonstrating the defendant's willingness to shirk court supervision. To do this, the defendant caused the victim to turn over its money subject to an express agreement by the defendant to maintain the victim's money in a "trust fund" and that the money would be refundable. The defendant took that money and transferred it into the account of one of his other companies. From there, the defendant made numerous transfers of the funds, including by sending $950,000 to meet a financial obligation owed to *another* Prime Capital client; paying $84,000 for a gold Rolex watch; and paying $101,000 to a private jet services company, for round-trip, private air travel between Albany and Anguilla, for a vacation. Thus, "the gravity of [the] charges weigh in the government's favor." *Cf. United States v. Dupree*, 833 F. Supp. 2d 241, 253 (E.D.N.Y. 2011) (denying motion for release and finding "the[] alleged offenses, and the millions of dollars involved in the various frauds, constitute serious charges"). Also, the government's investigation of Roglieri's scheme is ongoing and

18

A226

additional charges are expected. *See Bruno*, 89 F. Supp. 3d at 430 (court can consideration uncharged in assessing defendant's dangerousness).

**The Weight of the Evidence.**  The weight of the evidence also supports detention.  As detailed above, the indictment alleges a clearcut fraud involving a significant amount of money. The defendant induced his victim to transfer to millions of dollars with promises of a loan and the safety of its money, but then spent the money to fund another client and on extravagant personal expenditures.  What is more, the defendant knew this scheme was illegal, as his contemporaneous text messages with Person-1 in early January 2024 illustrate:

| Sender | Message |
|---|---|
| Person-1 | Can't you just keep working on those companies? |
| Person-1 | I know it might be hard at first, but look what you built this up to beat from nothing |
| Roglieri | Yea I can but not when I'm in fucking prison |
| Person-1 | Why do you think that's gonna happen? |
| Person-1 | Why can't it just be a bankruptcy? |
| Roglieri | Becuase I unused others money to fund deals |
| Roglieri | I already told you this |
| Person-1 | And that's illegal? |
| Roglieri | Yes |
|  |  |
| Person-1 | It's a civil case it's not a criminal case |
| Roglieri | It will turn criminal as soon as they get into bank statements |
| Roglieri | They will bring in the Feds |
| Roglieri | Once they figure it out |

Dkt. # 6-1 at Ex. 4.  The defendant's letter about committing suicide supplies further proof of his guilt.  He writes the "risks I took never panned out and so because of that I would have been convicted of financial crimes and would been away for a long time in prison."  Gov't Hr'g Ex. 2. And this is to say nothing of the government's financial analysis and other evidence, which shows that the defendant repeatedly used victim funds for profligate personal purchases and to make payments to other victims of the scheme. *See, e.g.*, Verified Complaint, *United States v. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659 et al.*, No. 1:24-cv-1345 (MAD/DJS)

(N.D.N.Y. Oct. 22, 2024) (describing basis for forfeiture of, *inter alia*, 12 luxury cars, more than $750,000 in currency, and seven high-end watches). The weight of the evidence is strong, and it shows that the defendant is willing to engage in a largescale fraud, including while he was under the supervision of a court-appointed professional.

Confronted with these unambiguous admissions and other evidence, defense counsel claims, without any elaboration, that the defendant has "a viable defense." Mem. at 14. This is apparently based on an affirmation from the defendant's civil attorney claiming that certain investigators did not identify the defendant as a target during December 2023 discussions. Dkt. # 66-1. But those investigators, who are with the Securities and Exchange Commission and the FBI's New York City Field Office, were involved in a *separate* investigation into the conduct of a *third party*. The defendant does not, and cannot, explain how a third party's conduct somehow licensed him to steal millions from his victims under his false promises of, among other things, security for the victims' ICA payments. Indeed, Prime Capital's civil complaint against the entity named in the defendant's motion was filed in February 2023 and relates to conduct in 2022, before much of the defendant's fraudulent activity occurred. *See* Complaint, Dkt. # 1, No. 1:23-cv-207 (FJS) (N.D.N.Y. Feb. 15, 2023).[8] The defendant cannot plausibly claim that the third party's conduct in 2022 explains and absolves his theft of $5 million in December 2023, as alleged in the indictment. In sum, there is no "viable defense" because, as the defendant admitted to Person-1, he "[]used others money to fund deals." Dkt. # 6-1 at Ex. 4.

---

[8] Additionally, Prime Capital alleges that it turned over $20 million to this third party on October 21, 2022. *See, e.g.*, Complaint ¶ 18, Dkt. # 1, No. 1:23-cv-207 (FJS) (N.D.N.Y. Feb. 15, 2023). But the FBI's financial analysis suggests that the defendant used $1.3 million in client funds to pay his personal taxes on October 19, 2022. This is another example of why the defense's claim is unpersuasive.

A228

*The Nature and Seriousness of the Danger.*   The nature and seriousness of the danger posed by the defendant factor amply supports detention.   "[O]bstruction poses a danger to the community," and where there is a risk that such activities will continue, pretrial detention may be appropriate. *United States v. Stein*, 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005); *see also United States v. Kwok*, 2023 WL 3027440, at *4 (S.D.N.Y. Apr. 20, 2023) (ordering detention based on, *inter alia*, defendant's likelihood of obstruction if released).   Thus, "obstruction of justice has been a traditional ground for pretrial detention by the courts." *LaFontaine*, 210 F.3d at 134.   As detailed above, the defendant has threatened to harm judicial officers, agents, and others involved in bringing his misconduct to light.   *See supra* at 7-8.   While the defendant did not communicate those threats directly to the people affected, they are, as Judge Hummel repeatedly observed, extremely troubling given their specificity and tenor.   Simply put, this Court should take the defendant at his word – he has suggested that he would "put a bullet" in the head of a prospective witness – and not release the defendant so that he can make that plan come to fruition.

The psychologists' report and testimony tendered by the defense are wide of the mark. Judge Hummel correctly determined that they are of limited value here.   In her testimony, Dr. Colistra acknowledged that a psychologist's opinion can be compromised where their subject is untruthful during an interview. *See, e.g.*, Nov. 25, 2024 Tr. at 36-37.   There is ample basis to find that the defendant acted deceptively during his interview and that the report overlooks important facts.   For example, the report states that the defendant "denied any outstanding debts," Def. Hr'g Ex. 2 at 2, notwithstanding the fact that he has been in ongoing personal bankruptcy proceedings since February 2024, *see In re Kris Daniel Roglieri*, No. 1:24-bk-10157 (Bankr. N.D.N.Y.); *see also* Nov. 25, 2024 Tr. at 38-42; Gov't Hr'g Ex. 1.   The defendant also tried to claim to the psychologists that his suicide letter "did not explicitly say he was planning to commit suicide,"

A229

Def. Hr'g Ex. 2 at 3, even though that letter literally says that it was written to explain the defendant's "decision to take [his] own life," Gov't Hr'g Ex. 2; *see* Nov. 25, 2024 Tr. at 43-46. When discussing the threatening statements proffered by the government at the June detention hearing, the defendant claimed that "he has no history o[f] making or acting on similar threats in the past." Def. Hr'g Ex. 2 at 5. The psychologists also reviewed letters of support for the defendant and wrote "there was not one indication of violence, threats, or aggressive behavior" in those letters. *Id.* But that is incomplete, as the defendant told his estranged wife in December 2023 that he "fear[ed]" he would "rip off [her] fucking throat and piss down [her] fucking neck." Gov't Hr'g Ex. 3 at 7; *see id.* at 8 (defendant responding "I don't give a fuck abou the cops [sic]" when the recipient suggested that she would report his threat to law enforcement). Dr. Colistra conceded that the defendant's denial of outbursts of anger was "inconsistent" with these text messages to his estranged wife. Nov. 25, 2024 Tr. at 47-50. The report based its conclusions on a finding that the defendant "does not have any traits generally associated criminality such as callousness, manipulation, and unwillingness to follow the rules." Def. Hr'g Ex. 2 at 10; *see* Nov. 25, 2024 Tr. at 50. The psychologists said this even though the defendant has described wanting to seek "vengeance" against attorneys and a judge while exclaiming that "I don't really play by the rules . . . [n]ever have and never will," and noting "that's dangerous as I feel myself getting to that point with all involved against me." Gov't Hr'g Ex. 5. On cross-examination, Dr. Colistra admitted that these text messages do not "indicate a willingness to follow the rules." Nov. 25, 2024 Tr. at 51. Finally, when asked whether "someone engaging in a scheme to fraudulently obtain $5 million from a victim and then spending that money on, for instance, a private jet, vacation, and a luxury watch exhibit[s] some level of callousness and manipulation" – *i.e.*, the allegations against the defendant in the indictment – Dr. Colistra responded "Not necessarily." *Id.*

A230

at 52. These flaws highlight why the opinion offered by the defense did not, and could not, assuage Judge Hummel's grave concerns about the danger posed by the defendant.

*The Defendant's History and Characteristics.* The defendant has no criminal convictions, and he was compliant during all of his encounters with the FBI, so his history does not support detention. That said, his commission of a major fraud while under Bankruptcy Court supervision, his threat to murder an FBI agent, his suicide note, and his statement that "if I go down, everyone goes down," indicate that he cannot control himself and will seek to harm others, as his life continues to spiral downward. Indeed, the defendant's own expert testified that extreme stress – like the prospect of a long prison sentence and losing all of one's possessions to creditors as is happening to the defendant here – could cause someone with no history of violence to act out of character. *See* Nov. 25, 2024 Tr. at 34-36.

## CONCLUSION

For the foregoing reasons, the defendant's challenge to the magistrate judge's detention order should be denied in its entirety without a hearing.

Dated: January 10, 2025

Respectfully submitted,

CARLA B. FREEDMAN
United States Attorney

By:    */s/ Joshua R. Rosenthal*

Joshua R. Rosenthal
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & 519140

A231

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua R. Rosenthal, hereby certify that on January 10, 2025, I electronically filed the foregoing opposition with the Clerk of the District Court using the CM/ECF system, which caused the same to be transmitted to defense counsel of record.

By:   */s/ Joshua R. Rosenthal*
_____
Joshua R. Rosenthal
Assistant United States Attorney

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

           -against-

**KRIS ROGLIERI,**

           **Defendant.**

**REPLY TO THE
GOVERNMENT'S RESPONSE**

**Indictment No. 24-CR-392 (MAD)**

 

**I.     Kris Roglieri is charged with economic crimes.**

The Government spends a lot of ink describing how strong the evidence is on Mr. Roglieri's Wire Fraud charges. However, Wire Fraud in violation of 18 U.S.C. § 1343 is not one of the offenses listed under 18 U.S.C. § 3142(f)(1) and therefore the strength of the government's evidence has no bearing on whether Mr. Roglieri is subject to pretrial detention. At any rate the government has misconstrued the business model employed by Prime Capital Ventures, LLC. The Interest Credit Accounts were deposited with Prime Capital Ventures, LLC, which was the lender for the various projects to the clients. As part of the agreement the ICA deposits would be issued as a credit on the accounts on the books of Prime Capital. Prime would then leverage the deposits to gain access to a credit line which they would then loan to the clients to fund their projects. During this process Prime Capital was defrauded by two business entities of tens of millions of dollars. In it's response the government claims that "For several years, [Mr. Roglieri] had conned a host of prospective borrowers…" Govt Response, Dkt#67 at pg. 3, but later states that, "Prime Capital's civil complaint against the entity named in the defendant's motion was filed in February 2023 and relates to conduct in 2022, *before much of the defendant's fraudulent activity occurred.*" *Id.* at pg. 22. If, as the government alleges, Mr. Roglieri was engaged in transactions involving ICA

**A233**

deposits from clients in exchange for a line of credit to fund projects, then Prime Capital being

defrauded of tens of millions of dollars would substantially impair his ability to full fund projects of

his clients.  From approximately October of 2022 and into 2023 Prime Capital was able to close

several deals which resulted in fees and interest pursuant to the agreements signed by the clients.

This is only the tip of the iceberg.  Regardless, the strength of the government's case on the Wire

Fraud charges has no bearing on whether Mr. Roglieri is subject to pretrial detention.

### II.     The Magistrate did not make any findings of fact at Mr. Roglieri's initial appearance on May 31, 2024.

No facts were proffered or otherwise introduced at the initial appearance by the government

sufficient to establish by a preponderance of the evidence that the government is entitled to a

detention hearing.  *See United States v. Watkins*, 940 F.3d 152, 158 (2nd Cir 2019).

When the Magistrate asked for "the government's position regarding Mr. Roglieri and the

issue of detention or release pending further proceedings in this matter?" OFFICIAL

TRANSCRIPT of Proceedings as to Kris Roglieri: FTR-recorded Initial Appearance held on

5/31/2024, (hereinafter IA Transcript) Dkt#24, at pg. 5, the government merely presumed there

would be a detention hearing in this case and said, "Your Honor, the government moves for a

continuance under Section 3142(f). We respectfully request that the Court hold a detention hearing

once a bail report has been prepared, and we respectfully request that the defendant be detained

pending that proceeding." *See*, IA Transcript at pg.6.

The government did nothing more than paraphrase the statute: "The government believes

it's entitled to a bail or a detention hearing under 3142(f)(2)(B), that the defendant poses a serious

risk that he will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to

threaten, injure, intimidate a prospective witness or juror." *See* IA Transcript at pg. 6.

A234

"The judicial officer shall hold a hearing ... upon motion of the attorney for the Government... in a case that involves a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B)

In contrast, Assistant Federal Public Defender Michael McGeown-Walker asked the Court to immediately release Mr. Roglieri on conditions and then proffered some actual facts: "You know, he's been aware of this case since February. He's shown up both when required and voluntarily to every single bankruptcy proceeding he's had. His passport has been confiscated. There are no guns at his residence. He has no criminal history or history of violence, and he's a longstanding member of the community. So we'd ask that he be released while this case remains pending or while the detention hearing was pending."  IA Transcript at pg. 6.  Not one of the above facts has been controverted by the government.

Because the government never provided any evidence, let alone a preponderance thereof, to establish that they were entitled to a detention hearing, the entire process is tainted.  The Bail Reform Act means what it says it means: "Detention hearings [are] available if" and only if one of the seven (f) factors is present. *United States v. Salerno,* 481 U.S. 739, 747 (1987).

The government mentioned that it was in possession of threats, but never deigned to put any specifics on the record at the initial appearance.  Instead, they withheld the details from the defense and preferred to allude to an *ex parte* disclosure of evidence to the Magistrate the night before.  Because the government failed to proffer any facts on the record, the Magistrate was not in a position to make any findings of facts or make any rulings thereon.  Nevertheless, the government has claimed multiple times that the Magistrate made findings at the initial appearance.

A235

- "his commonsense finding that the defendant's declarations about attacking investigating agents, attorneys, and judicial officers demonstrate a serious risk that the defendant will obstruct justice or harm a witness." Govt Response, at p 5

- "Judge Hummel had ample grounds to hold a detention hearing under 18 U.S.C. § 3142(f)(2) and made such a finding immediately upon Roglieri's first appearance." Govt Response, at pg.19[1]

### III. The government contends that the notice of appeal was filed over six months late.

The Government contends that "Roglieri's stale claim that Judge Hummel erred in his May 31, 2024 determination that a detention hearing was required by 18 U.S.C. § 3142(f)(2)(B) … should be rejected because it is waived." Govt Response at pg. 18.  As legal support for this contention the government cites the unpublished decision from the Northern District of Ohio, *U.S. v. Savage,* 2025 WL 26507.  That case is clearly distinguishable from the circumstances here.  In *Savage* the defendant's order of detention was issued on October 16, 2024, and Mr. Savage filed a motion to revoke the detention order 69 days later on December 24, 2024.  The District Court refused to reopen Mr. Savage's detention hearing. In the instant case there was essentially one detention hearing over two dates, June 3, 2024 and November 25, 2024.  The notice of appeal was timely filed on December 6, 2024.  The government is unsure if Local Rule 59.1 is applicable in this case because the statute only explicitly requires a Notice of Appeal to review pursuant to 18 U.S.C. §3145(c) whereas in this case Mr. Roglieri is seeking review by the judge having original jurisdiction over the offense under subsection (b) which is not mentioned in local rule 59.1 that only applies in appeals under section (c).

---

[1] Immediately after mistakenly claiming that the Magistrate made a finding that he had ample grounds to the government alludes to the "first appearance requirement" and cites *United States v. Montalvo-Murillo,* 495 U.S. 711, 718 (1990) which describes the requirement under the statute that says, "The [detention] hearing shall be held immediately upon the person's first appearance before the judicial officer" 18 U.S.C. §3142(f).

**IV    The massive volume of discovery materials in this case provides a substantial tactical advantage to the government as long as Mr. Roglieri is incarcerated.**

Mr. Roglieri is the foremost expert on what actually occurred in the business transactions underlying the allegations in the indictment and is therefore the best person to glean the documents that establish his defense from the .  While incarcerated he is constrained in his ability to research through the voluminous materials that are not necessarily organized in the most accessible way.  His access to the discovery materials will be limited as there are many other inmates who also seek to review the discovery materials in their case and computer access is limited.  These circumstances will necessarily prolong the trial preparation period for the defense and thereby exacerbate the negative impact that pretrial incarceration has on defendants awaiting trial.  As of this time there are over 300,000 pages of discovery materials and hundreds of GB of digital evidence to be reviewed.

**V.    The defense has consistently questioned the accuracy of the allegations made by "Person-1"**

At the first day of the detention hearing on June 3, 2024, Assistant Federal Public Defender Jeremy Sporn specifically denied that Mr. Roglieri ever made any statements as alleged by "Person-1" in Letter from USA as to Kris Roglieri, Dkt#6.  *See* OFFICIAL TRANSCRIPT of Proceedings as to Kris Roglieri: Detention Hearing held on 6/3/2024, Dkt#21, at pg. 13 & 16.

As noted by the government, Govt Response, at pg 16-17, "the magistrate or district judge must also ensure the reliability of the evidence, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000)(internal quotation omitted).  The oral statements made by Person-1 that were not made subject to the penalty of perjury, and having been conveyed through several intermediaries there is a high risk of inaccuracy.  Why wouldn't the government insist on continuing to merely proffer the oral statements rather than obtain a declaration under oath like the one they were able to obtain from his estranged wife?

A237

**VI.    Dr Colistra's conclusions outweigh off hand venting about his frustrations from the various litigations he was involved in 2023-2024**

Ever since his first appearance, Mr. Roglieri has consistently said through counsel that he was simply venting in the text exchange with Person-1.  Every time he was in the personal presence of any of the people described in the text messages he was cooperative and courteous.  Mr. Roglieri has a lifetime without a single act of violence.  Dr. Colistra found he was at minimal risk for violence.  The "withering" cross examination by the government did nothing to impair her conclusions.  As an experienced and professional psychologist who has evaluated many people she testified that she essentially expects most of the people she evaluates to lie to her in the interview process.  Dr. Colistra testified that a history of violent behavior is the strongest predictor of future violence.  *See* OFFICIAL TRANSCRIPT of Proceedings as to Kris Roglieri: Detention Hearing held on 11/25/2024, Dkt#64, at pg. 26.

## CONCLUSION

The detention order must be revoked and Mr. Roglieri released on his own recognizance, or at most on the least restrictive conditions necessary, because the government failed to provide any evidence at the initial appearance to warrant holding a detention hearing at all, *see Watkins, supra*.  Even if the government had met their burden at the initial appearance and provided by a preponderance of the evidence that Mr. Roglieri posed a serious risk of obstruction etc. instead of alluding to evidence presented to the Magistrate *ex parte* without even sharing it with the defense, the record clearly establishes not only that Mr. Roglieri does not pose any risk as the clear and convincing evidence submitted by the defense, including Dr. Colistra's Assessment as well as Dr. Walker's Release and Treatment Plan attached as Exhibit 1 to Letter from Matthew E. Trainor as to Kris Roglieri, Dkt#48, establishes that he poses no risk of dangerousness to anyone.

DATED: January 17, 2025

A238

Lisa Peebles
Federal Public Defender

By  Matthew E. Trainor

Matthew E.  Trainor, Esq.
Assistant Federal Public Defender
Bar # 105643
39 North Pearl Street, 5th Floor
Albany, New York 12207
Tel: (518) 436-1850
Fax: (518) 436-1780
matthew_trainor@fd.org

A239

**Certificate of Service**

I, Matthew E. Trainor, attorney of record for the above-named defendant, hereby certify that on

January 17, 2025, I electronically filed the foregoing Sentencing Memorandum, with the Clerk of the

District Court using the CM/ECF system, which sent notification of such filing to

Joshua Rosenthal and Michael Barnett, Assistant U.S. Attorneys.

by:  Matthew E. Trainor, Esq.
Assistant Federal Public Defender
Bar Roll No. 105643
54 State St, STE 310
Albany, New York 12207
Tel: (518) 436-1850
Fax: (518) 436-1780
matthew_trainor@fd.org

A240

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

     **vs.**                                                                                    **1:24-CR-392**
                                                                   **(MAD)**

**KRIS ROGLIERI,**

                                             **Defendant.**

_____

**APPEARANCES:**                       **OF COUNSEL:**

**OFFICE OF THE UNITED**        **JOSHUA R. ROSENTHAL, AUSA**
**STATE ATTORNEY**               **MICHAEL S. BARNETT, AUSA**
445 Broadway, Room 218         **ELIZABETH A. CONGER, AUSA**
Albany, New York 12207          **MELISSA O'BRIEN ROTHBART, AUSA**
Attorneys for the Government

**OFFICE OF THE FEDERAL**     **MATTHEW E. TRAINOR, AFPD**
**PUBLIC DEFENDER**             **JEREMY B. SPORN, AFPD**
54 State Street - Suite 310
Albany, New York 12207
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On May 28, 2024, Defendant Kris Roglieri was charged in a criminal complaint with wire fraud, in violation of 18 U.S.C. § 1343. *See* Dkt. No. 1. Defendant made his initial appearance before Magistrate Judge Christian F. Hummel on May 31, 2024. *See* Minute Entry 05/31/2024. The same day, the Government moved for Defendant's detention and requested a continuance. *See id.* Magistrate Judge Hummel scheduled a detention hearing for June 3, 2024. *See id.* The United States Probation Department completed a pretrial services report. *See* Dkt. No. 7. On

1

June 3, 2024, following the first detention hearing, Magistrate Judge Hummel ordered that Defendant be detained because there was no condition or combination of conditions that would reasonably ensure the safety of the community if Defendant were released. *See* Dkt. No. 11.

On July 13, 2024, Defendant requested a new detention hearing. *See* Dkt. No. 17. Magistrate Judge Hummel denied Defendant's request. *See* Dkt. No. 32. On September 19, 2024, the Government obtained an indictment against Defendant charging him with five counts of wire fraud in violation of 18 U.S.C. § 1343. *See* Dkt. No. 35. Defendant was arraigned on September 30, 2024, and Defendant entered a plea of not guilty. *See* Dkt. Nos. 41, 42. On October 25, 2024, Defendant again requested a new detention hearing. *See* Dkt. No. 48. The Government opposed Defendant's request. *See* Dkt. No. 51. Magistrate Judge Hummel granted, in part, Defendant's request and scheduled a hearing for November 22, 2024, to afford Defendant the opportunity to present evidence as to whether he was entitled to a new detention hearing. *See* Dkt. No. 56. At the conclusion of that hearing, Magistrate Judge Hummel concluded that Defendant met his burden of proving entitlement to reopening the detention determination based on new evidence. *See* Text Minute Entry 11/22/2024. Magistrate Judge Hummel conducted a second detention hearing on November 25, 2024. *See* Text Minute Entry 11/25/2024. At the conclusion of the hearing, Magistrate Judge Hummel determined that Defendant remained a danger to the community and continued Defendant in custody. *See* Dkt. No. 58.

Defendant filed the present appeal. *See* Dkt. No. 60. Defendant argues that (1) the Government failed to establish entitlement to a detention hearing during Defendant's initial appearance; and (2) Magistrate Judge Hummel erred in concluding that Defendant is a danger to the community. *See* Dkt. No. 66. The Government opposes Defendant's appeal. *See* Dkt. No. 67. Defendant replied. *See* Dkt. No. 70. For the following reasons, Defendant's appeal is denied.

A242

## II. DISCUSSION

**A.    Legal Standard**

"The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq*., authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal.  The procedures and standards for release or detention of a person such as Defendant pending trial are set forth at 18 U.S.C. § 3142."  *United States v. Arrington*, 661 F. Supp. 3d 33, 40 (W.D.N.Y. 2023).  "First, . . . the Government must establish by a preponderance of the evidence that it is entitled to a detention hearing."  *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019) (footnote omitted); *see also United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) ("After a motion for detention has been filed, the district court must undertake a two-step inquiry. . . .  It must first determine by a preponderance of the evidence . . . that the defendant has either been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice").

"[T]he Government is entitled to a pretrial detention hearing if: (1) the charged offense falls within any of the five subcategories set forth in [18 U.S.C.] § 3142(f)(1)(A)-(E); (2) the defendant poses a serious risk of flight; or (3) there is a serious risk that the defendant will attempt to obstruct justice, or threaten, injure, or intimidate a witness or juror."  *Watkins*, 940 F.3d at 158 (footnote omitted).  "Section 3142(f)(1) thus performs a gate-keeping function by 'limit[ing] the circumstances under which [pretrial] detention may be sought to the most serious of crimes.'"  *Id.* (footnote omitted).

"Once the Government has demonstrated to the District Court that it is entitled to seek pretrial detention under § 3142(f), a judicial officer must promptly hold a hearing."  *Id.*  "At this hearing, the parties may 'present information by proffer or otherwise,' since the 'rules concerning

3

admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing.'" *Id.* (footnote omitted). "The defendant has the right to be represented by counsel, and can testify on his own behalf, present witnesses, and cross-examine witnesses who appear at the hearing." *Id.*; *see also United States v. Shakur*, 817 F.2d 189, 194-95 (2d Cir. 1987) ("First, the court must make a finding as to whether the defendant presents a risk of flight if not detained. Second, if the court finds that a defendant is likely to flee, then the court must proceed to the second step of the inquiry, namely, whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released").

The Court must "impose the least restrictive bail conditions necessary" to reasonably assure (1) the defendant's appearance at trial, and (2) the safety of the community. *See United States v. Cicale*, No. 06-CR-285, 2006 WL 2252516, *2 (E.D.N.Y. Aug. 7, 2006) (citing 18 U.S.C. § 3142(c)(1)(B)). Where there are no conditions of release that would reasonably assure the defendant's appearance at trial and the safety of the community, the Bail Reform Act directs the court to order the defendant's detention pending trial. *See id.* (citing 18 U.S.C. § 3142(e)). In making a detention determination, the court must consider the following factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g)(1)-(4).

When a party files an appeal from a magistrate judge's decision to detain a defendant, the district judge "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). Therefore, a

A244

district judge must undertake a *de novo* review of a magistrate judge's decision to release or detain a defendant.  *See United States v. Rivera*, No. 20-CR-304, 2020 WL 4383505, *1 (S.D.N.Y. July 31, 2020) (citation omitted).  "When conducting *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Hagga*, No. 20-CR-49, 2021 WL 5822300, *3 (W.D.N.Y. Dec. 8, 2021) (citing *United States v. Colombo*, 777 F.2d 96, 98 (2d Cir. 1985)).  "The appeal of a magistrate judge's pretrial detention order to this Court is to be 'determined promptly.'" *Id.* (quoting 18 U.S.C. § 3145(b)).

**B.  Background**

Defendant's initial appearance on May 31, 2024, lasted approximately seven minutes.  *See* Dkt. No. 24.  The Government sought a continuance under 18 U.S.C. § 3142(f) and asked that Magistrate Judge Hummel hold a detention hearing once a bail report could be prepared.  *See id.* at 5.  The Government sought Defendant's detention pending the hearing.  *See id.*  Defendant's attorney argued that Defendant should be released on conditions because any purported threats made by Defendant and which the Government may attempt to rely on were not made directly to any witnesses or federal law enforcement agents, and because Defendant has "shown up both when required and voluntarily to every single bankruptcy proceeding he's had.  His passport has been confiscated. There are no guns at his residence.  He has no criminal history or history of violence, and he's a longstanding member of the community." *Id.* at 6.  Magistrate Judge Hummel then asked the Government to articulate the grounds upon which it was seeking detention, and the Government responded as follows:

> The government believes it's entitled to a bail or a detention hearing under 3142(f)(2)(B), that the defendant poses a serious risk that he will obstruct or attempt to obstruct justice, threaten, injure, or

A245

> intimidate or attempt to threaten, injure, intimidate a prospective
> witness or juror.  Your Honor, the government is in possession of
> threats that, while [defense counsel] has accurately stated were not
> transmitted to the supposed victims of the threats, they are quite
> concerning.  I know the Court is aware of at least some of them
> through the search warrant application that we made last night.
> And for those reasons, we believe that we'd be entitled to a
> detention hearing and that at the detention hearing, we would be
> able to meet our burden that the defendant is a danger to the
> community.

*Id.* at 6-7.  Magistrate Judge Hummel "agree[d] with the government that they are entitled to a

detention hearing in this matter" and held Defendant in custody until his detention hearing, which

was scheduled for three days later, June 3, 2024.  *Id.* at 7; *see also* Text Minute Entry 05/31/2024.

The morning of the detention hearing, the Government filed a letter in support of its

request for detention.  *See* Dkt. No. 6.  The Government argued that Defendant "presents an

unmistakably serious risk of obstruction of justice and danger to the community based on his

threats of violence, including his recent threat to murder an FBI agent who is investigating him."

Dkt. No. 6-1 at 1.  The Government outlined the bankruptcy and civil proceedings dating back to

December 19, 2023, which prompted its investigation into Defendant's company, Prime Capital

Ventures, LLC.  *See id.* at 1-3.  The Court is intimately familiar with the nature of the civil and

bankruptcy proceedings because it has presided over the civil case since its inception in January

2024.  *See Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC et al.*, No. 1:24-CV-55

(N.D.N.Y.), Dkt. No. 1.  As explained in the Government's letter, the civil and bankruptcy

proceedings allege that Defendant used his business to defraud companies out of millions of

dollars.  *See* Dkt. No. 6-1 at 2-3.

On February 2, 2024, the FBI executed a search warrant on Defendant's home and

observed numerous firearms including an AR-15 style rifle and a high-capacity magazine.  *See id.*

A246

at 3.  The Government notes that as a result of the FBI's finding, Defendant has been charged in state court with two counts of Criminal Possession of a Weapon in the Third Degree, in violation of N.Y. Penal Law § 265.02(7), (8).  *See id.*

The Government attached numerous text messages from Defendant to its letter.  *See* Dkt. No. 6-1 at 13-25.  The Government also reiterated verbal statements made by Person-1 to the FBI, which recounted statements purportedly made by the Defendant to Person-1.  *See id.* at 4. Defendant's text messages and purported statements include the following: "I'm f***ing gonna wack anybody that comes after me," "[f]air game"; "[y]ou wanna come after me with guns you gonna get the same"; "I feel myself getting angry and vengeance to those that are doing this," "[i]ncluding the attories [sic], judge, receiver etc"; "I don't really play by the rules," "[n]ever have and never will," "[a]nd that's dangerous as I feel myself getting to that point with all involved against me"; he knows "where [one of the agents] f***ing lives"; he would not put it past himself "to put a bullet in [that agent's] head"; and "when someone takes everything away from you . . . if I go down, everyone goes down."  Dkt. No. 6-1 at 4.

Despite these statements, the Government admits the Defendant was compliant during the search of his home and seizure of his vehicles.  *See* Dkt. No. 6-1 at 4.

The U.S. Probation Department conducted a pretrial services investigation prior to the first detention hearing.  *See* Dkt. No. 7.  During the interview, Defendant explained that his mother resides in a nursing home, and he has two brothers.  *See id.* at 1.  Defendant has two children with his estranged wife, Tina Roglieri.  *See id.* at 2.  They are in the process of a divorce, but Defendant had been the sole provider for her and their children until April of 2024.  *See id.* Defendant had a passport, but it was seized.  *See id.*  Defendant explained that he made between $600,000 and $1,000,000 a year, but as of June 3, 2024, he had not filed his 2022 and 2023 taxes;

7

A247

"therefore, he could not give a more accurate figure." *Id.* Probation's investigation revealed no criminal history besides the gun related charges derived from the FBI's search of Defendant's home. *See id.* at 3. Defendant did have "one suspension on his driving record, for persistent violator on September 25, 2023, which was cleared on October 25, 2023." *Id.* Defendant also had two traffic convictions which resulted in eight points on his license for each infraction. *See id.* The Probation Department concluded that Defendant poses a risk of danger to the community based on the threats presented by the Government. *See id.* at 4.

During the June 3, 2024, detention hearing, the Government sought "[D]efendant's detention for the reasons set forth in [its] letter based on danger to the community." Dkt. No. 21 at 3. In addition to the text messages sent by Defendant, the Government argued that no set of conditions would reasonably assure the safety of the community for the following reasons:

> The defendant has engaged in some extremely concerning conduct, including most recently, making a specific and detailed threat about one of the FBI agents involved in the investigation of his conduct. Even stringent conditions will not sufficiently mitigate the serious risk that the defendant presents. No firearms condition is largely contingent on a defendant who will obey that condition. And here, it is certainly possible the defendant stashed away guns or could easily obtain them. The government has obtained text messages where the defendant discussed wanting to hide assets from his creditors. So it isn't a stretch to think that he might have hidden personal property as well.

> Home detention, location monitoring, and a no-contact with potential witness provision do not present viable options here either. GPS monitors, as the Court knows, can be removed, and again, the defendant's compliance with home detention is based on his willingness to abide by the condition. . . .

> The conduct outlined in the complaint took place when an interim trustee was assigned to Prime Capital. So defendant has already disregarded a form of Court supervision. He also misled the Bankruptcy Court in December into believing that certain client [interest credit account] funds were at [the Royal Bank of Canada]

8

A248

> when that was not true. And most recently, defendant's former
> counsel in the personal bankruptcy proceeding suggested that the
> source of his firm's $100,000 retainer was misrepresented by the
> defendant.

*Id.* at 4-5.

Defendant responded, explaining that he is forty-four years old and has no criminal convictions. *See id.* at 6. "[H]e has substantial ties" to the community and has "been a pillar of the community here." *Id.* Specifically, Defendant stated that he "has a very lengthy record of philanthropic giving, charitable efforts and endeavors. He's handed out turkeys, for example, at Thanksgiving in the Albany area for years and years. He's been a primary benefactor of Albany Medical Center here in the area for years and years." *Id.* at 7. Defendant averred that if he was released, he would be able to go back to work or find different work, potentially in marketing. *See id.* Defendant emphasized that despite knowing of the potential for criminal charges, "he hasn't done anything to obstruct the proceedings. He's shown up in Bankruptcy Court. He's participated fully in the hearings, in the back and forth with the lawyers, with bankruptcy judges, trustees, et cetera." *Id.* at 8.

As to the text messages produced by the Government, Defendant argued that the characterization of the messages "as threats or a desire or an intention to do harm, significantly overstates not just what was said, but more importantly, what the actual desire or intention is." *Id.* at 9. Defendant explained that his "life has been upended. There's a lot of different ways we can describe what's occurred to him financially, professionally, emotionally, personally, and now criminally. Things, I don't want to say they're spiraling out of control, but certainly, they're spiraling downward." *Id.* Defendant stated that "[h]e's had a lot to deal with, a lot on his plate, and occasionally, he's vented, as people need an outlet to express their frustrations. So he said

9

A249

some things that by themselves in isolation, obviously appear somewhat troubling, at least to the government and most likely to anyone that would view them." *Id.* at 9-10. However, Defendant asked the Court to contrast his words "with what's actually happened, and what has actually happened with respect to those people, those witnesses, has been nothing. There's been no threat communicated to a witness, to an investigator, to an agent, to an attorney, certainly not to a judge, nobody . . . ." *Id.* at 10. Defendant argued that his statements were just "[s]omeone with no history of committing crimes or assaults or violent conduct is suddenly spouting off about vague, abstract notions of doing harm, more like he's just quoting bad movies or TV shows -- not necessarily bad movies or TV shows, but things that you hear in popular culture that don't reflect who he is, that don't reflect what he's trying to do." *Id.* Additionally, "he's been aware of this for six months. If he were the type of person to have an inclination to harm someone, we would see more in the record than just text messages and idle talk and idle chatter. That's really what it is." *Id.*

Defendant then focused on his compliance in surrendering his firearms. *See id.* at 10-11. Defendant noted that he "voluntarily turned over firearms for storage back in February." *Id.* at 11. However, "[i]n the course of going through his home, he came across three additional firearms that he had forgotten were there. He's brought that to our attention now. His girlfriend, I believe, can remove those from the home so that he doesn't have access to them. It's not a question of trying to hide anything or evade scrutiny, and if it were, again, the record would be different." *Id.* Defendant argued that "[i]t would not be three antique long guns or shotguns from a century ago. That's what it appears to be. He did have a concealed carry permit. That's been suspended, and the rest of the firearms have been turned over for storage, and we're happy to turn over these three as well. Again, much more in the issue of an oversight than any intentional part, intentional

10

A250

withholding on [Defendant's] part, and he's the person who's brought it to our attention to potentially resolve." *Id.*

Defendant also noted that the statements made by Person-1 to the FBI which repeated Defendant's supposed statements have not been corroborated and that Person-1 has "an ax to grind against" Defendant. *Id.* at 12. He explained that as to the statements of knowing where one of the federal agents lived, "[h]e doesn't know where these people live. He doesn't care where they live, and the only reason he would care where they live is so that he could know to stay away from that vicinity if he's released." *Id.* Defendant argued that he did not say any of the statements iterated by Person-1. *See id.* at 13. He further claimed that his text messages were nothing "more than idle talk, idle chatter, venting, blowing off steam . . . ." *Id.* at 14.

The Government responded, arguing that the weight of the evidence is great and "the defense admits that there's a downward spiral going on here. The evidence is exceedingly strong and provides more of a motivation to commit a violent act. And again, person-1's prior report was corroborated with text messages. Maybe the defendant didn't put this one in writing, but just the specificity is extremely troubling." *Id.* at 16. Defendant then reiterated his compliance during his interactions with law enforcement when they executed the search warrants. *See id.* at 17.

Magistrate Judge Hummel concluded that there was no set of conditions he could impose that would ensure the safety of the community if Defendant was released. *See id.* at 17-18. Magistrate Judge Hummel explained as follows:

> [I]t appears that the government's evidence in this case is strong. There appears to be substantial evidence which supports the allegations set forth in the complaint. The Court would further note that the nature of the charge alleges he'd engaged in fraud in an amount which appears to be in excess of $40 million.

A251

While [defense counsel] has tried and done an admirable job in trying to explain away these text messages, they are deeply disturbing to the Court, one of which reads, "I am wearing down." The next one reads, "I feel myself getting angry and vengeance to those that are doing this including the attorneys, the judge, and the receiver." That appears to the Court to be clearly a threat against those people involving the use of violence.

At a further point writes, "I don't really play by the rules. I never have and never will. And that's dangerous as I feel myself getting to the point with all involved against me." All of those statements raise grave concern for the Court as to the safety of the FBI agents, the Court personnel, and judges.

The Court further finds deeply disturbing these allegations set forth in the government's letter as conveyed by person-1, indicating on May 24 of 2024, person-1 advised the FBI that the plaintiff -- excuse me, the defendant told her he was in a dark place and felt he would be indicted soon. He allegedly further told person-1 that he knew the address of three FBI agents who were investigating him. He knew the home address of one of the agents, who he correctly identified by the first name, and said he would put a bullet in the agent's head. In addition, in a later interview, he said he knew where one of the agents lived. He would not put it past himself to put a bullet in the agent's head.

All of those comments, text messages, and those allegations set forth in the people's letter are deeply disturbing to the Court. There's nothing I can do with respect to setting conditions that would address those. If I put him on electronic monitoring and GPS and he's determined to follow [through] on those alleged threats, I have no ability to stop him from doing so, and neither would pretrial services.

I would further note that [Defendant] has a history involving ownership of substantial numbers of firearms. I would note that pursuant to a warrant which was issued by this Court, they searched his property, and among other things, observed numerous firearms including an AR-15 style rifle and a high-capacity magazine. Possession of some of these weapons resulted in state charges, which are currently pending against [Defendant].

*Id.* at 18-19.

A252

Prior to concluding the hearing, Defendant asked "if the Court might consider if the defense were to obtain a risk or threat assessment from someone who can sit down with [Defendant] and get a better sense of who he is and where he's coming from, and bring that to the Court's attention and come up with maybe a counseling plan for him to speak to someone as an outlet if he were to be released." *Id.* at 20. Magistrate Judge Hummel explained that Defendant can submit whatever he wishes to the Court and Magistrate Judge Hummel would review the information and determine if it provides a basis for another hearing. *See id.* Magistrate Judge Hummel entered his Order of Detention after the hearing. *See* Dkt. No. 11.

On July 13, 2024, Defendant filed a letter requesting a new detention hearing on the basis of information that was not previously available. *See* Dkt. No. 17. The letter explained that discovery in this case is voluminous and Defendant's "continued incarceration will only exacerbate the difficulty of reviewing and discussing the discovery materials due to the restrictive visitation schedule whereas if he were released on conditions he would be able to meet with counsel after hours or on weekends to collaborate on how various pieces of evidence impact the defense." *Id.* at 3. Defendant argued that "[i]f he had any inclination to engage in *any* form of violence he would have acted well before his arrest in May of 2024." *Id.* at 4. Defendant also relied on character letters submitted on his behalf from Defendant's family and friends attesting to his good character and lack of violent behavior. *See id.* at 7-17. Defendant provided an affirmation from his girlfriend who explained that they have been dating since September 2023, and she rented a house in Poughkeepsie, New York for Defendant to reside in if he was released. *See id.* at 12. She explained that she has a full-time job in New York City, but that Defendant could reside in the home on ankle monitoring. *See id.*

A253

The Government opposed Defendant's request for a new detention hearing, asserting that the information in Defendant's letter was previously available to Defendant. *See* Dkt. No. 26-1 at 1. The Government also argued that the information does not have a material bearing on Magistrate Judge Hummel's prior decision. *See id.* at 4; *see also* 18 U.S.C. § 3142(f). The Government explained that "there is *other* information that is in fact newly available and further supports the Court's detention ruling," which includes, what the Government characterizes as, a letter reflecting an intent to commit suicide. *Id.* at 4-5. The Government argues that the letter should be considered by the Court as supporting a risk of nonappearance as well as evidence of Defendant's "downward spiral and desperation, which, in turn, buttresses the Court's prior finding about his dangerousness." *Id.* at 5.

In reply, Defendant explained that his letter was drafted near the end of January 2024 when "[h]e had been experiencing significant stress and apprehension regarding the turn his various civil litigations had recently taken. Drafting the document was a means of working through his stress. Once it was drafted he printed out a single copy and put it in the pocket of a winter coat. It was never intended to be shared with anyone." Dkt. No. 30-1 at 1. Defendant argued that the letter "clearly provides material evidence that was not known on June 3 when the initial detention hearing was held which puts [Defendant's] statements into a very different context." *Id.* at 4. Defendant contends that if he wanted to take his own life he could have done so with his own firearms or by acting out during the execution of search warrants at his home. *See id.* He also argued that his girlfriend renting a home was new information. *See id.*

On August 5, 2024, Magistrate Judge Hummel denied Defendant's request for a new detention hearing. *See* Dkt. No. 32. Magistrate Judge Hummel "conclude[d] that none of

A254

defendant's new submissions constitute new evidence which was unavailable at the time of the detention hearing." *Id.* at 3.

The Government obtained an indictment against Defendant on September 19, 2024. *See* Dkt. No. 35. On October 25, 2024, Defendant filed another letter requesting a new detention hearing based on a risk assessment evaluation conducted by New Paradigm Psychological Services, PLLC, in which the provider concluded that Defendant posed a minimal risk of violence. *See* Dkt. Nos. 47-48. Defendant was interviewed for approximately two hours on September 26, 2024, by Victoria Dodge, Psy.D. *See* Def. Ex. 2 at 2. The report is dated October 11, 2024. *See id.* The report is signed by Dr. Dodge, "as supervised by" Katrina Colistra, Psy.D. *Id.* at 11. Dr. Colistra was not present during Defendant's interview. *See* Dkt. No. 64 at 8.

During the interview, Defendant described the letter he wrote as being "centered around [him] not being here anymore and here's what happened." Def. Ex. 2 at 3. Defendant denied the letter being a suicide note. *See id.* Despite the letter indicating a "decision to take [his] life," Defendant told Dr. Dodge that he was "just venting." *Id.* Defendant explained that his relationship with his estranged wife was "good" until "he suggested they move forward with a formal divorce because he thinks he 'met the one.'" *Id.* Defendant "denied any history of violence, fighting, or outbursts of anger." *Id.* He also denied making any verbal threats and said that his text messages were him "simply venting his frustrations and had no intentions of harming anyone." *Id.* at 5.

Dr. Dodge conducted a test called the Balanced Inventory of Desirable Responding. *See id.* at 5-6. The test measures "the tendency of people to respond to questions in a way that will be regarded positively by others." *Id.* at 5. Defendant scored "moderate-high" in his tendency to engage in self-deceptive enhancement which is "[t]he act of deceiving oneself as to the true nature

of one's feelings or motives." *Id.* at 6. He scored "very high" in his tendency to engage in impression management which is the "[p]urposeful tailoring of responses to impress others while being knowingly aware of exaggeration." *Id.* Dr. Dodge explained that "[d]eception in this type of evaluation can be minimization of problems or be related to fear of making things worse for oneself, it may not necessarily be nefarious, but can be." *Id.*

Dr. Dodge also performed a Million Clinical Multiaxial Inventory which is used "to help assess personality pathology and more acute clinical syndromes." *Id.* at 6. Defendant's testing revealed "a strong need to pursue unusually challenging endeavors and evince goal-oriented behaviors which most others would find unrealistic. He is frequently able to coax others into doing things they would not otherwise do and, often, he is successful in exciting their own wish fulfillment in the process." *Id.* at 7-8. The results described someone with Defendant's results as having the following personality traits:

> Any uncertainty this man may possess, whether by social doubt feelings of inefficacy, or reality testing against insurmountable challenges, is generally relegated to suppressed unawareness. Relationships tend to mirror an illusion of high-spirited optimism and vibrant energy, but with some tenuousness that he does not easily acknowledge.
>
> While this man is adept at winning over the favor of others, relatively few of his relationships are long-lasting. Those who have endured longer, and perhaps more involved, interactions with him may become drained by his seemingly unending enthusiasm. As others show waning interest, he may become even more absorbed by and concerned with their continued support and commitment. If rejection becomes imminent, his energy level may waver from excited exuberance to edgy irritability, and his buried self-doubt and uncertainty may surface. In the wake of rejection, he may withdraw from the situation entirely and reframe the encounter to invoke positive attention to himself declare his steadfastness to goals or principles, and/or proclaim his innocence.

16

A256

> This man may be unwilling to self-examine his role in
> difficult situations of prolonged distress and he may react externally
> by behaving erratically. Driven to deny life's more tedious realities,
> including realistic limit setting and accountability for less-than-
> perfect outcomes, he may seek out novel experiences and continue
> grasping for opportunities, possibly to the point of exhaustion.
> Fatigue in cases such as this may precipitate syndrome-based
> depression.

*Id.* at 8. Dr. Dodge did not diagnose Defendant with any clinical disorders, noting that "[t]he major complaints expressed by the patient do not take the form of distinct or isolated symptoms but rather appear to reflect pervasive difficulties." *Id.* at 9. As for personality pathology, Dr. Dodge diagnosed compulsive personality disorder with unspecified personality disorder (turbulent), histrionic personality type, and narcissistic personality style. *Id.*

Based on this evaluation, Dr. Dodge concluded as follows:

> [P]ersonality testing results are notable for positive impression
> management (i.e., attempting to portray oneself in a more positive
> light). While test results indicate that he is knowingly exaggerating,
> this is likely driven more by a desire to impress others than
> malicious manipulation. This may stem from his tarnished
> reputation, previously spotless, and a possible sense of
> embarrassment over his current situation. While he is intentionally
> presenting in a way that overly positive, this exaggeration does not
> suggest risk of violence. It is plausible that his exaggeration is a
> psychologically unsophisticated means of protecting himself rather
> than a manipulative attempt to deceive us with the intent to harm
> others upon release.
>
> Given the totality [of] known information at this time, it is
> the overall opinion of this evaluator that [Defendant's] risk of
> violence is minimal. . . .
>
> Further, [Defendant] currently does not have any known
> access to weapons, and he has previously surrendered all firearms to
> law enforcement. [Defendant's] alleged threats of violence seem to
> have been made during a time of significant psychological distress,
> and they do not appear to be part of a larger pattern of violence
> against others throughout his life. Further, there is no data that
> suggests he has difficulty following rules and/or conditions

A257

> mandated to him. Thus, the totality of the data suggests to us that
> [Defendant] could be safely managed if returned to the community
> at this time.

*Id.* at 10.

Defendant also submitted a letter from a licensed social worker, Elizabeth Walker, DSW,

LICSW. *See* Dkt. No. 48-1. Dr. Walker spoke to Defendant's girlfriend, his brother, and his ex-

wife. *See id.* at 2. She concluded that "[g]iven Dr. Dodge's assessment of minimal risk of

violence and that he has a strong support network and that, if released, he will play an important

role in caring for his ailing mother and his two children, [Defendant's] release from detention can

be both safely and adequately managed and will give him the opportunity to be a needed support

to his family." *Id.* at 3. The release plan outlined by the social worker recommended Defendant

residing with his girlfriend, spending time with his mother in her nursing home, attending church,

and working on his relationship with his children. *See id.* at 3-5. Dr. Walker described her

conversation with Mrs. Roglieri as follows:

> Ms. Tina Roglieri only started working recently. Ms. Roglieri
> reported that the children have suffered in their father's absence.
> His 14-year-old daughter is anxious about his safety and when she
> will see him again. His 12-year-old son has grown sullen. The
> father and children exchange letters regularly, but the confusion
> over Mr. Roglieri's arrest, their drastic lifestyle change, and their
> lengthy separation remains an unspoken tension. Mr. Roglieri does
> not want to expose his children to the jail environment and therefore
> has not visited with them in person in the months he's been
> detained. If released, Mr. Roglieri is committed to working to
> repair the damage done to their relationship and re-engaging in
> regular parenting and caretaking of his children.

*Id.* at 4-5. Dr. Walker noted that Defendant agreed to engage in mental health treatment if

released. *See id.* at 5. She also stated that "[e]verybody interviewed for this report, including

[Defendant's] ex-wife, Tina Roglieri, expressed support for his release from detention." *Id.*

18

A258

The Government opposed Defendant's motion, arguing that Defendant could have earlier sought the evaluation, and the evaluation findings do not support release. *See* Dkt. No. 51. As part of its opposition, the Government provided a declaration from Mrs. Roglieri. *See* Dkt. No. 51-2. She explained that she reviewed Dr. Walker's report and "the social worker left out some important things I told her, and I want to bring those things to the Court's attention." *Id.* at ¶ 6. Mrs. Roglieri stated that she was concerned about Defendant's mental health and that she told Dr. Walker, "that, under no circumstances would [she] agree to [Defendant] having unsupervised visitation with [their] children should he be released from jail. If necessary, [she] intend[s] to seek an emergency custody order from Family Court to make sure that [Defendant] is not alone with the children." *Id.* at ¶¶ 7-8. She also "told the social worker that [she] want[s] no contact with [Defendant] apart from issues concerning the children and, if he were released, [she] would be requesting an order of protection for [her]self." *Id.* at ¶ 9. Mrs. Roglieri noted that "[w]hile it is true that [Defendant] is a good father, and loves his children, the social worker failed to convey [her] level of concern about the potential of [Defendant] being released and having unsupervised visitation with [their] children at the present time. If the social worker took [her] comments to mean that [she] had no issues with [Defendant's] request for release, then she misconstrued [her] sentiments." *Id.* at ¶¶ 10-11.

After reviewing these submissions, Magistrate Judge Hummel scheduled a conference to determine whether a new detention hearing was warranted. *See* Text Minute Entry 11/15/2024. Following the conference, Magistrate Judge Hummel concluded that Defendant met his burden establishing entitlement to a new detention hearing. *See* Text Minute Entry 11/22/2024.

Defendant's second detention hearing was held on November 25, 2024. *See* Text Minute Entry 11/25/2024; *see also* Dkt. No. 64. Despite not being the individual who interviewed

A259

Defendant, Dr. Colistra testified during the hearing.  *See* Dkt. No. 64 at 8.  Dr. Colistra testified to

Dr. Dodge's evaluation findings that Defendant's "risk of violence is minimal," "he has no history

of violent behavior toward others, which research has shown to be predictive of future violence,"

and "the totality of the data suggests that [Defendant] could be safely managed if returned to the

community at this time."  Def. Ex. 2 at 10; *see also* Dkt. No. 64 at 9-10, 18-19.  Dr. Colistra

explained that "[t]here is no correlation between high impression management and a high level of

danger for physical harm."  Dkt. No. 64 at 13.

On cross examination, the Government asked Dr. Colistra about the inconsistency

between Defendant filing for individual bankruptcy and Defendant's statement to Dr. Dodge that

he had no outstanding debts.  *See id.* at 42.  Dr. Colistra confirmed that she believed Defendant

was not trying to conceal information but instead believed his bankruptcy and criminal cases were

intertwined.  *See id.* at 22, 37-38, 41-42.  The Government also asked Dr. Colistra to review

statements in Defendant's letter indicating that he "would have been convicted of financial crimes

and would have been away for a long time in prison" and that "[t]he pain is too much to think of

and frankly prison is not for me."  *Id.* at 45.  Dr. Colistra opined that the statements were made

while under a high degree of stress, which "may feel real at the time, and then months after, they

may be able to take a step back and then look at that behavior and characterize it as terrible

feelings in the moment, but not necessarily an accurate depiction of how they are overall."  *Id.* at

46.  The Government confirmed that, while making her report, Dr. Colistra did not know about

Defendant's suspended driver's license or his speeding infractions, nor did she know that he had a

2021 tax lien for "more than half a million dollars."  *Id.* at 52.  However, she testified such

information does not change her opinion.  *See id.*

In closing statements, defense counsel argued that, as to Mrs. Roglieri's declaration:

A260

> [t]he concerns that she may have about, you know, unsupervised
> visitation does not necessarily mean that Mrs. Roglieri wants him to
> be detained. She just wants -- it's pretty clear from the context of
> her declaration that she wants sufficient conditions such as an order
> of protection so that he will not send her mean text messages as he
> has in the past and be cordial when discussing issues with the
> children because she -- in the same declaration she says he's a
> wonderful father and does well by the children.

*Id.* at 66. As to Defendant's letter, defense counsel noted the "document does not explicitly say

that he is planning to commit suicide. It's written in the past tense about thence it never

happened." *Id.* Defense counsel characterized the letter as "a cathartic exercise to purge the

anxiety and stress related to the results of a complicated business deal that rapidly fell apart

resulting in civil litigation as well his own bankruptcy, which was extraordinarily stressful for him

because he ended up losing everything. He had no assets, nothing. And it was an extremely

stressful time in his life." *Id.* Defendant counsel continued, noting that Defendant "had five

months to make plans. He had five months to make an attempt. Nothing. Nothing happened. He

didn't do anything." *Id.* at 67-68.

Finally, Defendant argued that there is insufficient evidence to establish "that he poses a

danger to anyone physically." *Id.* at 70. He explained that, if released, he could reside with his

girlfriend, and he would follow conditions. *See id.* at 70-71. However, his possibility of

obtaining employment might be impacted by his bankruptcy proceeding. *See id.* at 71.

Magistrate Judge Hummel concluded that there are conditions he could set that would

ensure Defendant's appearance in Court, but that there is no set of conditions that would ensure

the safety of the community if Defendant were released. *See id.* at 80. Magistrate Judge Hummel

relied on Defendant's text messages and the Government's of Person-1's statements. *See id.* at 81-

82. Magistrate Judge Hummel stated that "[t]here is nothing set forth by the defendant today

A261

or by Dr. Colistra in her report that addresses any significant or serious fashion the Court's concern with respect to those statements." *Id.* at 82. Magistrate Judge Hummel determined that "[w]hile Ms. Colistra or Dr. Colistra has indicated she finds he represents a minimal risk of [danger] . . . Dr. Colistra's opinion [is] not worthy of serious consideration and frankly in no way addresses the Court's serious concerns in this matter." *Id.* at 82-83. Therefore, Magistrate Judge Hummel continued Defendant in detention pending further proceedings. *See id.* at 83.

**C.    Analysis**

### 1. Timing of Defendant's Arguments Regarding Entitlement to Detention Hearing

The Government first argues that Defendant waived his right to challenge Magistrate Judge Hummel's determination that a detention hearing was warranted because the decision was made on May 31, 2024. *See* Dkt. No. 67 at 18. The Government cites Local Criminal Rule 59.1 which states as follows: "A party seeking review of a Magistrate Judge's release or detention order pursuant to 18 U.S.C. § 3145(c) shall file a Notice of Appeal of Magistrate Judge Pretrial Order pursuant to Fed. R. Crim. P. 58(g)(2)(A) within fourteen (14) days of the date of entry." Dkt. No. 67 at 17 (quoting N.D.N.Y. L.R. Crim. P. 59.1(a)(3)). The Government argues that although the Local Rule specifically references only the release or detention decision, it applies with equal force to this issue because the Rule "clearly contemplates a procedure in which a district judge reviews the magistrate's order after briefing by the parties." *Id.* at 18.

Defendant argues that he "is seeking *review* by the judge having original jurisdiction over the offense under subsection (b)" of 18 U.S.C. § 3145, "which is not mentioned in local rule 59.1 that only applies in *appeals* under section (c)." Dkt. No. 70 at 4 (emphasis added). Defendant contends that, in this case, "there was essentially one detention hearing over two dates,

A262

June 3, 2024 and November 25, 2024.  The notice of appeal was timely filed on December 6, 2024." *Id.*

The Court is not certain whether the Local Criminal Rule applies to Defendant's filings in response to Magistrate Judge Hummel's determination at the initial appearance.  Defendant contends that he is seeking review of Magistrate Judge Hummel's decision under § 3145(b), which governs "[r]eview of a detention order," yet he also labels his brief as an "appeal" which is controlled by § 3145(c) concerning "Appeal from a release or detention order." *Id.*; *see also* Dkt. No. 66.

Local Criminal Rule 59.1(a)(3) does not clarify the issue.  Defendant is correct that Local Criminal Rule 59.1(a)(3) only references subsection (c), *see* Dkt. No. 70 at 4, but the Local Rule concerns when "[a] party seek[s] *review* of a Magistrate Judge's release or detention order pursuant to 18 U.S.C. § 3145(c)."  N.D.N.Y. L.R. Crim. P. 59.1.  As explained, subsection (c) governs an "appeal" from a detention order, whereas subsection (b) governs "review."  18 U.S.C. § 3145(b), (c).

A district court in the Western District of Pennsylvania has analyzed whether a defendant's filing to a district court judge from a decision of a magistrate judge falls under subsection (b) or (c) of § 3145.  *See United States v. Nesser*, 937 F. Supp. 507, 509 (W.D. Pa. 1996).  There, the court explained that "Section 3145(c) [] refers to 28 U.S.C. § 1291 and 18 U.S.C. § 3731.  The sole purpose of title 28 U.S.C. § 1291 is to assign jurisdiction to courts of appeals 'from all final decisions of the district courts of the United States' and other territorial district courts.  The sole purpose of title 18 U.S.C. § 3731 is to establish, in criminal cases, when 'an appeal by the United States shall lie to a court of appeals.'" *Id.* (footnote omitted).  "Since Congress provided that an 'appeal' from a release or detention order 'is governed by' these statutes, we find this an

A263

unmistakable indication that such an appeal is appropriately taken to the courts of appeals. The

first sentence of section 3145(c) otherwise makes no sense; it is not logical to construe the first

sentence as giving the district courts power to hear appeals (from themselves, no less) pursuant to

two statutes whose purpose is to establish the scope of jurisdiction for courts of appeals." *Id.* The

court also noted that "both sections 3145(a) and (b) contain references to judicial decisionmakers

'other than a Federal appellate court.' Section 3145(c) omits this language. The natural and

justifiable conclusion to draw from this structure is that the 'other than a Federal appellate court'

language is left out of section 3145(c) because Congress was addressing federal appellate courts

in that section, and so did not need to separately distinguish them." *Id.*

  The Court finds this to be a cogent reading of 18 U.S.C. § 3145. *See also In re Sealed

Case*, 242 F. Supp. 2d 489, 491 (E.D. Mich. 2003) (rejecting an argument that the bankruptcy

court "has the jurisdiction to act under § 3145(c)"); *United States v. Chen*, 257 F. Supp. 2d 656,

665 (S.D.N.Y. 2003) (concluding that "a district court may not consider 'exceptional reasons' as a

basis for release" under 18 U.S.C. § 3145(c)). *But see United States v. DiMattina*, 885 F. Supp.

2d 572, 586 (E.D.N.Y. 2012) ("[M]ost district courts in the Second Circuit have found that 18

U.S.C. § 3145(c) permits them to grant release pending appeal").

  A district judge in the Southern District of New York acutely analyzed the application of §

3145(c) to district courts by noting that "[t]he courts that have held that section 3145(c) is

available to district courts almost uniformly cite, without discussion, the Fifth Circuit's decision in

*Carr*. In that case—by far the most extensive treatment of the issue by an appellate court—the

court resolved the question in one paragraph[.]" *Chen*, 257 F. Supp. 2d at 662 (citing *United

States v. Carr*, 947 F.2d 1239, 1240 (5th Cir. 1991)); *see also United States v. DiSomma*, 951

F.2d 494, 496 (2d Cir. 1991) ("While the language of section 3143(b)(2) compels detention, an

A264

exception permits release of mandatory detainees who meet the requirements for release under

section 3143(b)(1), and 'if it is clearly shown that there are exceptional reasons why such person's

detention would not be appropriate.' 18 U.S.C. § 3145(c). . . . Only then does the *trial court*

consider the presence of exceptional circumstances making detention inappropriate") (citing *Carr*,

947 F.2d at 1240).

The Court concludes that subsection (c) most likely applies only to a federal appellate

court. However, the Court need not resolve this issue today. This Court's own Local Criminal

Rule lacks clarity on the issue. Although Local Criminal Rule 59.1(a)(3) states that a defendant

must seek "review" of a Magistrate Judge's decision "within fourteen (14) days of the date of

entry," it cites only subsection (c) of § 3145 which relates to an "appeal." Because of the lack of

clarity on this issue, the Court will not foreclose Defendant's arguments concerning his initial

appearance on timeliness grounds but will proceed to review the merits of the arguments.[1]

### 2. Entitlement to Detention Hearing

Defendant's initial appearance lasted approximately eight minutes. *See* Dkt. No. 24.

When asked what the Government's position was regarding detention, the Government moved for

a continuance under 18 U.S.C. § 3142(f). *See id.* at 5. The Government argued that it was

"entitled to a bail or a detention hearing under 3142(f)(2)(B), that the defendant poses a serious

risk that he will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to

threaten, injure, intimidate a prospective witness or juror." *Id.* It explained that it was "in

possession of threats" made by Defendant" that "are quite concerning" and which the Court

---

[1] As a practical matter, waiting six months to raise an issue with the Government's arguments and a Magistrate Judge's determination is inappropriate, especially where, as here, Defendant presents no reason for his delay. *See* Dkt. No. 70. Were this Court's Local Criminal Rule clearer, this Court would take no issue with concluding that Defendant's argument is foreclosed as untimely.

A265

reviewed "through the search warrant application that" the Government made the prior evening. *Id.* at 6. The Court agreed with the Government and concluded that it was entitled to a detention hearing. *See id.* at 7.

Defendant argues that "[b]ecause the government didn't even attempt to provide evidence let alone a preponderance, that [Defendant] posed a serious risk of obstructing justice, threatening, injuring or, intimidating any prospective witnesses at the initial appearance on May 31, 2024, his pretrial detention is illegal and void." Dkt. No. 66 at 6-7. He asserts that he did not receive a copy of the search warrant referenced by the Government during the initial appearance "until July 15, 2024 when it disclosed, among other materials, 2,871 PDFs collectively containing 55,634 pages. The PDF file names only included the Bates number on the first page of each file." *See id.* at 6. Additionally, Defendant states that "[t]he government is not entitled to a three-day continuance to seek evidence establishing an (f) factor. That evidence must be produced at the initial appearance and no later." *Id.* at 4.

Defendant's arguments are unpersuasive. 18 U.S.C. § 3142 specifically authorizes a continuance. In relevant part, the statutes states as follows: "The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of such person may not exceed five days (not including any intermediate Saturday, Sunday, or legal holiday), and a continuance on motion of the attorney for the Government may not exceed three days (not including any intermediate Saturday, Sunday, or legal holiday)." 18 U.S.C. § 3142(f)(2)(B).

Defendant does not present any legal authority to support an argument that the Government's request for a continuance was inappropriate. *See* Dkt. No. 66 at 4. The

Government is expressly entitled to a three-day continuance prior to a detention hearing. 18

U.S.C. § 3142(f)(2)(B). The Court is very cognizant that "the [Supreme] Court cautioned that in

the determination as to pretrial release or detention, 'a vital liberty interest is at stake. A prompt

hearing is necessary . . . ." *United States v. Havens*, 487 F. Supp. 2d 335, 338 (W.D.N.Y. 2007)

(quoting *United States v. Montalvo-Murillo*, 495 U.S. 711, 717 (1990)). However, because

Defendant has failed to present any authority, let alone binding or persuasive authority,

concerning the Government's request for a continuance, the Court rejects Defendant's argument

on this issue. The Government also did not wait three days to obtain evidence to support its

request for a detention hearing, but relied on evidence it presented to Magistrate Judge Hummel

"through the search warrant application that [it] made" the night before the initial appearance. *See*

Dkt. No. 24 at 6.

Next, as to whether the Government sufficiently established an (f) factor during the initial

appearance, the Court concludes that it did. Defendant's arguments amount to no more than

frustration with the timing and format of the Government's discovery production. *See* Dkt. No. 66

at 5. The Government was required to prove by a preponderance of the evidence that Defendant

posed "a serious risk" that he would "obstruct or attempt to obstruct justice, or threaten, injure, or

intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C.

§ 3142(f)(2)(B). The statute explains that during a detention hearing, "[t]he rules concerning

admissibility of evidence in criminal trials do not apply." *Id.* The statute does not mention initial

appearances. *See id.* There are also no discovery or production obligations delineated in the

statute. *See id.*

The Government sought a detention hearing on the ground that "[D]efendant poses a

serious risk that he will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or

A267

attempt to threaten, injure, intimidate a prospective witness or juror." Dkt. No. 24 at 6. The Government based its request on text messages submitted with a search warrant application. The Court has reviewed the search warrant application and concludes that it provides sufficient evidence to establish by a preponderance of the evidence that Defendant would "obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to threaten, injure, intimidate a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). The evidence attached to the search warrant consisted of Defendant's text messages and verbal conversations in which Defendant references guns, "tak[ing] out" individuals involved in Defendant's bankruptcy proceedings, feeling himself "getting angry and vengeance to those that are doing this," and identifying federal agents by their appearance and stating he knows where one lives. *See* Case No. 1:24-MJ-22, Sealed Dkt. No. 72.

Although the Court believes the Government should have shown defense counsel the text messages contained in the search warrant application at the initial appearance when the Government used them to support its request for a detention hearing, Defendant provides no authority that such production is required by law. Defendant responded to Government's reliance on his text messages by saying, "That's it. Nothing else. No mention at all of obstruction or intimidation." Dkt. No. 66 at 6. First, search warrant applications are filed under seal and are not available to public. The Court will not fault the Government for not reading Defendant's text messages that were a part of the search warrant application in open court which directly referenced the use of guns and vengeance against individuals involved in his cases. Second, the text messages clearly present evidence of obstruction, threats, and intimidation sufficient to warrant a detention hearing. Based on the foregoing, Defendant's motion is denied on this ground.

A268

### 3. Merits of Detention Determination

Defendant argues (1) "[t]he government never argued at the detention hearing that Mr. Roglieri would attempt to obstruct justice"; (2) "[t]he Magistrate never made any written finding that there was a serious risk that Mr. Roglieri would attempt to obstruct justice"; and (3) "[t]he Magistrate's findings following both detention hearings were not supported by clear and convincing evidence." Dkt. No. 66 at 7-9.

First, Defendant presents no authority that the Government was required to argue that Defendant would attempt to obstruct justice "at the detention hearing." *Id.* at 7. At the initial appearance, the Government presented sufficient evidence that Defendant posed a serious risk of attempting to obstruct justice sufficient to meet the requirement of 18 U.S.C. § 3142(f)(2)(B) and warrant a detention hearing. Once that has been satisfied, the Magistrate Judge must determine "whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The Court sees no requirement in § 3142(f) that the Government had to again specifically argue obstruction of justice during the two subsequent detention hearings. The Government sufficiently did so during the initial appearance. In any event, as the Government states, it did mention obstruction on multiple occasions. *See* Dkt. No. 67 at 19.

Second, Defendant's argument about written findings is meritless. As to the initial appearance, Defendant does not present any authority requiring Magistrate Judge Hummel to provide written findings about the initial obstruction of justice finding. Secrtion 3142(i) requires "written findings of fact and a written statement of the reasons for *the detention*." 18 U.S.C. § 3142(i) (emphasis added). The Second Circuit has also explicitly held "that where the court's

29

A269

findings and reasons for issuing a detention order are clearly set out in the written transcript of the hearing, the requirement of a writing is satisfied." *United States v. English*, 629 F.3d 311, 321 (2d Cir. 2011). The Court easily concludes that all of Magistrate Judge Hummel's conclusions are clearly set out in the written transcripts of the initial appearance and two detention hearings.[2]

Defendant argues that "[t]he evidence presented by the government is neither clear nor convincing that Mr. Roglieri poses a serious risk of obstruction etc. or a danger to the community at large." Dkt. No. 66 at 9.

Defendant argues that the evidence relied on by Magistrate Judge Hummel—text messages and verbal conversations—is not specific and uncorroborated. *See id.* at 9-11. Defendant is correct that in his text messages, he did not identify a specific individual by first and last name, nor did he provide a date, time, and location for when he might seek "vengeance." Defendant is also correct that Person-1's conversation with Defendant was not recorded and the purported statements are not corroborated. Likewise, Defendant accurately restates Dr. Colistra finding that Defendant's "risk of violence is minimal." *Id.* Defendant, therefore, asks this Court as follows: "How can uncorroborated claims of unrecorded statements from an antagonistic witness overcome Mr. Roglieri's 44 years of consistent history of non-violent behavior, and

---

[2] During the initial conference, Magistrate Judge Hummel did not reiterate the words "obstruct justice." He concluded as follows: "The Court agrees with the [G]overnment that they are entitled to a detention hearing in this matter." Dkt. No. 24 at 7. The Government explained its grounds for seeking a detention hearing—that Defendant "poses a serious risk that he will obstruct or attempt to obstruct justice, threaten, injure, or intimidate or attempt to threaten, injure, intimidate a prospective witness or juror"—and it presented the reasons underlying such application. *Id.* at 6. Magistrate Judge Hummel's "agree[ment]" with the Government's argument is sufficient for the Court to articulate his rationale and satisfy the writing requirement of 18 U.S.C. § 3142(i). *See United States v. Vondette*, 5 Fed. Appx. 73, 76 (2d Cir. 2001) ("While the district court did not issue a memorandum order expressly cataloging either its findings of fact or its reasons for the detention, the district court did incorporate as part of its order denying bail its findings and reasoning which it had provided orally in open court and which were subsequently transcribed. We believe this was sufficient to satisfy the writing requirement of § 3142(i)(1)").

30

A270

having been professional [sic] assessed by two psychiatrists who found that he represents at most a minimal risk of violent behavior[?]" *Id.* at 12.

The answer is simple: the Court is taking Defendant at his word. Defendant's statements include the following: "You f*** with the hand that feeds you and you're gonna get f***ed up the a** royally"; "And listen, I'll gladly talk about this, but my fear is I'll rip off your f***cking throat and piss down your f***cking neck"; "I don't give a f*** abou[t] the cops"; "I'm f***cking gonna wack anybody that comes after me"; "You wanna come after me with guns you gonna get the same"; "I feel myself getting angry and vengeance to those that are doing this . . . .  Including the attor[n]ies, judge, receiver, etc."  "I don't play by the rules . . .  Never have and never will . . . . And that's dangerous as I feel myself getting to that point with all involved against me."

The Court has rarely seen such degrading, threatening, and worrisome communications in the context of a financial fraud case.  Defendant did not mince words in his text messages.  He communicated precisely how he was feeling—angry and vengeful.  He stated that he did not care about authority and discussed the use of guns and physical violence and the specific individuals he was angry toward.

Defendant's assertion that the text messages are "vague at best" and "contain[] some bombastic language," is disingenuous.  Dkt. No. 66 at 11.  Defendant named who his intentions were aimed toward, with sincere vitriol.  When the Government searched Defendant's home, it found numerous firearms including an AR-15 style rifle.  *See* Dkt. No. 21 at 19.  At the June 3, 2024, detention hearing his attorney expressed that Defendant "had forgotten" three additional firearms he had in his home which were not produced to the FBI at the time of its search.  *Id.* at 10.  As the Government explained, Defendant's possession of some of the firearms resulted in state charges against Defendant.  *See id.* at 19.

A271

As to the psychological evaluation, Dr. Dodge (supervised by Dr. Colistra), concluded that Defendant "does not have any traits generally associated with criminality such as . . . manipulation." Def. Ex. 2 at 10. However, Defendant's personality testing was "notable for positive impression management (i.e., attempting to portray oneself in a more positive light)." *Id.* Dr. Dodge concluded that "this is likely driven more by a desire to impress others than malicious manipulation. This may stem from his tarnished reputation, previously spotless, and a possible sense of embarrassment over his current situation. While he is intentionally presenting in a way that [is] overly positive, this exaggeration does not suggest risk of violence." *Id.*

The Court is not able to make medical determinations. However, the Court finds it quite concerning that the only positive finding during Defendant's psychological exam—impression management—appears to directly relate to the charges in the indictment for obtaining millions of dollars from companies "under [] false promise[s] and representation[s]" whereby Defendant "used the funds . . . to fund his extravagant lifestyle." Dkt. No. 35. These allegations could be construed as reflecting a "desire to impress others" to such an extreme degree that Defendant purportedly engaged in criminal conduct. The state charges against Defendant also suggest a failure to abide by the law. *See* Dkt. No. 51-1 at 3. Dr. Dodge stated that Defendant "voluntarily surrendered all of his firearms to law enforcement. Notable, he did so prior to the occurrence of the alleged threats." Def. Ex. 2 at 3. That is an inaccurate statement. As demonstrated during the June 3, 2024, detention hearing, Defendant did not turn over three firearms which defense counsel described as "three antique long guns or shot guns from a century ago." Dkt. No. 21 at 11. Insofar as Dr. Dodge stated that Defendant turned over his firearms "prior" to making the threats, Defendant's text messages were sent on December 3, 2023, January 21, 2024, and January 25, 2024, and he turned over the firearms in February 2024. *See* Gov. Ex. 3, 4, 5; *see also* Dkt. No.

A272

21 at 11.  Defendant had access to his arsenal at the time he made his threats.  Likewise, as discussed during the second detention hearing, despite Defendant filling for bankruptcy, he informed Dr. Dodge that he did not have any debts.  *See* Dkt. No. 64 at 22, 37, 40-42.

Additionally, during the evaluation, Defendant told Dr. Dodge that his relationship with his estranged wife was "good" until "he suggested they move forward with a formal divorce because he thinks he 'met the one.'"  Def. Ex 2 at 3.  However, in the civil case against Defendant's company, Mrs. Roglieri's attorney submitted an affirmation under oath in which he attested under the penalty of perjury that "[u]pon information and belief, in January 2024, Tina Roglieri again commenced a divorce action against" Defendant.  *Compass-Charlotte*, No. 24-CV-55, Dkt. No. 101 at ¶ 11.  Based on these inconsistencies as well as Dr. Dodge's findings that Defendant "has a Moderate-High tendency to engage in the act of deceiving oneself as to the true nature of one's feelings or motives" and "a Very-High tendency to engage in the purposeful tailoring of his responses to impress other while knowingly aware of the exaggeration," the Court agrees with Magistrate Judge Hummel that "Dr. Colistra's opinion [is] not worthy of serious consideration and frankly in no way addresses the Court's serious concerns in this matter."  Dkt. No. 64 at 82-83.

To the extent Defendant argues that Person-1's statements are uncorroborated, Defendant's text messages referencing the use of firearms, and his ownership of numerous firearms, fully support his verbal statement that he would "put a bullet in" an agent's head.  Dkt. No. 67 at 10.  Additionally, the standard to support detention is not proof beyond a reasonable doubt.  The standard is clear and convincing evidence which "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'  The standard has also been more precisely defined as plac[ing] in the ultimate factfinder an abiding conviction that the truth

A273

of [the] factual contentions are 'highly probable.'" *Jimenez v. Stanford*, 96 F.4th 164, 190 (2d Cir.

2024) (quotations and quotation menus omitted).

The evidence presented by the Government convinces this Court that it is highly probable

Defendant might act out against himself or others despite his lack of criminal history.  His

communications were erratic.  He was charged not only in federal court with the financial crimes

involving alleged self-inflated statements and promises, but he was also charged in state court for

his firearm possession.

Next, in considering the nature and circumstances of the offense charged, Defendant

argues that the factor weighs in his favor because he is charged with an economic offense.  *See*

Dkt. No. 66 at 14.  Defendant presents no case law to support his argument.  *See id.*

Numerous courts have concluded "there is support for considering economic harm in

evaluating danger to the community under § 3142 of the Bail Reform Act." *United States v.*

*Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (collecting cases); *see also United States v.*

*Kwok*, No. 23-CR-118, 2024 WL 54170, *5 (S.D.N.Y. Jan. 4, 2024); *United States v. Persaud*,

No. 05-CR-368, 2007 WL 1074906, *1 (N.D.N.Y. Apr. 5, 2007); *United States v. Gulkarov*, No.

22-CR-20, 2022 WL 205252, *3 (S.D.N.Y. Jan. 24, 2022) ("Potential 'danger to any person or the

community' includes the risk that a defendant might cause financial or 'economic harm' if granted

pretrial release") (quotations and quotation marks omitted); *United States v. Dupree*, 833 F. Supp.

2d 241, 253 (E.D.N.Y. 2011) ("[T]hese alleged offenses, and the millions of dollars involved in

the various frauds, constitute serious charges").

The indictment charges Defendant with having fraudulently obtained $5,000,000 from an

innocent company which he used for his company, Prime Capital Ventures, LLC's business

expenses and "to fund his extravagant lifestyle."  Dkt. No. 35 at ¶ 8.  Despite their economic

A274

nature, the charges against Defendant are serious and a factor that the Court considers in making its detention determination. "[T]he Court may [also] consider uncharged conduct in assessing the degree of danger posed by a defendant's release." *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015); *see also Jules v. Searls*, No. 21-CV-6342, 2022 WL 20055440, *7 (W.D.N.Y. Aug. 8, 2022). The Government states that its investigation is ongoing and additional charges are expected. *See* Dkt. No. 67 at 20-21. The Court is also very familiar with the conduct alleged in the civil actions against Prime Capital by numerous other companies resulting in, at least, $52,364,000 missing that belongs to innocent companies and which involves allegedly fraudulent bank records. *See Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC*, No. 1: 24-CV-55, Dkt. No. 173 at 8-12. Such alleged conduct combined with that which is alleged in the indictment is extremely serious and tips this factor in the Government's favor.

As to the second factor, which relates to the weight of the evidence, Defendant argues that this factor is neutral because he "has a viable defense available." Dkt. No. 66 at 14. Defendant cites to an attorney affirmation as support for his argument. *See id.* The affirmation is from Defendant's attorney in civil litigation against another company, Reign Financial. *See* Dkt. No. 66-1 at ¶ 2. The attorney affirms that on December 8 and 24, 2023, "[b]oth the SEC and the FBI informed me that Mr. Roglieri and Prime Capital Ventures were not the target of their investigation, that Reign Financial was the target and had been 'on their radar' for some time." *Id.* at ¶ 7. Interestingly, after Defendant was told he was not the target of an investigation, the wire transfers alleged as fraudulent in the Government's indictment occurred on December 22, 26, and 29, 2023. *See* Dkt. No. 35.

The Court is unclear how an attorney's affirmation reiterating purported statements from federal agencies that they were targeting another company negates the possibility of Defendant

A275

being guilty of wire fraud. In any event, the Government has text messages wherein Defendant stated as follows: "I unused [sic] others money to fund deals," and he said, "yes," when asked if that was illegal. Dkt. No. 67 at 21. The weight of the evidence is, therefore, in the Government's favor.

The third factor—the history and characteristics of Defendant—also weighs in the Government's favor. Defendant has touted his philanthropic efforts in the community as a reason for him to be released pending trial. *See* Dkt. No. 64 at 74; Dkt. No. 66 at 14. Defendant has argued that he should be released to reside with his girlfriend in Poughkeepsie, New York. *See* Dkt. No. 64 at 73-74; see also Dkt. No. 17 at 6. The Government explained that Defendant's girlfriend is not in the home much of the time because she works full-time in New York City. *See* Dkt. No. 17 at 6. There is no evidence that Defendant has remained in contact with his estranged wife or his children. He has not offered another housing solution. Although Defendant stated in his motion that "he has deep ties to the community," he does not name a single other individual who would provide support and accountability for him if he was released. Dkt. No. 66 at 14.

As he admitted during the second detention hearing, his ability to obtain employment is unlikely because of the state of his bankruptcy case. *See* Dkt. No. 64 at 71. Although Defendant has done charitable deeds for the community and he has a supportive girlfriend, he does not propose any other ties to the community that would support his release.[3] Likewise, based on the text messages, Defendant's mental condition appears erratic. If, as Defendant purports, the text messages were not sincere, then such jest causes the Court to question Defendant's ability to differentiate humor and healthy expressions of frustration from violent threats. Defendant argues

---

[3] In previous submissions to Magistrate Judge Hummel, Dr. Walker proposed that Defendant's brother would be a resource for Defendant. *See* Dkt. No. 48-1.

that "[e]very time he was in the personal presence of any of the people described in the text messages he was cooperative and courteous." Dkt. No. 70 at 6. The Court does not find it persuasive that because Defendant maintained his composure in a courtroom while detained and surrounded by attorneys, law enforcement officers, and the public, this somehow negates the threats he made when he was out in the public, with an arsenal of weapons in his home, and stated, "[y]ou wanna come after me with guns you gonna get the same." Gov. Ex. 4.

The Court, of course, takes into consideration Defendant's lack of criminal history and the respect he has shown while in Court. However, as Defendant stated in an e-mail that the Government characterizes as a suicide letter, it was in "the last two years" that his life and business took a downward turn for Defendant. *See* Gov. Ex. 2. The civil lawsuits' allegations, Defendant's text messages, and the criminal charges against Defendant, all of which have occurred within the past year and a half, lead the Court to conclude that Defendant's history and characteristics support detention.

As to the fourth factor, Defendant argues that he "poses no danger to any person or the community" as demonstrated by his lack of a criminal history and the minimal risk finding from the psychological assessment. Dkt. No. 66 at 14.

Defendant's estranged wife swore under the penalty of perjury that she did not want Defendant to have any unsupervised contact with their children. *See* Dkt. No. 51-2. She stated that if Defendant was released, she would seek an order of protection for herself. *See id.* During the second detention hearing, defense counsel asserted that the estranged wife, "in the same declaration[,] she says he's a wonderful father and does well by the children." Dkt. No. 64 at 66. Her statements read, however, as follows: "While it is true that [Defendant] is a good father, and loves his children, the social worker failed to convey my level of concern about the potential of

A277

[Defendant] being released and having unsupervised visitation with our children at the present time." Dkt. No. 51-2. She did not say that Defendant does well or right by the children or that he is a "wonderful" father.

The Court is also concerned about Defendant's specific reference to "the attor[n]ies, judge, receiver, etc." who are involved in his civil and bankruptcy cases and who he stated he was "getting angry" toward and thinking about "vengeance" against. Gov. Ex. 5. The community that the Court must seek to protect is not limited to the general public. It also includes court personnel. *See* 18 U.S.C. § 3142(g)(4) (listing the consideration of "the nature and seriousness of the danger to *any* person or the community that would be posed by the person's release"). The Court again recognizes Dr. Colistra's conclusion that Defendant poses a minimal risk of violence. However, the Court does not find that this conclusion, following a single two-hour interview, outweighs Defendant's own words, made on different dates, and with specific reference to individuals involved in his cases.

Additionally, "the 'danger to any person or the community' language is not limited to the danger of physical violence." *United States v. Isaacs*, 469 F. Supp. 3d 801, 804 (S.D. Ohio 2020) (quoting *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) ("A danger to the community does not only include physical harm or violent behavior"); citing S. Rep. 98-225, 12, 1984 U.S.C.C.A.N. 3182, 3195 ("The Committee intends that the concern about safety be given a broader construction than merely a danger of harm involving physical violence")). Rather, the statute "'refers to the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Downs*, 406 F. Supp. 3d 1314, 1316 (N.D. Fla. 2019) (quoting *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989)); *see also United States v. Patriarca*, 776 F. Supp. 593, 597 (D. Mass. 1991).

A278

Courts have concluded that "'[t]hreats, particularly those as explicit, graphic, and repeated as those alleged in this case, harm people. They terrorize people. They affect the safety, security and well-being of people. They induce fear.'" *United States v. Dai*, No. 3:23-CR-478, 2023 WL 11016392, *9 (N.D.N.Y. Dec. 19, 2023), *aff'd*, 99 F.4th 136 (2d Cir. 2024) (quoting *United States v. Capriotti*, No. 21-CR-16, 2021 WL 229660, *5 (N.D. Ill. Jan. 22, 2021)). The Court does not read Mrs. Roglieri's declaration in the same light as defense counsel; as if she only wants to ensure that Defendant "will not send her mean text messages as he has in the past . . . ." Dkt. No. 64 at 66. Mrs. Roglieri attested in no uncertain terms that if Defendant "were released, [she] would be requesting an order of protection for [her]self." Dkt. No. 51-2 at ¶ 9. As explained, prior to the initiation of some of the legal proceedings against Defendant and his company, he was the sole provider for Mrs. Roglieri and their children. *See* Dkt. No. 7 at 2. The statements made in her declaration must be read in the context of Defendant sending text messages to Mrs. Roglieri, the mother of his children that, "[y]ou f*** with the hand that feeds you and you're gonna get f***ed up the a** royally" and that Defendant's "fear is I'll rip off your f***ing throat and piss down your f***cking neck. That's why I'm texting." Gov. Ex. 3; *see also* Dkt. No. 67 at 24. When Mrs. Roglieri stands up for herself and states that Defendant is "not going to f***cking abuse me" and threatens to call the police, Defendant responds, "I don't give a f*** about the cops." Gov. Ex. 3.

These threats present a serious risk of danger. Even if the Court were to diminish the threats of *physical* violence because of Dr. Dodge's conclusion about a minimal risk of violence (as Defendant would like the Court to do), the threats are *mentally* and *emotionally* harmful. Section 3142(g)(4) asks the Court to consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" and Congress did not limit

A279

that "danger" to only physical harm. 18 U.S.C. § 3142(g)(4). The Court also struggles to imagine

a set of conditions that would prevent Defendant from making further threats about his ex-wife or

the attorneys and court personnel involved in his cases. *See Dai*, 2023 WL 11016392, at *7 ("It is

also difficult to imagine a set of conditions that would prevent Defendant from accessing the

internet") (collecting cases).

 Finally, the Court will address the arguments presented about a risk of suicide. Recently,

Chief Judge Brenda K. Sannes concluded that a risk of suicide presents a serious risk of danger to

a defendant which can support detention. *See id.* Other courts across the country have concluded

the same. *See United States v. Drake*, No. 1:19-CR-00402, 2021 WL 1600485, *5 (D. Idaho Apr.

23, 2021); *United States v. Pyles*, No. CR-24-00170, 2024 WL 2886162, *5 (W.D. Okla. June 7,

2024); *United States v. George-Rodriguez*, No. 2:13-CR-378, 2013 WL 3246114, *6 (D. Utah

June 26, 2013); *United States v. Taylor*, No. 21-CR-193, 2023 WL 1928167, *2 (W.D. Wash.

Feb. 10, 2023).[4]

 The Court recognizes, as repeatedly emphasized by Defendant, that there is no evidence

he ever took steps to attempt suicide or expressed any other suicidal thoughts besides those

reflected in Government Exhibit 2. *See* Dkt. No. 65 at 64, 68. However, Defendant's own words

---

[4] *See also United States v. Storme*, 83 F.4th 1078, 1083 (7th Cir. 2023) (holding that "suicide risk alone" is not sufficient to justify detention because "[a]t best, therefore, § 3142(g) suggests that suicide risk is relevant only to the extent that it presents a risk of harm to others—for example, with a defendant who threatens to shoot himself and anyone else who seeks to monitor his whereabouts or well-being. But the mere risk of self-harm is not itself enough"); *United States v. Metz*, No. 12-M-01193, 2012 WL 6632501, *3 (W.D.N.Y. Dec. 12, 2012) (comparing the language in § 3142(f) and § 3142(g)(4) because "[t]he phrase 'any other person' cannot reasonably be interpreted to include defendant himself. Had Congress intended to allow consideration of defendant's own safety, it would have said so, as it in did in § 3142(g)(4) ("any person") and in 18 U.S.C. § 5034 (requiring the release of a juvenile delinquent from custody "unless the magistrate judge determines, after hearing . . . that the detention of such juvenile is required to secure his timely appearance before the appropriate court or to insure his safety or that of others")).

A280

that he "will be done in this world" and that "prison is not for" him present a level of risk that the Court can consider in its decision making process.  Gov. Ex. 2.  Defendant argued during the second detention hearing that "there's no reason to believe that he's going to commit suicide just to avoid prosecution under this current case."  Dkt. No. 64 at 68.  However, the Court is also concerned about the testimony from Dr. Colistra that Defendant presented with greater than average tendencies to be impulsive and exaggerative.  *See id.* at 15.  Even if the letter Defendant wrote indicated a fleeting suicidal ideation or was the Defendant merely expressing his emotions, the letter combined with Defendant's very specific threats, and Mrs. Roglieri's concerns, leads the Court to conclude that the fourth factor of § 3142(g) weighs in the Government's favor.

Based on the foregoing, the Court concludes that (1) Magistrate Judge Hummel did not clearly err in his determinations; (2) the Government has met its burden of proving by clear and convincing evidence that Defendant poses a danger to the community; and (3) that there are no conditions or set of conditions that would ensure the safety of the community if he was released.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that the Defendant's appeal of Magistrate Judge Hummel's detention order (Dkt. No. 60) is **DENIED**; and the Court further

**ORDERS** that the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 30, 2025
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

A281