UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————————————————

UNITED STATES OF AMERICA,

        Appellee,

       v.

KRIS ROGLIERI,

        Defendant-Appellant.

Docket No.

**25-277**

———————————————————————————

———————————————————————————

MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT-APPELLANT KRIS ROGLIERI'S
MOTION FOR RELEASE PENDING TRIAL

———————————————————————————

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

BACKGROUND .................................................................................. 2

    A.  Summary of Offense Conduct .................................................... 2

    B.  Relevant Factual Background ................................................... 3

    C.  Procedural History .................................................................. 6

LEGAL STANDARDS ....................................................................... 10

    A.  Bail Reform Act Procedures ................................................... 10

    B.  Standard of Review ............................................................... 12

ARGUMENT
The District Court Did Not Commit Clear Error by Ordering
Roglieri's Detention. ...................................................................... 13

    A.  The District Court Did Not Commit Clear Error by Ruling
        that a Detention Hearing Was Authorized. .......................... 13

    B.  The District Court's Dangerousness Determination Was
        Not Clearly Erroneous............................................................ 14

        1.   The Nature and Seriousness of the Danger Factor
            Strongly Favored Detention. ........................................... 14

        2.   Roglieri's History and Characteristics Favored Detention............. 17

        3.   The Nature of the Charged Offense Supported Detention. ........... 18

        4.   The Weight of the Evidence Supported Detention......................... 20

CONCLUSION................................................................................... 22

The United States respectfully submits this opposition to defendant-appellant Kris Roglieri's motion for pretrial release under 18 U.S.C. § 3145(c) and Fed. R. App. P. 9(a).

## INTRODUCTION

In late 2023, Kris Roglieri's multimillion-dollar advance fee and Ponzi scheme began to unravel. On numerous occasions, Roglieri suggested that he would harm or kill people involved in cases against him. A United States Magistrate Judge ordered Roglieri detained based on these "deeply disturb[ing]" threats, explaining "[t]here's nothing I can do with respect to setting conditions that would address" Roglieri's manifest danger. A.61. Roglieri asked the magistrate judge to reconsider based on a psychologist's report assessing him as posing a minimal risk of violence, but the subsequent hearing revealed that Roglieri misled the interviewing psychologist in many ways during the evaluation, and that the psychologist relied on erroneous assumptions about his conduct. When Roglieri appealed, the district court conducted a thorough *de novo* review and concluded "that it is highly probable [Roglieri] might act out against himself or others despite his lack of criminal history." A.274.

On appeal, Roglieri argues that the detention hearing was unwarranted because, in his view, there was too little evidence that he presents a serious risk of obstructing justice or harming potential witnesses and that on balance,

1

the evidence did not support his detention. But the district court was right that Roglieri's threats demonstrated a serious risk to the community and the administration of justice. And Roglieri's background before this case and his psychologist's conclusions fell far short of offsetting the danger evinced by those threats, overwhelming evidence that he committed the charged offenses while under the scrutiny of a court-appointed interim trustee, and his other erratic behavior. Simply put, two judges correctly took the defendant at his word. This Court should, too.

For these reasons, as explained in more detail below, Roglieri's motion should be denied in its entirety.

## BACKGROUND

### A.    Summary of Offense Conduct

This case arises from an ongoing investigation into a fraud scheme perpetrated by Roglieri that unraveled in late 2023. Since then, Roglieri, his companies, and others have been the subject of several litigations.

As alleged in the indictment, Roglieri held out two companies—Prime Capital Ventures, LLC ("Prime Capital") and Prime Commercial Lending, LLC ("Prime Commercial") (collectively, "Prime")—as commercial lending businesses. Dkt. # 1; A.12-16.[1] As part of contractual arrangements with

---

[1] "A." refers to Roglieri's addendum and "Dkt." refers to the docket report for Case No. 24-cr-392 (N.D.N.Y.) (A.1-11).

clients located across the country, Prime obtained upfront interest payments from prospective borrowers while it sought to secure loans for those borrowers. A.211-12. Prime characterized these upfront interest payments as the "Interest Credit Account Payment" or "ICA" payment. A.212. ICA payments did not represent fees to Prime. A.212. Instead, each borrower's upfront ICA payment would be debited over time as the loan was funded and accrued more interest. A.212. An ICA payment also would be refundable if Prime failed to secure a loan for the borrower client. A.212.

The current indictment alleges that Roglieri defrauded a prospective borrower of its $5 million ICA payment while Prime Capital was in involuntary bankruptcy proceedings and under the supervision of a court-appointed interim trustee. A.12-15; A.18-19. Roglieri promised to keep the ICA payment in a separate and distinct account, but immediately broke that promise by using the victim's money on, among other things: $950,000 toward a financial obligation owed to another Prime Capital client; $400,000 for Prime's law firm; $84,000 for a Rolex; and $101,000 in private jet flights for a family vacation. A.12-15. The government's ongoing investigation reveals many other victims and losses likely exceeding $75 million. A.217.

## B. Relevant Factual Background

*Cases Involving Prime and Roglieri.* Prime Capital was the subject of an involuntary Chapter 7 bankruptcy proceeding and bankruptcy trustee

oversight from December 21, 2023 to January 9, 2024. A.212. In that proceeding, three Prime Capital creditors sought to put Prime Capital into bankruptcy based on allegations that Prime Capital had fraudulently taken and refused to return $43 million from numerous entities, including more than $20 million from the petitioners. A.212. Following consensual dismissal of that proceeding, the same creditors sued Prime Capital, Roglieri, and others seeking, among other things, the appointment of a receiver for Prime Capital. A.212-13. Roglieri was dismissed from the receivership action in March 2024 after he filed for personal bankruptcy under Chapter 11 of the Bankruptcy Code. A.213. In May 2024, a bankruptcy judge converted Roglieri's personal bankruptcy proceeding into a Chapter 7 liquidation proceeding. A.213-14.

*The Searches.* On February 2, 2024, the FBI searched Roglieri's home in connection with the investigation. A.215. During the search, Roglieri was compliant, but agents observed numerous firearms, including an AR-15-style rifle and a high-capacity magazine. A.215. State authorities subsequently filed criminal charges against Roglieri for possession of the AR-15-style rifle and high-capacity magazine. A.215-16. These charges are pending. A.215.[2]

*Roglieri's Increasingly Threatening Behavior Before Arrest.* During a February 16, 2024 interview, Person-1 stated that around mid-January 2024,

---

[2] Roglieri was also compliant when agents executed court-authorized seizure warrants in March 2024. A.216.

in a telephone conversation, Roglieri said that he would "take out" the receiver and judge who were involved in his bankruptcy proceeding. A.215. Text messages from Roglieri to Person-1 include:

- January 21, 2024: "I'm fucking gonna wack anybody that comes after me," "Fair game," and "You wanna come after me with guns you gonna get the same."

- January 25, 2024: "I feel myself getting angry and vengeance to those that are doing this," "Including the attories [sic], judge, receiver etc," "I don't really play by the rules," "Never have and never will," "And that's dangerous as I feel myself getting to that point with all involved against me."

A.31-35.

On the evening of Friday, May 24, 2024, Person-1's attorney contacted prosecutors to urgently report threats by Roglieri. A.216. During an interview with an FBI agent later that night, Person-1 disclosed that earlier in the night, Roglieri told her that he was in a "dark place," because he was going through bankruptcy proceedings, had no money, and felt he would be indicted soon. A.21. Roglieri told Person-1 that he knew the three FBI agents who were investigating him. A.21. Roglieri further said that he knew the home address of one of the agents (whom he correctly identified by first name), and that he would "put a bullet in [that agent's] head." A.21. In a subsequent interview, Person-1 described the threats as Roglieri telling her that "'he knows where [one of the agents] fucking lives' and that he would not put it past himself 'to put a bullet in [that agent's] head.'" A.21. Roglieri said to Person-1 that "when

5

someone takes everything away from you . . . if I go down, everyone goes down." A.21. Sometime between approximately February and May 2024, Roglieri authored a letter saying he planned to kill himself because "frankly[,] prison is not for me." A.216.[3]

### C. Procedural History

Roglieri was arrested and made his initial appearance on the complaint before then-U.S. Magistrate Judge Christian F. Hummel on May 31, 2024. A.3; Dkt. # 1. At the initial appearance, the government sought and obtained over the defense's objection a detention hearing under 18 U.S.C. § 3142(f)(2)(B), based on the serious risk that Roglieri would obstruct justice and threaten or harm prospective witnesses if released. A.245-46. Judge Hummel found that a detention hearing was authorized by the Bail Reform Act and scheduled one for June 3, 2024. A.246.

On June 2, 2024, the government submitted a letter arguing for Roglieri's detention based on the danger that he presented. A.18-42. The letter proffered Person-1's account of Roglieri's May 24, 2024 statements about killing an FBI agent and attached, among other things, the January 2024 text messages that Roglieri sent to Person-1 described above. A.21, 31-35; *see supra* at 5. The pretrial services report, issued on June 3, 2024, recommended

---

[3] Roglieri submitted this letter to the district court under seal. Dkt. # 16. Roglieri submitted it to this Court as part of a sealed addendum.

detention. Dkt. # 7. At the detention hearing, defense counsel argued against detention. A.47-57. Judge Hummel found that that the government had met its burden of demonstrating the danger posed by Roglieri and that he could not set conditions that would reasonably assure the safety of the community. A.59-62. Explaining his decision, Judge Hummel noted "substantial evidence" supporting the allegation that Roglieri engaged in a sizable fraud as well as his "grave concern" with Roglieri's text messages and oral statements about harming people. A.60. Judge Hummel reasoned: "[a]ll of those comments, text messages, and those allegations set forth in the [government]'s letter are deeply disturbing to the Court" and [t]here's nothing I can do with respect to setting conditions that would address those." A.61.

After unsuccessfully moving to reopen the detention hearing in July 2024 by submitting several character references, Dkt. ## 26, 32, the defense again moved to reopen the detention hearing in October 2024 by submitting (1) a release and treatment plan prepared by Elizabeth Walker, a mitigation specialist at the Federal Public Defender's Office; and (2) a forensic mental health assessment prepared by psychologists Victoria Dodge and Katrina Colistra, A.65-75. Judge Hummel presided over the second detention hearing on November 25, 2024. A.105. The defense presented testimony from Dr. Colistra, who confirmed her opinion was that "within a reasonable degree of professional certainty[,] Mr. Roglieri will present minimal risk of violence."

7

A.113-14. On cross-examination, Dr. Colistra admitted that it is impossible to know with complete certainty what a person will do in the future and that she can only assess, based on her training and observations, the likelihood that a person will engage in violence. A.135-36. When asked whether extreme stress could cause a person with no history of violence to act violently, Dr. Colistra replied "I am not sure I can answer that with a direct yes or no, but anything is possible." A.139. She acknowledged that a psychologist's assessment could be rendered inaccurate if their subject is deceptive. A.136-40. The government then walked Dr. Colistra through a series of representations that Roglieri made during his interview with her colleague, including:

- Roglieri's denial of "any outstanding debts" despite his being in bankruptcy proceedings in which he disclosed, *inter alia*, owing more than $500,000 to state tax authorities. A.141-46.

- Roglieri's initial denial in his interview that he had planned to commit suicide, even though he had previously written a letter describing his decision "to take [his] own life," because "[t]he pain is too much to think of and frankly prison is not for me." A.147-50.

- Roglieri's claim he never previously made threats like those described *supra* at 5-6, even though Roglieri previously sent text messages to his estranged wife that he "fear[ed]" he would "rip off [her] fucking throat and piss down [her] fucking neck." A.151-53; *see* A.82-89.

Dr. Colistra did not change her opinion in response to these questions and documents. A.159.

8

After hearing additional argument, Judge Hummel again found that he could not set conditions that would reasonably assure the safety of the community if Roglieri were released. A.160-87. Judge Hummel explained that "the Court continues to be greatly concerned by the text messages which Mr. Roglieri sent." A.185. He went on to detail Person-1's recounting of Roglieri's threats to investigating agents, as proffered by the government. A.186. Finally, he explained that "nothing" in Dr. Colistra's report and testimony "addresse[d in] any significant or serious fashion the Court's concern with respect to [Roglieri's] statements." A.186.[4]

In December 2024, Roglieri moved for review of the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b) and the government opposed his motion. A.188-240. In a January 30, 2025 decision, U.S. District Judge Mae A. D'Agostino affirmed Judge Hummel's decisions to hold a detention hearing and order Roglieri's detention. A.241-81. Judge D'Agostino thoroughly reviewed the record and applied the Bail Reform Act's factor test, described Roglieri's text messages as "degrading, threatening, and worrisome," and found that "it is highly probable [Roglieri] might act out against himself or others despite his lack of criminal history." A.271, 274. Judge D'Agostino found that the serious economic harm caused by the charged offenses, the

---

[4] Judge Hummel rejected the government's argument for detention based on the risk of nonappearance presented by Roglieri's suicidal ideation. A.183-84.

strength of the evidence, the emotional harm that threats can cause, Roglieri's pending firearms charges, and Roglieri's erratic behavior all supported detention.  A.269-81.

## LEGAL STANDARDS

### A.    Bail Reform Act Procedures

Under the Bail Reform Act, detention determinations are a two-step inquiry.  *See United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019).  First, the court must determine whether a detention hearing is authorized by the statute.  *Id.*  A detention hearing is authorized if the government establishes by a preponderance of the evidence that the case involves an offense enumerated in 18 U.S.C. § 3142(f)(1) or that the defendant presents certain risk factors identified in 18 U.S.C. § 3142(f)(2), which include a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.  *See id*.

Second, if the district court determines that a detention hearing is authorized, it must consider whether, as relevant here, any condition or combination of conditions will reasonably assure the safety of the community.  18 U.S.C. § 3142(f).  In making this determination, courts examine four factors: (1) the nature and circumstances of the crime charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the

defendant's release, and (4) the weight of the evidence against the defendant. 18 U.S.C. § 3142(g). The facts underpinning a dangerousness finding must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995). If, following the hearing, the district court determines that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community," the district court "shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

The court "may consider uncharged conduct in assessing the degree of danger posed by a defendant's release." *United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015) (citing *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991)). Indeed, there is no "requirement that the violent conduct" subject of this inquiry "be connected to the activity charged in the indictment." *Rodriguez*, 950 F.2d at 88.

Because the rules concerning admissibility of evidence in criminal trials do not apply to bail hearings, 18 U.S.C. § 3142(f), parties may proceed by way of proffer, *see, e.g.*, *United States v. Abuhamra*, 389 F.3d 309, 325 (2d Cir. 2004). The Bail Reform Act "encourage[s] informal methods of proof" because "Congress did not want detention hearings to resemble mini-trials." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). Still, the district court "must also ensure the reliability of the evidence, by selectively insisting upon

11

the production of the underlying evidence or evidentiary sources where their accuracy is in question." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B.    Standard of Review

This Court applies a "deferential review to a district court's order of detention and will not reverse except for clear error, *i.e.*, unless on the entire evidence [it is] left with the definite and firm conviction that a mistake has been committed." *Watkins*, 940 F.3d at 158 (internal quotation omitted). "The clearly erroneous standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently," because "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Mattis*, 963 F.3d 285, 295 (2d Cir. 2020) (internal quotation omitted). "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* "The clear error standard applies not only to the factual predicates underlying the district court's decision, but 'also to its overall assessment, based on those predicate facts, as to the . . . danger presented by defendant's release.'" *Id.* at 291 (quoting *Abuhamra*, 389 F.3d at 317). The weight accorded to each factor set

forth in 18 U.S.C. § 3142(g) is "the special province" of the factfinder. *United States v. Shakur*, 817 F.2d 189, 196 (2d Cir. 1987).

## ARGUMENT

**The District Court Did Not Commit Clear Error by Ordering Roglieri's Detention.**

Roglieri advances two arguments on appeal grounded in the same facts. First, he argues that the district court committed clear error by ruling that a detention hearing was authorized based on the serious risk that Roglieri would obstruct justice or threaten a witness if released. Mot. 20-23. Second, Roglieri claims that the district court clearly erred by ordering his detention based on its finding that no conditions of release could reasonably assure the safety of the community. Mot. 24-32. Both arguments are without merit.

### A. The District Court Did Not Commit Clear Error by Ruling that a Detention Hearing Was Authorized.

Judge Hummel and Judge D'Agostino did not err in their rulings that the government was entitled to a detention hearing under 18 U.S.C. § 3142(f)(2)(B), let alone commit clear error. There was ample reason to conclude that Roglieri would obstruct justice and threaten or try to harm prospective witnesses if released. Roglieri had voiced his intent to kill an agent involved in the government's investigation—*i.e.*, a prospective witness. A.21. Before that, Roglieri said that he wanted to seek "vengeance" against the attorneys and judges involved in the various cases concerning him. A.21, 31-

13

35.     Taken together, these troubling statements met the government's preponderance of the evidence burden for obtaining a detention hearing.  *See United States v. Hale-Cusanelli*, 3 F.4th 499, 456-57 (D.C. Cir. 2021) (affirming detention where district court found serious risk of obstruction and threats to witnesses by defendant who made "prior statements about 'committing violence against those who he feels are pitted against him.'").

## B.     The District Court's Dangerousness Determination Was Not Clearly Erroneous.

Clear and convincing evidence supported the district court's conclusion that no set of conditions could reasonably assure the safety of others in the community if Roglieri were released.  Roglieri's claims on appeal boil down to a series of meritless challenges to how the district court weighed certain evidence.  Because the district court's evaluation of the record was well within the bounds of permissible decisions, Roglieri's arguments fall far short of demonstrating clear error.

### 1.     The Nature and Seriousness of the Danger Factor Strongly Favored Detention.

The district court did not err in ruling that the nature and seriousness of Roglieri's danger to the community strongly supports detention.  *See* 18 U.S.C. § 3142(g)(4).  Threats to kill undoubtedly support a dangerousness determination, *Hale-Cusanelli*, 3 F.4th at 456-57, and, as this Court observed, "obstruction of justice has [also] been a traditional ground for pretrial

14

detention," *LaFontaine*, 210 F.3d at 134. Roglieri has threatened to harm judicial officers, investigating agents, and others involved in bringing his misconduct to light. A.21, 31-35. While Roglieri did not communicate those threats directly to the people affected, they are, as the district court observed, extremely troubling given their specificity and tenor. A.270-74, 277-80.

The district court's determination was amply supported by numerous threatening text messages that Roglieri authored. *See, e.g.*, A.31-36, 82-89. Roglieri's oral threat concerning an investigating agent conveyed to Person-1, A.20-21, also provided a persuasive basis for detention. The fact that the district court did not require Person-1 to testify does not change this analysis, as the district court's acceptance of the government's proffer about Person-1's interactions with Roglieri was well within its discretion. The government's proffer was appropriate as the district court and the parties were all aware of Person-1's potential bias against Roglieri, *see, e.g.*, A.54, and her proffered statements were consistent with Roglieri's earlier threatening text messages, *see LaFontaine*, 210 F.3d at 131 (district court did not abuse discretion in not requiring live testimony from witness who previously lied in grand jury testimony where government disclosed that perjury and its "proffer was corroborated by extrinsic evidence").

Contrary to Roglieri's arguments, the district court did not commit clear error by giving little weight to the psychologist's opinion about Roglieri's risk

15

of violence. In her testimony, Dr. Colistra acknowledged that a psychologist's opinion can be compromised where their subject is untruthful during an interview. A.140-41. The government then walked her through several exhibits showing that Roglieri was indeed misleading in his interview with her colleague, though Dr. Colistra ultimately declined to revise her opinion. *See* A.142-59. The district court properly recognized that Roglieri's deceptiveness undercut the value of Dr. Colistra's opinion. A.272-73. What is more, the district court noted that portions of the psychologist's report suggested that Roglieri "presented with greater than average tendencies to be impulsive and exaggerative," A.281, which provided another good reason for the district court's concern about his dangerousness. In the face of evidence demonstrating Roglieri's erratic and threatening behavior, the court's decision to give less weight to the more favorable aspects of Dr. Colistra's opinion was not clear error. *See Mattis*, 963 F.3d at 295 ("[T]he factfinder's choice between [two permissible views of evidence] cannot be clearly erroneous.").

Nor was the district court's discussion of Roglieri's suicidal ideation misguided as Roglieri contends. A.280-81. In Roglieri's telling, the district court clearly erred by considering his suicide letter in its dangerousness analysis. Mot. 26. But in context, the district court appropriately looked to Roglieri's desire to harm himself as indicative of his mental decline and the likelihood that he would commit violence based on a feeling of having nothing

16

to lose.  A.280-81.  Thus, the district court's discussion of Roglieri's suicide letter is no basis to find clear error.[5]

Likewise, the district court's discounting of Roglieri's compliance with agents during the search of his home and seizure of his vehicles before his threats to harm law enforcement also does not amount to clear error.  The district court was free to give this fact less consideration than Roglieri's statements and alarming behavior.  *See Mattis*, 963 F.3d at 295.  In any event, simply because Roglieri's yielded to numerous armed agents during daylight interactions hardly means that Roglieri would not plan to harm one of them by, as he suggested to Person-1, confronting a single agent at the agent's home with a gun.  The district court thus did not commit clear error on this point.

### 2.  Roglieri's History and Characteristics Favored Detention.

The district court's ruling that Roglieri's history and characteristics weighed in favor of detention was not clear error.  *See* 18 U.S.C. § 3142(g)(3).

---

[5] Roglieri's suggestion that Judge D'Agostino misread *United States v. Dai*, No. 23-cr-478, 2023 WL 11016392 (N.D.N.Y. Dec. 19, 2023), Mot. 26-27, is incorrect.  *Dai* considered the defendant's suicidal ideation both as a potential risk of nonappearance and as a potential danger of harm.  2023 WL 11016392, at *5-6, *9.  The court there concluded "[d]efendant's release would unquestionably present a serious risk of danger to himself given his recent history of suicidal thoughts and suicide attempt."  *Id.* at *9. Roglieri's contention that the *Dai* court "determined that suicide risk was *only* 'relevant in assessing the risk of nonappearance,'" Mot. 26-27 (quoting *Dai*, 2023 WL 11016392, at *7) (emphasis added), is therefore false.

17

As explained above, the district court had a sufficient basis to find that Roglieri's lack of prior convictions was offset by his recent conduct, which included not only the threats and erratic behavior but also his illegal possession of an AR-15-style rifle and a high-capacity magazine. A.20.

### 3. The Nature of the Charged Offense Supported Detention.

The district court did not commit clear error in ruling that the nature of the crime charged supported detention. *See* 18 U.S.C. § 3142(g)(1). Roglieri argues that the district court clearly erred because "[t]he government failed to prove that there was a *serious* risk that [he] would commit economic harm to the community in the future if he was released." Mot. 25 (emphasis in original). This claim misses the point. Roglieri's offenses are very serious. As alleged in the indictment, while in bankruptcy proceedings where his company's creditors alleged frauds exceeding $40 million, Roglieri nevertheless brazenly defrauded yet another victim of $5 million. *See* A.12-15; A.18-19. And this happened even as Prime Capital was under the supervision of an interim bankruptcy trustee, demonstrating Roglieri's willingness to shirk court supervision. A.18-29. Roglieri caused the victim to turn over its money subject to an express agreement by Roglieri to maintain the victim's money in a "trust fund" and that the money would be refundable. A.13. Instead, Roglieri took that money and transferred it into the account of one of his other

companies. A.13. From there, he made numerous transfers of the funds, including by sending $950,000 to meet a financial obligation owed to *another* Prime Capital client; paying $84,000 for a gold Rolex watch; and paying $101,000 to a private jet services company, for round-trip, private air travel between Albany and Anguilla for a vacation. A.13-15. Thus, "the gravity of [the] charges weigh in the government's favor." *Cf. United States v. Dupree*, 833 F. Supp. 2d 241, 253 (E.D.N.Y. 2011) (denying release in fraud case and finding "the[] alleged offenses, and the millions of dollars involved in the various frauds, constitute serious charges").

Roglieri's only case on this point, *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009), is distinguishable. In *Madoff*, a magistrate judge rejected the government's argument that "the danger to the community based on the possibility that Madoff may attempt to distribute restitution assets rises to the level of a safety concern as contemplated by § 3142 of the Bail Reform Act." 586 F. Supp. 2d at 251. Here, by contrast, the government has proffered facts showing that Roglieri engaged in new fraudulent activity while under the supervision of a court-ordered interim trustee. Thus, even if this Court adopted *Madoff*'s conclusion that dissipation of a defendant's assets is unlikely to be a sufficient harm under the Bail Reform Act on its own, the issues raised by Roglieri's conduct—that is, the participation in a new fraud while under court supervision—would still require detention because those issues reinforce

19

concerns about Roglieri's erratic behavior, state of mind, and the threats of harm he has made. That two of Roglieri's businesses are now defunct, Mot. 25, does not meaningfully address this concern, because it is anchored in Roglieri's disregard for court supervision. As Roglieri himself said: "I don't really play by the rules," "[n]ever have and never will," "[a]nd that's dangerous . . . ." A.35. In short, the nature and circumstances of the crime charged factor supports the district court's conclusion that Roglieri could not be trusted to abide by any conditions of release.

### 4. The Weight of the Evidence Supported Detention.

Lastly, the weight of the evidence factor also supported the district court's decision, *see* 18 U.S.C. § 3142(g)(2), and Roglieri does not appear to argue otherwise on appeal. As detailed above, the indictment alleges a clearcut fraud involving a significant amount of money. Roglieri induced his victim to transfer to millions of dollars with promises of a loan and the safety of its money, but then spent the money to fund another client and on extravagant personal expenditures. Roglieri knew this scheme was illegal, as his contemporaneous text messages with Person-1 in early January 2024 illustrate:

| Sender | Message |
|---|---|
| Person-1 | Can't you just keep working on those companies? |
| Person-1 | I know it might be hard at first, but look what you built this up to beat from nothing |
| Roglieri | Yea I can but not when I'm in fucking prison |

| Sender | Message |
| --- | --- |
| Person-1 | Why do you think that's gonna happen? |
| Person-1 | Why can't it just be a bankruptcy? |
| Roglieri | Becuase I unused others money to fund deals |
| Roglieri | I already told you this |
| Person-1 | And that's illegal? |
| Roglieri | Yes |
| | |
| Person-1 | It's a civil case it's not a criminal case |
| Roglieri | It will turn criminal as soon as they get into bank statements |
| Roglieri | They will bring in the Feds |
| Roglieri | Once they figure it out |

A.37-42. Roglieri's letter about committing suicide supplies further proof of his guilt. He wrote: the "risks I took never panned out and so because of that I would have been convicted of financial crimes and would been away for a long time in prison." A.227. The government also proffered financial analysis and other evidence showing that Roglieri repeatedly used victim funds for profligate personal purchases and to make payments to other victims of the scheme. *See* A.227-28. The strength of the evidence thus favored detention. Moreover, the overwhelming evidence of Roglieri's guilt buttresses the district court's concerns that he is in a desperate place and would attempt to avoid the consequences of his conduct by harming investigators and witnesses.

Accordingly, Roglieri fails to identify any clear error in the district court's decision to detain him.

21

## CONCLUSION

The motion for release pending trial should be denied in its entirety.

Respectfully submitted,

DANIEL HANLON
*Acting United States Attorney*
*Northern District of New York*
*Attorney for Appellee*


s/ *Joshua R. Rosenthal*
By:   JOSHUA R. ROSENTHAL
Michael S. Barnett
*Assistant United States Attorneys*

Dated:   Albany, New York
March 10, 2025

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27(d)(2)(A) and 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned counsel for the United States hereby certifies that this brief complies with the type volume limitation of Rule 27(d)(2)(A). As measured by the word-processing system used to prepare this brief, there are 4,866 words in the brief, excluding items excludable under Rule 32(f).

DANIEL HANLON
*Acting United States Attorney*
*Northern District of New York*

s/ *Joshua R. Rosenthal*
By: JOSHUA R. ROSENTHAL
*Assistant United States Attorney*