# 25-277

---

United States Court Of Appeals
For The Second Circuit

---

United States of America,

Appellee,

-v-

Kris Roglieri,

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Northern District of New York

---

Reply Memorandum in Support of Kris Roglieri's Appeal
from an Order of Detention Pending Trial

---

Melissa A. Tuohey
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

# Table of Contents

Table of Authorities ............................................................................. ii

Argument .............................................................................................. 1

Conclusion ............................................................................................ 9

Certificate of Compliance ................................................................. 10

Certificate of Service ........................................................................ 11

# Table of Authorities

**Cases**

*United States v. Madoff,* 586 F.Supp.2d 240, 254 (S.D.N.Y. 2009) ... 7, 8

*United States v. Stein,* 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005) ....... 7

**Statutes**

18 U.S.C. § 3142(b) ................................................................................. 8
18 U.S.C. § 3142(f)(2) ............................................................................. 9

## Argument[1]

The government contends that Dr. Colistra's hearing testimony negated the Risk Assessment's conclusion, prepared by two psychological experts, that Mr. Roglieri's risk of committing violence if released into the community was minimal. The government's specious claims rest on information purportedly withheld by Mr. Roglieri during his forensic evaluation interview with Dr. Colistra and Dr. Dodge. The record proves otherwise.

First, the government points to Mr. Roglieri's alleged failure to inform the interviewing psychologists that he had outstanding debts related to bankruptcy proceedings connected to the instant federal offense. Gov't MOL at p. 8. The below testimony reveals that Dr. Colistra was not so deceived:

> Q   Do you recall asking Mr. Roglieri about any outstanding debts he may have?
>
> A   Yes, I do.
>
> Q   And were you aware that Mr. Roglieri was involved in bankruptcy proceedings?

---

[1] Kris Roglieri objects to and disagrees with many contentions presented in the government's opposition. This reply is limited solely to those warranting a response. Contentions left unaddressed herein are sufficiently met with the facts and arguments presented in Mr. Roglieri's opening memorandum.

1

A    Yes, I was.

Q    Was your question and Mr. Roglieri's answer about debts, was that understood to be apart from this case and the bankruptcy proceedings?

A    Yes. That's correct.

Q    To your understanding, are the bankruptcy proceedings involved or intertwined with the criminal charges here?

A    Yes. That's my understanding.

Q    Did you get the impression in speaking about debts or liabilities that Mr. Roglieri was attempting to conceal the bankruptcy cases?

A    No, I did not.

Q    Did you get the impression he was trying to conceal or minimize debts or liabilities in those bankruptcy filings?

A    No, I did not.

A125-126.

Further proof that Mr. Roglieri informed Dr. Colistra of the bankruptcy proceedings is found in the Medical and Mental Health History section of the Risk Assessment where Mr. Roglieri discussed the suicide note, stating it was found "*by a bankruptcy trustee.*" Risk Assessment, p. 3 (emphasis added). As she testified, Mr. Roglieri shared with her information about the bankruptcy proceedings and that information was

considered when she prepared the Risk Assessment. A142, 146. No deception exists here.

Second, the government complains that Mr. Roglieri denied that he intended to commit suicide because of a forgotten note he wrote that he never acted upon. Gov't MOL at p. 8. Dr. Colistra testified that they discussed the note and Mr. Roglieri indicated he had no intent to kill himself either at the time he wrote the note or anytime thereafter. A127. Mr. Roglieri's actual conduct supports his denial. As the Magistrate found, despite the existence of the suicide note, there was no indication in the record that Mr. Roglieri actively considered following through with committing suicide. A184. No deception exists here.

Third, the government did not appreciate that Dr. Colistra could not know with complete certainty what a person will do in the future. Gov't MOL at p. 8. Of course not, and if she claimed otherwise, her testimony would have rightly been deemed incredible. Instead, she correctly testified that her role in the proceedings was to provide "an educated opinion based upon research, skills, training, experience, interviews, testing" as to Mr. Roglieri's dangerousness. A136. The

government was not satisfied and pressed on about what a hypothetical person might do under extreme stress, with the following questioning:

> Q    As a general matter, do you think it's fair to say that extreme stress could cause a person to act out of character?
>
> A    I think that's fair to say, yes.
>
> Q    Could extreme stress cause a person with no history of violence to act violently?
>
> A    Well, that's a large question. I am not sure I can answer that with a direct yes or no, but anything is possible.
>
> Q    Could the prospect of a long prison sentence cause extreme stress?
>
> A    In some individuals, yes, it could.
>
> Q    Could someone having their home taken from them by creditors cause extreme stress?
>
> A    That's also possible.
>
> Q    Could someone having their businesses get abruptly shut down lead to extreme stress?
>
> A    That's also possible, yes.

A138-139.

This line of questioning only further negates future dangerousness because Mr. Roglieri was under this type of "extreme stress" in the months leading up to his arrest where he was involved in bankruptcy

proceedings that resulted in the loss of his possessions and home while federal criminal charges were looming on the horizon. While under this extreme stress, Mr. Roglieri had access to firearms, yet he voluntarily surrendered them and, most importantly, never acted violently. At the time of the second detention hearing, Mr. Roglieri had been detained at the Rensselaer County Jail for six months without *any* reports of poor behavior. Certainly, being jailed is extremely stressful.

As for Government Exhibit 3, consisting of the text messages between Mr. Roglieri and Person-1, from December of 2023, the fact that Mr. Roglieri failed to mention them during his interview did not affect Dr. Colistra's ultimate opinion as to Mr. Roglieri's future risk of violence. A129. She learned of these text messages after drafting the Risk Assessment and prior to testifying. A129. The government's frustration with Dr. Colistra's refusal to change her opinion, A159, based on Mr. Roglieri's failure to disclose text messages sent *nine months* before he was interviewed, does not mean Dr. Colistra's overall opinion should be discredited. Given the nine-month lag, it is reasonable to conclude that Mr. Roglieri may have forgotten about this exchange with Person-1,

5

especially where there is no evidence in the record that his omission was intentional.

In the end, Dr. Colistra's opinion encompassed all the information the government claims Mr. Roglieri was not forthright about. Importantly, Dr. Colistra testified that she does not always expect to receive truthful responses because of a person's natural inclination for self-protection. A158. There is nothing "nefarious or sinister" about this because "all humans are wired for self-protection," and in a forensic setting, it is not uncommon to see this tendency. A117. As such, her opinion in any given case is based on the possibility that answers received may not always be a hundred percent accurate or truthful. A158. Furthermore, the evaluation is not based solely on her communications with the subject of the evaluation. A140-141. Ultimately, any perceived deception was not material to Dr. Colistra's consistent expert opinion that Mr. Roglieri's release would not present a danger to the community.

Given this record, it was clearly erroneous for the district court to determine that Roglieri's alleged deceptiveness undercut the value of Dr. Colistra's expert opinion. A272-273. Nor does Dr. Colistra's testimony that Mr. Roglieri "presented with greater than average tendencies to be

6

impulsive and exaggerative," A119, 281, provide good reason for the district court's dangerousness findings, as the government contends. Dr. Colistra informed that these traits did not amount to a disorder and were not necessarily pathological or interfering. A119. Instead, the Risk Assessment informed that exaggeration does not suggest a risk of violence. Risk Assessment, p. 10. The expert findings lend support to Mr. Roglieri's consistent arguments below – the content of his text messages to Person-1 were nothing more than exaggerations.

Finally, as in the court below, the government asserts that Mr. Roglieri's past conduct supports detention based on dangerousness, while making "no real effort to suggest that there is a substantial risk that he will continue to do so if released pending trial, particularly given the change in his personal circumstances." *United States v. Stein,* 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005). Notably, the government's response in opposition wholly ignores the proposed conditions of pretrial release that Mr. Roglieri would be subject to if released. *See United States v. Madoff,* 586 F.Supp.2d 240, 254 (S.D.N.Y. 2009) ("In fact, [the government's] failure to respond to the various additional bail conditions presented by Madoff further supports the weakness of its argument and

its inability to show why Madoff's detention would markedly ameliorate any alleged danger to the community that may result from dissipation of his assets."). Nor should Mr. Roglieri's release on conditions be thwarted by the government's reliance on Mr. Roglieri's alleged commission of the charged offenses while under scrutiny of a court-appointed interim bankruptcy trustee. As pointed out in *Madoff*, the setting of bail conditions is not based on "the trustworthiness of the defendant." *Id.,* at 255. "Indeed, implicit in the bail condition analysis is the assumption that the defendant cannot be trusted on his own." *Id.* The Bail Reform Act has levels of release depending on the accused. First, the accused is to be released on personal recognizance or through the execution of an unsecured bond, 18 U.S.C. § 3142(b), but additional conditions should be imposed "[o]nly if the court determines that trust of the defendant is insufficient to assure appearance and maintain safety." *Id.*

8

## Conclusion

For these reasons, as well as those presented in the opening memorandum in support of bail, this Court should vacate the order of detention and remand with instructions to grant release because Mr. Roglieri's release does not present a serious risk of danger to the community under Section 3142(f)(2).

March 13, 2025                    Respectfully submitted,

*/s/*
Melissa A. Tuohey
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

## Certificate of Compliance

Pursuant to Rules 27(d)(2)(C) and 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned counsel for the Appellant certifies that this Memorandum complies with the type limitations of Rule 27(d)(2)(C). As measured by the word-processing system used to prepare this Memorandum, there are 1, 517 words in the Memorandum, excluding items excludable under Rule 32(f).

*/s/*
Melissa A. Tuohey

## Certificate of Service

  I, Renata Hohl, certify that today, March 13, 2025, one copy of the Appellant's Memorandum Reply Brief, was served upon Joshua R. Rosenthal, Assistant United States Attorney, 445 Broadway, Rm 218, Albany, New York 12207, by ECF with a paper copy to follow.

             */s/*
            Renata Hohl